UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL RODIO,

                    Plaintiff,

        v.                                      Civil Action No. 04-CV-10006-JGD

R.J. REYNOLDS TOBACCO COMPANY,

                    Defendant.

DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant R. J. Reynolds Tobacco Company ("Reynolds") respectfully submits this
Memorandum of Law in Support of its Motion for Summary Judgment.  Also in support of its
Motion, and in accordance with Local Rule 56.1, Reynolds has submitted a separate statement of
material facts as to which there is no genuine issue to be tried.

SUMMARY OF ARGUMENT

        This is "a lawsuit in search of a theory."  First, Michael Rodio alleged then abandoned
age discrimination.  Next, he tried out then disavowed an "Enron-like" public policy discharge
theory, and a Fortune good faith and fair dealing claim based on his pension.  His Complaint
even included a misguided M.G.L. 93A claim.  The list of Rodio's legal theories goes on, but the
summary judgment record -- including Rodio's own deposition testimony --  makes perfectly
clear that Rodio has no legal or factual basis whatsoever for any claim that he was unlawfully
discharged from employment as a sales representative.  To the contrary, the record demonstrates
beyond any genuine dispute that Rodio was dismissed because of serious, persistent and well-
documented performance problems.

To the extent Rodio now claims that Reynolds terminated his employment to deny him pension benefits, or that Reynolds treated him differently based on age, those claims are baseless and have been waived. There is not a shred of evidence supporting a causal connection between Rodio's age or his pension benefits and his termination. Moreover, Rodio expressly waived his pension claim in his deposition. In any event, Rodio was terminated <u>five</u> <u>years</u> before he would have been eligible for the benefits in question and his pension-related claims must fail for that reason alone. Rodio's Chapter 93A claim can be dismissed straight away as that statute simply is not applicable to disputes arising from an employment relationship. Finally, Rodio's various public policy discharge claims all must fail for the principal reason that Rodio has implicated no well-established public policy concern. For each of these reasons, amplified more fully below, the Court should grant summary judgment in favor of Reynolds and dismiss the Complaint in its entirety.

## STATEMENT OF FACTS[1]

Reynolds is a cigarette manufacturer and sells its products directly to licensed, wholesale tobacco distributors. During the times relevant to this action, Rodio was an "Area Sales Representative" ("sales representative") for Reynolds, with a territory that encompassed Fall River and Taunton, Massachusetts. Rodio was discharged on October 28, 2002, after well-documented, progressive counselings for a variety of performance-related issues. The details regarding his discharge are set forth in the Defendant's Statement of Undisputed Material Fact and supporting documentation. The following is a summary.

---

[1] This statement is a summary of the key undisputed facts in this case and is provided as background. Because of the number of legal issues in this case and the 20-page limit on memoranda in support of summary judgment, Reynolds will not set forth the details of Rodio's employment in this Memorandum. Defendant's Local Rule 56.1 statement is filed herewith.

Rodio's date of birth is August 1, 1952, and his date of hire with Reynolds was October 12, 1976. Defendant's Local Rule 56.1 Statement of Undisputed Material Facts for Which No Genuine Dispute Exists (hereinafter "Stmt, ¶."), ¶1. At all relevant times, he was a sales representative for Reynolds. Id., ¶2. Beginning approximately late 1998 or early 1999, Rodio began reporting to Carlo Fasciani ("Fasciani"). Id., ¶¶4-5. During the time that Rodio reported to Fasciani, he had a territory that included Fall River and Taunton, Massachusetts. Id., ¶5.

Reynolds sales representatives do not "sell cigarettes." Id., ¶6. Rather, they engage primarily in activities related to the advertising, merchandising and promotion of Reynolds products in retail stores. Id. They sell or offer various contractual programs to retailers related to the advertising and promotion of Reynolds products. Id. For example, they sell or offer "contracts" to retailers, by which Reynolds pays the retailer in exchange for its agreement to place certain advertising displays in the store, or to sell certain Reynolds brands at a certain price relative to certain competitors' brands. Id.

It is very important that the retailer comply with the terms of the applicable contract because Reynolds is paying the retailer to comply. Id., ¶7. Thus, a vital part of the sales representative's job is to ensure that retailers are in compliance with any applicable contracts. Id. "Enforcing" the contracts requires either that the sales representative persuade a non-compliant retailer to comply, or, alternatively, to cancel the contract for non-compliance. Id. A Reynolds contract is not a prerequisite to selling Reynolds products, because retailers purchase cigarette products directly from licensed, wholesale distributors. Id.

Rodio had good relationships with his accounts and sold a large number of various types of contracts. Id., ¶9. He also increased Reynolds's market share with his accounts. However, he

did not "enforce compliance" with the contracts as he was expected to[2]. Id., ¶¶9, 19, 30. In addition, he had issues with timely and accurate reporting. Id., ¶¶9, 16, 30.

Fasciani gave Rodio an oral warning in May 1999, followed by an annual performance evaluation with an overall rating of "Needs Improvement" in January 2000. Id., ¶¶21-22. Rodio's performance improved afterward, and his overall rating on his annual performance evaluation in January 2001 was "Fully Meets Expectations." Id., ¶24. However, Rodio's performance declined again, and in September 2001 he received a First Written Reprimand. Id., ¶30. The issues related to contract administration and reporting. Id. Rodio wrote a rebuttal, which essentially failed to address these issues but emphasized his good sales and market share. Id., ¶31.

Rodio received a Final Written Reprimand in November 2001, based on complaints of numerous errors and missed deadlines that Fasciani and Fasciani's supervisor, Richard Kane ("Kane"), had received from the regional office staff. Id., ¶¶35-36. In his January 2002 performance evaluation, Rodio was rated overall "Fails to Meet Expectations." Id., ¶41. Rodio wrote a rebuttal, which again focused primarily on his market share and relationships. Id.

Fasciani accompanied Rodio on some calls in May 2002, and he found more deficiencies in Rodio's performance but also some improvements. Id., ¶42. The problems were documented, and no further action was taken against Rodio. Id. Finally, in October 2002, Fasciani visited some of Rodio's accounts one to two days after Rodio had visited them. Id., ¶43. Fasciani found numerous issues again. Id. He consulted with Kane and with the human resources representative, Gerry Deschenes, and they made the decision to terminate Rodio's employment. Id. Rodio wrote

---

[2] Indeed, Rodio's lax contract enforcement is arguably the reason for both his impressive sales and his good relationships with retailers.

two rebuttals to his termination document but did not produce them to Reynolds until 2005.  Id.,
¶44.

Plaintiff's "Claims"

Rodio's claims in this lawsuit have been a moving target.  He has claimed that his
troubles with Fasciani began either with a "vacation meeting" that took place during the summer
of 2001 or with a "parking lot incident" that took place shortly thereafter[3].  Stmt., ¶¶ 27-29.  Yet
he testified that he believed Reynolds terminated him to deprive him of a more-favorable pension
benefit for which he would have qualified five years hence ("the pension theory")[4].  Id., ¶¶ 51,
52.  On or about April 23, 2003, he filed a Charge of Discrimination with the Massachusetts
Commission Against Discrimination ("MCAD"), alleging "age discrimination" based on the
pension theory.  Id., ¶48.

In his lawsuit, filed November 19, 2003, Rodio asserted no age discrimination claim.  Id.,
¶49.  Rather, he sued for breach of the covenant of good faith and fair dealing based on the
pension theory, wrongful discharge in violation of public policy based on (1) an alleged
disclosure of "inflated stock prices and insider trading" at Reynolds, ("the Enron theory"), and
(2) an alleged requirement that he "pedal" [sic] cigarettes in violation of applicable minimum
price laws, ("the minimum-price theory"); and unfair and deceptive trade practices in violation of
Massachusetts G.L. c. 93A, §11 ("the 93A theory").  Id.

Rodio's deposition was taken in two parts.  The first part took place on August 31, 2004,
and was adjourned because of discovery issues. Id., ¶50.  Rodio testified that he did not know the

---

[3] For a description of the "vacation meeting" incident, see Stmt. ¶27.  For a description of the "parking lot" incident,
see Stmt. ¶29.  Rodio's account of the latter is disputed in certain key respects; however, solely for purposes of this
Motion for Summary Judgment, Reynolds will assume Rodio's account is correct.

[4] Rodio's pension theory is that he was age 50 and had 26 years of service with Reynolds at the time of his
discharge.  At age 55 and after 30 years of service, he would have qualified for a more-favorable pension benefit.
Stmt., ¶52. Ergo, he argues, he was discharged so that Reynolds would not have to provide him with this favorable
pension benefit.

basis for his claims.  Id., ¶51.  Then he said that he might have been terminated because of his

age, or perhaps because management did not like him, or perhaps because management did not

like his attitude. Id.  After exhausting all the other possibilities, he settled back on the pension

theory and said that he was not aware of any other reason he could have been discharged. Id.,

¶¶51-55.

     Rodio's deposition was adjourned before it was completed because it became clear that

he had not produced all relevant documents that had been requested in discovery.  Reynolds filed

a Motion to Compel, and as a result Rodio was directed to produce the documents, and his

deposition reconvened on June 14, 2005. At this point, Rodio expressly abandoned both the

pension theory and the Enron theory.  Id., ¶¶56, 64.  Now he contended that was terminated

because he would not "coerce" retailers to sell  Monarch brand cigarettes for less than the state

minimum price and because he refused to violate an alleged law requiring that cigarette

advertisements be at least five feet off the floor or higher.  Id., ¶65 (the "advertising theory"). [5]

Moreover, now he said that these were the only reasons he was terminated. Id.  Now he said that

the pension theory was only the consequence of his termination, not the reason for it. Id., ¶56.

Because Rodio's theories seem to blow with the wind, Reynolds will address them all.  As will

be demonstrated below, they are all without merit.

ARGUMENT

A.    Age Discrimination/the Pension Theory

     As stated above, Rodio had no age discrimination claim in his lawsuit.  To the extent that

he might contend that the pension theory is a type of age discrimination, he is clearly wrong.  See

---

[5] The minimum-price theory was alleged in the Complaint, but Rodio had testified in Part I of his deposition that the pension theory was the only reason he was discharged.  Stmt., ¶51. The advertising allegation, on the other hand, was completely new – it was never even mentioned in any of Rodio's evaluation rebuttals, his MCAD charge, or his Complaint. Id., ¶¶66-69.  Rodio did testify in Part I of his deposition about the incident that allegedly gave rise to the advertising theory, but he did not contend at that time that it had anything to do with his discharge. Id., ¶70.

*Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed.2d 338 (1993) (termination merely to prevent pension vesting does not normally violate Age Discrimination in Employment Act). In any event, he has no evidence that would form a causal connection between his age and his termination. *See, e.g., id.*, 507 U.S. at 610, 113 S. Ct. at 1706 ("a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome").

His pension theory purports to be based on the Massachusetts cause of action for breach of the covenant of good faith and fair dealing. Rodio explicitly waived the pension theory in Part II of his deposition (Stmt., ¶ 56), and so the corresponding claim should be dismissed.

In any event, it is clear that the breach of covenant cause of action does not apply to an employee who was terminated five years before he would have even qualified for the benefit. *See, e.g., Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977) (claim was valid where plaintiff was terminated without just cause on next business day after procuring order worth $5MM, which under terms of commission arrangement meant that company could keep 25 percent of commission that would otherwise have been payable to plaintiff); *Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21 (1981) (plaintiff was terminated without just cause, which allowed defendants to retain his renewal commissions on insurance policies he had already sold).

"Under Massachusetts law, an employee who would be entitled to a bonus or commission based on his past performance and who is deprived of it by a discharge without 'good cause' may recover the sum already earned . . . ." *Joyal v. Hasbro, Inc.*, 380 F.3d 14 (1st Cir. 2004), cert. denied, 125 S. Ct. 1325 (2005). A cause of action for breach of the covenant of good faith and fair dealing has two prerequisites: (1) the plaintiff must be "entitled" to a bonus or

commission based on past performance; and (2) the termination must be without "good cause." Rodio lacks both.

First, assuming for the sake of argument that Reynolds's enhanced pension benefit would have been sufficiently akin to a "bonus or commission," Rodio was not entitled to it because he had not yet "performed" as required. In contrast, the plaintiff in Fortune had already made the $5MM sale, and the plaintiff in Gram had already sold the policies. The plaintiff in Joyal was discharged three days before he would have qualified for an annual bonus, and so arguably he had fulfilled the requirements for the bonus except for three days' service.

Rodio's claim is analogous to that of the plaintiff in Christensen v. Kingston School Committee, 360 F. Supp.2d 212 (D. Mass. 2005), in which Judge Young refused to apply the theory where an employment contract was terminated early. The decision in Christensen emphasizes the importance of the "already-earned" component to the claim. See id. at 227-28. See also Devlin v. WSI Corp., 833 F. Supp. 69, 77 (D. Mass. 1993) (employer must seek to deprive employee of money 'fairly earned and legitimately expected'), quoted in Christensen at 228.

Second, the cause of action for breach of the covenant of good faith and fair dealing applies only where the termination is in bad faith. See Christensen at 227; Devlin at 77. Compare, e.g., Joyal, 380 F.3d at 20 (indicating that absence of "good (or just) cause," rather than "bad faith," is sufficient). Rodio has no evidence that Reynolds acted in bad faith in terminating his employment; moreover, even under the standard applied by the First Circuit, Reynolds clearly had "good/just cause":

> The standard of "just cause" . . . would require determination (among other matters) whether there existed (1) a reasonable basis for employer dissatisfaction with [an] employee, entertained in good faith, for reasons such as lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or

> inappropriate behavior, or (2) grounds for discharge reasonably related, in the employer's honest judgment, to the needs of his business. Discharge for a "just cause" is to be contrasted with discharge on unreasonable grounds or arbitrarily, capriciously, or in bad faith.

G&M Employment Serv., Inc. v. Commonwealth, 358 Mass. 430, 265 N.E.2d 476, 480 (1970) (defining "just cause" for purposes of statute requiring payment of refunds by employment agencies to employees who were discharged early without just cause), quoted and applied in Joyal, 380 F.3d at 21. Thus, Rodio's claim for breach of the covenant of good faith and fair dealing completely fails.

B.    Chapter 93A

Rodio's claim under G.L. c. 93A, §11, can be disposed of even more quickly. It is well-established in Massachusetts that the statute does not apply to disputes between employer and employee. Manning v. Zuckerman, 388 Mass. 8, 12, 444 N.E.2d 1262, 1265 (1983). Accord: Falmouth Ob-Gyn Assocs., Inc. v. Abisla, 417 Mass. 176, 177, 629 N.E.2d 291, 292 n. 1 (1994); Informix v. Rennell, 41 Mass. App. Ct. 161, 163, 668 N.E.2d 1351, 1353, rev. denied, 423 Mass. 1110, 672 N.E.2d 538 (1996) (TABLE); Benoit v. Landry, Lyons & Whyte Co., Inc., 31 Mass. App. Ct. 948, 580 N.E.2d 1053, 1054 (1991).

C.    Public Policy Wrongful Discharge

Viewing the claims in the light most favorable to Rodio, his claim for wrongful discharge is currently based on the minimum-price theory and the advertising theory. Rodio has expressly waived the Enron theory. Stmt., ¶ 56.

The courts of Massachusetts generally recognize public policy claims based on the following reasons for termination: (1) because the employee asserted a legally guaranteed right; (2) because the employee did what was required by law; (3) because the employee refused to do something illegal; or (4) because the employee cooperated with an ongoing criminal

investigation.  See, e.g., Flesner v. Technical Communications Corp., 410 Mass. 805, 575 N.E.2d

1107 (1991); Smith-Pfeffer v. Walter E. Fernald State School, 404 Mass. 145, 533 N.E.2d 1368

(1989).

     1.     The "Enron Theory"

Reynolds will address the Enron theory even though Rodio has now disavowed it.  The

incidents giving rise to the "Enron theory" are essentially undisputed.  The parties agree that

Rodio and Fasciani – both field sales employees who had no control over Reynolds's reported

earnings or its stock price – had two brief "exchanges"[6] about the price of Reynolds stock and its

reported earnings. Stmt., ¶25. Fasciani avers that he considered the conversations to be nothing

more than idle, speculative discussion. Id. He avers that he thought nothing more about them and

did nothing with the "information." Id.  Rodio has no evidence to the contrary, and so Fasciani's

testimony is undisputed.  Finally, Rodio has no evidence that Reynolds in fact engaged in any

misconduct with respect to its stock price or reported earnings.  Thus, at most, this is the type of

"internal corporate matter" that does not give rise to a public-policy cause of action.  See, e.g.,

King v. Driscoll, 418 Mass. 576, 638 N.E.2 488 (1994) (shareholder's derivative action does not

raise public policy implications because it relates merely to the well-being of the corporation and

shareholders); Mistishen v. Falcone Piano Co., Inc., 36 Mass. App. Ct. 243, 630 N.E.2d 294, rev.

denied, 418 Mass. 1102, 636 N.E.2d 278 (1994) (complaint that employer's products are shoddy

does not raise public policy implications); Wright v. Shriners Hospital for Crippled Children,

412 Mass. 469, 589 N.E.2d 1241 (1992) (disclosure to auditor of poor communications between

physicians and nursing staff, with impact on patient care, does not raise public policy

---

[6] To even refer to these as "conversations" is an exaggeration.  According to Rodio, in January 2001, he told
Fasciani that Reynolds's stock price "seemed kind of odd."  Stmt., ¶25.  In response, Fasciani "kind of nodded." Id.
In June 2001, after Reynolds allegedly announced that it had changed its accounting methods, Fasciani told Rodio
that Rodio had (accurately) predicted it.  Id., ¶26. Rodio apparently said nothing in response. Id.

implications); Smith-Pfeffer, supra (internal complaints about plaintiff's supervisor and about reorganization did not raise public policy implications, even though issues arguably affected quality of care of mentally retarded students).

    2.      The "minimum-price theory"

Rodio's "minimum-price theory" is that the "every day low pricing" ("EDLP") contract "forced" retailers to sell Reynolds's products for less than the applicable state minimum prices. Stmt., ¶57. Rodio has no evidence to support this contention.  The EDLP contract merely required that Reynolds's Monarch brand be sold as the lowest priced cigarette brand in the store or in parity with the lowest priced cigarette brand in the store. Id.  The EDLP contract did not state what that "lowest price" should be, and Rodio admits that he never made any such suggestion. Id., ¶63.  Indeed, Reynolds field sales employees had been instructed not to discuss "absolute" price with retailers because of antitrust concerns. Id., ¶61. There is no dispute that the retailers established the prices for cigarettes sold in their stores and that the most Reynolds could do was offer discounts or rebates from the retailer-established price, or require (based on applicable contracts) that the retailer-established price for Reynolds products be the lowest in the store or at parity with the lowest. Id.

Retailers were not required to enter into EDLP contracts with Reynolds. Id., ¶7. It is undisputed that Rodio sold more EDLP contracts than almost any of his counterparts; therefore, it was possible to be judicious in selling EDLP contracts while remaining a sales representative in good standing.  Id., ¶¶7-9.   Reynolds always had the option to cancel an EDLP contract with a non-compliant retailer[7], and the performance documentation related to Rodio shows that he was

---

[7] It should also be noted that, although Rodio's discipline included instances in which he had failed to require retailers to comply with their EDLP contracts, Rodio's rebuttals never stated once that the reason for non-compliance was the state minimum price law. Id., ¶¶35, 41, 42, 44, 60, 63. This also defeats his claim.  See, e.g., Hinchey v. NYNEX Corp., 979 F. Supp. 40 (D. Mass. 1997), aff'd, 144 F.3d 134 (1st Cir. 1998) (plaintiff alleged he

continually being counseled for his failure to either enforce the contract or cancel it. <u>Id.</u>, ¶39.

Thus, Rodio's first obstacle to a viable claim is that nothing in the EDLP program or contract

required a retailer to sell below the state minimum price.  Obviously, then, the EDLP program

cannot form the basis for a "public policy" for purposes of his wrongful discharge claim, and

Rodio's failure to either enforce or cancel non-compliant EDLP contracts was at most an

"internal corporate matter" that does not give rise to a public policy claim.

The case of Acher v. Fujitsu Network Communications, Inc., 354 F. Supp.2d 26 (D. Mass.

2005), in which the district court found no public policy violation, has many similarities to the

instant case.  In Acher, the plaintiff was a sales manager responsible for the defendant's account

with Verizon.  The vice president of sales, and the plaintiff's supervisor, proposed a plan that

certain equipment be provided to Verizon on the condition that Verizon uninstall certain

equipment manufactured by the defendant's competitors.  The plaintiff  believed that this

proposal would violate Network Equipment Building Standards ("NEBS"), which he claimed

had been incorporated into federal telecommunications regulations and therefore had force of

law.  The plaintiff persuaded his supervisor to withdraw the plan, and the plan actually offered to

Verizon did not include the "uninstall" component.  Shortly afterward, the plaintiff was

terminated for his unspecified handling of the Verizon account.

Despite the fact that the plaintiff's termination clearly appeared to be related to his raising

the issue of NEBS violation, the district court adopted the magistrate's recommendation that

summary judgment be granted to the defendant.  First, the court noted that the supervisor's

proposal, if carried out, would have not been surreptitious but would have been fully disclosed to

Verizon.  There was no reason to believe that pertinent information would have been withheld

---

was terminated for raising "business and procurement irregularities" and antitrust violations, but documentation
showed that he merely had disagreement with employer regarding vendors; summary judgment granted to
employer).

from Verizon.  Second, the court noted that the decision to accept the defendant's proposal –

and, presumably, to violate the NEBS – would have been Verizon's, not the defendant's.

    The parallel to the instant case is clear.  The EDLP contract contains no secrets – it

clearly states that the retailer is agreeing to sell certain Reynolds brands at either the lowest price

in the store, at parity with the lowest, or at or below a higher price (if applicable) being charged

for a competitor's brand.  Just as the retailer decides what cigarette brands to sell and at what

price, the retailer is free to accept or reject these terms.  As stated above, the EDLP contract is

capable of being performed in a completely lawful manner; thus, to the extent that it is not, that

is the decision of the retailer.

    The Acher court also rejected the plaintiff's argument that violation of the NEBS was a

public safety issue.  The plaintiff had argued that uninstalling competitors' equipment could

weaken the telecommunications infrastructure, which could have had public health and safety

implications in the event of an emergency. The court found that the alleged threat to the public

safety was too remote and speculative to form the basis for a public policy claim.  Moreover, the

court reiterated, the decision to allegedly jeopardize the public safety would have been Verizon's

to make, not the defendant's.

    It is not clear what type of "public policy" Rodio will claim is implicated in the state

minimum price for cigarettes.  To the extent that he contends it is a health and safety issue, the

court's reasoning in Acher is applicable – the chain of causation is far too remote and

speculative. See also Wright, supra (patient care issues not rising to level of abuse, neglect,

malpractice or professional incompetence not sufficient); Smith-Pfeffer, supra (welfare of

mentally retarded students not sufficient).  And, again, the decision to sell below state minimum

prices is that of the retailer, not Reynolds.

The Acher court concluded by reiterating the strong general policy in Massachusetts favoring employment at will:

> That is not to say that the company's actions – assuming, of course, that plaintiff's allegations are correct – are necessarily admirable. It would be better, in the abstract, to protect the employee who spoke out against a bad, or even potentially harmful, idea, not the one who suggested it. But with narrow exceptions, employers are free to hire and fire at-will employees as they please, without justification. That doctrine would be considerably eroded if the exceptions were extended to protect at-will employees who resisted bad ideas that, at worst, constituted remote or insubstantial threats to public safety. The law does not thereby seek to reward the bad and punish the good, but rather to promote and protect an important form of freedom of association from undue interference by the courts.

Finally, because it is undisputed that EDLP contracts could have been enforced legally, to the extent that Rodio was unable to enforce them, he was unable to perform a key component of his job, and thus his discharge was lawful. See, e.g., Korb v. Raytheon Corp., 410 Mass. 581, 574 N.E.2d 370 (1991) (corporate spokesman for defense contractor who spoke out against defense spending was ineffective in position, and termination was lawful).

3.     The "advertising theory"

Finally, Rodio now contends that he was discharged because he refused to require a retailer to place advertising on a counter, which he contends was a violation of a regulation requiring that cigarette advertising be placed five feet off the floor or higher (the "five-foot requirement") -- reversing course as usual. This "advertising theory" arose from at least one incident, the first of which occurred in December 2001, after Rodio had already been placed on a final warning. Stmt., ¶¶37, 73. Rodio and Fasciani had gone together to one of Rodio's accounts that had an EDLP contract. Id., ¶37. Certain countertop advertising was required under the applicable contract, but the store was lacking the advertising. Id. According to Rodio, a store manager told Rodio and Fasciani that the "Board of Health" had told him not to put tobacco

14

advertising on his countertop.  Id.  Rodio asserted that Fasciani said he "didn't care" and told

Rodio to put Reynolds advertising on the store countertop.  Id.  Rodio complied.  Id.

Fasciani took no action against Rodio based on this incident.  Id., ¶39.  He merely told

Rodio to either see that the store comply with the contract or cancel the contract.  Id.  However,

Rodio apparently contends that every time he was written up about a store that did not have

required counter advertising, he was in effect being reprimanded for refusing to engage in illegal

activity.  Id., ¶72.

There are two major problems with Rodio's tardily-raised advertising theory:  (1) he had

already testified at length to the fact that he did not refuse to place "illegal" [sic] countertop

advertising in his retailers' establishments, id., ¶37, 45-47; and (2) there has never been a valid

law prohibiting countertop tobacco advertising, which Rodio should have known. Id., ¶¶76-78.

In January 1999, the Attorney General of Massachusetts promulgated a number of

regulations aimed at tobacco sales, to take effect February 2000.  940 Code of Mass. Regs.

§21.01-07, 22.01-09 (2000).  Among them was a prohibition on advertisements of cigarettes at a

height of less than five feet from the floor.  940 C.M.R. §21.04(5), (5)(b).

In February 1999, Reynolds along with a number of other tobacco companies, filed suit

in the U.S. District Court for the District of Massachusetts, contending among other things that

the five-foot requirement was unconstitutional.  By a decision dated January 24, 2000, the court

invalidated the five-foot requirement on First Amendment grounds.  See Lorillard Tobacco Co.

v. Reilly, 84 F. Supp.2d 180 (D. Mass. 2000).  On January 31, 2000, the U.S. Court of Appeals

for the First Circuit stayed enforcement of the regulations pending appeal.  Cross-appeals were

filed, and in Consolidated Cigar Corp. v. Reilly, 218 F.3d 80 (1st Cir. 2000), the First Circuit

reversed the pertinent portion of the District Court's decision.  The First Circuit decision was

issued July 17, 2000, but the stay remained in place pending appeal to the U.S. Supreme Court. By decision issued June 28, 2001, the U.S. Supreme Court held that the pertinent portion of the regulations did in fact violate the First Amendment. See Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 121 S. Ct. 2404, 150 L. Ed.2d 532 (2001). Thus, the regulation never went into effect, and by the time Rodio had his first, and possibly only, conversation with Fasciani regarding countertop advertising in December 2001, the regulation had been declared invalid, finally and conclusively, for approximately six months.

To be cognizable, generally a public policy claim must implicate a law. See, e.g., Smith v. Mitre Corp., 949 F. Supp. 943 (D. Mass. 1997) (noting that public policy is often determined with reference to legislative enactments). Although the law may be involved only indirectly, the connection between the law and the protected activity must not be remote or speculative. Compare Falcon v. Leger, 62 Mass. App. Ct. 352, 816 N.E.2d 1010, rev. denied, 443 Mass. 1102, 820 N.E.2d 258 (2004) (allegedly deceiving inspector from Underwriters Laboratories did not violate law but resulted in sale of non-certified electrical wire, which when used for its intended purpose would have violated applicable building and electrical codes) with Upton v. JPW Businessland, 425 Mass. 756, 682 N.E.2d 1357 (1997) (termination because of inability to work long hours because of childcare responsibilities did not implicate public policy).

Even if a relevant statute or other source of law exists – which is not the case here – the subject matter may not be sufficiently important to create a "public policy." See, e.g., King, supra, 418 Mass. 576, 638 N.E.2d 488 (1994) (refusing to find public policy based on statutory right to file shareholder derivative suit); Mistishen, supra (refusing to find public policy violation based on alleged violation of Chapter 93A); Wright, supra (refusing to find public policy violation based on nurses' ethical code or state regulation stating that duty of registered nurse

16

was to "collaborate, communicate, and cooperate as appropriate with other health care providers to ensure quality and continuity of care").

The public policy exception does not protect employees who engage in every type of salutary act. See, e.g., Smith-Pfeffer, supra (no protection for resisting reorganization of home for mentally retarded on ground that reorganization would harm patients); Wright, supra (no protection for nurse who was allegedly terminated for revealing patient-care issues as required by nursing code of ethics). To afford legal protection to all "good deeds" by employees would in effect impose a "just-cause" requirement on employers and eviscerate the employment-at-will rule. Wright, 412 Mass. at 475, 589 N.E.2d at 1245.

Rodio may claim that he is nonetheless protected because he had a good-faith erroneous belief that such a law existed. In addition to being a highly dubious proposition in itself[8], such a mistaken belief would not rescue his claim because the exception for the good-faith mistaken belief appears to apply only where the employee makes some type of complaint, whether internal or external. In Rodio's case, the issue was raised, Fasciani told him to put the advertisement on the counter, and Rodio complied. Stmt., ¶37. There was no further discussion, and by Rodio's admission the issue never arose again. Id. Thus, the cases in which the courts have recognized at least the possibility of claims based on mistaken beliefs are inapposite. See, e.g., Falcon, supra (claim recognized where plaintiff alleged that he was discharged for refusing to participate in scheme that he believed was illegal); Mello v. Stop & Shop Cos., 402 Mass. 555, 524 N.E.2d 105

---

[8] Although the retailer's erroneous belief may have been in good faith, it is a real stretch to assume that Rodio's was. Reynolds had notified its sales staff, including Rodio, regarding the need for compliance with the portions of the regulation that had been upheld by the courts and informing them of the status of the litigation. Stmt., ¶78. In any event, assuming solely for purposes of Reynolds's Motion for Summary Judgment that Rodio had a "pure heart and empty head," this will not suffice. See, e.g., Acher, supra, 354 F. Supp.2d at 31 (erroneous good-faith belief must also be reasonable), citing Falcon, supra, 62 Mass. App. Ct. at 364 (accord).

(1988) (claim recognized, arguendo, where plaintiff made several complaints of alleged

dishonesty and false claims).

    4.    Causal connection between "protected activity" and discharge (all three theories)

Finally, Reynolds submits that it is entitled to summary judgment on Rodio's wrongful

discharge claim because he has failed to create a genuine issue of material fact that there was a

causal connection between his "protected activity" [sic] and his discharge.  "An assertion or

speculation that [the employer] discharged [the plaintiff] is not sufficient to create a dispute of

material fact concerning the reason for [the] discharge."  See, e.g., Shea v. Emmanuel College,

425 Mass. 761, 682 N.E.2d 148 (1997) (although plaintiff's complaints of alleged theft may have

been protected activity, summary judgment for employer was affirmed because plaintiff failed to

establish that she was terminated because of the protected activity).  Compare Hoeppner v.

Crotched Mountain Rehabilitation Center, 31 F.3d 9, 14 (1st Cir. 1994) (affirming summary

judgment for employer in retaliation case under Title VII of the Civil Rights Act, 42 U.S.C.

§2000e, et seq. ("Title VII")) (essential element of prima facie case of Title VII retaliation is

causal connection between protected activity and adverse employment action).

Viewing the chronology of events in the light most favorable to Rodio, there is no pattern

that would give rise to an inference that his discharge was caused by his (allegedly) protected

activity.  Rodio believed that Richard Kane, Fasciani's supervisor, was out to get Rodio before

Fasciani even came into the picture.  Stmt., ¶20.  After Fasciani became Rodio's supervisor, he

gave Rodio an oral warning in May 1999, a "Needs Improvement" performance review in

January 2000, and told Rodio that he did not like Rodio's attitude in approximately the summer

of 2000.  Id., ¶¶21-23.  Admittedly, Rodio improved and got a "Fully Meets" review in January

2001.  Id., ¶24.  The first conversation that forms the basis of Rodio's Enron theory occurred that

same month.  Id., ¶25.  The second occurred in June 2001.  Id., ¶26.  Then the Vacation Meeting occurred in July 2001, when according to Rodio, all his troubles with Fasciani began.  Id., ¶¶27-29.  Thus, Rodio's own timeline negates the Enron theory, even if he had not already expressly repudiated it.

The Parking Lot Incident, in which Fasciani allegedly said that he would "destroy" and "ruin" Rodio, occurred shortly thereafter.  Id., ¶29.  Rodio got his First Written Reprimand on September 5, 2001.  Id., ¶30.  He got his Final Written Reprimand on November 19, 2001.  Id., ¶35.  In December 2001, after he had already been through all this overwhelming alleged negativity with Fasciani, the Advertising Incident occurred.  Id., ¶37.  Although he received his "Fails to Meet" performance review in January 2002, after the Advertising Incident, the poor review is obviously a result of the First Written and Final Written reprimands that he had received since September 2001.

The only remaining major developments before Rodio's discharge were the May 2002 work-with and Training Analysis that resulted in a write-up but no disciplinary action, and the termination event in October 2002.  Id., ¶¶42, 43.  Finally, it should again be noted that, in response to Fasciani's criticisms that he failed to enforce EDLP contracts (presumably the basis for the minimum-price theory) and failed to place certain countertop advertising (presumably the basis for the advertising theory), Rodio's consistent response was that he had in fact enforced the EDLP contracts and that he had in fact placed the advertising on countertops.  Id., ¶¶37, 45-47,63.  Thus, Rodio's own contemporaneous responses to Fasciani's criticism negate the causation element.

Because Rodio has failed to state a public policy and has failed to establish causation, his claim for wrongful discharge in violation of the public policy of the Commonwealth of Massachusetts likewise fails.

<u>CONCLUSION</u>

Rodio has flitted from one theory to another, but he has yet to alight on one that can withstand even a modicum of scrutiny. He has changed his story too many times, and now he is left with testimony from certain phases of the lawsuit that directly conflict with his testimony from other phases. Moreover, even if his stories were to be believed – at this point, Reynolds submits, a logical impossibility – they fail as a matter of law.

It seems that the only theory Rodio has failed to advance in this case is the true one: that he was terminated because of severe, longstanding issues with contract administration and reporting after nearly three years of warnings. Rodio has thus failed to create a genuine issue of material fact that his discharge was unlawful in any respect. Accordingly, Reynolds respectfully requests that its Motion for Summary Judgment be granted.

Respectfully submitted,

R.J. REYNOLDS TOBACCO COMPANY

By its attorneys,

/s/ Mark H. Burak
Mark H. Burak, BBO# 558805
Sandra E. Kahn, BBO # 564510
Morse, Barnes-Brown & Pendleton, P.C.
Reservoir Place
1601 Trapelo Road
Waltham, MA 02451
(781) 622-5930
(781) 622-5933 (facsimile)

OF COUNSEL:

W.R. Loftis, Jr., N.C. Bar No. 2774
Kristine M. Howard, N.C. Bar No. 26903
Candice S. Wooten, N.C. Bar No. 28161
Constangy, Brooks & Smith, LLC
100 North Cherry Street, Suite 300
Winston-Salem, NC   27101
(336) 721-1001
(336) 748-9112 (facsimile)

Dated:  August 15, 2005