UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL RODIO,

                    Plaintiff,

        v.                                              Civil Action No. 04-CV-10006-JGD

R.J. REYNOLDS TOBACCO COMPANY,

                    Defendant.

DEFENDANT'S LOCAL RULE 56.1 STATEMENT
OF MATERIAL FACTS AS TO WHICH NO GENUINE DISPUTE EXISTS

Pursuant to Local Rule 56.1, Defendant R. J. Reynolds Tobacco Company ("Reynolds" or "the Company"), hereby submits in support of its motion for summary judgment the following Statement of Material Facts as to Which No Genuine Dispute Exists[1].

Background

1.      Michael Rodio ("Rodio"), date of birth August 1, 1952, was hired by Defendant Reynolds on October 12, 1976.  (Ex. A, Complaint at 1.)

2.      Throughout his employment with Reynolds, Rodio's job title was Area Sales Representative ("sales representative").  Rodio was discharged on October 28, 2002, on the stated grounds of misuse of company resources, failure to satisfactorily perform job accountability, and failure to follow management direction. (Ex. B, Affidavit of Carlo E. Fasciani ("Fasciani Aff."), ¶37.)

---

[1] All affidavits, deposition transcripts, and exhibits cited herein are contained in Defendant's Appendix of Summary Judgment Materials.

3.      At the time of his discharge, Rodio was 50 years old and had been employed with Reynolds approximately 26 years.  (Ex. G, Charge of Discrimination Filed with Massachusetts Commission Against Discrimination dated April 23, 2003 ("MCAD Charge"); Ex. A, at 1.)

4.      In late 1998 or early 1999, Carlo Fasciani ("Fasciani") became Division Sales Manager with supervisory responsibility over a division that included parts of the Commonwealth of Massachusetts.  (Ex. B, Affidavit of Carlo E. Fasciani ("Fasciani Aff."), ¶2.) Fasciani and Art Scott ("Scott"), another Division Sales Manager who at the time was Rodio's direct supervisor, both reported to Richard Kane ("Kane"), who at the time was Region Manager for Reynolds's Boston sales region.  (Ex. E, Deposition of Michael Rodio, Vol. I ("Rodio Depo. I"), at 56.); Ex. C, Affidavit of Richard Kane ("Kane Aff."), ¶1.)

5.      Shortly after Fasciani became a Division Sales Manager in Massachusetts, Rodio came under his supervision due to a restructuring.  During the entire time that Rodio reported to Fasciani, his territory included Fall River and Taunton, Massachusetts, and some other towns in Massachusetts ("the Fall River territory").  (Ex. B, Fasciani Aff., ¶2.)  Rodio reported to Fasciani and served the Fall River territory until his termination. (Id.)

The Sales Representative Position

6.      Reynolds sales accounts are unique.  (Id., ¶3.)  Retail stores buy cigarettes from wholesalers, not from Reynolds. (Id.) Thus, Reynolds sales representatives do not "sell cigarettes." (Id.) Instead, the sales representatives engage primarily in activities related to the advertising, merchandising and promotion of Reynolds products in retail stores. (Id.) They sell or offer various contractual programs to retailers related to the advertising and promotion of Reynolds products. (Id.) For example, they sell or offer "contracts" to retailers, by which Reynolds pays the retailer in exchange for its agreement to place certain advertising displays in

2

the store, or to sell certain Reynolds brands at a certain price level relative to certain competitors'
brands. (Id.)

7.    A primary duty of the sales representative is to "administer" these contracts with
the retailers – in other words, to make sure that the retailer is complying with the terms of the
contracts and, in some cases, convincing the retailer of the importance of complying. (Id., ¶4.)
Admittedly, it is also important that the sales representative see that Reynolds products are being
sold by the retailer – but not at the expense of contract compliance. (Id.) Reynolds is simply
"throwing money away" by making contract payments to a retailer who has a contract but does
not comply with all the elements of the contract. (Id.)  It should also be noted that the lack of a
contract does not preclude a retailer from selling Reynolds products.  (Id., ¶5.)  The ideal sales
representative is friendly with retailers and persuades them to sell Reynolds products – but, more
importantly, he or she is an effective administrator of the contracts.  (Id., ¶6.)

8.    Contract administration has always been a responsibility of sales representatives,
but the responsibility has become increasingly demanding and complex over the years.  (Id., ¶7.)
Approximately 15 years ago, a typical Division Manager might have approximately 10 to 12
sales representative direct reports as well as a full-time secretary.  (Id.) The secretary was
available to help sales representatives prepare their reports, and also reminded them when they
were late with a required report.  (Id.) In later days, the division secretary position was
eliminated and a support staff was available at the region office. (Id.) Nowadays, a Division
Manager has approximately twice as many reports, and no secretary or support staff in a local
office. (Id.) The "leaner" management and absence of support staff means that the sales
representatives are solely responsible for doing their own reporting via laptop computers, and
there is no one to give them "friendly reminders" if they are past due or to correct mistakes sent

into the office. (<u>Id</u>.)  As a practical matter, these changes meant that sales representatives under the "current way" have had to be much more adept with computers, much more proactive about meeting deadlines, and much more self-directed to manage a large number of administrative issues. (<u>Id</u>.) Through a culture of increased productivity over the years, it is estimated that one sales representative today must handle the workload that was handled by two to three sales representatives in the past. (<u>Id</u>.)

9.      Rodio had good relationships with retailers and had increased the market share for Reynolds products in his accounts. (<u>Id</u>., ¶8.) However, in Fasciani's opinion, Rodio's "administrative" performance was very poor.  (<u>Id</u>.) In Fasciani's opinion, Rodio failed to manage the workload, balance priorities and adapt to the company's strategic direction. (<u>Id</u>.)

10.     For a full understanding of the performance issues in this case, it is necessary to define some terms.  A "WW" is the abbreviation for a "work-with," which is simply when the Division Sales Manager goes on sales calls with the sales representative.  (<u>Id</u>., ¶9.)  A "TA" is the abbreviation for a "Training Analysis." (<u>Id</u>.) On a TA, the Division Sales Manager goes alone to the sales representatives' accounts one or two days after the sales representative has been there. (<u>Id</u>.) After both the WW and the TA, the Division Sales Manager gives feedback, both positive and negative, to the sales representative regarding the accounts.  (<u>Id</u>.)

11.     "PA" stands for "product availability." (<u>Id</u>., ¶10.) It means simply that "product" – i.e., a particular brand of cigarettes – is available at the store. (<u>Id</u>.) "EDLP" stands for "every day low pricing," and is a type of contract that a retailer may elect to enter into. (<u>Id</u>.) By the terms of the EDLP contract, the retailer agrees not to sell another competitive brand that is priced lower than Reynolds's brand (either Monarch or Doral). (<u>Id</u>.) "VAP" stands for "value-added promotion," which is communicated to the consumer by a plastic display that is used in stores.

(Id.) "POS" stands for "point of sale" advertising or consumer communication, and includes the paper or card containing pricing information that goes into the VAP display.  (Id.)

12.     "Product availability" is considered present as long as there is one pack of the applicable cigarette in the store. (Id., ¶23.) For example, a sales representative might make a call on an account on a Monday, review product availability for Camel Lights (soft pack), and find a minimum of one pack in the store. (Id.) He would then be expected to record on his laptop that this particular product (i.e., brand style) is "available" or in stock. (Id.)  If Fasciani then conducted a TA, he would do so on Tuesday or Wednesday. (Id.)  Because of the lapse of time, it is possible that a customer could come to the store and purchase the one pack of Camel Lights (soft). (Id.) Then when Fasciani went to the store for the TA, he would see that Camel Lights (soft) were not available, even though the sales representative had properly recorded product availability at the time. (Id.)

13.     To determine whether the sales representative misreported product availability or whether a customer had merely intervened, Fasciani considered whether the brand was a fast-selling one. (Id., ¶24.) Using the example of Camel Lights (soft pack) again, it is not particularly fast-selling; therefore, it would be unlikely to have been sold in a day or two. (Id.) On the other hand, Camel Lights (hard pack) is a fast seller, so if a representative reported that it was available on a Monday, and then it was gone on Tuesday or Wednesday, Fasciani would assume that the product availability had been accurately reported and that the product had simply been sold.  (Id.)

14.     Another very important consideration – if available – is feedback from the store employees. (Id., ¶25.) If the employee told Fasciani that one pack of Camel Lights (soft) had sold on Tuesday, then Fasciani knew that the representative had accurately recorded product

availability on Monday. (Id.) On the other hand, if the employee told Fasciani that the store

never carried Camel Lights (soft), then Fasciani would know that product availability had not

been recorded accurately. (Id.) Store employee feedback is often unavailable because often no

single employee worked all shifts at the store between the sales representative's call and

Fasciani's TA.  (Id.)

        15.     Another consideration for Fasciani was the number of times he found that a

product recorded "available" was not there. (Id., ¶26.)  For example, if product availability was

recorded inaccurately at two of ten stores, Fasciani would give the representative the benefit of

the doubt and assume that the product had been sold between the representative's visit and

Fasciani's TA visit. (Id.) On the other hand, if ten of ten stores visited had that problem, Fasciani

would tend to assume that the representative was not accurately reporting product availability.

(Id.)

        16.     Generally, Fasciani found numerous product availability errors in Rodio's stores,

including at times multiple errors in a single store.  (Id.)  This caused Fasciani to believe that

Rodio had made errors in reporting product availability.  (Id.)

        17.     Fasciani used essentially the same system when determining whether a sales

representative had placed advertising in a store according to the terms of the applicable contracts.

(Id., ¶27.)  It was possible for a sales representative to correctly place all required

advertisements, only to have them taken down after he left the store.  (Id.)  When this happened,

the advertisements were usually removed by a competitor of Reynolds or by a store employee.

(Id.)

        18.     If the store employee told Fasciani that this happened, Fasciani took the store

employee at his or her word.  (Id., ¶28.) Even if no store employee was available, Fasciani gave

the sales representative the benefit of the doubt provided it did not occur often.  (Id.)  However, on some occasions the store employee would tell Fasciani that the ads were never placed, or that a competitor had not been to the store since the last visit of the Reynolds sales representative. (Id.) In these instances, Fasciani tended to believe that the lack of placement was the fault of the sales representative. (Id.)  Even if he was unable to talk to a store employee who knew what had happened, Fasciani was able to deduce that the lack of placement was the fault of the sales representative based on the number of times that Fasciani found lack of compliance with the advertising requirements in the applicable contracts.  (Id.)

19.    Generally, Fasciani found numerous instances in which Rodio failed to enforce the terms of applicable contracts and in which required advertisements were missing.  (Id., ¶29.) This caused Fasciani to believe that the errors were Rodio's. (Id.)

Rodio's Performance and Termination

20.    Beginning at least with the time that Scott was Rodio's direct supervisor and continuing afterward, Rodio believed that Kane did not like Rodio.  (Ex. E, Deposition of Michael Rodio, Vol. I ("Rodio Depo. I"), at 56-58.)  Rodio did not know why Kane allegedly did not like him.  (Id.)

21.    A few months after Fasciani became Rodio's supervisor, in May 1999, Fasciani issued Rodio an oral warning for a variety of issues relating to a lack of performance and failure to follow management direction. (Id., ¶11.)

22.    In January 2000, Rodio received his first annual performance evaluation from Fasciani, and his overall rating was "Needs Improvement."  (Ex. E, Rodio Depo. I, Exh. 2.)

23.    According to Rodio[2], after a work-with in 2000, while he and Fasciani were sitting in a car, Fasciani told Rodio that he did not like Rodio's attitude.  (Ex. E, Rodio Depo. I at 51-52, 55-56.)  Rodio felt that Kane might have "pushed" Fasciani to say this.  (Id. at 55-56.)

24.    In January 2001, Fasciani gave Rodio his annual performance evaluation with an overall rating of "Fully Meets Expectations."  (Ex. B, Fasciani Aff., ¶11.)

25.    Sometime in approximately January 2001, Fasciani and Rodio had a conversation about Reynolds's reported earnings and stock price.  (Ex. E, Deposition of Michael Rodio, Vol. II ("Rodio Depo. II") at 56-58.)  Rodio told Fasciani that Reynolds's stock price "seemed kind of odd."  (Id.)  Fasciani "kind of nodded" in response.  (Id.)  Fasciani considered this to be an idle, casual conversation and paid no attention to it.  (Ex. B., Fasciani Aff., ¶40.)  Fasciani did not do anything with Rodio's "information," and he did not discuss the conversation with anyone else. (Id.)

26.    In June 2001, according to Rodio, Reynolds announced publicly that it was going to make a change in its accounting methods.  (Ex. E, Rodio Depo. II at 58-59.)  Fasciani told Rodio that Rodio had predicted that.  (Id.)  Although Rodio's lawsuit alleges that he was discharged because he disclosed information about "insider trading" at Reynolds, (Ex. A, Complaint, ¶14.), Rodio has testified that he does not know whether this conversation had anything to do with his discharge. (Ex. E, Rodio Depo. II at 59.)

27.    In the summer of 2001, Fasciani had a meeting with all sales representatives who reported to him.  (Ex. B, Fasciani Aff., ¶12.)  He asked the group about their vacation plans. (Id.) Several representatives, including but not limited to Rodio, said that they were taking

---

[2] Whenever this Statement says "according to Rodio," it may be assumed that there is a fact dispute with respect to that particular point of testimony.  In many instances, Fasciani strongly disagrees with Rodio's characterizations of his actions and motives, and has provided his own explanation in his affidavit.  However, solely for purposes of this Motion for Summary Judgment, Reynolds is presenting the testimony in the light most favorable to Rodio.

vacation in the next month or so. (Id.)  Fasciani asked whether their stores were covered, and several said they were not. (Id.) Normally, before a sales representative takes vacation, Fasciani expects him or her to make sure that all accounts are in good enough shape to be left alone for a week. (Id.) Sometimes this entails more work before the vacation starts. (Id.)  If the sales representative fails to do this, then other employees are unfairly burdened with the work that the vacationing sales representative failed to perform. (Id.) When the representatives told Fasciani that they had not made the necessary arrangements, according to Rodio, Fasciani went into a "rage."  (Ex. E, Rodio Depo. I at 58-59.)  This meeting will be referred to as "the Vacation Meeting."  Rodio believes that Fasciani was upset because he was afraid that he would not meet his sales goals.  (Ex. E, Rodio Depo. I at 95.)  Rodio has heard that Fasciani had a similar outburst in 2004, approximately two years after Rodio's termination.  (Id.)

28.    Rodio claims that his troubles with Fasciani began with this Vacation meeting. (Ex. E, Rodio Depo. II at 58-62.)

29.    Shortly after the Vacation Meeting, Fasciani called Rodio and said he wanted to give Rodio his mid-year performance evaluation.  (Ex. E, Rodio Depo. I, at 59; Ex. B, Fasciani Aff., ¶13.)  Rodio considered this to be disruptive to his work.  (Ex. E, Rodio Depo. I, at 94.) Rodio's mid-year evaluation was going to be positive overall.  (Ex. B, Fasciani Aff., ¶13.)  Per Fasciani's normal practice, they first did a work-with together.  (Id.)  Fasciani was displeased with the condition in the stores they visited.  (Id.)  Rodio does not dispute the condition of the stores but says that he did the best he could.  (Ex. E, Rodio Aff. I at 98-99, Exh. 8.)  Rodio and Fasciani met at a restaurant in Taunton to discuss the calls they made that morning and also to go over Rodio's mid-year review.  (Ex. E, Rodio Depo. I at 94; Ex. B, Fasciani Aff., ¶13.)  Fasciani forgot to bring the evaluation to the restaurant.  (Ex. B, Fasciani Aff., ¶13.)  Rodio took Fasciani

to his car to get the evaluation, and Fasciani did not have the evaluation in his car, either. (Id.)

Rodio said, "Well, if we're meeting to do the evaluation, why would you leave the thing at

home?" (Ex. E, Rodio Depo. I at 59-60.) According to Rodio, Fasciani became irate and said

that he would "destroy" Rodio's career and would "ruin" Rodio. (Id. at 59-60.) (This incident

will be referred to as the "Parking Lot Incident.") Rodio complained about the Parking Lot

Incident to Kane, Fasciani's supervisor. (Id. at 59-60.) According to Rodio, Fasciani apologized

to Rodio, and they scheduled another work-with to take place shortly afterward. (Id.) According

to Rodio, on the work-with, Fasciani looked for "any little thing he could find to make me look –

to downplay me and then reprimanded me that day." (Id. at 61.) Rodio claims that his troubles

with Fasciani also began with this Parking Lot Incident. (Ex. E, Rodio Depo. II at 51-58.)

  30. On or about September 5, 2001, Fasciani issued to Rodio a First Written

Reprimand pertaining to calls made by Rodio on August 8 and 9, and a TA performed by

Fasciani on Rodio's stores on August 10, 2001. (Ex. E, Rodio Depo. I, Exh. 9.) The first

comment is that Rodio "failed to accurately record product availability in this account" despite

having been instructed to do so via voice mail and e-mail communications. (Id.) The reprimand

notes that Fasciani asked Rodio why he had failed to accurately record product availability, and

that Rodio's response was "I thought I did." (Id.) The second deficiency noted is that Rodio

failed to place any communication to show the discounting of Reynolds brands. (Id.) The third

deficiency noted is that Rodio failed to record any point of sale advertising in "SIS," which is the

Reynolds system. (Id.; Ex. B, Fasciani Aff., ¶17.) The fourth deficiency noted is that Rodio

recorded that he placed three "high-impact" displays when in fact he had placed only one. (Ex.

E, Rodio Depo. I, Exh. 9.) The fifth deficiency noted is that Rodio entered into the system that

he had placed ten high-impact displays in about six weeks but was supposed to place (and

record) only one per visit. (Id.) Sales representatives are expected to visit their accounts at least

once a month, so assuming Rodio visited his accounts twice each month, he should have

recorded no more than three high-impact displays during that six-week period. (Ex. B, Fasciani

Aff., ¶19.)

31.    Rodio's written response to all of the above was that the account had a high

volume and large market share of Reynolds products. (Ex. E, Rodio Depo. I, Exh. 9; Ex. B,

Fasciani Aff., ¶20.) This may have been true, but it had nothing to do with the business issues

addressed in the reprimand. (Exh. B, Fasciani Aff., ¶20.) The issues in the reprimand were

inaccurate reporting and failure to place advertising in accordance with contract requirements,

management instruction and Reynolds policy. (Id.)

32.    Rodio's response to the September 5 reprimand was the beginning of what

Fasciani perceived to be a pattern of responding to constructive criticism in one area by citing a

completely unrelated area in which he had done well. (Id., ¶21.) In Fasciani's opinion, Rodio's

typical response was analogous to that of a house painter who entered a contract with a

homeowner to paint the homeowner's house blue but then painted the house yellow instead.

(Id.) Instead of apologizing for painting the house the wrong color and trying to make amends,

the painter points out that he masked the windows well and covered the old paint nicely. (Id.)

This type of response to job-related criticism will be referred to as the "housepaint" response.

33.    When not giving the "housepaint response," Fasciani perceived that Rodio

typically gave one or more of the following responses: (a) he had not made the mistake on

purpose; (b) his computer was malfunctioning; (c) someone else was to blame (either a

competitor who took down his Reynolds display or a customer who bought the last pack of

cigarettes in a particular brand after he had left the store); (d) he didn't have enough "help"

(whether this was true or not, all sales representatives were in the same situation); or (e) Fasciani did not like him.  (Id., ¶22.)

34.    All that said, Fasciani and Rodio did another work-with on September 18, 2001, and it went relatively well.  (Id., ¶31; Ex. E, Rodio Depo. I, Exhibit 12.)

35.    Afterward, however, the staff in the Regional Office told Fasciani and Kane that Rodio had made numerous errors and missed deadlines with respect to contract administration. (Ex. B, Fasciani Aff., ¶32.)  As a result, Fasciani issued a Final Written Reprimand to Rodio on or about November 19, 2001.  (Id.; Ex. E, Rodio Depo. I, Exhibit 13.)  Rodio refused to sign the Final Reprimand and submitted a rebuttal.  (Ex. E, Rodio Depo. I, Exh. 14.)

36.    Fasciani has explained the first entry on Exhibit 13. (Ex. B, Fasciani Aff., ¶33.) The first account, "Plymouth Avenue Shell," had what Reynolds calls a "New World" contract. (Id.) The store was not in compliance with the contract, and Rodio apparently cancelled it effective the beginning of July 2001 but did not report the cancellation. (Id.) (The abbreviation "ROU" refers to the regional office. (Id.))  Meanwhile, Rodio incorrectly reported that the store was in compliance during visits in July and August 2001. (Id.) On September 25, 2001, the regional office received paperwork terminating the contract effective the beginning of August, rather than July. (Id.)  Then, on October 17, 2001, Rodio submitted more documentation showing that the contract should have been cancelled effective the beginning of July (which was apparently correct). (Id.) Because of the discrepancy, Rodio was required to provide a written explanation for the change. (Id.) Rodio's explanation was "change did not meet deadline." (Id.) The meaning of this was unclear and did not address why the contract was cancelled or why there was a discrepancy between the September 25 and the October 17 paperwork, so the regional office had to request another explanation.  (Id.)

37.    Rodio contends that on another work-with in December 2001, after his receipt of this final warning, he and Fasciani went to a Texaco Gas store.  (Ex. E, Rodio Depo. I, 161-64, Exhibit 15.)  The store was lacking counter advertising that was required under its EDLP contract.  (Ex. B, Fasciani Aff., ¶41.)  The store manager said that he had taken all cigarette advertising off the counter because someone from the "Board of Health" had told him to take it down.  (Ex. E, Rodio Depo. I, 161-64.)  Fasciani "didn't care" and told Rodio to put the advertising back on the counter.  (Id.)  Rodio says that he did as instructed.  (Id. at 163-64.)  This incident will be referred to as the "Advertising Incident." The EDLP contract provided for cancellation if the retailer did not comply.  (Id. at 163.)  Rodio said that the issue never arose again.  (Ex. E, Rodio Depo. II, at 64.)  Rodio admitted that he had testified regarding everything he knew about the Advertising Incident. (Id. at 65-66.)

38.    At no time relevant to this action was there a law in effect Massachusetts prohibiting cigarette advertising on countertops.  (Ex. C, Kane Aff., ¶3, Exhibit A.)  Moreover, Reynolds communicated with all sales representatives in Massachusetts about legal limitations on cigarette advertising.  (Ex. C, Kane Aff., ¶3, Exhibits B and C.)  See also infra.

39.    Fasciani did not take any action against Rodio based on the Advertising Incident. (Ex. B, Fasciani Aff., ¶41; Ex. E, Rodio Depo. I, Exhibit 15.)  Fasciani's instructions to Rodio were to either see that the retailer complied with the EDLP contract or cancel the contract.  (Ex. E, Rodio Depo. I, Exhibit 15.)

40.    Rodio's Complaint does not allege any claim based on the Advertising Incident. (Ex. A, Complaint.)  Although Rodio testified about the Advertising Incident in Part I of his deposition on August 31, 2004, he never contended that it was the reason for his discharge until

Part II of his deposition on June 14, 2005, almost three years after his discharge. (Ex. E, Rodio Depo. I at 161-64; Rodio Depo. II at 59.)

     41.    In January 2002, Rodio received his annual performance evaluation and was rated overall "Failed to Meet Expectations." (Ex. E, Rodio Depo. I, Exhibit 17.) Rodio refused to sign the evaluation and submitted a rebuttal. (Id.) The rebuttal focuses primarily on Rodio's market share and customer relationships. (Id.)

     42.    In May 2002, Fasciani did another work-with with Rodio and also a TA. (Ex. B, Fasciani Aff., ¶36.) Issues with misreporting product availability, lack of compliance with contracts and failure to follow management direction, again came to the fore. (Id.) However, because some aspects of Rodio's job performance had improved, the decision was made to document the deficiencies but to take no further disciplinary action. (Id.) Fasciani documented the problems and shared the documentation with Rodio, but did not take him further in the disciplinary process. (Id.; Ex. E, Rodio Depo. I, Exhibit 18.) Again, Rodio wrote a detailed rebuttal. (Ex. E, Rodio Depo. I, Exhibit 19.)

     43.    The last TA that Fasciani performed on Rodio's stores was October 9, 2002, for calls Rodio had made on October 7 and 8, 2002. (Ex. B, Fasciani Aff., ¶37.) The same performance issues manifested themselves again in October. (Id.) Fasciani consulted with Gerry Deschenes ("Deschenes"), who provides Human Resources support to the field sales staff, and they agreed that Rodio was not going to improve to a level that met expectations. (Id.) Accordingly, they made the decision to terminate Rodio's employment. (Id.) The termination document describes in detail the problems noted in Fasciani's last TA. (Id.; Ex. E, Rodio Depo. I, Exhibit 21.)

44.    Rodio wrote two rebuttals to the termination document, but he did not give them to Reynolds at the time of his termination.  (Ex. E, Rodio Depo. II, Exhibits 28 and 29; Ex. B, Fasciani Aff., ¶38.)  The rebuttals were finally produced during discovery.

45.    In his rebuttal, Rodio wrote that in-store product pricing was correct "with the exceptions of a few stores," and that he made "sure all the pricing was proper on the [Reynold's cigarette pack] racks."   (Ex. E, Rodio Depo. II, Exhibits 28.)

46.    In his rebuttal, Rodio wrote that the Sunnyhill Farm store he serviced "had a monarch edlp contract with a monarch display on the counter and monarch sign in the window, but this was not mentioned in Mr. Fasciani's report."  (Id.)

47.    In his rebuttal, Rodio wrote that, in the Cloverdale Farm store he serviced, "there was a vap-pricing card on the counter and there were digital prices on the rack itself, which could easily be viewed by the consumer.  (Id.)  Further, Rodio wrote:  "Monarch was in a prime position and properly priced at the lowest price.  I was going to address placing a Monarch sign on the counter as soon as I could meet with the manager."  (Id.)

Rodio's Post-Termination Contentions

48.    On or about April 23, 2003, Rodio filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD"), alleging that he was discharged because of his age (50 at the time).  (Ex. G, MCAD Charge.)

49.    Rodio's Complaint in this action was filed November 19, 2003.  (Ex. A, Complaint.)  He alleged that he was discharged in violation of the covenant of good faith and fair dealing, with no factual grounds stated other than his 26 years of service.  (Id., ¶¶7-10.)  He also asserted a public policy claim, alleging that Reynolds "prodded and urged him to pedal [sic] cigarettes below the minimum price legally set by the Commonwealth of Massachusetts" ("the

Minimum-Price Theory"). (Id., ¶¶11-13.) His public policy claim was also based on the

allegation that "the plaintiff had been warning the company regarding the inflation of its earnings

and insider trading based on these inflated stock prices" ("the Enron Theory"). (Id., ¶14.) His

last claim was that his discharge was an unfair and deceptive trade practice within the meaning

of c. 93A of the General Laws of Massachusetts. (Id., ¶15-19, Exhibits 1 and 2.) Exhibit 1 to the

Complaint was a demand letter dated August 4, 2003, from Rodio's counsel, Michael Sahady, to

Deschenes. (Id., Exhibit 1.) The legal wrongs asserted in Mr. Sahady's letter were identical to

those in the Complaint: wrongful termination based on the Pension Theory, the Minimum-Price

Theory, and the Enron Theory, and violation of c. 93A. (Id.)

     50.    Part I of Rodio's deposition in this action took place on August 31, 2004. (Ex. E,

Rodio Depo. I.) Rodio testified about the Pension Theory and the Minimum-Price Theory.

Rodio's deposition was continued and completed on June 14, 2005, almost a year later. (Ex. E,

Rodio Depo. II.) Rodio testified more about the Pension Theory (id. at 37-39, 60), and the

Minimum Price Theory. (Id. at 34, 64-66.) He also had the opportunity to testify for the first time

about the Enron Theory. (Id. at 56-59.)

Rodio's Various Theories as to Why He Was Discharged

A.    The Pension Theory

     51.    Rodio initially testified that he did not know the basis for his claims. (Ex. E,

Rodio Depo. I at 63-64.) Then he testified that he might have been terminated because of his

age, or perhaps because management did not like him, or perhaps because management did not

like his attitude. (Id. at 65-66.) Finally, he testified that he was not aware of any reason he could

have been discharged other than the Pension Theory. (Id. at 66-71.)

52.     Regarding the Pension Theory, Rodio testified in Part I of his deposition that he believed Reynolds might have been terminating him to prevent him from obtaining the enhanced retirement benefit.  (Id. at 66.)  He said that this was the best explanation he had been able to come up with and that he still believed it as of August 31, 2004. (Id. at 67-69.)  He testified that he could think of no other reason why he would have been terminated, and he said that if he had remained employed until he had reached age 55 and 30 years of service, he would have been eligible for the enhanced benefit.  (Id. at 69-71.)  He then testified that he had nothing more to add regarding the basis for the Pension Theory.  (Id. at 71.)  After this testimony, he did add that he had heard "rumors" that Reynolds was terminating sales representatives to prevent them from receiving their enhanced benefit.  (Id. at 85-88.)

53.     Rodio is entitled to, and is in receipt of, a vested pension benefit under the terms of the Reynolds retirement plan, based on Credited Service through the date of termination of his employment on October 28, 2002.  (Ex. D, Affidavit of Gerald R. Deschenes ("Deschenes Aff."), ¶3(a).)

54.     In accordance with the terms of the Reynolds retirement plan, the calculation of Rodio's vested pension benefit includes a reduction factor for each year that Rodio is less than age 65, as of the date of commencement of his pension benefit.  (Id., ¶3(c).)

55.     Rodio's 30th anniversary of employment with Reynolds would have been October 12, 2006, almost exactly four years after his discharge. (Id., ¶3(b).)  His 55th birthday will be August 1, 2007, almost five years after his discharge. (Id., ¶3(c).) If Rodio had been terminated on or after August 1, 2007, he would have accumulated at least 30 years of Eligibility Service, and under the terms of the Reynolds retirement plan, the calculation of his vested pension benefit would not have included a reduction factor for each year less than age 65.  (Id., ¶3(d).)

56.     In any event, in Part II of his deposition, Rodio explicitly abandoned the Pension Theory.  (Ex. E, Rodio Depo. II at 60.) His attorney stated on the record that loss of the enhanced retirement benefit was the effect of his allegedly unlawful termination, but not the cause.  (Id.)

B.     The Minimum-Price Theory

57.     Regarding the Minimum-Price Theory, Rodio testified that this arose from the EDLP contract enforcement. (Ex. E, Rodio Depo. I at 191-201.)  As stated above, the EDLP contract provides that Reynolds will pay a retailer to sell Monarch or Doral cigarettes at the lowest price or at parity with the lowest price in the store. Rodio testified that he had told Fasciani that the EDLP contract "coerced," or at least encouraged, retailers to sell cigarettes for less than the state minimum price.  (Id. at 193, 199.)  Yet he also admitted that he had been told to simply remove an account from the EDLP program if the account would or could not comply with the pricing guidelines.  (Id. at 191, 194-95, 198.) He also admitted that the retailer had the option of selling the Reynolds brands per the terms of the EDLP contract, or declining or terminating the EDLP contract.  (Id. at 216-20.)

58.     Rodio is expected to contend that the state minimum price for Monarch cigarettes at the times relevant to this action was $4.01 per pack.  (Ex. F, Deposition of Richard Kane ("Kane Depo."), at 75, Exhibit 2.)

59.      Rodio's deposition testimony conflicts with his prior statements contained in his rebuttals to the termination document, (Ex. E, Rodio Depo. II, Exhibits 28).  In his rebuttal, Rodio states that his retailers were generally in compliance with their EDLP contracts.  (Id.) When a retailer was not in compliance with an EDLP contract, Rodio typically would attribute the non-compliance to "sabotage" by the retailer or a Reynolds competitor after Rodio had left the store. (Id.)  In every case where a retailer was non-compliant with an EDLP contract, Rodio

stated he intended to make diligent efforts to obtain compliance.  (Id.)  In virtually every case where Fasciani might have found that EDLP pricing was incorrect, Rodio stated that the pricing had been correct when Rodio had left the store.  (Id.)  Rodio stated that there was one retailer, Assonet Stores, which was not selling Reynolds brands in accordance with the EDLP contract, but even in this case Rodio stated that he had discussed the issue with the store owner and that the store owner would comply.  (Id.)

60.    Not once in his rebuttals did Rodio allege that any non-compliance with EDLP contracts was a result of his refusing to "coerce" or "encourage" a retailer to price Reynolds' brands below the state minimum price.  (Id.)  None of Rodio's rebuttals to reprimands or other performance documentation contains any reference to alleged violation of the state minimum price, much less any allegation that Rodio's alleged refusal to be a party to alleged illegal activity was a reason for his failure to meet Fasciani's expectations as a sales representative. (Ex. E, Rodio Depo. I, Exhibits 9, 14, 17, 19; Ex. E, Rodio Depo. II, Exhibits 28, 29.)

61.    Reynolds' policy is to not discuss "absolute" pricing with retailers.  (Ex. B, Fasciani Aff., ¶45; Ex. C, Kane Aff., ¶4.)  This is based on an understanding that directing a retailer as to what its price should be could raise a serious issue under the antitrust laws. (Ex. C, Kane Aff., ¶4.) Accordingly, Kane has been instructed, and he instructs his sales staff, to completely refrain from having any discussion with retailers about setting prices or price levels for tobacco products in their stores. (Id.) Sales representatives may discuss discounts, rebates, and how the prices of Reynolds' products compare with the prices of competitors' products, but they may not discuss the retailer's "absolute" price – for example, whether a given pack of cigarettes should sell for $4 rather than $6. (Id.) Reynolds's policy is to leave that decision completely to the retailer, and as limited by law. (Id.) Fasciani also understood that it would be

illegal to require a retailer to sell cigarettes at any particular price. (Ex. B, Fasciani Aff., ¶45.) Accordingly, his sales representatives' "pricing discussions" with retailers were limited to (a) making sure that, if required, Reynolds products are in parity with other products (without dictating any particular price); and (b) making sure that discounts from Reynolds to retailers are passed along to consumers (without dictating any particular pre-discount price). (Id.) Put another way, a retailer could sell a Reynolds brand for $100 a pack and still be in compliance with the EDLP contract; the only limitation the EDLP contract would place on such an arrangement is that the retailer could not sell any other brands in his store for less than $100 a pack. (Id., ¶42.)

62.    Rodio sold more EDLP contracts than perhaps any other sales representative who reported to Fasciani. (Id., ¶43; Rodio Depo. II at 34.) Although Fasciani noted this as somewhat of a positive (Ex. B, Fasciani Aff., ¶43), he told Rodio on more than one occasion that he should not offer EDLP contracts to retailers who could not comply with the contracts. (Id., ¶44.) The problem, as Fasciani perceived it, was that Rodio continued to offer and sell EDLP contracts to retailers but then failed to enforce the contracts. (Id.) Fasciani believed that Reynolds would have been better served if Rodio had declined to offer EDLP contracts to retailers who were unable to comply with them. (Id.) Reynolds' position was that, if the retailer could not comply with the EDLP contract, then the sales representative should not sell the retailer an EDLP contract. (Id.)

63.    Rodio admitted in Part II of his deposition that he never told a retailer anything more than that the EDLP contract required the price of Monarch cigarettes to be the lowest in the store or at parity with the lowest. (Ex. E, Rodio Depo. II at 64-66.) He also admitted that his two written rebuttals to his termination document did not mention the Minimum Price Theory in any respect. (Id. at 73-74, Exhibits 28 and 29.)

C.    The Enron Theory

64.    Rodio abandoned the Enron Theory in Part II of his deposition.  (Ex. E, Rodio Depo. II at 59.)

D.    The Advertising Theory

65.    Rodio contended in Part II of his deposition that he was discharged for two reasons:  refusing to sell [sic] Monarch cigarettes at a price below the state minimum (the Minimum-Price Theory), and refusing to place allegedly illegal counter advertising (the Advertising Theory).  (Id. at 59, 65.)

66.    None of Rodio's rebuttals to performance documentation issued by Fasciani made any reference to the Advertising Theory.  (Ex. E, Rodio Depo. I, Exhibits 9, 14, 17, 19; Rodio Depo. II, Exhibits 28, 29.)

67.    Rodio first alleged that he was discharged because of his alleged refusal to comply with an allegedly illegal directive regarding countertop advertising nearly three full years after his discharge.  (Ex. E, Rodio Depo. II at 59.)

68.    Rodio did not raise the Advertising Theory in connection with his MCAD charge filed on or about April 23, 2003.  (Ex. G, MCAD Charge.)

69.    Rodio did not use the Advertising Theory as the basis for any of the claims in his Complaint filed on or about November 19, 2003.  (Ex. A, Complaint.)

70.    Rodio never asserted in Part I of his deposition, conducted on August 31, 2004, that he was discharged, in whole or in part, because of the Advertising Incident described in ¶¶37-39, above.  (Ex. E, Rodio Depo. I, passim.)

71.    The first time that Rodio contended he was discharged because of his alleged refusal to comply with an allegedly illegal directive regarding advertising placement was June 14, 2005, almost three full years after his discharge.  (Ex. E, Rodio Depo. II at 59.)

72.    The gravamen of Rodio's Advertising Theory is that there was an alleged regulation prohibiting cigarette advertising placed at less than five feet above floor level ("the five-foot requirement").  In effect, such a limitation would prohibit all countertop advertising.  (Id. at 60.)  Thus, he contends, every time Fasciani noted that one of Rodio's retailers lacked countertop advertising, Rodio was in effect being reprimanded for refusing to engage in illegal activity.  (Id.)

73.    It is unclear whether Rodio contends that the one incident at Texaco Gas in December 2001 was the only time that he explicitly discussed the Advertising Issue with Fasciani.  (Id. at 61, 63-64, 71-72.)  In any event, he does not allege that the Advertising Issue was discussed before December 2001.  (Ex. E, Rodio Depo. I at 161-64.)

74.    With regard to his alleged deficiencies in enforcing counter advertising requirements, Rodio has consistently stated that he had in fact placed advertising on the countertops.  (Ex. E, Rodio Depo. II, Exhibits 28 and 29.)  In his termination rebuttals, Rodio wrote that he had placed monarch displays on store countertops.  (Id.)  Where such advertising was lacking, Rodio put the blame on competitor or retailer sabotage; or retailer preference.  (Id.)

75.    With respect to one store, Sunnyhill Farm, Rodio wrote that it "had a monarch edlp contract with a monarch display on the counter and monarch sign in the window, but this was not mentioned in Mr. Fasciani's report."  (Id.)

76.    In any event, there was never a valid law requiring that cigarette advertisements be placed five feet off the floor or higher.  In January 1999, the Attorney General of

Massachusetts promulgated a number of regulations aimed at tobacco sales, to take effect February 2000. 940 Code of Mass. Regs. §21.01-07, 22.01-09 (2000). Among them was a prohibition on advertisements of cigarettes at a height of less than five feet from the floor of any retail establishment (excluding any adult-only retail establishment) that is situated within a 1,000-foot radius of any public playground, playground area in a public park, elementary school, or secondary school. 940 C.M.R. §21.04(5), (5)(b).

77.    In February 1999, Reynolds along with a number of other tobacco companies, filed suit in the U.S. District Court for the District of Massachusetts, contending among other things that the five-foot requirement was unconstitutional. By a decision dated January 24, 2000, the court invalidated the five-foot requirement on First Amendment grounds. See Lorillard Tobacco Co. v. Reilly, 84 F. Supp.2d 180 (D. Mass. 2000). On January 31, 2000, the U.S. Court of Appeals for the First Circuit stayed enforcement of the regulations pending appeal. Cross-appeals were filed, and in Consolidated Cigar Corp. v. Reilly, 218 F.3d 80 (1st Cir. 2000), the First Circuit reversed the pertinent portion of the District Court's decision. The First Circuit decision was issued July 17, 2000, but the stay remained in place pending appeal to the U.S. Supreme Court. By decision issued June 28, 2001, the U.S. Supreme Court held that the pertinent portion of the regulations did in fact violate the First Amendment. See Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 121 S. Ct. 2404, 150 L. Ed.2d 532 (2001). Thus, the regulation never went into effect, and by the time Rodio had his first, and possibly only, conversation with Fasciani regarding the Advertising Issue in December 2001 (supra), the regulation had been declared invalid, finally and conclusively, for approximately six months.

78.     Rodio and the other sales representatives who worked in Massachusetts received communications from Reynolds regarding the status of the litigation and how they should comply with the regulations pending the litigation.  (Ex. C, Kane Aff., ¶3.)

Conclusion

79.     Rodio was discharged after almost three years of warnings that cited poor job performance (arising from errors in reporting and failure to properly administer the contracts), failure to follow management instructions regarding the same, and failure to administer contracts, which in effect resulted in Reynolds's paying retailers for nothing (misuse of company resources).  (Ex. B, Fasciani Aff., ¶46.)

Respectfully submitted,

R.J. REYNOLDS TOBACCO COMPANY

By its attorneys,

/s/ Mark H. Burak
Mark H. Burak, BBO# 558805
Sandra E. Kahn, BBO # 564510
Morse, Barnes-Brown & Pendleton, P.C.
Reservoir Place
1601 Trapelo Road
Waltham, MA 02451
(781) 622-5930
(781) 622-5933 (facsimile)

OF COUNSEL:

W.R. Loftis, Jr., N.C. Bar No. 2774
Kristine M. Howard, N.C. Bar No. 26903
Candice S. Wooten, N.C. Bar No. 28161
Constangy, Brooks & Smith, LLC
100 North Cherry Street, Suite 300
Winston-Salem, NC   27101
(336) 721-1001
(336) 748-9112 (facsimile)

Dated:  August 15, 2005