UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL RODIO,

                    Plaintiff,

        v.                                    Civil Action No. 04-CV-10006-JGD

R.J. REYNOLDS TOBACCO COMPANY,

                    Defendant.

## DEFENDANT'S APPENDIX OF SUMMARY JUDGMENT MATERIALS

| Tab | Document |
|-----|----------|
| A | Complaint |
| B | Affidavit of Carlo E. Fasciani |
| C | Affidavit of Richard Kane |
| D | Affidavit of Gerald R. Deschenes |
| E | Excerpts from Deposition of Michael Rodio, Vols. I and II |
| F | Excerpts from Deposition of Richard Kane |
| G | Charge of Discrimination filed with Massachusetts Commission Against Discrimination ("MCAD") dated April 23, 2003 |

Respectfully submitted,

R.J. REYNOLDS TOBACCO COMPANY

By its attorneys,


/s/ Mark H. Burak
Mark H. Burak, BBO# 558805
Sandra E. Kahn, BBO # 564510
Morse, Barnes-Brown & Pendleton, P.C.
Reservoir Place
1601 Trapelo Road
Waltham, MA 02451
(781) 622-5930
(781) 622-5933 (facsimile)

OF COUNSEL:

W.R. Loftis, Jr., N.C. Bar No. 2774
Kristine M. Howard, N.C. Bar No. 26903
Candice S. Wooten, N.C. Bar No. 28161
Constangy, Brooks & Smith, LLC
100 North Cherry Street, Suite 300
Winston-Salem, NC   27101
(336) 721-1001
(336) 748-9112 (facsimile)

Dated:  August 15, 2005

# EXHIBIT A

#22

## COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.                                  SUPERIOR COURT
                                                CIVIL ACTION NO:


MICHAEL RODIO                    )
                 Plaintiff       )
                                 )
        vs.                      )
                                 )
R.J. REYNOLDS TOBACCO COMPANY    )
                 Defendant       )
_____  )


### *PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL*


### The parties

1. The plaintiff is MICHAEL RODIO, a natural person residing at Wrentham, Norfolk

   County, Commonwealth of Massachusetts.

2. The defendant, R.J. REYNOLDS TOBACCO COMPANY, hereinafter referred to as

   R.J. REYNOLDS, is a foreign corporation doing business at 1500 West Park Drive,

   Westborough, Worcester County, Commonwealth of Massachusetts.

### Factual Allegations

### COUNT I

3. The plaintiff, MICHAEL RODIO, worked as a sales representative for R.J. REYNOLDS

   for twenty-six (26) years namely from October 12, 1976 to October 28, 2002, when he

   was wrongfully terminated.

4. The plaintiff, MICHAEL RODIO, had worked for the twenty-six years on a full-time

   basis and was paid about One Thousand ($1,000.00) Dollars a week.

SAHADY ASSOCIATES, P.C.
COUNSELLORS at LAW
399 NORTH MAIN STREET
FALL RIVER,
MASSACHUSETTS 02720

TEL. (508) 674-9444
FAX: (508) 674-8430

5.  The employment of the plaintiff by the defendant, R.J. REYNOLDS, was on an at-will basis.

6.  The plaintiff was wrongfully terminated on October 28, 2002 without the expiration of a reasonable period following the notice of termination contrary to the laws of the Commonwealth of Massachusetts.

WHEREFORE, the plaintiff, MICHAEL RODIO, requests that the Court ascertain plaintiff's damages and enter judgment for him in that amount.

## COUNT II

7.  The plaintiff realleges and reavers the allegations contained in paragraphs 1 through 6 and incorporates them herein by reference.

8.  On October 28, 2002, the defendant, R.J. REYNOLDS, in violation of the covenant of good faith and fair dealing wrongfully discharged the plaintiff, MICHAEL RODIO, from its employ after twenty-six (26) years of good and faithful service to the defendant tobacco company.

9.  As a result of his wrongful discharge from the employ of the defendant tobacco company, the plaintiff lost raises and bonuses, lost auto benefits, lost insurance coverage, lost retirement benefits, lost profit sharing benefits, lost social security contributions, lost stock options, lost vacation time and many other benefits to which he would have been otherwise entitled had he not been wrongfully terminated.

10. The plaintiff, MICHAEL RODIO, has suffered humiliation, mental and emotional suffering, and distress, and has suffered diminution of future earning capacity, for all of which he claims damages from the defendant, R.J. REYNOLDS.

IIADY ASSOCIATES, P.C.
COUNSELLORS at LAW
) NORTH MAIN STREET
FALL RIVER,
!ASSACHUSETTS 02720

TEL. (508) 674-9444
FAX: (508) 674-8430

WHEREFORE, the plaintiff, MICHAEL RODIO, requests that the Court ascertain plaintiff's damages and enter judgment for him in that amount.

## COUNT III

11. The plaintiff realleges and reavers the allegations contained in paragraphs 1 through 10 and incorporates them herein by reference.

12. On October 28, 2002, MICHAEL RODIO, was wrongfully terminated from the employ of the defendant, R.J. REYNOLDS after twenty-six (26) years.

13. The plaintiff's wrongful termination was contrary to good public policy in that the defendant, R.J. REYNOLDS had prodded and urged him to pedal cigarettes below the minimum price legally set by the Commonwealth of Massachusetts.

14. The termination was contrary to public policy in that the plaintiff had been warning the company regarding the inflation of its earnings and insider trading based on these inflated stock prices.

WHEREFORE, the plaintiff, MICHAEL RODIO, requests that the Court ascertain plaintiff's damages and enter judgment for him in that amount.

## COUNT IV

15. The plaintiff realleges and reavers the allegations contained in paragraphs 1 through 14 and incorporates them herein by reference.

16. By letter dated August 4, 2003, forwarded to the defendant under the provisions of Chapter 93A of the General Laws of the Commonwealth of Massachusetts, the plaintiff demanded relief from the defendant for the losses that he suffered as a result of

AHADY ASSOCIATES, P.C.
COUNSELLORS at LAW
99 NORTH MAIN STREET
FALL RIVER,
MASSACHUSETTS 02720

TEL. (508) 674-9444
FAX: (508) 674-8430

defendant's wrongful termination of him, a copy of which letter is annexed hereto and made a part hereof and marked as Exhibit 1.

17. By letter dated 8/12/03, counsel for the defendant, and on behalf of the defendant, refused to grant or offer any relief to the plaintiff, a copy of defendant's counsel letter to plaintiff's counsel is annexed hereto and made a part hereof and is marked as Exhibit 2.

18. The defendant, R.J. REYNOLDS, knew or should have known that its actions in firing the plaintiff constituted wrongful termination and relief under Chapter 93a of the General Laws should have been granted.

19. Defendant's refusal to fairly compensate the plaintiff for his damages is a willful act of unfair business practices and is made in bad faith.

WHEREFORE, the plaintiff requests that the Court determine the fair and adequate compensation due the plaintiff and award him three times that amount as per the provisions of Chapter 93A of the General Laws of the Commonwealth of Massachusetts, together with his costs and attorney's fees.

THE PLAINTIFF CLAIMS A TRIAL BY JURY ON ALL COUNTS.

By his attorney,

Michael S. Sahady
373 North Main Street
Fall River, MA 02720
508-674-9444
BBO#437820

Dated: November 19, 2003

AHADY ASSOCIATES, P.C.

COUNSELLORS at LAW

199 NORTH MAIN STREET

FALL RIVER,

MASSACHUSETTS 02720

TEL. (508) 674-9444

FAX: (508) 674-8430

# SAHADY ASSOCIATES, P.C.

### Counsellors at Law

Michael S. Sahady
John M. Sahady
Paul M. Sahady

399 North Main Street
Fall River, MA 02720

Tel. 508-674-9444   Fax  508-674-8430

August 4, 2003

Mr. G.R. Deschenes
Senior Manager
Sales Employment Practices
R.J. REYNOLDS
401 N. Main Street
Winston-Salem, NC 27102

Re:  Michael Rodio v. R.J. Reynolds Tobacco Company
No:  03BEM01129

*DEMAND FOR RELIEF UNDER THE PROVISIONS OF
CHAPTER 93A OF THE GENERAL LAWS
OF THE COMMONWEALTH OF MASSACHUSETTS*

Dear Sir:

Please be advised that I represent Mr. Michael Rodio in his claim against R.J. Reynolds Tobacco Company and others.  Please consider this letter as a demand for relief under the provisions of Chapter 93A of the General Laws of the Commonwealth of Massachusetts.

The factual basis of this claim for relief under the provisions of Chapter 93A is in part as follows:

Mr. Rodio was wrongfully terminated from employment with your company on or about October 29, 2002 after twenty-six (26) years of devoted and faithful service to this corporation.  The termination of Mr. Rodio, who was an employee at will,

1. was against the covenant of good faith and fair dealing;
2. was in violation of public policy; and
3. was without reasonable notice.

You have acted in bath faith in your termination of Mr. Rodio's employment when he was on the brink of retirement with all its accrued benefits after 26 years of service to your company. You have been overreaching in your relations with Mr. Rodio in that your bad faith termination of his employment will cause the forfeiture by this employee of benefits almost earned for the very substantial services that he has rendered to your company for 26 years. You have acted in violation of the laws of the Commonwealth as enunciated by our Supreme Judicial Court in Fortune v. National Cash Register, 373 Mass. 96, 364 N.E.2d 1251, and King v. Driscoll, 424 Mass. 1; 673 N.E.2d 859. That your termination of Mr. Rodio's employment is pretextual, has already been determined to have been so by a competent department of the Commonwealth, namely the Department of Labor and Workforce Development, Division of Employment and Training in its decision dated January 31, 2003. Your abusive exercise of employer power has devastated Mr. Rodio's life emotionally, psychologically, physically, and financially. He has lost wages for lack of reasonable notice in your termination of him; he has been made to forfeit benefits almost earned by him for the substantial services he had rendered, and these benefits include lost raises and bonuses, lost auto benefits, lost insurance coverage, lost retirement benefits, lost profit sharing benefits, lost social security contributions, lost stock options, lost vacation time, and all other benefits to which he would have been otherwise entitled had he not been wrongfully terminated. He has suffered humiliation, mental and emotional suffering and distress, and has suffered diminution of future earning capacity.

All of the above damages are claimed from you also because Mr. Rodio's termination was against public policy. His termination was contrary to public policy in that you pushed and urged him to peddle your cigarettes below the minimum price legally set by the State and for his warnings regarding the inflation of the company's earnings and insider trading of its stock.

Based upon all the facts of Mr. Michael Rodio's case, your termination of him was wrongful and was an unfair and deceptive act, all in violation of Chapter 93A of the General Laws. Your deceptive act and practices outlined in this correspondence have been done willfully and in knowing violation of Mass. G.L. c. 93A which subjects you to double or triple damages. Mr. Rodio has calculated his damages to be well over $1,000,000.00 for loss of all benefits mentioned above. Mr. Rodio, therefore, hereby demands triple damages pursuant to c. 93A of the General Laws, namely damages in the amount of $3,000,000.00 plus interest and reasonable attorney's fees.

You should rest assured that we will pursue you to a verdict failing your adequate compensation of Mr. Michael Rodio for the losses which your unfair and deceptive acts and wrongful termination have caused him to suffer.

If within thirty (30) days of your receipt of this letter you do not agree to compensate Mr. Rodio for his mentioned losses, I shall then commence an action against you claiming triple damages.

Very truly yours,

Michael S. Sahady

MSS/app

CERTIFIED MAIL, RETURN RECEIPT REQUESTED

# CONSTANGY, BROOKS & SMITH, LLC

ATTORNEYS AT LAW

100 N. CHERRY STREET

SUITE 300

WINSTON-SALEM, NORTH CAROLINA 27101

TELEPHONE (336) 721-1001  •  FACSIMILE (336) 748-9112

IN CHARLOTTE CALL (704) 344-1040

www.constangy.com

August 12, 2003

Michael S. Sahady
399 North Main Street
Fall River, Massachusetts 02720

RE:  Michael Rodio v. R.J. Reynolds Tobacco Company

Dear Mr. Sahady:

This firm represents R.J. Reynolds Tobacco Company (the "Company") in connection with certain employment matters and I am responding to your letter of August 4 to Mr. Deschenes regarding the above captioned matter. Mr. Rodio's termination was for legitimate and lawful reasons. His termination was not in violation of Chapter 93A of the General Laws of the Commonwealth of Massachusetts or any other State or Federal law. As such your demand is rejected.

In light of my representation of the Company, please direct any further correspondence regarding Mr. Rodio to my attention.

Very truly yours,

W. R. Loftis, Jr.

WRL,Jr./te
Enc.

ARLINGTON, VA      ATLANTA, GA      BIRMINGHAM, AL      COLUMBIA, SC      JACKSONVILLE, FL

KANSAS CITY, MO      LAKELAND, FL      MACON, GA      NASHVILLE, TN      TAMPA, FL      WINSTON-SALEM, NC

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL RODIO,

                    Plaintiff,

        v.                                              Civil Action No. 04-CV-10006-JGD

R.J. REYNOLDS TOBACCO COMPANY,

                    Defendant.

## AFFIDAVIT OF CARLO E. FASCIANI

The affiant, having been duly sworn, affirms and states as follows:

1.      My name is Carlo E. Fasciani.  I am Division Sales Manager for the Defendant,
R. J. Reynolds Tobacco Company ("Reynolds").  I have personal knowledge of the facts stated
herein.

2.      From approximately late 1998 or very early 1999 through October 28, 2002, one
of my direct reports was the Plaintiff, Michael Rodio ("Rodio").  During this period Rodio was
an Area Sales Representative for Reynolds, covering certain stores primarily in Fall River and
Taunton, Massachusetts.

3.      Reynolds sales accounts are different from what people might normally envision.
Retail stores buy cigarettes from wholesalers, not from Reynolds.  Thus, our sales people do not
"sell cigarettes."  Instead, the sales representatives engage primarily in activities related to the
advertising, merchandising and promotion of Reynolds products in retail stores.  They sell or

offer various contractual programs to retailers related to the advertising and promotion of Reynolds products. For example, they sell or offer "contracts" to retailers, by which Reynolds pays the retailer in exchange for its agreement to place certain advertising displays in the store, or to sell certain Reynolds brands at a certain price level relative to certain competitors' brands.

4.    A primary duty of the sales representative is to "administer" these contracts with the retailers – in other words, to make sure that the retailer is complying with the terms of the contracts and, in some cases, convincing the retailer of the importance of complying. Admittedly, it is also important that the sales representative see that Reynolds products are being sold by the retailer – but not at the expense of contract compliance. Reynolds is simply "throwing money away" by making contract payments to a retailer who has a contract but does not comply with all the elements of the contract.

5.    It should also be noted that the lack of a contract does not preclude a retailer from selling Reynolds products.

6.    Given this background, the ideal sales representative is friendly with retailers and persuades them to sell Reynolds products – but, more importantly, he or she is an effective administrator of the contracts.

7.    Contract administration has always been a responsibility of sales representatives, but the responsibility has become increasingly demanding and complex over the years. Approximately 15 years ago, a typical Division Manager might have approximately 10 to 12

sales representative direct reports as well as a full-time secretary. The secretary was available to help sales representatives prepare their reports, and also reminded them when they were late with a required report. In later days, the division secretary position was eliminated and a support staff was available at the region office. Nowadays, a Division Manager has approximately twice as many reports, and no secretary or support staff in a local office. The "leaner" management and absence of support staff means that the sales representatives are solely responsible for doing their own reporting via laptop computers, and there is no one to give them "friendly reminders" if they are past due or to correct mistakes sent into the office. As a practical matter, these changes meant that sales representatives under the "current way" have to be much more adept with computers, much more proactive about meeting deadlines, and much more self-directed to manage a large number of administrative issues. Through a culture of increased productivity over the years, it is safe to say that one sales representative today must handle the workload that was handled by two to three sales representatives in the past.

8.    Rodio was one of the very few sales representatives I knew who failed to adjust to the new demands of the sales representative position. He had good relationships with retailers and had increased the market share for Reynolds products in his accounts. These were both positive things. However, his "administrative" performance was very poor, and his failure to improve after numerous progressive warnings was what led to his discharge. He failed to manage the workload, balance priorities and adapt to the company's strategic direction.

9.    At this point, it would probably be helpful to define some terminology in the Reynolds system. A "WW" is the abbreviation for a "work-with," which is simply when the

Division Sales Manager goes on sales calls with the sales representative. A "TA" is the abbreviation for a "Training Analysis." On a TA, the Division Sales Manager goes alone to the sales representatives' accounts one or two days after the sales representative has been there. After both the WW and the TA, the Division Sales Manager gives feedback, both positive and negative, to the sales representative regarding the accounts.

10.    There is some other terminology that should be defined. "PA" stands for "product availability." It means simply that "product" – *i.e.*, a particular brand of cigarettes – is available at the store. "EDLP" stands for "every day low pricing," and is a type of contract that a retailer may elect to enter into. By the terms of the EDLP contract, the retailer agrees not to sell another competitive brand that is priced lower than Reynolds's brand (either Monarch or Doral). "VAP" stands for "value-added promotion," which is communicated to the consumer by a plastic display that is used in stores. "POS" stands for "point of sale" advertising or consumer communication, and includes the paper or card containing pricing information that goes into the VAP display.

11.    I became Division Sales Manager in New England in November 1998. Within 2-3 months, I became Rodio's supervisor after the territories underwent a restructuring. I issued Rodio an oral warning in May 1999 for a variety of issues relating to a lack of performance and failure to follow management direction. Rodio's performance at first seemed to improve after this first warning. Indeed, in his annual performance review given in January 2001 (assessing performance for the year 2000), I rated him "Fully Met Expectations," the second-highest possible rating.

12.    I am not completely certain of the time frame, but I believe in the summer of 2001, I had a meeting with all sales representatives who reported to me. I asked the group about their vacation plans. Several representatives, including but by no means limited to Rodio, said that they were taking vacation in the next month or so. I asked whether their stores were covered, and several said they were not. Normally, before a sales representative takes vacation, I expect him or her to make sure that all accounts are in good enough shape to be left alone for a week. Sometimes this entails a little extra work before the vacation starts. If the sales representative fails to do this, then other employees are unfairly burdened with the work that the vacationing sales representative failed to perform. When the representatives told me that they had not made the necessary arrangements, I became impatient and probably frustrated because this is not the level of professionalism I would have expected. I did not single out Rodio for criticism because I perceived this as a generalized problem. I encourage my reports to take well-deserved vacation time, although I expect that they will use good planning to ensure that business issues are not left unattended.

13.    In addition to the formal annual performance evaluation that I prepare in January of each year, I give each sales representative reporting to me a "mid-year" evaluation. This is much less formal than the annual evaluation; it is generally a one-page document. My normal practice is to prepare the document and then make a "date" to accompany the sales representative on two or three calls, have lunch and give the evaluation plus any feedback from our calls of that morning. I had prepared Rodio's mid-year evaluation for 2001, and it was overall positive. However, when I went with him on his calls the morning that we had scheduled, the accounts were in poor shape and it was obvious that he was not following management direction. As a

result, our lunch was relatively stressful and negative, as I tried to explain the deficiencies and he made excuses for them. I thought the evaluation form was in my car, which was parked away from the restaurant, so I asked Rodio to drive me to my car so I could give him the evaluation. Rodio did so, and when I got to the car, I realized I had not brought it. I was embarrassed, but given the condition of Rodio's accounts, I was also relieved because it would not have accurately reflected Rodio's performance.

14.     In August 2001, I did a work-with with Rodio and found that his accounts were in poor condition. As a result, I issued him a written reprimand dated September 5, 2001, based on his failure to perform job accountabilities and failure to follow management direction. (Ex. E, Deposition of Michael Rodio, Vol. I ("Rodio Depo. I"), Exhibit 9.) I would like to explain the first entry (Town Food Market) in detail, and then afterward the other entries (and Rodio's responses) will hopefully make sense without detailed explanations.

15.     My first comment is that Rodio "failed to accurately record product availability in this account" despite having been instructed to do so via voice mail and e-mail communications. The reprimand notes that I asked Rodio why he had failed to accurately record product availability, and his response was "I thought I did." (Id.)

16.     The second deficiency is that Rodio failed to place any communication to show the discounting of Reynolds brands. (Id.)

17.    The third deficiency is that Rodio failed to record any POS advertising in the Reynolds system (that is what "SIS" means). (Id.)

18.    The fourth deficiency is that Rodio recorded that he placed three "high-impact" displays when in fact he had placed only one. (Id.)

19.    The fifth deficiency is that Rodio entered into the system that he had placed ten high-impact displays in about six weeks but was supposed to place (and record) only one per visit.  (Sales representatives are expected to visit their accounts at least once a month, so assuming Rodio visited his accounts twice each month, he should have recorded no more than three high impact displays during that six-week period.) (Id.)

20.    The handwriting on Exhibit 9 is Rodio's written response to all of the above. Rodio responded that the account had a high volume and large market share of Reynolds products. (Id.)  This may have been true, but it had nothing whatsoever to do with the important business issues addressed in the reprimand.   The issues in the reprimand were inaccurate reporting and failure to place advertising in accordance with contract requirements, management instruction and Reynolds policy.

21.    In summary, Rodio's response to the September 5 reprimand, in what would become a pattern, was to cite completely unrelated areas in which he had done well.  I would like to analogize to a more everyday situation:  Suppose a painter entered a contract with a homeowner to paint the homeowner's house blue.  After all the arrangements were made, the

homeowner came home one day and found the house painted yellow instead. When she confronted the painter, the painter responded, "I really did a nice job masking the windows and making sure the yellow paint gave good cover." This, in essence, was Rodio's response to nearly every constructive criticism I made. I will refer to this as the "housepaint" response.

22.    When he wasn't giving me the "housepaint response," he typically gave me a variety of the following excuses: (a) he had not made the mistake on purpose; (b) his computer was malfunctioning; (c) someone else was to blame (either a competitor who took down his Reynolds display or a customer who bought the last pack of cigarettes in a particular brand after he had left the store); (d) he didn't have enough "help" (whether this was true or not, all sales representatives were in the same situation); or (e) I didn't like him.

23.    Regarding the accurate reporting of product availability, I should perhaps explain. "Product availability" is considered present as long as there is one pack of the applicable cigarette in the store. I will use the example of Camel Lights (soft pack). The sales representative might make a call on an account on a Monday, review product availability for Camel Lights (soft), and find a minimum of one pack in the store. He would then be expected to record on his laptop that this particular product (*i.e.*, brand style) is "available" or in stock. If I then conducted a TA, I would do so on Tuesday or Wednesday. Of course, because of the lapse of time, it is possible that a customer could come to the store and purchase the one pack of Camel Lights (soft). Then when I went to the store for the TA, I would see that Camel Lights (soft) were not available, even though the sales representative had properly recorded product availability at the time.

24.    I am obviously aware that this can happen, and I have no desire to criticize sales representatives for things that are not their fault. On the other hand, accurate reporting is crucial. Thus, I weigh a number of factors in determining what happened. One consideration would be whether the brand was a fast-selling one. Camel Lights (soft) is not particularly fast-selling; therefore, it would be unlikely to have been sold in a day or two. On the other hand, Camel Lights (hard pack) is a fast seller, so if a representative reported that it was available on a Monday, and then it was gone on Tuesday or Wednesday, I would assume that the product availability had been accurately reported and that the product had simply been sold.

25.    Another very important consideration – if available – is feedback from the store employees. If the employee tells me that one pack of Camel Lights (soft) sold on Tuesday, then I know that the representative accurately recorded product availability on Monday. On the other hand, if the employee tells me that the store never carries Camel Lights (soft), then I know that product availability was not recorded accurately. The problem with store employee feedback is that it is often unavailable because no one employee worked all shifts at the store between the sales representative's call and my TA.

26.    Another consideration with product availability is the number of times I find that a product recorded "available" is not there. For example, I might conduct a TA and go to ten stores. Perhaps at two of the ten stores, product availability had been recorded but there is no product when I get to the stores. At this rate, I would give the representative the benefit of the doubt and assume that the product had been sold between the representative's visit and my TA

visit. On the other hand, if ten of ten stores visited have this problem, I tend to assume that the representative is not accurately reporting product availability. In this particular case, Rodio not only inaccurately recorded product availability in most all of the stores repeatedly, but there were also numerous errors in each *individual* store.

27.     I use essentially the same system as that set forth in Paragraphs 25 and 26 for determining whether the sales representative has placed advertising in a store according to the terms of the applicable contracts. It is possible that a sales representative would correctly place all required advertisements, only to have them taken down after he leaves the store by a competitor of Reynolds or by a store employee.

28.     If the store employee tells me that this happened, I have no reason to doubt it. Or, even if no store employee is available, if it occurs in a relative handful of instances, then I assume it may be due to causes that are not the fault of the sales representative. However, it is also possible that the store employee will tell me that the ads were never placed, or that a competitor had not been to the store since Monday. In these instances, I would tend to believe that the lack of placement was the fault of the sales representative. Even if I am unable to talk to a store employee who knows what happened, I can deduce that the lack of placement is the fault of the sales representative based on the number of times that I find lack of compliance with the advertising requirements in the applicable contracts.

29.     Although I do not remember specific conversations with store employees regarding Rodio's accurate reporting of product availability or advertising placement, I know

that I would have attempted to have such conversations because that is my normal practice on TA's. I also must say that the sheer volume of errors in Rodio's reporting and failure to enforce contracts made it clear to me that the problem came from Rodio, not store employees, competitors, or customers.

30.    On page 5 of Exhibit 9, Rodio writes that the reprimand is "an abuse of power and an act of rage." I frankly have no idea what Rodio is talking about. There have been times that I have raised my voice and become emphatic in talking to Rodio, seeking to get across to him that his job was in jeopardy if he did not improve. I admit that I have been frustrated, not only by his failure to improve, but also by his responses to constructive criticism as summarized in Paragraphs 21 and 22. Although I may have become "emphatic," I never cursed at Rodio, made personal remarks about him (such as, that I don't like him), screamed or yelled at him, or threatened him in any way. Rodio had many good qualities, and I had always hoped that he would improve and thrive as a sales representative.

31.    Rodio and I did a work-with on September 18, 2001, and it went fairly well. (Ex. E, Rodio Depo. I, Exhibit 12.) Although there are some criticisms in it, I consider this to have been an overall positive write-up. I gave Rodio other positive written feedback at appropriate times throughout the time that he reported to me.

32.    However, I issued another reprimand to Rodio on November 19, 2001, based on numerous errors and many missed deadlines in contract administration. These deficiencies had been reported by region office personnel to me and to my supervisor, Richard Kane, Regional

Manager. (Ex. E, Rodio Depo. I, Exhibit 13.) As with the September 5, 2001, first written reprimand, I will give a detailed explanation of one account on the November 19 final reprimand as an illustrative sample.

33.     On page 2 of Exhibit 13, paragraph "Plymouth Avenue Shell," I noted a complex web of deficiencies. This store had what we call a "New World" contract with Reynolds. The store was not in compliance with the contract, and Rodio apparently cancelled it effective the beginning of July 2001 but did not report the cancellation. (The abbreviation "ROU" refers to the regional office.) Meanwhile, Rodio incorrectly reported that the store was in compliance during visits in July and August 2001. On September 25, 2001, the regional office received paperwork terminating the contract effective the beginning of *August*, rather than July. Then, on October 17, 2001, Rodio submitted more documentation showing that the contract should have been cancelled effective the beginning of *July* (which was apparently correct). Because of the discrepancy, Rodio was required to provide a written explanation for the change. Rodio's explanation was "change did not meet deadline." The meaning of this was unclear and did not address why the contract was cancelled or why there was a discrepancy between the September 25 and the October 17 paperwork, so the regional office had to request another explanation.

34.     In January 2002, Rodio was due for his annual performance evaluation. I rated him overall "Failed to Meet Expectations" based on the problems already noted during the year 2001. (Ex. E, Rodio Depo. I, Exhibit 17.)

35.    Rodio wrote a response to the evaluation, which is included with Exhibit 17.  As can be seen, Rodio continues to avail himself of the "houespaint" response – focusing primarily on his market share and relationships.


36.    In May 2002, I did a work-with with Rodio and also a TA.  Once again, issues with misreporting product availability, lack of compliance with contracts and failure to follow management direction, came to the fore.  However, there were some aspects of Rodio's job performance that reflected some improvement.  I consulted with Gerry Deschenes, the person who provided human resources support to the field sales force, regarding the appropriate action to take with Rodio at this stage.  After careful consideration, both Gerry Deschenes and I agreed that the job performance deficiencies should be documented and that the next step of corrective action was not necessary.  Accordingly, I documented the problems and shared the documentation with Rodio, but we did not take him further along the disciplinary process.  (Ex. E, Rodio Depo. I, Exhibit 18.)


37.    The last TA I performed on Rodio's stores was October 9, 2002, for calls he had made on October 7 and 8, 2002.  The same problems documented in Exhibit 18 manifested themselves again in October.  At this point, Gerry Deschenes and I believed Rodio was not going to improve to a level that met our expectations, and we agreed that termination was appropriate. Again, I documented in detail the problems I found on my October 9 TA.  (Ex. E, Rodio Depo. I, Exhibit 21.)

38.    I never received a rebuttal to Exhibit 21 from Rodio or anyone acting on his behalf.

39.    I understand that Rodio claims he was wrongfully discharged for a number of reasons, some of which have shifted during the course of this lawsuit. I believe his original contention was that he was discharged because of his age. As the above should make clear, Rodio's age had nothing whatsoever to do with his termination. He also alleged at one time that he was discharged because Reynolds wanted to deprive him of pension benefits that were due to vest at some point in the future. I understand that he has abandoned this claim now. I understand that he may now be contending that he was discharged for one, two, or all of the following: (1) his disclosure of information regarding "insider trading" at Reynolds; (2) his alleged refusal to place advertisements in a manner that violated the law; and (3) his statements that EDLP contracts encouraged retailers to sell below state minimum pricing laws.

40.    Regarding the "insider trading" issue, this is my recollection. After the corporate scandals involving Enron and WorldCom had come to light, Rodio made some comment to the effect that he thought Reynolds was "cooking the books" – in other words, inflating its earnings. Because Rodio has no more basis for believing this than I do, I took it as casual, uninformed, idle conversation that people often engage in. I did not take it seriously, nor did I act on it in any manner. I did not tell anyone that Rodio had made the comment. I should note that Reynolds has a toll-free ethics line and that Rodio should have used it if he had sincerely believed that ethical violations were taking place.

41.    Regarding the placement of advertisements, I recall that one time Rodio and I went to a store that was not placing our advertising in accordance with the applicable contract. The issue was that the contract required placement of some advertising on the counter. Either Rodio or the store owner told me that the store had failed to place the advertising on the counter because someone from the "Board of Health" had told the store not to. It was my understanding at this time that placement of advertising on store counters was perfectly legal. Reynolds kept us apprised of legal restrictions on advertising, and I had not been informed that there was a problem in Massachusetts with counter advertising. In my experience, it is not uncommon for a government official to direct a store to do something that is not actually required by law. Therefore, I told Rodio to put the ad on the counter, notwithstanding the alleged instruction of the person from the "Board of Health." To the best of my recollection, we put the advertising back on the counter, and this issue never arose again – at this store, or anywhere else. This incident was certainly not the basis for any adverse action taken against Rodio.

42.    Finally, Rodio contends that he was terminated because he said that our EDLP program requires or encourages retailers to sell cigarettes below the state minimum price. First, this is *not* what our EDLP program requires. By its terms, the EDLP contract requires only that the retailer not sell a competitive product priced lower than the Monarch brand. The EDLP contract does not dictate what that price must or should be for any product. A retailer could charge $100 for a pack of Monarch cigarettes and still be in complete compliance with the EDLP contract, as long as it did not sell any other brands for less than $100 a pack. Reynolds does not dictate to retailers what they should charge for Reynolds products. Second, the EDLP program does not "encourage" retailers to sell cigarettes below the state minimum price. It is perfectly

fine under the EDLP program for a retailer to keep the price of Monarch cigarettes at or above the state minimum.

43.    Nor was Rodio subjected to adverse employment action for making such comments about the EDLP program. Rodio was very successful at selling EDLP contracts to retailers, and this was noted in some of his performance documentation. I also noted as a negative, though, that he was not always making sure that EDLP retailers were selling Monarch as the everyday low price brand in the store, with no competitive brand priced lower. In response to this criticism, Rodio sometimes responded that this could not be done without lowering the price of Monarchs to a level below the state minimum. (If, for example, a retailer was selling a competitor's brand at less than the state minimum.)

44.    Reynolds's position on this was that, if the retailer could not comply with the EDLP contract, then we should not sell the retailer an EDLP contract.   I told Rodio on more than one occasion that he should not offer EDLP contracts to retailers who could not comply with the contracts. The problem was that Rodio continued to offer and sell EDLP contracts to retailers, but then failing to enforce the contracts. The company would have been better served if he had declined to offer EDLP contracts to retailers who were unable to comply with them.

45.    As a final note on the EDLP issue, I and the Reynolds sales force have always been instructed by Reynolds that we should not discuss pricing with retailers in any manner because (I understand) it violates some laws for us to do so. Accordingly, any discussions that sales representatives have with retailers regarding pricing are limited to (a) making sure that, if

required, Reynolds products are in parity with other products (without dictating any particular price); and (b) making sure that discounts from Reynolds to retailers are passed along to consumers (without dictating any particular pre-discount price).    It has always been my understanding that to go beyond this would be illegal.


46.    I did not terminate Mike Rodio because of his age or because we wanted to deprive him of an enhanced pension benefit.  I did not terminate Mike Rodio in retaliation for discussing Reynolds's stock price and reported earnings with me, for "refusing" to encourage retailers to sell Reynolds products below the state minimum price, or for "refusing" to violate legal restrictions on countertop advertising – or for any other improper reason.  I terminated Mike Rodio, after almost three years of warnings, because of poor performance (arising from errors in reporting and failure to properly administer the contracts), failure to follow my instructions regarding the same, and failure to administer contracts, which in effect resulted in Reynolds's paying retailers for nothing (misuse of company resources).  His failure to perform satisfactorily in these key job accountabilities was the only reason for his termination.

This the _3rd_ day of ~~July~~ *Aug*, 2005.

Carlo E. Fasciani

MARSHA A. CAYON
Notary Public
Commonwealth of Massachusetts
My Commission Expires
February 3, 2006

SWORN TO AND SUBSCRIBED BY ME
This the _3rd_ day of ~~July~~ *Aug*, 2005

Notary Public
My Commission Expires: _2-3-06_

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL RODIO,

            Plaintiff,

    v.

                          Civil Action No. 04-CV-10006-JGD

R.J. REYNOLDS TOBACCO COMPANY,

            Defendant.

## **AFFIDAVITOF RICHARD KANE**

The affiant, having been duly sworn, affirms and states as follows:

1.      My name is Richard Kane.  I am currently Director of Region Sales, Boston Region, for the Defendant, R. J. Reynolds Tobacco Company ("Reynolds").  During the times relevant to this action, my title was Region Manager, Boston Region.  My duties have been essentially the same under both job titles.  I am the direct supervisor of Carlo E. Fasciani, Division Sales Manager, who was the direct supervisor of the Plaintiff, Michael Rodio.  I have personal knowledge of the facts stated herein.

2.      I was deposed in this action on June 14, 2005.  Mr. Rodio's attorney asked me whether I was aware of any *"Board of Health"* requirement that prohibits the display of cigarette advertising below a certain minimum height.  I truthfully answered that I was not.  Mr. Rodio's attorney then went on to other subjects and did not ask me any more questions about this.

3.      If he had asked, I would have answered that I was aware of a proposed regulation issued by the *Attorney General of the State of Massachusetts* that never took effect. The regulation purported to require, among other things, that point-of-sale advertisements for certain tobacco products be placed five feet off the floor or higher in certain retail establishments. I will refer to this portion of the proposed regulation as the "counter-height requirement." Before the proposed counter-height requirement was to take effect, it was invalidated on the ground that it violated the First Amendment to the U.S. Constitution. Enforcement was stayed while appeals were pending. The case eventually went to the U.S. Supreme Court, which held that the counter-height requirement violated the First Amendment. The Supreme Court decision, which contains a good summary of the regulation and the resulting litigation, is *Lorillard Tobacco Co. v. Reilly*. I have attached a copy of the decision as Exhibit A. The long and short of it is, there has never been a law in effect in Massachusetts requiring cigarette advertisements to be five feet off the floor or higher. We advised our sales representatives, including Mr. Rodio, about all changes made in the Massachusetts regulation that were upheld by the courts. Copies of these communications, which were transmitted by e-mail, are attached as Exhibits B and C. Had the courts upheld the proposed regulation, we would have informed our sales representatives and required them to comply with the law.

4.      I was also never asked in my deposition why Reynolds did not get involved in determining whether retailers complied with applicable state minimum pricing laws. It is my understanding that directing a retailer as to what its price should be could raise a serious issue under the antitrust laws. Accordingly, I have been instructed by the Company, and I have instructed my sales staff, to completely refrain from having any discussion with retailers about

setting prices or price levels for tobacco products in their stores. It is permissible to discuss discounts, rebates, and how the prices of Reynolds' products compare with the prices of competitors' products, but it is not permissible to discuss the retailer's "absolute" price – for example, whether a given pack of cigarettes should sell for $4 rather than $6. It is my understanding, and it is our company's policy, that that decision must be left completely to the retailer, and of course as limited by law.

This the 1st day of August, 2005.


Richard Kane


SWORN TO AND SUBSCRIBED BY ME
This the 15 day of August, 2005

Notary Public
My Commission Expires: 5/15/09

CHRISTINE TUCCIO
Notary Public
Commonwealth of Massachusetts
My Commission Expires
May 15, 2009

Westlaw.

121 S.Ct. 2404                                                                                     Page 1
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

▷

**Briefs and Other Related Documents**

Supreme Court of the United States
LORILLARD TOBACCO CO., et al., Petitioners,
v.
Thomas F. REILLY, Attorney General of
Massachusetts, et al.
Altadis U.S.A. Inc., etc., et al., Petitioners,
v.
Thomas F. Reilly, Attorney General of
Massachusetts, et al.
**Nos. 00-596, 00-597.**

Argued April 25, 2001.
Decided June 28, 2001.

Manufacturers and sellers of cigarettes, smokeless
tobacco products, and cigars challenged
Massachusetts regulations restricting sale, promotion,
and labeling of tobacco products. The United States
District Court for the District of Massachusetts,
William G. Young, Chief Judge, rejected preemption
arguments, 76 F.Supp.2d 124, and thereafter rejected
Commerce Clause claims and, with one exception,
First Amendment claims, 84 F.Supp.2d 180.
Plaintiffs appealed and state cross-appealed. The
Court of Appeals for the First Circuit, 218 F.3d 30,
Torruella, Chief Judge, affirmed in part and reversed
in part. Certiorari was granted. The Supreme Court,
Justice O'Connor, held that: (1) regulations governing
outdoor and point-of-sale cigarette advertising were
preempted by Federal Cigarette Labeling and
Advertising Act (FCLAA); (2) regulations
prohibiting outdoor advertising of smokeless tobacco
or cigars within 1,000 feet of school or playground
violated First Amendment; (3) regulations prohibiting
indoor, point-of-sale advertising of smokeless
tobacco and cigars lower than 5 feet from floor of
retail establishment located within 1,000 feet of
school or playground violated First Amendment; but
(4) regulations requiring retailers to place tobacco
products behind counters and requiring customers to
have contact with salesperson before they are able to
handle such products did not violate First
Amendment.

Affirmed in part, reversed in part, and remanded.

Justice Kennedy concurred in part, concurred in
judgment, and filed opinion in which Justice Scalia
joined.

Justice Thomas concurred in part, concurred in
judgment, and filed opinion.

Justice Souter concurred in part, dissented in part,
and filed opinion.

Justice Stevens concurred in part, concurred in
judgment in part, dissented in part, and filed opinion
in which Justices Ginsburg and Breyer joined, and in
Part I of which Justice Souter joined.

West Headnotes

**[1] States** ⛨18.3
360k18.3 Most Cited Cases
Under Supremacy Clause, state action may be
foreclosed by express language in congressional
enactment, by implication from depth and breadth of
congressional scheme that occupies legislative field,
or by implication because of conflict with
congressional enactment. U.S.C.A. Const. Art. 6, cl.
2.

**[2] States** ⛨18.13
360k18.13 Most Cited Cases
Regulation of advertising falls within historic police
powers of states, which are not to be superseded by
federal statute unless that is clear and manifest
purpose of Congress. U.S.C.A. Const. Art. 6, cl. 2.

**[3] Consumer Protection** ⛨11
92Hk11 Most Cited Cases

**[3] States** ⛨18.84
360k18.84 Most Cited Cases
Massachusetts regulations governing outdoor and
point-of-sale cigarette advertising were preempted by
Federal Cigarette Labeling and Advertising Act
(FCLAA); regulations were not generally applicable
zoning regulations, but rather expressly targeted
cigarette advertising, which was area exclusively
occupied by FCLAA. U.S.C.A. Const. Art. 6, cl. 2;
Federal Cigarette Labeling and Advertising Act, §
5(b), 15 U.S.C.A. § 1334(b); Mass.Regs. Code title
940, § § 21.04(5)(a), 22.06(5)(a)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                        Page 2
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

**[4] Consumer Protection** ☜➟11
92Hk11 Most Cited Cases

**[4] States** ☜➟18.84
360k18.84 Most Cited Cases
Federal Cigarette Labeling and Advertising Act's
(FCLAA) pre-emption provision does not restrict
states' and localities' ability to enact generally
applicable zoning restrictions on location and size of
advertisements that apply to cigarettes on equal terms
with other products, or to regulate conduct as it
relates to sale or use of cigarettes, by prohibiting
cigarette sales to minors, and related inchoate
offenses that attach to such criminal conduct, such as
solicitation, conspiracy, and attempt. Federal
Cigarette Labeling and Advertising Act, § 5, 15
U.S.C.A. § 1334.

**[5] Constitutional Law** ☜➟90.2
92k90.2 Most Cited Cases
Test for determining whether regulation of
commercial speech violates First Amendment is
whether: (1) proscribed expression is protected by
First Amendment, (2) asserted governmental interest
is substantial, (3) regulation directly advances
governmental interest asserted, and (4) regulation is
not more extensive than is necessary to serve that
interest. U.S.C.A. Const.Amend. 1.

**[6] Constitutional Law** ☜➟90.3
92k90.3 Most Cited Cases

**[6] Consumer Protection** ☜➟7
92Hk7 Most Cited Cases
Massachusetts regulations prohibiting outdoor
advertising of smokeless tobacco or cigars within
1,000 feet of school or playground violated First
Amendment; although regulations directly advanced
governmental interest in preventing underage use of
smokeless tobacco and cigars, their reach,
constituting nearly complete ban in some
metropolitan areas, unduly impinged sellers'
opportunity to propose legal transactions with adults.
U.S.C.A. Const.Amend. 1; Mass.Regs. Code title
940, § § 21.04(5)(a), 22.06(5)(a).

**[7] Constitutional Law** ☜➟90.3
92k90.3 Most Cited Cases

**[7] Consumer Protection** ☜➟7
92Hk7 Most Cited Cases
Massachusetts regulations prohibiting indoor, point-
of-sale advertising of smokeless tobacco and cigars
lower than 5 feet from floor of retail establishment
located within 1,000 feet of school or playground
violated First Amendment; rule did not advance
governmental interest in preventing underage use of
smokeless tobacco and cigars. U.S.C.A.
Const.Amend. 1;
Mass.Regs. Code title 940, § § 21.04(5)(b),
22.06(5)(b).

**[8] Constitutional Law** ☜➟90(3)
92k90(3) Most Cited Cases
There is no de minimis exception for a speech
restriction that lacks sufficient tailoring or
justification. U.S.C.A. Const.Amend. 1.

**[9] Constitutional Law** ☜➟90.1(1)
92k90.1(1) Most Cited Cases

**[9] Consumer Protection** ☜➟6
92Hk6 Most Cited Cases
Massachusetts regulations requiring retailers to place
tobacco products behind counters and requiring
customers to have contact with salesperson before
they are able to handle such products did not violate
First Amendment; state had substantial interest in
preventing access to tobacco products by minors and
regulations were appropriately narrow means of
advancing that interest. U.S.C.A. Const.Amend. 1;
Mass.Regs. Code title 940, § § 21.04(2)(c, d),
22.06(2)(c, d).

**\*\*2405** *Syllabus* [FN\*]

> FN\* The syllabus constitutes no part of the
> opinion of the Court but has been prepared
> by the Reporter of Decisions for the
> convenience of the reader. See *United
> States v. Detroit Timber & Lumber Co.,* 200
> U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

**\*525** After the Attorney General of Massachusetts
(Attorney General) promulgated comprehensive
regulations governing the advertising and sale of
cigarettes, smokeless tobacco, and cigars, petitioners,
a **\*\*2406** group of tobacco manufacturers and
retailers, filed this suit asserting, among other things,
the Supremacy Clause claim that the cigarette
advertising regulations are pre-empted by the Federal
Cigarette Labeling and Advertising Act (FCLAA),
which prescribes mandatory health warnings for
cigarette packaging and advertising, 15 U.S.C. §
1333, and pre-empts similar state regulations, §
1334(b); and a claim that the regulations violate the
First and Fourteenth Amendments to the Federal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                                          Page 3
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

Constitution. In large measure, the District Court upheld the regulations. Among its rulings, the court held that restrictions on the location of advertising were not pre-empted by the FCLAA, and that neither the regulations prohibiting outdoor advertising within 1,000 feet of a school or playground nor the sales practices regulations restricting the location and distribution of tobacco products violated the First Amendment. The court ruled, however, that the point-of-sale advertising regulations requiring that indoor advertising be placed no lower than five feet from the floor were invalid because the Attorney General had not provided sufficient justification for that restriction. The First Circuit affirmed the District Court's rulings that the cigarette advertising regulations are not pre-empted by the FCLAA and that the outdoor advertising regulations and the sales practices regulations do not violate the First Amendment under _Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y., 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341,_ but reversed the lower court's invalidation of the point-of-sale advertising regulations, concluding that the Attorney General is better suited than courts to determine what restrictions are necessary.

_Held:_

1. The FCLAA pre-empts Massachusetts' regulations governing outdoor and point-of-sale cigarette advertising. Pp. 2414-2421.

**\*526** a) The FCLAA's pre-emption provision, § 1334, prohibits (a) requiring cigarette packages to bear any "statement relating to smoking and health, other than the statement required by" § 1333, and (b) any "requirement or prohibition based on smoking and health ... imposed under state law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with" § 1333. The Court's analysis begins with the statute's language. _Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881._ The statute's interpretation is aided by considering the predecessor pre-emption provision and the context in which the current language was adopted. See, e.g., _Medtronic, Inc. v. Lohr, 518 U.S. 470, 486, 116 S.Ct. 2240, 135 L.Ed.2d 700._ The original provision simply prohibited any "statement relating to smoking and health ... in the advertising of any cigarettes the packages of which are labeled in conformity with the [Act's] provisions." Without question, the current pre-emption provision's plain language is much broader. _Cipollone v. Liggett Group, Inc., 505 U.S._

_504, 520, 112 S.Ct. 2608, 120 L.Ed.2d 407._ Rather than preventing only "statements," the amended provision reaches all "requirement[s] or prohibition[s] ... imposed under State law." And, although the former statute reached only statements "in the advertising," the current provision governs "with respect to the advertising or promotion" of cigarettes. At the same time that Congress expanded the pre-emption provision with respect to the States, it enacted a provision prohibiting cigarette advertising in electronic media altogether. Pp. 2414-2417.

(b) Congress pre-empted state cigarette advertising regulations like the Attorney General's because they would upset federal legislative choices to require specific warnings and to impose the ban on cigarette advertising in electronic media in order to address concerns about smoking and health. In holding that the FCLAA does not nullify the Massachusetts regulations, the First Circuit concentrated on **\*\*2407** whether they are "with respect to" advertising and promotion, concluding that the FCLAA only pre-empts regulations of the content of cigarette advertising. The court also reasoned that the regulations are a form of zoning, a traditional area of state power, and, therefore, a presumption against pre-emption applied, see _California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc., 519 U.S. 316, 325, 117 S.Ct. 832, 136 L.Ed.2d 791._ This Court rejects the notion that the regulations are not "with respect to" cigarette advertising and promotion. There is no question about an indirect relationship between the Massachusetts regulations and cigarette advertising: The regulations expressly target such advertising. _Id., at 324-325, 117 S.Ct. 832._ The Attorney General's argument that the regulations are not "based on smoking and health" since they do not involve health-related content, but instead target youth exposure to cigarette advertising, is unpersuasive because, at bottom, the youth exposure concern is **\*527** intertwined with the smoking and health concern. Also unavailing is the Attorney General's claim that the regulations are not pre-empted because they govern the location, not the content, of cigarette advertising. The content/location distinction cannot be squared with the pre-emption provision's language, which reaches _all_ "requirements" and "prohibitions" "imposed under State law." A distinction between advertising content and location in the FCLAA also cannot be reconciled with Congress' own location-based restriction, which bans advertising in electronic

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                    Page 4
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

media, but not elsewhere.  The Attorney General's assertion that a complete state ban on cigarette advertising would not be pre-empted because Congress did not intend to preclude local control of zoning finds no support in the FCLAA, whose comprehensive warnings, advertising restrictions, and pre-emption provision would make little sense if a State or locality could simply target and ban all cigarette advertising.  Pp. 2417-2419.

(c) The FCLAA's pre-emption provision does not restrict States' and localities' ability to enact generally applicable zoning restrictions on the location and size of advertisements that apply to cigarettes on equal terms with other products, see, *e.g., Metromedia, Inc. v. San Diego,* 453 U.S. 490, 507-508, 101 S.Ct. 2882, 69 L.Ed.2d 800, or to regulate conduct as it relates to the sale or use of cigarettes, as by prohibiting cigarette sales to minors, see 42 U.S.C. § § 300x-26(a)(1), 300x-21, as well as common inchoate offenses that attach to criminal conduct, such as solicitation, conspiracy, and attempt, cf. *Central Hudson, supra,* at 563-564, 100 S.Ct. 2343.  Pp. 2419- 2420.

(d) Because the issue was not decided below, the Court declines to reach the smokeless tobacco petitioners' argument that, if the outdoor and point-of-sale advertising regulations for cigarettes are pre-empted, then the same regulations for smokeless tobacco must be invalidated because they cannot be severed from the cigarette provisions.  Pp. 2420-2421.

2.  Massachusetts' outdoor and point-of-sale advertising regulations relating to smokeless tobacco and cigars violate the First Amendment, but the sales practices regulations relating to all three tobacco products are constitutional.  Pp. 2421-2430.

(a) Under *Central Hudson's* four-part test for analyzing regulations of commercial speech, the Court must determine (1) whether the expression is protected by the First Amendment, (2) whether the asserted governmental interest is substantial, (3) whether the regulation directly advances the governmental interest asserted, and (4) whether it is not more extensive than is necessary to serve that interest.  447 U.S., at 566, 100 S.Ct. 2343. Only the last two steps are at issue here.  The Attorney General has assumed for summary judgment purposes that the First Amendment protects the speech of petitioners, none of whom contests **\*528** the importance of the **\*\*2408** State's interest in

preventing the use of tobacco by minors.  The third step of *Central Hudson* requires that the government demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.  *Edenfield v. Fane,* 507 U.S. 761, 770-771, 113 S.Ct. 1792, 123 L.Ed.2d 543.  The fourth step of *Central Hudson* requires a reasonable fit between the legislature's ends and the means chosen to accomplish those ends, a means narrowly tailored to achieve the desired objective.  *E.g., Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 632, 115 S.Ct. 2371, 132 L.Ed.2d 541.  Pp. 2421-2422.

(b) The outdoor advertising regulations prohibiting smokeless tobacco or cigar advertising within 1,000 feet of a school or playground violate the First Amendment.  Pp. 2422-2427.

(1) Those regulations satisfy *Central Hudson's* third step by directly advancing the governmental interest asserted to justify them.  The Court's detailed review of the record reveals that the Attorney General has provided ample documentation of the problem with underage use of smokeless tobacco and cigars.  In addition, the Court disagrees with petitioners' claim that there is no evidence that preventing targeted advertising campaigns and limiting youth exposure to advertising will decrease underage use of those products.  On the record below and in the posture of summary judgment, it cannot be concluded that the Attorney General's decision to regulate smokeless tobacco and cigar advertising in an effort to combat the use of tobacco products by minors was based on mere "speculation and conjecture." *Edenfield, supra,* at 770, 113 S.Ct. 1792.  Pp. 2422-2425.

(2) Whatever the strength of the Attorney General's evidence to justify the outdoor advertising regulations, however, the regulations do not satisfy *Central Hudson's* fourth step.  Their broad sweep indicates that the Attorney General did not "carefully calculat[e] the costs and benefits associated with the burden on speech imposed." *Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 417, 113 S.Ct. 1505, 123 L.Ed.2d 99.  The record indicates that the regulations prohibit advertising in a substantial portion of Massachusetts' major metropolitan areas; in some areas, they would constitute nearly a complete ban on the communication of truthful information.  This substantial geographical reach is compounded by other factors. "Outdoor" advertising includes not only advertising located outside an establishment, but also advertising inside a store if visible from outside.  Moreover, the regulations

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                                Page 5
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

restrict advertisements of any size, and the term advertisement also includes oral statements. The uniformly broad sweep of the geographical limitation and the range of communications restricted demonstrate a lack of tailoring. The governmental interest in preventing underage tobacco use is substantial, and even compelling, but it is no less true that the sale and use of tobacco products by *529 adults is a legal activity. A speech regulation cannot unduly impinge on the speaker's ability to propose a commercial transaction and the adult listener's opportunity to obtain information about products. The Attorney General has failed to show that the regulations at issue are not more extensive than necessary. Pp. 2425-2427.

(c) The regulations prohibiting indoor, point-of-sale advertising of smokeless tobacco and cigars lower than 5 feet from the floor of a retail establishment located within 1,000 feet of a school or playground fail both the third and fourth steps of the *Central Hudson* analysis. The 5-foot rule does not seem to advance the goals of preventing minors from using tobacco products and curbing demand for that activity by limiting youth exposure to advertising. Not all children are less than 5 feet tall, and those who are can look up and take in their surroundings. Nor can the blanket height restriction be construed as a mere regulation of communicative action under **2409*United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672, since it is not unrelated to expression, see, *e.g., Texas v. Johnson,* 491 U.S. 397, 403, 109 S.Ct. 2533, 105 L.Ed.2d 342, but attempts to regulate directly the communicative impact of indoor advertising. Moreover, the restriction does not constitute a reasonable fit with the goal of targeting tobacco advertising that entices children. Although the First Circuit decided that the restriction's burden on speech is very limited, there is no *de minimis* exception for a speech restriction that lacks sufficient tailoring or justification. Pp. 2427-2428.

(d) Assuming that petitioners have a cognizable speech interest in a particular means of displaying their products, cf. *Cincinnati v. Discovery Network, Inc., supra,* at 410, 113 S.Ct. 1505, 123 L.Ed.2d 99, the regulations requiring retailers to place tobacco products behind counters and requiring customers to have contact with a salesperson before they are able to handle such a product withstand First Amendment scrutiny. The State has demonstrated a substantial interest in preventing access to tobacco products by minors and has adopted an appropriately narrow

means of advancing that interest. See, *e.g., O'Brien, supra,* at 382, 88 S.Ct. 1673. Because unattended displays of such products present an opportunity for access without the proper age verification required by law, the State prohibits self-service and other displays that would allow an individual to obtain tobacco without direct contact with a salesperson. It is clear that the regulations leave open ample communication channels. They do not significantly impede adult access to tobacco products, and retailers have other means of exercising any cognizable speech interest in the presentation of their products. The Court presumes that vendors may place empty tobacco packaging on open display, and display actual tobacco products so long as that display is only accessible to sales personnel. As for cigars, there is no indication that a customer is unable to examine a cigar prior to purchase, *530 so long as that examination takes place through a salesperson. Pp. 2428-2430.

(e) The Court declines to address the cigar petitioners' First Amendment challenge to a regulation prohibiting sampling or promotional giveaways of cigars and little cigars. That claim was not sufficiently briefed and argued before this Court. P. 2430.

218 F.3d 30, affirmed in part, reversed in part, and remanded.

O'CONNOR, J., delivered the opinion of the Court, Parts I, II-C, and II-D of which were unanimous; Parts III-A, III-C, and III-D of which were joined by REHNQUIST, C. J., and SCALIA, KENNEDY, SOUTER, and THOMAS, JJ.; Part III-B-1 of which was joined by REHNQUIST, C. J., and STEVENS, SOUTER, GINSBURG, and BREYER, JJ.; and Parts II-A, II-B, III-B-2, and IV of which were joined by REHNQUIST, C. J., and SCALIA, KENNEDY, and THOMAS, JJ. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment, in which SCALIA, J., joined, *post,* p. 2430. THOMAS, J., filed an opinion concurring in part and concurring in the judgment, *post,* p. 2431. SOUTER, J., filed an opinion concurring in part and dissenting in part, *post,* p. 2440. STEVENS, J., filed an opinion concurring in part, concurring in the judgment in part, and dissenting in part, in which GINSBURG and BREYER, JJ., joined, and in which SOUTER, J., joined as to Part I, *post,* p. 2440.

Jeffrey S. Sutton, Columbus, OH, for petitioners.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                                    Page 6
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

William W. Porter, Boston, MA, for respondents.

Barbara D. Underwood, Brooklyn, NY, for United States as amicus curiae, by special leave of the Court, supporting the respondents.

**\*532** Justice O'CONNOR delivered the opinion of the Court.

In January 1999, the Attorney General of Massachusetts promulgated comprehensive regulations governing the advertising and sale of cigarettes, smokeless tobacco, and cigars. 940 Code of Mass. Regs. § § 21.01-21.07, 22.01-22.09 (2000). Petitioners, a group of cigarette, smokeless tobacco, and cigar manufacturers and retailers, filed suit in Federal District Court claiming that the regulations violate federal and the United States Constitution. In large measure, the District Court determined that the regulations are valid and enforceable. The United States Court of Appeals for the First Circuit affirmed in part and reversed in part, concluding that the regulations are not pre-empted by federal law and do not violate the First Amendment. The first question presented for our review is whether certain cigarette advertising regulations are pre-empted by the Federal Cigarette Labeling and Advertising Act (FCLAA), 79 Stat. 282, as amended, 15 U.S.C. § 1331 et seq. The second question presented is whether certain regulations governing the advertising and sale of tobacco products violate the First Amendment.

**\*533 I**

In November 1998, Massachusetts, along with over 40 other States, reached a landmark agreement with major manufacturers in the cigarette industry. The signatory States settled their claims against these companies in exchange for monetary payments and permanent injunctive relief. See App. 253-258 (Outline of Terms for Massachusetts in National Tobacco Settlement); Master Settlement Agreement (Nov. 23, 1998), http://www.naag.org. At the press conference covering Massachusetts' decision to sign the agreement, then-Attorney General Scott Harshbarger announced that as one of his last acts in office, he would create consumer protection regulations to restrict advertising and sales practices for tobacco products. He explained that the regulations were necessary in order to "close holes" in the settlement agreement and "to stop Big Tobacco from recruiting new customers among the children of Massachusetts." App. 251.

In January 1999, pursuant to his authority to prevent unfair or deceptive practices in trade, Mass. Gen. Laws, ch. 93A, § 2 (1997), the Massachusetts Attorney General (Attorney General) promulgated regulations governing the sale and advertisement of cigarettes, smokeless tobacco, and cigars. The purpose of the cigarette and smokeless tobacco regulations is "to eliminate deception and unfairness in the way cigarettes and smokeless tobacco products are marketed, sold and distributed in Massachusetts in order to address the incidence of cigarette smoking and smokeless tobacco use by children under legal age ... [and] in order to prevent access to such products by underage consumers." 940 Code of Mass. Regs. § 21.01 (2000). The similar purpose of the cigar regulations is "to eliminate deception and unfairness in the way cigars and little cigars are packaged, marketed, sold and distributed in Massachusetts [so that] ... consumers may be adequately informed about the health **\*534** risks associated with cigar smoking, its addictive properties, and the false perception that cigars are a safe alternative to cigarettes ... [and so that] the incidence of cigar use by children under legal age is addressed ... in order to prevent access to such products by underage consumers." Ibid. The regulations have a broader scope than the master settlement agreement, reaching advertising, sales practices, and members of the tobacco industry not covered by the agreement. The regulations place a variety of restrictions on outdoor advertising, point-of-sale advertising, retail sales transactions, transactions **\*\*2411** by mail, promotions, sampling of products, and labels for cigars.

The cigarette and smokeless tobacco regulations being challenged before this Court provide:

"(2) Retail Outlet Sales Practices. Except as otherwise provided in [§ 21.04(4) ], it shall be an unfair or deceptive act or practice for any person who sells or distributes cigarettes or smokeless tobacco products through a retail outlet located within Massachusetts to engage in any of the following retail outlet sales practices:

                    . . . . .

"(c) Using self-service displays of cigarettes or smokeless tobacco products;
"(d) Failing to place cigarettes and smokeless tobacco products out of the reach of all consumers, and in a location accessible only to outlet personnel." § § 21.04(2)(c)-(d).
"(5) Advertising Restrictions. Except as provided in [§ 21.04(6) ], it shall be an unfair or deceptive act or practice for any manufacturer, distributor or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                                     Page 7
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
(Cite as: 533 U.S. 525, 121 S.Ct. 2404)

retailer to engage in any of the following practices:
"(a) Outdoor advertising, including advertising in enclosed stadiums and advertising from within a retail establishment that is directed toward or visible from the *535 outside of the establishment, in any location that is within a 1,000 foot radius of any public playground, playground area in a public park, elementary school or secondary school;
"(b) Point-of-sale advertising of cigarettes or smokeless tobacco products any portion of which is placed lower than five feet from the floor of any retail establishment which is located within a one thousand foot radius of any public playground, playground area in a public park, elementary school or secondary school, and which is not an adult-only retail establishment." § § 21.04(5)(a)-(b).

The cigar regulations that are still at issue provide:
"(1) Retail Sales Practices. Except as otherwise provided in [§ 22.06(4) ], it shall be an unfair or deceptive act or practice for any person who sells or distributes cigars or little cigars directly to consumers within Massachusetts to engage in any of the following practices:
"(a) sampling of cigars or little cigars or promotional give-aways of cigars or little cigars." § 21.06(1)(a).
"(2) Retail Outlet Sales Practices. Except as otherwise provided in [§ 22.06(4) ], it shall be an unfair or deceptive act or practice for any person who sells or distributes cigars or little cigars through a retail outlet located within Massachusetts to engage in any of the following retail outlet sales practices:
. . . . .
"(c) Using self-service displays of cigars or little cigars;
"(d) Failing to place cigars and little cigars out of the reach of all consumers, and in a location accessible only to outlet personnel." § § 22.06(2)(c)-(d).
"(5) Advertising Restrictions. Except as provided in [§ 22.06(6) ], it shall be an unfair or deceptive act or practice for any manufacturer, distributor or retailer to engage in any of the following practices:
*536 "(a) Outdoor advertising of cigars or little cigars, including advertising in enclosed stadiums and advertising from within a retail establishment that is directed toward or visible from the outside of the establishment, in any location within a 1,000 foot radius of any public playground, playground area in a public park, elementary school or secondary school;

"(b) Point-of-sale advertising of cigars or little cigars any portion of which is placed lower than five feet from the floor of any retail establishment which is located within a one thousand foot radius of any public playground, playground **2412 area in a public park, elementary school or secondary school, and which is not an adult-only retail establishment." § § 22.06(5)(a)-(b).

The term "advertisement" is defined as:
"any oral, written, graphic, or pictorial statement or representation, made by, or on behalf of, any person who manufactures, packages, imports for sale, distributes or sells within Massachusetts [tobacco products], the purpose or effect of which is to promote the use or sale of the product. Advertisement includes, without limitation, any picture, logo, symbol, motto, selling message, graphic display, visual image, recognizable color or pattern of colors, or any other indicia of product identification identical or similar to, or identifiable with, those used for any brand of [tobacco product]. This includes, without limitation, utilitarian items and permanent or semi-permanent fixtures with such indicia of product identification such as lighting fixtures, awnings, display cases, clocks and door mats, but does not include utilitarian items with a volume of 200 cubic inches or less." § § 21.03, 22.03.

Before the effective date of the regulations, February 1, 2000, members of the tobacco industry sued the Attorney General in the United States District Court for the District *537 of Massachusetts. Four cigarette manufacturers (Lorillard Tobacco Company, Brown & Williamson Tobacco Corporation, R.J. Reynolds Tobacco Company, and Philip Morris Incorporated), a maker of smokeless tobacco products (U.S. Smokeless Tobacco Company), and several cigar manufacturers and retailers claimed that many of the regulations violate the Commerce Clause, the Supremacy Clause, the First and Fourteenth Amendments, and Rev. Stat. § 1979, 42 U.S.C. § 1983. The parties sought summary judgment. 76 F.Supp.2d 124, 127 (D.Mass.1999); 84 F.Supp.2d 180, 183 (D.Mass.2000).

In its first ruling, the District Court considered the Supremacy Clause claim that the FCLAA, 15 U.S.C. § 1331 et seq., pre-empts the cigarette advertising regulations. 76 F.Supp.2d. at 128-134. The FCLAA prescribes the health warnings that must appear on packaging and in advertisements for cigarettes. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                          Page 8
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

FCLAA contains a pre-emption provision that prohibits a State from imposing any "requirement or prohibition based on smoking and health ... with respect to the advertising or promotion of ... cigarettes." § 1334(b). The FCLAA's pre-emption provision does not cover smokeless tobacco or cigars.

The District Court explained that the central question for purposes of pre-emption is whether the regulations create a predicate legal duty based on smoking and health. The court reasoned that to read the pre-emption provision to proscribe any state advertising regulation enacted due to health concerns about smoking would expand Congress' purpose beyond a reasonable scope and leave States powerless to regulate in the area. The court concluded that restrictions on the location of advertising are not based on smoking and health and thus are not pre-empted by the FCLAA. The District Court also concluded that a provision that permitted retailers to display a black and white "tombstone" sign reading "Tobacco Products Sold Here," 940 Code of Mass. Regs. § 21.04(6) (2000), was pre-empted by the FCLAA.

**\*538** In a separate ruling, the District Court considered the claim that the Attorney General's regulations violate the First Amendment. 84 F.Supp.2d, at 183-196. Rejecting petitioners' argument that strict scrutiny should apply, the court applied the four-part test of _Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.,_ 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), for commercial speech. The court reasoned that the Attorney General had provided an adequate basis for regulating cigars and smokeless tobacco as well as cigarettes because of the similarities among the products. The court held that the outdoor advertising regulations, **\*\*2413** which prohibit outdoor advertising within 1,000 feet of a school or playground, do not violate the First Amendment because they advance a substantial government interest and are narrowly tailored to suppress no more speech than necessary. The court concluded that the sales practices regulations, which restrict the location and distribution of tobacco products, survive scrutiny because they do not implicate a significant speech interest. The court invalidated the point-of-sale advertising regulations, which require that indoor advertising be placed no lower than five feet from the floor, finding that the Attorney General had not provided sufficient justification for that restriction. The District Court's ruling with respect to the cigar warning requirements and the Commerce Clause is

not before this Court.

The United States Court of Appeals for the First Circuit issued a stay pending appeal, App. 8-9, and affirmed in part and reversed in part the District Court's judgment, _Consolidated Cigar Corp. v. Reilly,_ 218 F.3d 30 (C.A.1 2000). With respect to the Supremacy Clause, the Court of Appeals affirmed the District Court's ruling that the Attorney General's cigarette advertising regulations are not pre-empted by the FCLAA. The First Circuit was persuaded by the reasoning of the Second and Seventh Circuits, which had concluded that the FCLAA's pre-emption provision is ambiguous, and held that the provision pre-empts regulations **\*539** of the content, but not the location, of cigarette advertising. See _Greater New York Metropolitan Food Council, Inc. v. Giuliani,_ 195 F.3d 100, 104-110 (C.A.2 1999); _Federation of Advertising Industry Representatives, Inc. v. Chicago,_ 189 F.3d 633, 636- 640 (C.A.7 1999).

With respect to the First Amendment, the Court of Appeals applied the _Central Hudson_ test. 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). The court held that the outdoor advertising regulations do not violate the First Amendment. The court concluded that the restriction on outdoor advertising within 1,000 feet of a school or playground directly advances the State's substantial interest in preventing tobacco use by minors. The court also found that the outdoor advertising regulations restrict no more speech than necessary, reasoning that the distance chosen by the Attorney General is the sort of determination better suited for legislative and executive decisionmakers than courts. The Court of Appeals reversed the District Court's invalidation of the point-of-sale advertising regulations, again concluding that the Attorney General is better suited to determine what restrictions are necessary. The Court of Appeals also held that the sales practices regulations are valid under the First Amendment. The court found that the regulations directly advance the State's interest in preventing minors' access to tobacco products and that the regulations are narrowly tailored because retailers have a variety of other means to present the packaging of their products and to allow customers to examine the products.

As for the argument that smokeless tobacco and cigars are different from cigarettes, the court expressed some misgivings about equating all tobacco products, but ultimately decided that the Attorney General had presented sufficient evidence

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                                   Page 9
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

with respect to all three products to regulate them similarly.    The Court of Appeals' decision with respect to the cigar warning requirements and the Commerce Clause is not before this Court.

*540 The Court of Appeals stayed its mandate pending disposition of a petition for a writ of certiorari.    App. 13.    The cigarette manufacturers and U.S. Smokeless Tobacco Company filed a petition, challenging the Court of Appeals' decision with respect to the outdoor and point-of-sale advertising regulations on pre-emption and First Amendment grounds, and the sales practices regulations on First Amendment grounds.    The cigar companies filed a separate petition, again raising a First **2414 Amendment challenge to the outdoor advertising, point-of-sale advertising, and sales practices regulations.    We granted both petitions, 531 U.S. 1068, 121 S.Ct. 755, 148 L.Ed.2d 659 (2001), to resolve the conflict among the Courts of Appeals with respect to whether the FCLAA pre-empts cigarette advertising regulations like those at issue here, cf. *Lindsey v. Tacoma-Pierce County Health Dept.,* 195 F.3d 1065 (C.A.9 1999), and to decide the important First Amendment issues presented in these cases.

## II

Before reaching the First Amendment issues, we must decide to what extent federal law pre-empts the Attorney General's regulations.    The cigarette petitioners contend that the FCLAA, 15 U.S.C. § 1331 *et seq.,* pre-empts the Attorney General's cigarette advertising regulations.

## A

[1] Article VI, cl. 2, of the United States Constitution commands that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."    See also *McCulloch v. Maryland,* 4 Wheat. 316, 427, 4 L.Ed. 579 (1819) ("It is of the very essence of supremacy, to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments").    This relatively clear and simple mandate has generated considerable discussion in cases where we have had to discern whether Congress has pre-empted state action in a particular *541 area. State action may be foreclosed by express language in a congressional enactment, see, *e.g., Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 517, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), by implication from the depth and breadth of a congressional scheme that

occupies the legislative field, see, *e.g., Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), or by implication because of a conflict with a congressional enactment, see, *e.g., Geier v. American Honda Motor Co.,* 529 U.S. 861, 869-874, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000).

In the FCLAA, Congress has crafted a comprehensive federal scheme governing the advertising and promotion of cigarettes.    The FCLAA's pre-emption provision provides:

"(a) Additional statements

"No statement relating to smoking and health, other than the statement required by section 1333 of this title, shall be required on any cigarette package.

"(b) State regulations

"No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." 15 U.S.C. § 1334.

The FCLAA's pre-emption provision does not cover smokeless tobacco or cigars.

[2] In these cases, our task is to identify the domain expressly pre-empted, see *Cipollone, supra,* at 517, 112 S.Ct. 2608, because "an express definition of the pre-emptive reach of a statute ... supports a reasonable inference ... that Congress did not intend to pre-empt other matters," *Freightliner Corp. v. Myrick,* 514 U.S. 280, 288, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995).    Congressional purpose is the "ultimate touchstone" of our inquiry.    *Cipollone, supra,* at 516, 112 S.Ct. 2608 (internal quotation marks omitted).    Because "federal law is said to bar state action in [a] fiel[d] of traditional state regulation," namely, advertising, see *Packer Corp. v. Utah,* 285 U.S. 105, 108, 52 S.Ct. 273, 76 L.Ed. 643 (1932)," we "wor[k] on the assumption that *542 the historic police powers of the States [a]re not to be superseded by the Federal Act unless that [is] the clear and manifest purpose of Congress." **2415*California Div. of Labor Standards Enforcement v. Dillingham Constr., N. A., Inc.,* 519 U.S. 316, 325, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) (internal quotation marks omitted).    See also *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).

Our analysis begins with the language of the statute. *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999).    In the pre-

121 S.Ct. 2404                                                                                    Page 10
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

emption provision, Congress unequivocally precludes the requirement of any additional statements on cigarette packages beyond those provided in § 1333. 15 U.S.C. § 1334(a). Congress further precludes States or localities from imposing any requirement or prohibition based on smoking and health with respect to the advertising and promotion of cigarettes. § 1334(b). Without question, the second clause is more expansive than the first; it employs far more sweeping language to describe the state action that is pre-empted. We must give meaning to each element of the pre-emption provision. We are aided in our interpretation by considering the predecessor pre-emption provision and the circumstances in which the current language was adopted. See *Medtronic, supra,* at 486, 116 S.Ct. 2240; *McCarthy v. Bronson,* 500 U.S. 136, 139, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991); *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988).

In 1964, the groundbreaking Report of the Surgeon General's Advisory Committee on Smoking and Health concluded that "[c]igarette smoking is a health hazard of sufficient importance in the United States to warrant appropriate remedial action." Department of Health, Education, and Welfare, U.S. Surgeon General's Advisory Committee, Smoking and Health 33. In 1965, Congress enacted the FCLAA as a proactive measure in the face of impending regulation by federal agencies and the States. Pub.L. 89-92, 79 Stat. 282. See also *Cipollone, supra,* at 513-515, 112 S.Ct. 2608. The purpose of the FCLAA was twofold: to inform the public adequately about the hazards of cigarette smoking, and to protect the national *543 economy from interference due to diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to the relationship between smoking and health. Pub.L. 89-92, § 2. The FCLAA prescribed a label for cigarette packages: "Caution: Cigarette Smoking May Be Hazardous to Your Health." § 4. The FCLAA also required the Secretary of Health, Education, and Welfare (HEW) and the Federal Trade Commission (FTC) to report annually to Congress about the health consequences of smoking and the advertising and promotion of cigarettes. § 5.

Section 5 of the FCLAA included a pre-emption provision in which "Congress spoke precisely and narrowly." *Cipollone, supra,* at 518, 112 S.Ct. 2608. Subsection (a) prohibited any requirement of additional statements on cigarette packaging. Subsection (b) provided that "[n]o statement relating

to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." Section 10 of the FCLAA set a termination date of July 1, 1969, for these provisions. As we have previously explained, "on their face, [the pre-emption] provisions merely prohibited state and federal rulemaking bodies from mandating particular cautionary statements on cigarette labels [subsection (a) ] or in cigarette advertisements [subsection (b) ]." *Cipollone, supra,* at 518, 112 S.Ct. 2608.

The FCLAA was enacted with the expectation that Congress would reexamine it in 1969 in light of the developing information about cigarette smoking and health. H.R.Rep. No. 586, 89th Cong., 1st Sess., 6 (1965); 111 Cong. Rec. 16541 (1965). In the intervening years, Congress received reports and recommendations from the HEW Secretary and the FTC. S.Rep. No. 91-566, pp. 2-6 (1969). The HEW Secretary recommended that Congress strengthen the warning, require **2416 the warning on all packages and in advertisements, and publish tar and nicotine levels on packages and in advertisements. *Id.,* at 4. The FTC made similar and additional *544 recommendations. The FTC sought a complete ban on radio and television advertising, a requirement that broadcasters devote time for health hazard announcements concerning smoking, and increased funding for public education and research about smoking. *Id.,* at 6. The FTC urged Congress not to continue to prevent federal agencies from regulating cigarette advertising. *Id.,* at 10. In addition, the Federal Communications Commission (FCC) had concluded that advertising which promoted the use of cigarettes created a duty in broadcast stations to provide information about the hazards of cigarette smoking. *Id.,* at 6-7.

In 1969, House and Senate committees held hearings about the health effects of cigarette smoking and advertising by the cigarette industry. The bill that emerged from the House of Representatives strengthened the warning and maintained the pre-emption provision. The Senate amended that bill, adding the ban on radio and television advertising, and changing the pre-emption language to its present form. H.R. Conf. Rep. No. 91-897, pp. 4-5 (1970).

The final result was the Public Health Cigarette Smoking Act of 1969, in which Congress, following the Senate's amendments, made three significant changes to the FCLAA. Pub.L. 91-222, § 2, 84 Stat. 87. First, Congress drafted a new label that read:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                                          Page 11
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

"Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous to Your Health." FCLAA, § 4. Second, Congress declared it unlawful to advertise cigarettes on any medium of electronic communication subject to the jurisdiction of the FCC. § 6. Finally, Congress enacted the current pre-emption provision, which proscribes any "requirement or prohibition based on smoking and health ... imposed under State law with respect to the advertising or promotion" of cigarettes. § 5(b). The new subsection (b) did not pre-empt regulation by federal agencies, freeing the FTC to impose warning requirements in cigarette advertising. See *Cipollone*, 505 U.S., at 515, 112 S.Ct. 2608. The new pre-emption provision, like its predecessor, only applied to cigarettes, and not other tobacco products.

**\*545** In 1984, Congress again amended the FCLAA in the Comprehensive Smoking Education Act. Pub.L. 98-474, 98 Stat. 2200. The purpose of the Act was to "provide a new strategy for making Americans more aware of any adverse health effects of smoking, to assure the timely and widespread dissemination of research findings and to enable individuals to make informed decisions about smoking." § 2. The Act established a series of warnings to appear on a rotating basis on cigarette packages and in cigarette advertising, § 4, and directed the Health and Human Services Secretary to create and implement an educational program about the health effects of cigarette smoking, § 3.

The FTC has continued to report on trade practices in the cigarette industry. In 1999, the first year since the master settlement agreement, the FTC reported that the cigarette industry expended $8.24 billion on advertising and promotions, the largest expenditure ever. FTC, Cigarette Report for 1999, p. 1 (2000). Substantial increases were found in point-of-sale promotions, payments made to retailers to facilitate sales, and retail offers such as buy one, get one free, or product giveaways. *Id.*, at 4-5. Substantial decreases, however, were reported for outdoor advertising and transit advertising. *Id.*, at 2. Congress and federal agencies continue to monitor advertising and promotion practices in the cigarette industry.

The scope and meaning of the current pre-emption provision become clearer once we consider the original pre-emption language and the amendments to the FCLAA. Without question, "the plain language **\*\*2417** of the pre-emption provision in the 1969 Act is much broader." *Cipollone, 505 U.S., at 520, 112*

S.Ct. 2608. Rather than preventing only "statements," the amended provision reaches all "requirement[s] or prohibition[s] ... imposed under State law." And, although the former statute reached only statements "in the advertising," the current provision governs "with respect to the advertising or promotion" of cigarettes. See *ibid.* Congress expanded the pre-emption provision with respect to the **\*546** States, and at the same time, it allowed the FTC to regulate cigarette advertising. Congress also prohibited cigarette advertising in electronic media altogether. Viewed in light of the context in which the current pre-emption provision was adopted, we must determine whether the FCLAA pre-empts Massachusetts' regulations governing outdoor and point-of-sale advertising of cigarettes.

B

[3] The Court of Appeals acknowledged that the FCLAA pre-empts any "requirement or prohibition based on smoking and health ... with respect to the advertising or promotion of ... cigarettes," 15 U.S.C. § 1334(b), but concluded that the FCLAA does not nullify Massachusetts' cigarette advertising regulations. The court concentrated its analysis on whether the regulations are "with respect to" advertising and promotion, relying on two of its sister Circuits to conclude that the FCLAA only pre-empts regulations of the content of cigarette advertising. The Court of Appeals also reasoned that the Attorney General's regulations are a form of zoning, a traditional area of state power; therefore the presumption against pre-emption applied.

The cigarette petitioners maintain that the Court of Appeals' "with respect to" analysis is inconsistent with the FCLAA's statutory text and legislative history, and gives the States license to prohibit almost all cigarette advertising. Petitioners also maintain that there is no basis for construing the pre-emption provision to prohibit only content-based advertising regulations.

Although they support the Court of Appeals' result, the Attorney General and United States as *amicus curiae* do not fully endorse that court's textual analysis of the pre-emption provision. Instead, they assert that the cigarette advertising regulations are not pre-empted because they are not "based on smoking and health." The Attorney General and **\*547** the United States also contend that the regulations are not pre-empted because they do not prescribe the content of cigarette advertising and they fall squarely within the State's traditional powers to control the location

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                      Page 12
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

of advertising and to protect the welfare of children.

Turning first to the language in the pre-emption provision relied upon by the Court of Appeals, we reject the notion that the Attorney General's cigarette advertising regulations are not "with respect to" advertising and promotion. We disagree with the Court of Appeals' analogy to the Employee Retirement Income Security Act of 1974 (ERISA). In some cases concerning ERISA's pre-emption of state law, the Court has had to decide whether a particular state law "relates to" an employee benefit plan covered by ERISA even though the state law makes no express reference to such a plan. See, e.g., *California Div. of Labor Standards Enforcement v. Dillingham Constr., N. A., Inc.,* 519 U.S., at 324-325, 117 S.Ct. 832. Here, however, there is no question about an indirect relationship between the regulations and cigarette advertising because the regulations expressly target cigarette advertising. 940 Code of Mass. Regs. § 21.04(5) (2000).

Before this Court, the Attorney General focuses on a different phrase in the pre-emption provision: "based on smoking and health." The Attorney General argues that the cigarette advertising regulations are not "based on smoking and health," because they do not involve health-related **2418 content in cigarette advertising but instead target youth exposure to cigarette advertising. To be sure, Members of this Court have debated the precise meaning of "based on smoking and health," see *Cipollone, supra,* at 529, n. 7, 112 S.Ct. 2608 (plurality opinion), but we cannot agree with the Attorney General's narrow construction of the phrase.

As Congress enacted the current pre-emption provision, Congress did not concern itself solely with health warnings for cigarettes. In the 1969 amendments, Congress not only *548 enhanced its scheme to warn the public about the hazards of cigarette smoking, but also sought to protect the public, including youth, from being inundated with images of cigarette smoking in advertising. In pursuit of the latter goal, Congress banned electronic media advertising of cigarettes. And to the extent that Congress contemplated additional targeted regulation of cigarette advertising, it vested that authority in the FTC.

The context in which Congress crafted the current pre-emption provision leads us to conclude that Congress prohibited state cigarette advertising regulations motivated by concerns about smoking

and health. Massachusetts has attempted to address the incidence of underage cigarette smoking by regulating advertising, see 940 Code of Mass. Regs. § 21.01 (2000), much like Congress' ban on cigarette advertising in electronic media. At bottom, the concern about youth exposure to cigarette advertising is intertwined with the concern about cigarette smoking and health. Thus the Attorney General's attempt to distinguish one concern from the other must be rejected.

The Attorney General next claims that the State's outdoor and point-of-sale advertising regulations for cigarettes are not pre-empted because they govern the location, and not the content, of advertising. This is also STEVENS' main point with respect to pre-emption. *Post,* at 2443 (opinion concurring in part, concurring in judgment in part, and dissenting in part).

The content versus location distinction has some surface appeal. The pre-emption provision immediately follows the section of the FCLAA that prescribes warnings. See 15 U.S.C. § § 1333, 1334. The pre-emption provision itself refers to cigarettes "labeled in conformity with" the statute. § 1334(b). But the content/location distinction cannot be squared with the language of the pre-emption provision, which reaches *all* "requirements" and "prohibitions" "imposed under State law." A distinction between the content *549 of advertising and the location of advertising in the FCLAA also cannot be reconciled with Congress' own location-based restriction, which bans advertising in electronic media, but not elsewhere. See § 1335. We are not at liberty to pick and choose which provisions in the legislative scheme we will consider, see *post,* at 2443, n. 5 (opinion of STEVENS, J.), but must examine the FCLAA as a whole.

Moreover, any distinction between the content and location of cigarette advertising collapses once the implications of that approach are fully considered. At oral argument, the Attorney General was pressed to explain what types of state regulations of cigarette advertising, in his view, are pre-empted by the FCLAA. The Attorney General maintained that a state law that required cigarette retailers to remove the word "tobacco" from advertisements, or required cigarette billboards to be blank, would be pre-empted if it were a regulation of "health-related content." Tr. of Oral Arg. 41, 42. The Attorney General also maintained, however, that a complete ban on all cigarette advertising would not be pre-empted

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                                                      Page 13
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

because Congress did not intend to invade local control over zoning. *Id.,* at 42-44. The latter position clearly follows from the factual distinction between content and location, but it finds no support in the text of the FCLAA's pre-emption provision. We believe that Congress wished to ensure that "a State could not do through negative mandate (*e.g.,* **2419 banning all cigarette advertising) that which it already was forbidden to do through positive mandate (*e.g.,* mandating particular cautionary statements)." *Cipollone,* 505 U.S., at 539, 112 S.Ct. 2608 (Blackmun, J., joined by KENNEDY and SOUTER, JJ., concurring in part and dissenting in part). See also *Vango Media, Inc. v. New York,* 34 F.3d 68 (C.A.2 1994) (holding pre-empted a regulation that required one public health message for every four cigarette advertisements).

Justice STEVENS, *post,* at 2443-2445, maintains that Congress did not intend to displace state regulation of the location of cigarette advertising. There is a critical distinction, ***550** however, between generally applicable zoning regulations, see *infra,* this page and 2420, and regulations targeting cigarette advertising. The latter type of regulation, which is inevitably motivated by concerns about smoking and health, squarely contradicts the FCLAA. The FCLAA's comprehensive warnings, advertising restrictions, and pre-emption provision would make little sense if a State or locality could simply target and ban all cigarette advertising.

Justice STEVENS finds it ironic that we conclude that "federal law precludes States and localities from protecting children from dangerous products within 1,000 feet of a school," in light of our prior conclusion that the "Federal Government lacks the constitutional authority to impose a similarly motivated ban" in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). *Post,* at 2445, n. 8. Our holding is not as broad as Justice STEVENS states; we hold only that the FCLAA pre-empts state regulations targeting cigarette advertising. States remain free to enact generally applicable zoning regulations, and to regulate conduct with respect to cigarette use and sales. *Infra,* at 2420. The reference to *Lopez* is also inapposite. In *Lopez,* we held that Congress exceeded the limits of its Commerce Clause power in the Gun-Free School Zones Act of 1990, which made it a federal crime to possess a firearm in a school zone. 514 U.S., at 553- 568, 115 S.Ct. 1624. These cases, by contrast, concern the Supremacy Clause and the doctrine of pre-emption as applied in a case where

Congress expressly precluded certain state regulations of cigarette advertising. Massachusetts did not raise a constitutional challenge to the FCLAA, and we are not confronted with whether Congress exceeded its constitutionally delegated authority in enacting the FCLAA.

In sum, we fail to see how the FCLAA and its pre-emption provision permit a distinction between the specific concern about minors and cigarette advertising and the more general concern about smoking and health in cigarette advertising, especially in light of the fact that Congress crafted a legislative***551** solution for those very concerns. We also conclude that a distinction between state regulation of the location as opposed to the content of cigarette advertising has no foundation in the text of the pre-emption provision. Congress pre-empted state cigarette advertising regulations like the Attorney General's because they would upset federal legislative choices to require specific warnings and to impose the ban on cigarette advertising in electronic media in order to address concerns about smoking and health. Accordingly, we hold that the Attorney General's outdoor and point-of-sale advertising regulations targeting cigarettes are pre-empted by the FCLAA.

### C

[4] Although the FCLAA prevents States and localities from imposing special requirements or prohibitions "based on smoking and health" with respect to the advertising or promotion" of cigarettes, that language still leaves significant power in the hands of States to impose generally applicable zoning regulations and to regulate conduct. As we noted in *Cipollone,* "each phrase within [the provision] limits the universe of [state action] pre-empted **2420 by the statute." 505 U.S., at 524, 112 S.Ct. 2608 (plurality opinion).

For instance, the FCLAA does not restrict a State or locality's ability to enact generally applicable zoning restrictions. We have recognized that state interests in traffic safety and esthetics may justify zoning regulations for advertising. See *Metromedia, Inc. v. San Diego,* 453 U.S. 490, 507-508, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). See also *St. Louis Poster Advertising Co. v. St. Louis,* 249 U.S. 269, 274, 39 S.Ct. 274, 63 L.Ed. 599 (1919); *Thomas Cusack Co. v. Chicago,* 242 U.S. 526, 529-531, 37 S.Ct. 190, 61 L.Ed. 472 (1917). Although Congress has taken into account the unique concerns about cigarette smoking and health in advertising, there is no indication that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                                      Page 14
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

Congress intended to displace local community interests in general regulations of the location of billboards or large marquee advertising, or that Congress intended cigarette advertisers to be afforded special treatment in that regard. Restrictions *552 on the location and size of advertisements that apply to cigarettes on equal terms with other products appear to be outside the ambit of the pre-emption provision. Such restrictions are not "based on smoking and health."

The FCLAA also does not foreclose all state regulation of conduct as it relates to the sale or use of cigarettes. The FCLAA's pre-emption provision explicitly governs state regulations of "advertising or promotion." [FN*] Accordingly, the FCLAA does not pre-empt state laws prohibiting cigarette sales to minors. To the contrary, there is an established congressional policy that supports such laws; Congress has required States to prohibit tobacco sales to minors as a condition of receiving federal block grant funding for substance abuse treatment activities. 106 Stat. 394, 388, 42 U.S.C. § § 300x-26(a)(1), 300x-21.

> FN* The Senate Report explained that the pre-emption provision "would in no way affect the power of any State or political subdivision of any State with respect to the taxation or the sale of cigarettes to minors, or the prohibition of smoking in public buildings, or similar police regulations. It is limited entirely to State or local requirements or prohibitions in the advertising of cigarettes." S.Rep. No. 91-566, p. 12 (1969).

In Massachusetts, it is illegal to sell or distribute tobacco products to persons under the age of 18. Mass. Gen. Laws, ch. 270, § 6 (2000). Having prohibited the sale and distribution of tobacco products to minors, the State may prohibit common inchoate offenses that attach to criminal conduct, such as solicitation, conspiracy, and attempt. Cf. Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York, 447 U.S. at 563-564, 100 S.Ct. 2343; Carey v. Population Servs. Int'l, 431 U.S. 678, 701, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 772, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); 60 Fed.Reg. 41330-41332 (1995) (citing evidence that industry may be attempting to induce individuals under 18 to smoke cigarettes). States and localities also have at their

disposal other means of regulating conduct to ensure that minors do not obtain cigarettes. See Part III-D, infra.

*553 D

The smokeless tobacco petitioners argue that if the State's outdoor and point-of-sale advertising regulations for cigarettes are pre-empted, then the same advertising regulations with respect to smokeless tobacco must be invalidated because they cannot be severed from the cigarette provisions. Brief for Petitioner U.S. Smokeless Tobacco Co. in Nos. 00-596 and 00- 597, p. 4, n. 5. The District Court did not reach the severability issue with respect to the advertising provisions that are before this Court. 76 F.Supp.2d, at 134, n. 11. The Court of Appeals also did not reach severability because that court likewise concluded that the cigarette advertising regulations were not pre-empted. 218 F.3d, at 37, n. 3. We decline to reach an issue that was not decided below. **2421 National Collegiate Athletic Assn. v. Smith, 525 U.S. 459, 470, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999).

III

By its terms, the FCLAA's pre-emption provision only applies to cigarettes. Accordingly, we must evaluate the smokeless tobacco and cigar petitioners' First Amendment challenges to the State's outdoor and point-of-sale advertising regulations. The cigarette petitioners did not raise a pre-emption challenge to the sales practices regulations. Thus, we must analyze the cigarette as well as the smokeless tobacco and cigar petitioners' claim that certain sales practices regulations for tobacco products violate the First Amendment.

A

[5] For over 25 years, the Court has recognized that commercial speech does not fall outside the purview of the First Amendment. See, e.g., Virginia Bd. of Pharmacy, supra, at 762, 96 S.Ct. 1817. Instead, the Court has afforded commercial speech a measure of First Amendment protection " 'commensurate' " with its position in relation to other constitutionally guaranteed expression. See, e.g., *554 Florida Bar v. Went For It, Inc., 515 U.S. 618, 623, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) (quoting Board of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 477, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)). In recognition of the "distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech," Central Hudson, supra, at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                    Page 15
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

562, 100 S.Ct. 2343 (internal quotation marks omitted), we developed a framework for analyzing regulations of commercial speech that is "substantially similar" to the test for time, place, and manner restrictions, *Board of Trustees of State Univ. of N.Y. v. Fox, supra,* at 477, 109 S.Ct. 3028. The analysis contains four elements:

"At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Central Hudson, supra,* at 566, 100 S.Ct. 2343.

Petitioners urge us to reject the *Central Hudson* analysis and apply strict scrutiny. They are not the first litigants to do so. See, *e.g., Greater New Orleans Broadcasting Assn., Inc. v. United States,* 527 U.S. 173, 184, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999). Admittedly, several Members of the Court have expressed doubts about the *Central Hudson* analysis and whether it should apply in particular cases. See, *e.g., Greater New Orleans, supra,* at 197, 119 S.Ct. 1923 (THOMAS, J., concurring in judgment); *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 501, 510-514, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (joint opinion of STEVENS, KENNEDY, and GINSBURG, JJ.); *id.,* at 517, 116 S.Ct. 1495 (SCALIA, J., concurring in part and concurring in judgment); *id.,* at 518, 116 S.Ct. 1495 (THOMAS, J., concurring in part and concurring in judgment). But here, as in *Greater New Orleans,* we see "no need to break new ground. *Central Hudson,* as **\*555** applied in our more recent commercial speech cases, provides an adequate basis for decision." 527 U.S., at 184, 119 S.Ct. 1923.

Only the last two steps of *Central Hudson's* four-part analysis are at issue here. The Attorney General has assumed for purposes of summary judgment that petitioners' speech is entitled to First Amendment protection. 218 F.3d, at 43, 84 F.Supp.2d, at 185-186. With respect to the second step, none of the petitioners **\*\*2422** contests the importance of the State's interest in preventing the use of tobacco products by minors. Brief for Petitioners Lorillard Tobacco Co. et al. in No. 00-596, p. 41; Brief for Petitioner U.S. Smokeless Tobacco Co. in Nos. 00-

596 and 00-597, at 16; Brief for Petitioners Altadis U.S.A. Inc. et al. in No. 00-597, p. 8.

The third step of *Central Hudson* concerns the relationship between the harm that underlies the State's interest and the means identified by the State to advance that interest. It requires that

"the speech restriction directly and materially advanc[e] the asserted governmental interest. 'This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.' " *Greater New Orleans, supra,* at 188, 119 S.Ct. 1923 (quoting *Edenfield v. Fane,* 507 U.S. 761, 770-771, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993)).

We do not, however, require that "empirical data come ... accompanied by a surfeit of background information .... [W]e have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and 'simple common sense.' " *Florida Bar v. Went For It, Inc., supra,* at 628, 115 S.Ct. 2371 (citations and internal quotation marks omitted).

**\*556** The last step of the *Central Hudson* analysis "complements" the third step, "asking whether the speech restriction is not more extensive than necessary to serve the interests that support it." *Greater New Orleans, supra,* at 188, 119 S.Ct. 1923. We have made it clear that "the least restrictive means" is not the standard; instead, the case law requires a reasonable " 'fit between the legislature's ends and the means chosen to accomplish those ends, ... a means narrowly tailored to achieve the desired objective.' " *Went For It, Inc., supra,* at 632, 115 S.Ct. 2371 (quoting *Board of Trustees of State Univ. of N.Y. v. Fox, supra,* at 480, 109 S.Ct. 3028). Focusing on the third and fourth steps of the *Central Hudson* analysis, we first address the outdoor advertising and point-of-sale advertising regulations for smokeless tobacco and cigars. We then address the sales practices regulations for all tobacco products.

B

[6] The outdoor advertising regulations prohibit smokeless tobacco or cigar advertising within a 1,000-foot radius of a school or playground. 940

121 S.Ct. 2404                                                                    Page 16
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

Code of Mass. Regs. § § 21.04(5)(a), 22.06(5)(a) (2000). The District Court and Court of Appeals concluded that the Attorney General had identified a real problem with underage use of tobacco products, that limiting youth exposure to advertising would combat that problem, and that the regulations burdened no more speech than necessary to accomplish the State's goal. 218 F.3d, at 44- 53, 84 F.Supp.2d, at 186-193. The smokeless tobacco and cigar petitioners take issue with all of these conclusions.

1

The smokeless tobacco and cigar petitioners contend that the Attorney General's regulations do not satisfy *Central Hudson's* third step. They maintain that although the Attorney General may have identified a problem with underage cigarette smoking, he has not identified an equally severe problem with respect to underage use of smokeless tobacco **557** or cigars. The smokeless tobacco petitioner emphasizes the "lack of parity" between cigarettes and smokeless tobacco. Brief for Petitioner U.S. Smokeless Tobacco Co. in Nos. 00-596 and 00-597, at 19; Reply Brief for Petitioner U.S. Smokeless Tobacco Co. in Nos. 00-596 and 00-597, pp. 4, **2423** 10-11. The cigar petitioners catalog a list of differences between cigars and other tobacco products, including the characteristics of the products and marketing strategies. Brief for Petitioners Altadis U.S.A. Inc. et al. in No. 00-597, at 9-11. The petitioners finally contend that the Attorney General cannot prove that advertising has a causal link to tobacco use such that limiting advertising will materially alleviate any problem of underage use of their products. Brief for Petitioner U.S. Smokeless Tobacco Co. in Nos. 00-596 and 00-597, at 20-22; Brief for Petitioners Altadis U.S.A. Inc. et al. in No. 00-597, at 9-16.

In previous cases, we have acknowledged the theory that product advertising stimulates demand for products, while suppressed advertising may have the opposite effect. See *Rubin,* 514 U.S., at 487, 115 S.Ct. 1585; *United States v. Edge Broadcasting Co.,* 509 U.S. 418, 434, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993); *Central Hudson,* 447 U.S., at 568-569, 100 S.Ct. 2343. The Attorney General cites numerous studies to support this theory in the case of tobacco products.

The Attorney General relies in part on evidence gathered by the Food and Drug Administration (FDA) in its attempt to regulate the advertising of cigarettes and smokeless tobacco. See Regulations Restricting the Sale and Distribution of Cigarettes and Smokeless Tobacco Products to Protect Children and Adolescents, FDA Proposed Rule, 60 Fed.Reg. 41314 (1995); Regulations Restricting the Sale and Distribution of Cigarettes and Smokeless Tobacco to Protect Children and Adolescents, FDA Final Rule, 61 Fed.Reg. 44396 (1996). The FDA promulgated the advertising regulations after finding that the period prior to adulthood is when an overwhelming majority of Americans first decide to use tobacco products, and that advertising plays a crucial *558 role in that decision. *Id.,* at 44398-44399. We later held that the FDA lacks statutory authority to regulate tobacco products. See *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). Nevertheless, the Attorney General relies on the FDA's proceedings and other studies to support his decision that advertising affects demand for tobacco products. Cf. *Erie v. Pap's A. M.,* 529 U.S. 277, 296, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion) (cities and localities may rely on evidence from other jurisdictions to demonstrate harmful secondary effects of adult entertainment and to justify regulation); *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 583-584, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (SOUTER, J., concurring in judgment) (same); *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 50-52, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (same). See also *Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377, 393, and n. 6, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (discussing evidence of corruption and the appearance of corruption in campaign finance).

In its rulemaking proceeding, the FDA considered several studies of tobacco advertising and trends in the use of various tobacco products. The Surgeon General's report and the Institute of Medicine's report found that "there is sufficient evidence to conclude that advertising and labeling play a significant and important contributory role in a young person's decision to use cigarettes or smokeless tobacco products." 60 Fed.Reg. 41332. See also Pierce et al., Tobacco Industry Promotion of Cigarettes and Adolescent Smoking, 279 JAMA 511, 514 (1998).

For instance, children smoke fewer brands of cigarettes than adults, and those choices directly track the most heavily advertised brands, unlike adult choices, which are more dispersed and related to pricing. FDA Proposed Rule, 60 Fed.Reg. 41332. Another study revealed that 72% of 6 year olds and 52% of children ages 3 to 6 recognized "Joe Camel,"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                    Page 17
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

the cartoon anthropomorphic symbol of R.J. Reynolds' Camel brand cigarettes. _Id., at 41333._ **2424 After the introduction of Joe Camel, Camel cigarettes' share of the youth market rose from 4% to 13%. _Id., at 41330._ The FDA also identified *559 trends in tobacco consumption among certain populations, such as young women, that correlated to the introduction and marketing of products geared toward that population. _Id., at 41333._

The FDA also made specific findings with respect to smokeless tobacco. The FDA concluded that "[t]he recent and very large increase in the use of smokeless tobacco products by young people and the addictive nature of these products has persuaded the agency that these products must be included in any regulatory approach that is designed to help prevent future generations of young people from becoming addicted to nicotine-containing tobacco products." _Id., at 41318._ Studies have analyzed smokeless tobacco use by young people, discussing trends based on gender, school grade, and locale. See, _e.g.,_ Boyd et al., Use of Smokeless Tobacco among Children and Adolescents in the United States, 16 Preventative Medicine 402-418 (1987), Record, Doc. No. 38, Exh. 63.

Researchers tracked a dramatic shift in patterns of smokeless tobacco use from older to younger users over the past 30 years. See, _e.g.,_ FDA Proposed Rule, 60 Fed.Reg. 41317; Tomar, Giovano, J. Erickson, Smokeless tobacco brand preference and brand switching among U.S. adolescents and young adults, 4 Tobacco Control 67 (1995), Record, Doc. No. 38, Exh. 62; Department of Health and Human Services, Preventing Tobacco Use Among Young People: A Report of the Surgeon General 163 (1994), Record, Doc. No. 36, Exh. 1. In particular, the smokeless tobacco industry boosted sales tenfold in the 1970's and 1980's by targeting young males. FDA Proposed Rule, 60 Fed.Reg. 41331. See also National Cancer Institute, Cigars: Health Effects and Trends, Smoking and Tobacco Control Monograph No. 9, p. 16 (1998), Record, Doc. No. 39, Exh. 67. Another study documented the targeting of youth through smokeless tobacco sales and advertising techniques. Ernster, Advertising and Promotion of Smokeless Tobacco Products, National Cancer Institute *560 Monograph No. 8, pp. 87-93 (1989), Record, Doc. No. 38, Exh. 66.

The Attorney General presents different evidence with respect to cigars. There was no data on underage cigar use prior to 1996 because the behavior was considered "uncommon enough not to be worthy of examination." Smoking and Tobacco Control Monograph No. 9, at 13; FTC Report to Congress: Cigar Sales and Advertising and Promotional Expenses for Calendar Years 1996 and 1997, p. 9 (1999), Record, Doc. No. 39, Exh. 71. In 1995, the FDA decided not to include cigars in its attempted regulation of tobacco product advertising, explaining that "the agency does not currently have sufficient evidence that these products are drug delivery devices .... FDA has focused its investigation of its authority over tobacco products on cigarettes and smokeless tobacco products, and not on pipe tobacco or cigars, because young people predominantly use cigarettes and smokeless tobacco products." 60 Fed.Reg. 41322.

More recently, however, data on youth cigar use has emerged. The National Cancer Institute concluded in its 1998 Monograph that the rate of cigar use by minors is increasing and that, in some States, the cigar use rates are higher than the smokeless tobacco use rates for minors. Smoking and Tobacco Control Monograph No. 9, at 19, 42-51. In its 1999 Report to Congress, the FTC concluded that "substantial numbers of adolescents are trying cigars." FTC Report to Congress, at 9. See also Department of Health and Human Services, Office of Inspector General, Youth Use of Cigars: Patterns of Use and Perceptions of Risk (1999), Record, Doc. No. 39, Exh. 78.

Studies have also demonstrated a link between advertising and demand for cigars. **2425 After Congress recognized the power of images in advertising and banned cigarette advertising in electronic media, television advertising of small cigars "increased dramatically in 1972 and 1973," "filled the void left by cigarette advertisers," and "sales ... soared." *561 Smoking and Tobacco Control Monograph No. 9, at 24. In 1973, Congress extended the electronic media advertising ban for cigarettes to little cigars. Little Cigar Act, Pub.L. 93-109, § 3, 87 Stat. 352, as amended, 15 U.S.C. § 1335. In the 1990's, cigar advertising campaigns triggered a boost in sales. Smoking and Tobacco Control Monograph No. 9, at 215.

Our review of the record reveals that the Attorney General has provided ample documentation of the problem with underage use of smokeless tobacco and cigars. In addition, we disagree with petitioners' claim that there is no evidence that preventing targeted campaigns and limiting youth exposure to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-10006-JGD     Document 35     Filed 08/15/2005     Page 53 of 83

121 S.Ct. 2404                                                                   Page 18
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

advertising will decrease underage use of smokeless tobacco and cigars. On this record and in the posture of summary judgment, we are unable to conclude that the Attorney General's decision to regulate advertising of smokeless tobacco and cigars in an effort to combat the use of tobacco products by minors was based on mere "speculation [and] conjecture." *Edenfield v. Fane,* 507 U.S., at 770, 113 S.Ct. 1792.

                                2

Whatever the strength of the Attorney General's evidence to justify the outdoor advertising regulations, however, we conclude that the regulations do not satisfy the fourth step of the *Central Hudson* analysis. The final step of the *Central Hudson* analysis, the "critical inquiry in this case," requires a reasonable fit between the means and ends of the regulatory scheme. 447 U.S., at 569, 100 S.Ct. 2343. The Attorney General's regulations do not meet this standard. The broad sweep of the regulations indicates that the Attorney General did not "carefully calculat[e] the costs and benefits associated with the burden on speech imposed" by the regulations. *Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 417, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (internal quotation marks omitted).

The outdoor advertising regulations prohibit any smokeless tobacco or cigar advertising within 1,000 feet of schools **\*562** or playgrounds. In the District Court, petitioners maintained that this prohibition would prevent advertising in 87% to 91% of Boston, Worcester, and Springfield, Massachusetts. 84 F.Supp.2d, at 191. The 87% to 91% figure appears to include not only the effect of the regulations, but also the limitations imposed by other generally applicable zoning restrictions. See App. 161-167. The Attorney General disputed petitioners' figures but "concede[d] that the reach of the regulations is substantial." 218 F.3d, at 50. Thus, the Court of Appeals concluded that the regulations prohibit advertising in a substantial portion of the major metropolitan areas of Massachusetts. *Ibid.*

The substantial geographical reach of the Attorney General's outdoor advertising regulations is compounded by other factors. "Outdoor" advertising includes not only advertising located outside an establishment, but also advertising inside a store if that advertising is visible from outside the store. The regulations restrict advertisements of any size and the term advertisement also includes oral statements. 940 Code of Mass. Regs § § 21.03, 22.03 (2000).

In some geographical areas, these regulations would constitute nearly a complete ban on the communication of truthful information about smokeless tobacco and cigars to adult consumers. The breadth and scope of the regulations, and the process by which the Attorney General adopted the regulations, do not demonstrate a careful calculation of the speech interests involved.

**\*\*2426** First, the Attorney General did not seem to consider the impact of the 1,000-foot restriction on commercial speech in major metropolitan areas. The Attorney General apparently selected the 1,000-foot distance based on the FDA's decision to impose an identical 1,000-foot restriction when it attempted to regulate cigarette and smokeless tobacco advertising. See FDA Final Rule, 61 Fed.Reg. 44399; Brief for Respondents 45, and n. 23. But the FDA's 1,000-foot regulation was not an adequate basis for the Attorney General **\*563** to tailor the Massachusetts regulations. The degree to which speech is suppressed--or alternative avenues for speech remain available--under a particular regulatory scheme tends to be case specific. See, *e.g., Renton,* 475 U.S., at 53-54, 106 S.Ct. 925. And a case specific analysis makes sense, for although a State or locality may have common interests and concerns about underage smoking and the effects of tobacco advertisements, the impact of a restriction on speech will undoubtedly vary from place to place. The FDA's regulations would have had widely disparate effects nationwide. Even in Massachusetts, the effect of the Attorney General's speech regulations will vary based on whether a locale is rural, suburban, or urban. The uniformly broad sweep of the geographical limitation demonstrates a lack of tailoring.

In addition, the range of communications restricted seems unduly broad. For instance, it is not clear from the regulatory scheme why a ban on oral communications is necessary to further the State's interest. Apparently that restriction means that a retailer is unable to answer inquiries about its tobacco products if that communication occurs outdoors. Similarly, a ban on all signs of any size seems ill suited to target the problem of highly visible billboards, as opposed to smaller signs. To the extent that studies have identified particular advertising and promotion practices that appeal to youth, tailoring would involve targeting those practices while permitting others. As crafted, the regulations make no distinction among practices on this basis.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-10006-JGD     Document 35     Filed 08/15/2005     Page 54 of 83

121 S.Ct. 2404                                                                    Page 19
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

The Court of Appeals recognized that the smokeless tobacco and cigar petitioners' concern about the amount of speech restricted was "valid," but reasoned that there was an "obvious connection to the state's interest in protecting minors." 218 F.3d, at 50. Even on the premise that Massachusetts has demonstrated a connection between the outdoor advertising regulations and its substantial interest in preventing underage tobacco use, the question of tailoring remains. *564 The Court of Appeals failed to follow through with an analysis of the countervailing First Amendment interests.

The State's interest in preventing underage tobacco use is substantial, and even compelling, but it is no less true that the sale and use of tobacco products by adults is a legal activity. We must consider that tobacco retailers and manufacturers have an interest in conveying truthful information about their products to adults, and adults have a corresponding interest in receiving truthful information about tobacco products. In a case involving indecent speech on the Internet we explained that "the governmental interest in protecting children from harmful materials ... does not justify an unnecessarily broad suppression of speech addressed to adults." _Reno v. American Civil Liberties Union,_ 521 U.S. 844, 875, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (citations omitted). See, _e.g., Bolger v. Youngs Drug Products Corp.,_ 463 U.S. 60, 74, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) ("The level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox"); _Butler v. Michigan,_ 352 U.S. 380, 383, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957) ("The incidence of this enactment is to reduce the adult population ... to reading only what is fit for children"). As the State protects children from tobacco advertisements, tobacco manufacturers and retailers and their adult consumers still have a protected interest in communication. **2427 Cf. _American Civil Liberties Union, supra,_ at 886- 889, 117 S.Ct. 2329 (O'CONNOR, J., concurring in judgment in part and dissenting in part) (discussing the creation of "adult zones" on the Internet).

In some instances, Massachusetts' outdoor advertising regulations would impose particularly onerous burdens on speech. For example, we disagree with the Court of Appeals' conclusion that because cigar manufacturers and retailers conduct a limited amount of advertising in comparison to other tobacco products, "the relative lack of cigar advertising also means that the burden imposed on cigar advertisers is correspondingly small." 218 F.3d, at 49. If some retailers have relatively small advertising budgets, and use *565 few avenues of communication, then the Attorney General's outdoor advertising regulations potentially place a greater, not lesser, burden on those retailers' speech. Furthermore, to the extent that cigar products and cigar advertising differ from that of other tobacco products, that difference should inform the inquiry into what speech restrictions are necessary.

In addition, a retailer in Massachusetts may have no means of communicating to passersby on the street that it sells tobacco products because alternative forms of advertisement, like newspapers, do not allow that retailer to propose an instant transaction in the way that onsite advertising does. The ban on any indoor advertising that is visible from the outside also presents problems in establishments like convenience stores, which have unique security concerns that counsel in favor of full visibility of the store from the outside. It is these sorts of considerations that the Attorney General failed to incorporate into the regulatory scheme.

We conclude that the Attorney General has failed to show that the outdoor advertising regulations for smokeless tobacco and cigars are not more extensive than necessary to advance the State's substantial interest in preventing underage tobacco use. Justice STEVENS urges that the Court remand the case for further development of the factual record. _Post,_ at 2446-2447. We believe that a remand is inappropriate in these cases because the State had ample opportunity to develop a record with respect to tailoring (as it had to justify its decision to regulate advertising), and additional evidence would not alter the nature of the scheme before the Court. See _Greater New Orleans,_ 527 U.S., at 189, n. 6, 119 S.Ct. 1923.

A careful calculation of the costs of a speech regulation does not mean that a State must demonstrate that there is no incursion on legitimate speech interests, but a speech regulation cannot unduly impinge on the speaker's ability to propose a commercial transaction and the adult listener's opportunity to obtain information about products. After *566 reviewing the outdoor advertising regulations, we find the calculation in these cases insufficient for purposes of the First Amendment.

### C

Massachusetts has also restricted indoor, point-of-

533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

sale advertising for smokeless tobacco and cigars. Advertising cannot be "placed lower than five feet from the floor of any retail establishment which is located within a one thousand foot radius of" any school or playground. 940 Code of Mass. Regs. § § 21.04(5)(b), 22.06(5)(b) (2000). The District Court invalidated these provisions, concluding that the Attorney General had not provided a sufficient basis for regulating indoor advertising. 84 F.Supp.2d, at 192-193, 195. The Court of Appeals reversed. 218 F.3d, at 50-51. The court explained: "We do have some misgivings about the effectiveness of a restriction that is based on the assumption that minors under five feet tall will not, or will less frequently, raise their view above eye-level, but we find that such [a] determination falls within that range of reasonableness in which the Attorney General is best suited to pass judgment." Id., at 51.

**\*\*2428** [7] We conclude that the point-of-sale advertising regulations fail both the third and fourth steps of the *Central Hudson* analysis. A regulation cannot be sustained if it " 'provides only ineffective or remote support for the government's purpose,' " *Edenfield,* 507 U.S., at 770, 113 S.Ct. 1792 (quoting *Central Hudson,* 447 U.S., at 564, 100 S.Ct. 2343), or if there is "little chance" that the restriction will advance the State's goal, *Greater New Orleans, supra,* at 193, 119 S.Ct. 1923 (internal quotation marks omitted). As outlined above, the State's goal is to prevent minors from using tobacco products and to curb demand for that activity by limiting youth exposure to advertising. The 5-foot rule does not seem to advance that goal. Not all children are less than 5 feet tall, and those who are certainly have the ability to look up and take in their surroundings.

**\*567** By contrast to Justice STEVENS, *post,* at 2448, we do not believe this regulation can be construed as a mere regulation of conduct under *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). To qualify as a regulation of communicative action governed by the scrutiny outlined in *O'Brien,* the State's regulation must be unrelated to expression. *Texas v. Johnson,* 491 U.S. 397, 403, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). See also *Erie v. Pap's A. M.,* 529 U.S., at 289-296, 120 S.Ct. 1382 (plurality opinion). Here, Massachusetts' height restriction is an attempt to regulate directly the communicative impact of indoor advertising.

[8] Massachusetts may wish to target tobacco advertisements and displays that entice children,

much like floor-level candy displays in a convenience store, but the blanket height restriction does not constitute a reasonable fit with that goal. The Court of Appeals recognized that the efficacy of the regulation was questionable, but decided that, "[i]n any event, the burden on speech imposed by the provision is very limited." 218 F.3d, at 51. There is no *de minimis* exception for a speech restriction that lacks sufficient tailoring or justification. We conclude that the restriction on the height of indoor advertising is invalid under *Central Hudson's* third and fourth prongs.

### D

The Attorney General also promulgated a number of regulations that restrict sales practices by cigarette, smokeless tobacco, and cigar manufacturers and retailers. Among other restrictions, the regulations bar the use of self-service displays and require that tobacco products be placed out of the reach of all consumers in a location accessible only to salespersons. 940 Code of Mass. Regs. § § 21.04(2)(c)-(d), 22.06(2)(c)-(d) (2000). The cigarette petitioners do not challenge the sales practices regulations on pre-emption grounds. Brief for Petitioners Lorillard Tobacco Co. et al. in No. 00-596, at 5, n. 2. Two of the cigarette petitioners (Brown & Williamson Tobacco Corporation and Lorillard Tobacco Company), petitioner U.S. Smokeless Tobacco Company, **\*568** and the cigar petitioners challenge the sales practices regulations on First Amendment grounds. The cigar petitioners additionally challenge a provision that prohibits sampling or promotional giveaways of cigars or little cigars. 940 Code of Mass. Regs. § 22.06(1)(a) (2000).

The District Court concluded that these restrictions implicate no cognizable speech interest, 84 F.Supp.2d, at 195-196, but the Court of Appeals did not fully adopt that reasoning. The Court of Appeals recognized that self-service displays "often do have some communicative commercial function," but noted that the restriction in the regulations "is not on speech, but rather on the physical location of actual tobacco products." 218 F.3d, at 53. The court reasoned that nothing in the regulations would prevent the display of empty tobacco product containers, so long as no actual tobacco product was displayed, much like movie jackets at a video store. *Ibid.* With **\*\*2429** respect to cigar products, the court observed that retailers traditionally allow access to those products, so that the consumer may make a selection on the basis of a number of objective and

121 S.Ct. 2404                                                                                          Page 21
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

subjective factors including the aroma and feel of the cigars. *Ibid.* Even assuming a speech interest, however, the court concluded that the regulations were narrowly tailored to serve the State's substantial interest in preventing access to tobacco products by minors. *Id., at 54.* The court also noted that the restrictions do not apply to adult-only establishments. *Ibid.*

[9] Petitioners devoted little of their briefing to the sales practices regulations, and our understanding of the regulations is accordingly limited by the parties' submissions. As we read the regulations, they basically require tobacco retailers to place tobacco products behind counters and require customers to have contact with a salesperson before they are able to handle a tobacco product.

The cigarette and smokeless tobacco petitioners contend that "the same First Amendment principles that require invalidation of the outdoor and indoor advertising restrictions *569 require invalidation of the display regulations at issue in this case." Brief for Petitioners Lorillard Tobacco Co. et al. in No. 00-596, at 46, n. 7. See also Reply Brief for Petitioner U.S. Smokeless Tobacco Co. in Nos. 00-596 and 00-597, at 12, n. 7. The cigar petitioners contend that self-service displays for cigars cannot be prohibited because each brand of cigar is unique and customers traditionally have sought to handle and compare cigars at the time of purchase. Brief for Petitioners Altadis U.S.A. Inc. et al. in No. 00-597, at 23, n. 9; Reply Brief for Petitioners Altadis U.S.A. Inc. et al. in No. 00-597, p. 10, n. 7.

We reject these contentions. Assuming that petitioners have a cognizable speech interest in a particular means of displaying their products, cf. *Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (distribution of a magazine through newsracks), these regulations withstand First Amendment scrutiny.

Massachusetts' sales practices provisions regulate conduct that may have a communicative component, but Massachusetts seeks to regulate the placement of tobacco products for reasons unrelated to the communication of ideas. See *O'Brien, supra,* at 382, 88 S.Ct. 1673. See also *Pap's A. M.,* 529 U.S., at 289, 120 S.Ct. 1382 (plurality opinion); *id.,* at 310, 120 S.Ct. 1382 (SOUTER, J., concurring in part and dissenting in part); *Johnson, supra,* at 403, 109 S.Ct. 2533. We conclude that the State has demonstrated a substantial interest in preventing access to tobacco

products by minors and has adopted an appropriately narrow means of advancing that interest. See *O'Brien, supra,* at 382, 88 S.Ct. 1673.

Unattended displays of tobacco products present an opportunity for access without the proper age verification required by law. Thus, the State prohibits self-service and other displays that would allow an individual to obtain tobacco products without direct contact with a salesperson. It is clear that the regulations leave open ample channels of communication. The regulations do not significantly impede adult access to tobacco products. Moreover, retailers have other *570 means of exercising any cognizable speech interest in the presentation of their products. We presume that vendors may place empty tobacco packaging on open display, and display actual tobacco products so long as that display is only accessible to sales personnel. As for cigars, there is no indication in the regulations that a customer is unable to examine a cigar prior to purchase, so long as that examination takes place through a salesperson.

The cigar petitioners also list Massachusetts' prohibition on sampling and free giveaways among the regulations they challenge on First Amendment grounds. See **2430940 Code of Mass. Regs. § 22.06(1)(a) (2000); Brief for Petitioners Altadis U.S.A. Inc. et al. in No. 00-597, at 2. At no point in their briefs or at oral argument, however, did the cigar petitioners argue the merits of their First Amendment claim with respect to the sampling and giveaway regulation. We decline to address an issue that was not sufficiently briefed and argued before this Court. See *Northwest Airlines, Inc. v. County of Kent,* 510 U.S. 355, 366, n. 10, 114 S.Ct. 855, 127 L.Ed.2d 183 (1994); *Williams v. United States,* 503 U.S. 193, 206, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992); *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 38-40, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989).

We conclude that the sales practices regulations withstand First Amendment scrutiny. The means chosen by the State are narrowly tailored to prevent access to tobacco products by minors, are unrelated to expression, and leave open alternative avenues for vendors to convey information about products and for would-be customers to inspect products before purchase.

                    IV
We have observed that "tobacco use, particularly among children and adolescents, poses perhaps the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                    Page 22
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

single most significant threat to public health in the United States." *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S., at 161, 120 S.Ct. 1291. From a policy perspective, it is understandable for the States to attempt to prevent minors from using tobacco products before they reach an age where they are capable of weighing *571 for themselves the risks and potential benefits of tobacco use, and other adult activities. Federal law, however, places limits on policy choices available to the States.

In these cases, Congress enacted a comprehensive scheme to address cigarette smoking and health in advertising and pre-empted state regulation of cigarette advertising that attempts to address that same concern, even with respect to youth. The First Amendment also constrains state efforts to limit advertising of tobacco products, because so long as the sale and use of tobacco is lawful for adults, the tobacco industry has a protected interest in communicating information about its products and adult customers have an interest in receiving that information.

To the extent that federal law and the First Amendment do not prohibit state action, States and localities remain free to combat the problem of underage tobacco use by appropriate means. The judgment of the United States Court of Appeals for the First Circuit is therefore affirmed in part and reversed in part, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice KENNEDY, with whom Justice SCALIA joins, concurring in part and concurring in the judgment.

The obvious overbreadth of the outdoor advertising restrictions suffices to invalidate them under the fourth part of the test in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). As a result, in my view, there is no need to consider whether the restrictions satisfy the third part of the test, a proposition about which there is considerable doubt. Cf. *post,* at 2436-2437 (THOMAS, J., concurring in part and concurring in judgment). Neither are we required to consider whether *Central Hudson* should be retained in the face of the substantial objections that can be made to it. See *post,* at 2432-2436 (opinion of THOMAS, J.). My continuing concerns that the test gives *572 insufficient protection to

truthful, nonmisleading commercial speech require me to refrain from expressing agreement with the Court's application of the third part of *Central Hudson.* See, e.g., *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 501-504, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (opinion of STEVENS, J., joined by KENNEDY and GINSBURG, JJ.). With **2431 the exception of Part III-B-1, then, I join the opinion of the Court.

Justice THOMAS, concurring in part and concurring in the judgment.

I join the opinion of the Court (with the exception of Part III-B-1) because I agree that the Massachusetts cigarette advertising regulations are pre-empted by the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. § 1331 *et seq.* I also agree with the Court's disposition of the First Amendment challenges to the other regulations at issue here, and I share the Court's view that the regulations fail even the intermediate scrutiny of *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). At the same time, I continue to believe that when the government seeks to restrict truthful speech in order to suppress the ideas it conveys, strict scrutiny is appropriate, whether or not the speech in question may be characterized as "commercial." See *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 518, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (THOMAS, J., concurring in part and concurring in judgment). I would subject all of the advertising restrictions to strict scrutiny and would hold that they violate the First Amendment.

I

At the heart of this litigation is a Massachusetts regulation that imposes a sweeping ban on speech about tobacco products. 940 Code of Mass. Regs. § 21.04(5) (2000), which governs cigarettes and smokeless tobacco, and § 22.06(5), which governs cigars, prohibit all outdoor advertising, all indoor advertising that can be seen from outdoors, and all point-of-sale advertising (even if not visible from outdoors) that is *573 lower than five feet from the floor. [FN1] These restrictions are superficially limited in their geographic scope: They apply only within 1,000 feet of "any public playground, playground area in a public park, elementary school or secondary school." § 21.04(5)(a). But the Court of Appeals acknowledged that the zone of prohibition covers as much as 90 percent of the three largest cities in Massachusetts, *Consolidated Cigar Corp. v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                                        Page 23
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

*Reilly,* 218 F.3d 30, 50 (C.A.1 2000), so the practical effect is little different from that of a total ban. Cf. *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 812, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) ("The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans").

> FN1. Other regulations prohibit the sale of tobacco products "in any manner other than in a direct, face-to-face exchange," forbid self-service displays, and require that tobacco products be accessible only to store personnel. See § § 21.04(2)(a), (c)-(d), § § 22.06(2)(a), (c)-(d). In addition, they prohibit sampling and promotional giveaways. See § § 21.04(1), 22.06(1). I agree with the Court, see *ante,* at 2428-2434, that these regulations, which govern conduct rather than expression, should be upheld under the test of *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

Respondents suggest in passing that the regulations are "zoning-type restrictions" that should receive "the intermediate level of scrutiny traditionally associated with various forms of 'time, place, and manner' regulations." Brief for Respondents 31. We have indeed upheld time, place, and manner regulations that prohibited certain kinds of outdoor signs, see, e.g., *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), and we have similarly upheld zoning laws that had the effect of restricting certain kinds of sexually explicit expression, see, e.g., *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). But the abiding characteristic of valid time, place, and manner regulations is their content neutrality. See *Ward v. Rock Against Racism,* 491 U.S. 781, 791-796, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). In *Vincent* the city prohibited all signs on public property, not to suppress *574 the message conveyed **2432 by any of the signs, but simply to minimize the esthetic effect of visual clutter. Likewise, the ordinance in *Renton* was aimed not at expression, but at the "secondary effects" caused by adult businesses.

The regulations here are very different. Massachusetts is not concerned with any "secondary effects" of tobacco advertising--it is concerned with the advertising's primary effect, which is to induce those who view the advertisements to purchase and

use tobacco products. Cf. *Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) ("Listeners' reactions to speech are not the type of 'secondary effects' we referred to in *Renton* "). In other words, it seeks to suppress speech about tobacco because it objects to the content of that speech. We have consistently applied strict scrutiny to such content-based regulations of speech. See, e.g., *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 641-643, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).

A

There was once a time when this Court declined to give any First Amendment protection to commercial speech. In *Valentine v. Chrestensen,* 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), the Court went so far as to say that "the Constitution imposes [no] restraint on government as respects purely commercial advertising." *Id.,* at 54, 62 S.Ct. 920. That position was repudiated in *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), which explained that even speech "which does 'no more than propose a commercial transaction' " is protected by the First Amendment. *Id.,* at 762, 96 S.Ct. 1817 (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 385, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973)). Since then, the Court has followed an uncertain course--much of the uncertainty being generated by the malleability of the four-part balancing test of *Central Hudson.* See *44 Liquormart,* 517 U.S., at 520-522, 116 S.Ct. 1495 (THOMAS, J., concurring in part and concurring in judgment).

*575 I have observed previously that there is no "philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech." *Id.,* at 522, 116 S.Ct. 1495. Indeed, I doubt whether it is even possible to draw a coherent distinction between commercial and noncommercial speech. See *id.,* at 523, n. 4, 116 S.Ct. 1495 (citing Kozinski & Banner, Who's Afraid of Commercial Speech, 76 Va. L.Rev. 627 (1990)). [FN2]

> FN2. Tobacco advertising provides a good illustration. The sale of tobacco products is the subject of considerable political controversy, and not surprisingly, some tobacco advertisements both promote a product and take a stand in this political debate. See Brief for National Association

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                    Page 24
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

of Convenience Stores as *Amicus Curiae* 20-22. A recent cigarette advertisement, for example, displayed a brand logo next to text reading, "Why do politicians smoke cigars while taxing cigarettes?" App. to Brief for National Association of Convenience Stores as *Amicus Curiae* 2a.

It should be clear that if these regulations targeted anything other than advertising for commercial products--if, for example, they were directed at billboards promoting political candidates--all would agree that the restrictions should be subjected to strict scrutiny. In my view, an asserted government interest in keeping people ignorant by suppressing expression "is *per se* illegitimate and can no more justify regulation of 'commercial' speech than it can justify regulation of 'noncommercial' speech." 517 U.S., at 518, 116 S.Ct. 1495 (THOMAS, J., concurring in part and concurring in judgment). That is essentially the interest asserted here, and, adhering to the views I expressed in *44 Liquormart,* I would subject the Massachusetts regulations to strict scrutiny.

B

Even if one accepts the premise that commercial speech generally is entitled to **2433 a lower level of constitutional protection than are other forms of speech, it does not follow that the regulations here deserve anything less than strict scrutiny. Although we have recognized several categories of *576 speech that normally receive reduced First Amendment protection, or no First Amendment protection at all, we have never held that the government may regulate speech within those categories in any way that it wishes. Rather, we have said "that these areas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content.*" *R.A.V. v. St. Paul,* 505 U.S. 377, 383, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). Even when speech falls into a category of reduced constitutional protection, the government may not engage in content discrimination for reasons unrelated to those characteristics of the speech that place it within the category. For example, a city may ban obscenity (because obscenity is an unprotected category, see, *e.g., Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)), but it may not ban "only those legally obscene works that contain criticism of the city government." *R.A.V., supra, at* 384, 112 S.Ct. 2538.

In explaining the distinction between commercial speech and other forms of speech, we have emphasized that commercial speech is both "more easily verifiable by its disseminator" and less likely to be "chilled by proper regulation." *Virginia Bd., 425 U.S., at 772, n. 24, 96 S.Ct. 1817.* These characteristics led us to conclude that, in the context of commercial speech, it is "less necessary to tolerate inaccurate statements for fear of silencing the speaker," and also that it is more "appropriate to require that a commercial message appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive." *Ibid.* Whatever the validity of this reasoning, it is limited to the peculiarly commercial harms that commercial speech can threaten--*i.e.,* the risk of deceptive or misleading advertising. As we observed in *R.A.V.:*

"[A] State may choose to regulate price advertising in one industry but not in others, because the risk of fraud (one of the characteristics of commercial speech that justifies depriving it of full First Amendment protection) is in its view greater there. But a State may not prohibit *577 only that commercial advertising that depicts men in a demeaning fashion." 505 U.S., at 388-389, 112 S.Ct. 2538 (citations omitted).

In *44 Liquormart,* several Members of the Court said much the same thing:

"[W]hen a State entirely prohibits the dissemination of truthful, nonmisleading commercial messages for reasons unrelated to the preservation of a fair bargaining process, there is far less reason to depart from the rigorous review that the First Amendment generally demands." 517 U.S., at 501, 116 S.Ct. 1495 (opinion of STEVENS, J., joined by KENNEDY and GINSBURG, JJ.).

Whatever power the State may have to regulate commercial speech, it may not use that power to limit the content of commercial speech, as it has done here, "for reasons unrelated to the preservation of a fair bargaining process." Such content-discriminatory regulation--like all other content-based regulation of speech--must be subjected to strict scrutiny.

C

In an effort to avoid the implications of these basic principles of First Amendment law, respondents make two principal claims. First, they argue that the regulations target deceptive and misleading speech. See Brief for Respondents 33 ("Petitioners' advertising clearly engenders 'the potential for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                                           Page 25
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

deception or confusion' that allows for regulation of commercial speech based on its content" (quoting *Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983)*)). Second, they argue that the regulations restrict speech that promotes **2434 an illegal transaction-- *i.e.,* the sale of tobacco to minors. See Brief for Respondents 15 ("The regulations ... exhibit a close connection to a commercial transaction the State has prohibited").

Neither theory is properly before the Court. For purposes of summary judgment, respondents were willing to assume "*578 that the tobacco advertisements at issue here are truthful, nonmisleading speech about a lawful activity." 218 F.3d, at 43. Although respondents now claim that they have not conceded this point, see Brief for Respondents 35, n. 17, the fact remains that they did not urge their theories in the lower courts, and in general, we do not consider arguments for affirmance that were not presented below. See, *e.g., Glover v. United States,* 531 U.S. 198, 205, 121 S.Ct. 696, 148 L.Ed.2d 604 (2001). These concessions should make this an easy case, one clearly controlled by *44 Liquormart* and by *Greater New Orleans Broadcasting Assn., Inc. v. United States,* 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999). At all events, even if we were to entertain these arguments, neither is persuasive.

Respondents suggest that tobacco advertising is misleading because "its youthful imagery and ... sheer ubiquity" leads children to believe "that tobacco use is desirable and pervasive." Brief for Respondents 33; see also Brief for United States as *Amicus Curiae* 7 ("[S]o many children lack the maturity in judgment to resist the tobacco industry's appeals to excitement, glamour, and independence"). This justification is belied, however, by the sweeping overinclusivity of the regulations. Massachusetts has done nothing to target its prohibition to advertisements appealing to "excitement, glamour, and independence"; the ban applies with equal force to appeals to torpor, homeliness, and servility. It has not focused on "youthful imagery"; smokers depicted on the sides of buildings may no more play shuffleboard than they may ride skateboards.

The regulations even prohibit a store from accurately stating the prices at which cigarettes are sold. Such a display could not possibly be misleading, unless one accepts the State's apparent view that the simple existence of tobacco advertisements misleads people into believing that tobacco use is more pervasive than

it actually is. The State misunderstands the purpose of advertising. Promoting a product that is not yet pervasively used (or a cause that is not yet *579 widely supported) is a primary purpose of advertising. Tobacco advertisements would be no more misleading for suggesting pervasive use of tobacco products than are any other advertisements that attempt to expand a market for a product, or to rally support for a political movement. Any inference from the advertisements that businesses would like for tobacco use to be pervasive is entirely reasonable, and advertising that gives rise to that inference is in no way deceptive.

The State also contends that tobacco advertisements may be restricted because they propose an illegal sale of tobacco to minors. A direct solicitation of unlawful activity may of course be proscribed, whether or not it is commercial in nature. See *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) *(per curiam).* The State's power to punish speech that solicits or incites crime has nothing to do with the commercial character of the speech. After all, it is often the case that solicitation to commit a crime is entirely noncommercial. The harm that the State seeks to prevent is the harm caused by the unlawful activity that is solicited; it is unrelated to the commercial transaction itself. Thus there is no reason to apply anything other than our usual rule for evaluating solicitation and incitement simply because the speech in question happens to be commercial. See *Carey v. Population Services Int'l,* 431 U.S. 678, 701-702, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977).

Viewed as an effort to proscribe solicitation to unlawful conduct, these regulations clearly fail the *Brandenburg* test. A State may not "forbid or proscribe advocacy of **2435 the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg, supra,* at 447, 89 S.Ct. 1827. Even if Massachusetts could prohibit advertisements reading, "Hey kids, buy cigarettes here," these regulations sweep much more broadly than that. They cover "*any* ... statement or representation ... the purpose or effect of which is to promote the use or sale" of tobacco products, whether or not the statement is directly or indirectly *580 addressed to minors. 940 Code of Mass. Regs. § 21.03 (2000). On respondents' theory, *all* tobacco advertising may be limited because *some* of its viewers may not legally act on it.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                           Page 26
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

It is difficult to see any stopping point to a rule that would allow a State to prohibit all speech in favor of an activity in which it is illegal for minors to engage. Presumably, the State could ban car advertisements in an effort to enforce its restrictions on underage driving. It could regulate advertisements urging people to vote, because children are not permitted to vote. And, although the Solicitor General resisted this implication of her theory, see Tr. of Oral Arg. 55-56, the State could prohibit advertisements for adult businesses, which children are forbidden to patronize.

At bottom, respondents' theory rests on the premise that an indirect solicitation is enough to empower the State to regulate speech, and that, as petitioners put it, even an advertisement directed at adults "will give any children who may happen to see it the wrong idea and therefore must be suppressed from public view." Brief for Petitioners Lorillard Tobacco Co. et al. in No. 00-596, p. 36. This view is foreign to the First Amendment. "Every idea is an incitement," _Gitlow v. New York,_ 268 U.S. 652, 673, 45 S.Ct. 625, 69 L.Ed. 1138 (1925) (Holmes, J., dissenting), and if speech may be suppressed whenever it might inspire someone to act unlawfully, then there is no limit to the State's censorial power. Cf. _American Booksellers Assn., Inc. v. Hudnut,_ 771 F.2d 323 (C.A.7 1985), aff'd, 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986).

There is a deeper flaw in the State's argument. Even if Massachusetts has a valid interest in regulating speech directed at children--who, it argues, may be more easily misled, and to whom the sale of tobacco products is unlawful--it may not pursue that interest at the expense of the free speech rights of adults.

The theory that public debate should be limited in order to protect impressionable children has a long historical pedigree: **\*581** Socrates was condemned for being "a doer of evil, inasmuch as he corrupts the youth." 1 Dialogues of Plato, Apology 348 (B. Jowett transl., 4th ed.1953). But the theory has met with a less enthusiastic reception in this Court than it did in the Athenian assembly. In _Butler v. Michigan,_ 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957), we struck down a statute restricting the sale of materials " 'tending to incite minors to violent or depraved or immoral acts.' " _Id.,_ at 381, 77 S.Ct. 524 (quoting then Mich. Penal Code § 343). The effect of the law, we observed, was "to reduce the adult population of Michigan to reading only what is fit for children."

352 U.S., at 383, 77 S.Ct. 524. As Justice Frankfurter colorfully put it, "Surely, this is to burn the house to roast the pig." _Ibid._

We have held consistently that speech "cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." _Erznoznik v. Jacksonville,_ 422 U.S. 205, 213-214, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); accord, _Bolger,_ 463 U.S., at 74, 103 S.Ct. 2875 ("The level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox"). To be sure, in _FCC v. Pacifica Foundation,_ 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), we upheld the Federal Communications Commission's **\*\*2436** power to regulate indecent but nonobscene radio broadcasts. But _Pacifica_ relied heavily on what it considered to be the "special justifications for regulation of the broadcast media that are not applicable to other speakers." _Reno v. American Civil Liberties Union,_ 521 U.S. 844, 868, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). It emphasized that radio is "_uniquely_ pervasive" and "_uniquely_ accessible to children, even those too young to read." _Pacifica, supra,_ at 748-749, 98 S.Ct. 3026 (emphasis added).

Outside of the broadcasting context, we have adhered to the view that "the governmental interest in protecting children from harmful materials" does not "justify an unnecessarily broad suppression of speech addressed to adults." _Reno, supra,_ at 875, 117 S.Ct. 2329; see also _Playboy Entertainment,_ 529 U.S., at 814, 120 S.Ct. 1878 ("[T]he objective of shielding children does not **\*582** suffice to support a blanket ban if the protection can be accomplished by a less restrictive alternative"). Massachusetts may not avoid the application of strict scrutiny simply because it seeks to protect children.

II

Under strict scrutiny, the advertising ban may be saved only if it is narrowly tailored to promote a compelling government interest. See, e.g., _id.,_ at 813, 120 S.Ct. 1878. If that interest could be served by an alternative that is less restrictive of speech, then the State must use that alternative instead. See _ibid.; Reno, supra,_ at 874, 117 S.Ct. 2329. Applying this standard, the regulations here must fail.

A

Massachusetts asserts a compelling interest in reducing tobacco use among minors. Applied to adults, an interest in manipulating market choices by

121 S.Ct. 2404                                                                                                    Page 27
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
(Cite as: 533 U.S. 525, 121 S.Ct. 2404)

keeping people ignorant would not be legitimate, let alone compelling. See *supra*, at 2432-2433. But assuming that there is a compelling interest in reducing underage smoking, and that the ban on outdoor advertising promotes this interest, I doubt that the same is true of the ban on point-of-sale advertising below five feet. See 940 Code of Mass. Regs. § § 21.04(5)(b), 22.06(5)(b) (2000). The Court of Appeals admitted to having "some misgivings about the effectiveness of a restriction that is based on the assumption that minors under five feet tall will not, or will less frequently, raise their view above eye-level," 218 F.3d. at 51, as well it might have, since respondents have produced no evidence to support this counterintuitive assumption. Obviously even short children can see objects that are taller than they are. Anyway, by the time they are 12 1/2 years old, both the median girl and the median boy are over five feet tall. See U.S. Centers for Disease Control and Prevention, Growth Charts (2000). Thus, there is no reason to believe that this regulation does anything to protect minors from **583** exposure to tobacco advertising. [FN3] Far from serving a compelling interest, the ban on displays below five feet seems to lack even a minimally rational relationship to any conceivable interest.

> FN3. This is not to say that the regulation does nothing at all. As the Court points out, see *ante*, at 2427, security concerns require that convenience stores be designed so that the interior of the store is visible from the street. See also Occupational Safety and Health Administration, Recommendations for Workplace Violence Prevention Programs in Late-Night Retail Establishments 6 (1998) ("Shelves should be low enough to assure good visibility throughout the store"). The § 21.04(5)(b) ban on displays below five feet and the § 21.04(5)(a) ban on displays visible from outside the store, combined with these security concerns, would prevent many convenience stores from displaying any tobacco products at all. Thus, despite the State's disclaimers, see Brief for Respondents 30 ("The State, quite clearly, is not trying to suppress altogether the communication of product information to interested consumers"), the restrictions effectively produce a total ban.

There is also considerable reason to doubt that the restrictions on cigar and **2437** smokeless tobacco

outdoor advertising promote any state interest. Outdoor advertising for cigars, after all, is virtually nonexistent. Cigar makers use no billboards in Massachusetts, and in fact their nationwide outdoor advertising budget is only about $50,000 per year. See 218 F.3d, at 49. To the extent outdoor advertising exists, there is no evidence that it is targeted at youth or has a significant effect on youth. The Court of Appeals focused on the State's evidence of a relationship between "tobacco advertising and tobacco use," *id.*, at 48, thus eliding the dearth of evidence showing any relationship between *cigar* advertising and *cigar* use by minors. Respondents principally rely on a National Cancer Institute report on cigar smoking, see Brief for Respondents 39, n. 19. But that report contains only the conclusory assertion that cigars are being "heavily promoted in ways likely to influence adolescent use," and it does not even discuss outdoor advertising, instead focusing on "[e]ndorsements by celebrities," "the resurgence **584** of cigar smoking in movies," and "cigar lifestyle magazines such as 'Cigar Aficionado.' " National Cancer Institute, Cigars: Health Effects and Trends, Smoking and Tobacco Control Monograph No. 9, pp. 14-15 (1998), Record, Doc. No. 39, Exh. 67. The report candidly acknowledges that "[a]dditional information is needed to better characterize marketing efforts for cigars" and "to learn the extent to which advertising and promotion for cigars ... reaches and affects kids." *Id.*, at 216-217. In other words, respondents have adduced no evidence that a ban on cigar advertising will do anything to promote their asserted interest.

Much the same is true of smokeless tobacco. Here respondents place primary reliance on evidence that, in the late 1960's, the U.S. Smokeless Tobacco Company increased its sales through advertising targeted at young males. See Brief for Respondents 39, n. 19. But this does nothing to show that advertising affecting minors is a problem today. The Court invokes the Food and Drug Administration's findings, see *ante*, at 2424, but the report it cites based its conclusions on the observed "very large increase in the use of smokeless tobacco products by young people." 60 Fed.Reg. 41318 (1995). This premise is contradicted by one of respondents' own studies, which reports a large, steady *decrease* in smokeless tobacco use among Massachusetts high school students during the 1990's. See App. 292. This finding casts some doubt on whether the State's interest in additional regulation is truly compelling. More importantly, because cigarette smoking among high school students has not exhibited such a trend,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                Page 28
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
(Cite as: 533 U.S. 525, 121 S.Ct. 2404)

see *ibid.,* it indicates that respondents' effort to aggregate cigarettes and smokeless tobacco is misguided.

B

In any case, even assuming that the regulations advance a compelling state interest, they must be struck down because they are not narrowly tailored. The Court is correct, see *ante,* at 2425-2426, that the arbitrary 1,000-foot radius demonstrates *585 a lack of narrow tailoring, but the problem goes deeper than that. A prohibited zone defined solely by circles drawn around schools and playgrounds is necessarily overinclusive, regardless of the radii of the circles. Consider, for example, a billboard located within 1,000 feet of a school but visible only from an elevated freeway that runs nearby. Such a billboard would not threaten any of the interests respondents assert, but it would be banned anyway, because the regulations take no account of whether the advertisement could even be seen by children. The prohibited zone is even more suspect where, as here, it includes all but 10 percent of the area in the three largest cities in the State.

The loose tailoring of the advertising ban is displayed not only in its geographic scope but also in the nature of the advertisements it affects. The regulations define "**2438 advertisement" very broadly; the term includes any "written ... statement or representation, made by" a person who sells tobacco products, "the purpose or effect of which is to promote the use or sale of the product." 940 Code of Mass. Regs. § 21.03 (2000). Almost everything a business does has the purpose of promoting the sale of its products, so this definition would cover anything a tobacco retailer might say. Some of the prohibited speech would not even be commercial. If a store displayed a sign promoting a candidate for Attorney General who had promised to repeal the tobacco regulations if elected, it probably would be doing so with the long-term purpose of promoting sales, and the display of such a sign would be illegal.

Even if the definition of "advertisement" were read more narrowly so as to require a specific reference to tobacco products, it still would have Draconian effects. It would, for example, prohibit a tobacconist from displaying a sign reading "Joe's Cigar Shop." The effect of this rule is not to make cigars impossible to find; retailers are after all allowed to display a 576-square-inch black-and-white sign reading "Tobacco Products Sold Here." § 22.06(6). Rather, it is to *586 make individual cigar retailers

more difficult to identify by making them change their names. Respondents assert no interest in cigar retailer anonymity, and it is difficult to conceive of any other interest to which this rule could be said to be narrowly tailored.

The regulations fail the narrow tailoring inquiry for another, more fundamental reason. In addition to examining a narrower advertising ban, the State should have examined ways of advancing its interest that do not require limiting speech at all. Here, respondents had several alternatives. Most obviously, they could have directly regulated the conduct with which they were concerned. See, *e.g., Rubin v. Coors Brewing Co.,* 514 U.S. 476, 490-491, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995) (invalidating ban on disclosure of alcohol content on beer labels, in part because the Government could have pursued alternatives such as "directly limiting the alcohol content of beers"); see also 44 Liquormart, 517 U.S., at 524, 116 S.Ct. 1495 (THOMAS, J., concurring in part and concurring in judgment) ("[I]t would seem that directly banning a product (or ... otherwise restricting its sale in specific ways) would virtually always be at least as effective in discouraging consumption as merely restricting advertising"). Massachusetts already prohibits the sale of tobacco to minors, but it could take steps to enforce that prohibition more vigorously. It also could enact laws prohibiting the purchase, possession, or use of tobacco by minors. And, if its concern is that tobacco advertising communicates a message with which it disagrees, it could seek to counteract that message with "more speech, not enforced silence," *Whitney v. California,* 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring).

III

Underlying many of the arguments of respondents and their *amici* is the idea that tobacco is in some sense *sui generis*--that it is so special, so unlike any other object of regulation, that application of normal First Amendment principles should be suspended. See, *e.g.,* Brief for Respondents 50 *587 referring to tobacco use as "one of the State's--and indeed the Nation's--most urgent problems"); Brief for United States as *Amicus Curiae* 19- 20 (cataloging the prevalence and the effects of tobacco use); Brief for American Medical Association et al. as *Amici Curiae* 24 (advocating "the authority of governments to protect children from uniquely dangerous messages"). Smoking poses serious health risks, and advertising may induce children (who lack the judgment to make an intelligent decision about

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                                                                Page 29
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
(Cite as: 533 U.S. 525, 121 S.Ct. 2404)

whether to smoke) to begin smoking, which can lead to addiction. The State's assessment of the urgency of the problem posed by tobacco is a policy judgment, and it is not **2439 this Court's place to second-guess it. Nevertheless, it seems appropriate to point out that to uphold the Massachusetts tobacco regulations would be to accept a line of reasoning that would permit restrictions on advertising for a host of other products.

Tobacco use is, we are told, "the single leading cause of preventable death in the United States." Brief for United States as *Amicus Curiae* 19. The *second* largest contributor to mortality rates in the United States is obesity. Koplan & Dietz, Caloric Imbalance and Public Health Policy, 282 JAMA 1579 (1999). It is associated with increased incidence of diabetes, hypertension, and coronary artery disease, *ibid.,* and it represents a public health problem that is rapidly growing worse. See Mokdad et al., The Spread of the Obesity Epidemic in the United States, 1991-1998, 282 JAMA 1519 (1999). Although the growth of obesity over the last few decades has had many causes, a significant factor has been the increased availability of large quantities of high-calorie, high-fat foods. See Hill, Environmental Contributions to the Obesity Epidemic, 280 Science 1371 (1998). Such foods, of course, have been aggressively marketed and promoted by fast food companies. See Nestle & Jacobson, Halting the Obesity Epidemic, U.S. Dept. of Health and Human Services, 115 Public Health Reports 12, 18 (2000).

*588 Respondents say that tobacco companies are covertly targeting children in their advertising. Fast food companies do so openly. See, *e.g.,* Kramer, McD's Steals Another Toy from BK, Advertising Age, Nov. 15, 1999, p. 1 (describing a McDonald's promotional campaign); Lucas, BK Takes Choice Message to Kids, Adweek, June 29, 1998, p. 4 (describing a Burger King promotional campaign). Moreover, there is considerable evidence that they have been successful in changing children's eating behavior. See Borzekowski & Robinson, The 30-Second Effect, 101 J. Am. Dietetic Assn. 42 (2001); Taras, Sallis, Patterson, Nader, & Nelson, Television's Influence on Children's Diet and Physical Activity, 10 J. Dev. & Behav. Pediatrics 176 (1989). The effect of advertising on children's eating habits is significant for two reasons. First, childhood obesity is a serious health problem in its own right. Troiano & Flegal, Overweight Children and Adolescents, 101 Pediatrics 497 (1998). Second, eating preferences formed in childhood tend

to persist in adulthood. Birch & Fisher, Development of Eating Behaviors Among Children and Adolescents, 101 Pediatrics 539 (1998). So even though fast food is not addictive in the same way tobacco is, children's exposure to fast food advertising can have deleterious consequences that are difficult to reverse.

To take another example, the third largest cause of preventable deaths in the United States is alcohol. McGinnis & Foege, Actual Causes of Death in the United States, 270 JAMA 2207, 2208 (1993). Alcohol use is associated with tens of thousands of deaths each year from cancers and digestive diseases. *Id.,* at 2208-2209. And the victims of alcohol use are not limited to those who drink alcohol. In 1996, over 17,000 people were killed, and over 321,000 people were injured, in alcohol-related car accidents. U.S. Dept. of Justice, Alcohol and Crime 13 (1998). Each year, alcohol is involved in several million violent crimes, including almost 200,000 sexual assaults. *Id.,* at 3-4.

*589 Although every State prohibits the sale of alcohol to those under age 21, much alcohol advertising is viewed by children. Federal Trade Commission, J. Evans & R. Kelly, Self-Regulation in the Alcohol Industry (Sept.1999); Grube & Wallack, Television Beer Advertising and Drinking Knowledge, Beliefs, and Intentions among Schoolchildren, 84 Am. J. Pub. Health 254 (1994). Not surprisingly, there is considerable evidence that exposure to alcohol advertising is associated with underage drinking. See Atkin, Survey and Experimental Research on Effects of Alcohol Advertising, **2440 in The Effects of the Mass Media on the Use and Abuse of Alcohol 39 (S. Martin ed.1995); Madden & Grube, The Frequency and Nature of Alcohol and Tobacco Advertising in Televised Sports, 1990 through 1992, 84 Am. J. Pub. Health 297 (1994).

Like underage tobacco use, underage drinking has effects that cannot be undone later in life. Those who begin drinking early are much more likely to become dependent on alcohol. Indeed, the probability of lifetime alcohol dependence decreases approximately 14 percent with each additional year of age at which alcohol is first used. Grant & Dawson, Age at Onset of Alcohol Use and its Association with DSM-IV Alcohol Abuse and Dependence, 9 J. Substance Abuse 103, 108 (1997). And obviously the effects of underage drinking are irreversible for the nearly 1,700 Americans killed

121 S.Ct. 2404                                                                                      Page 30
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

each year by teenage drunk drivers.    See National Highway Traffic Safety Administration, 1998 Youth Fatal Crash and Alcohol Facts.

Respondents have identified no principle of law or logic that would preclude the imposition of restrictions on fast food and alcohol advertising similar to those they seek to impose on tobacco advertising.    Cf. Tr. of Oral Arg. 56- 57.   In effect, they seek a "vice" exception to the First Amendment. No such exception exists.    See *44 Liquormart, 517 U.S., at 513-514, 116 S.Ct. 1495* (opinion of STEVENS, J., joined by KENNEDY, THOMAS, and GINSBURG, JJ.).   If it did, it would have almost no limit, for "any product that poses some threat to **\*590** public health or public morals might reasonably be characterized by a state legislature as relating to 'vice activity.' " *Id., at 514, 116 S.Ct. 1495.*   That is why "a 'vice' label that is unaccompanied by a corresponding prohibition against the commercial behavior at issue fails to provide a principled justification for the regulation of commercial speech about that activity." *Ibid.*

No legislature has ever sought to restrict speech about an activity it regarded as harmless and inoffensive.   Calls for limits on expression always are made when the specter of some threatened harm is looming.    The identity of the harm may vary. People will be inspired by totalitarian dogmas and subvert the Republic.    They will be inflamed by racial demagoguery and embrace hatred and bigotry. Or they will be enticed by cigarette advertisements and choose to smoke, risking disease.    It is therefore no answer for the State to say that the makers of cigarettes are doing harm: perhaps they are.    But in that respect they are no different from the purveyors of other harmful products, or the advocates of harmful ideas.    When the State seeks to silence them, they are all entitled to the protection of the First Amendment.

Justice SOUTER, concurring in part and dissenting in part.

I join Parts I, II-C, II-D, III-A, III-B-1, III-C, and III-D of the Court's opinion.    I join Part I of the opinion of Justice STEVENS concurring in part, concurring in the judgment in part, and dissenting in part.    I respectfully dissent from Part III-B-2 of the opinion of the Court, and like Justice STEVENS would remand for trial on the constitutionality of the 1,000-foot limit.

Justice STEVENS, with whom Justice GINSBURG and Justice BREYER join, and with whom Justice SOUTER joins as to Part I, concurring in part, concurring in the judgment in part, and dissenting in part.

This suit presents two separate sets of issues.    The first--involving pre-emption--is straightforward.    The second--**\*591** involving the First Amendment--is more complex.    Because I strongly disagree with the Court's conclusion that the Federal Cigarette Labeling and Advertising Act of 1965 (FCLAA or Act), *15 U.S.C. § 1331 et seq.,* as amended, precludes States and localities from regulating the location of cigarette advertising, I **\*\*2441** dissent from Parts II-A and II-B of the Court's opinion.    On the First Amendment questions, I agree with the Court both that the outdoor advertising restrictions imposed by Massachusetts serve legitimate and important state interests and that the record does not indicate that the measures were properly tailored to serve those interests.    Because the present record does not enable us to adjudicate the merits of those claims on summary judgment, I would vacate the decision upholding those restrictions and remand for trial on the constitutionality of the outdoor advertising regulations.    Finally, because I do not believe that either the point-of-sale advertising restrictions or the sales practice restrictions implicate significant First Amendment concerns, I would uphold them in their entirety.

I

As the majority acknowledges, *ante,* at 2414, under prevailing principles, any examination of the scope of a preemption provision must " 'start with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.' " *Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)* (quoting *Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)*); see also, *e.g., California Div. of Labor Standards Enforcement v. Dillingham Constr., N. A., Inc., 519 U.S. 316, 325, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997); Medtronic, Inc. v. Lohr, 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).*    As the regulations at issue in this suit implicate two powers that lie at the heart of the States' traditional police power--the power to regulate land usage and the power to protect the health and safety of minors--our precedents require that the Court construe the pre-emption provision "narrow[ly]." *Id., at 485, 116 S.Ct.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                                    Page 31
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525,  121 S.Ct. 2404)**

2240; *592 see also *Cipollone*, 505 U.S., at 518, 112 S.Ct. 2608. If Congress' intent to pre-empt a particular category of regulation is ambiguous, such regulations are not pre-empted. [FN1]

> FN1. See, *e.g.*, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146-147, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963) ("[W]e are not to conclude that Congress legislated the ouster of this [state] statute ... in the absence of an unambiguous congressional mandate to that effect"); *Cipollone*, 505 U.S., at 533, 112 S.Ct. 2608 (Blackmun, J., joined by KENNEDY and SOUTER, JJ., concurring in part, concurring in judgment in part, and dissenting in part) ("The principles of federalism and respect for state sovereignty that underlie the Court's reluctance to find pre-emption where Congress has not spoken directly to the issue apply with equal force where Congress has spoken, though ambiguously. In such cases, the question is not whether Congress intended to pre-empt state regulation, but to what extent. We do not, absent unambiguous evidence, infer a scope of pre-emption beyond that which clearly is mandated by Congress' language" (emphasis deleted)).

The text of the preemption provision must be viewed in context, with proper attention paid to the history, structure, and purpose of the regulatory scheme in which it appears. See, *e.g.*, *Medtronic*, 518 U.S., at 484-486, 116 S.Ct. 2240; *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655-656, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995); *Cipollone*, 505 U.S., at 513-515, 519-520, 529, 530, n. 27, 112 S.Ct. 2608; accord, *ante*, at 2414-2415. [FN2] An assessment of the scope of a pre-emption provision must give effect to a "reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Medtronic*, 518 U.S., at 486, 116 S.Ct. 2240.

> FN2. Cf. *Central Hanover Bank & Trust Co. v. Commissioner*, 159 F.2d 167, 169 (C.A.2 1947) (L.Hand, J.) ("There is no more likely way to misapprehend the meaning of language--be it in a constitution, a statute, a will or a contract--than to read the words literally, forgetting the object which the

document as a whole is meant to secure").

This task, properly performed, leads inexorably to the conclusion that Congress **2442 did not intend to pre-empt state and local regulations of the location of cigarette advertising when it adopted the provision at issue in this suit. In both 1965 and 1969, Congress made clear the purposes of its regulatory *593 endeavor, explaining with precision the federal policies motivating its actions. According to the Acts, Congress adopted a "comprehensive Federal Program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health," for two reasons: (1) to inform the public that smoking may be hazardous to health and (2) to ensure that commerce and the interstate economy not be "impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health." 15 U.S.C. § 1331.

In order to serve the second purpose it was necessary to pre-empt state regulation of the content of both cigarette labels and cigarette advertising. If one State required the inclusion of a particular warning on the package of cigarettes while another State demanded a different formulation, cigarette manufacturers would have been forced into the difficult and costly practice of producing different packaging for use in different States. To foreclose the waste of resources that would be entailed by such a patchwork regulatory system, Congress expressly precluded other regulators from requiring the placement on cigarette packaging of any "statement relating to smoking and health." § 1334(a). Similar concerns applied to cigarette advertising. If different regulatory bodies required that different warnings or statements be used when cigarette manufacturers advertised their products, the text and layout of a company's ads would have had to differ from locale to locale. The resulting costs would have come with little or no health benefit. Moreover, given the nature of publishing, it might well have been the case that cigarette companies would not have been able to advertise in national publications without violating the laws of some jurisdictions. In response to these concerns, Congress adopted a parallel provision pre-empting state and local regulations requiring inclusion in cigarette advertising of any "statement relating to smoking and health." § 1334(b) (1970 ed.) (amended 1970).

*594 There was, however, no need to interfere with state or local zoning laws or other regulations

Case 1:04-cv-10006-JGD    Document 35    Filed 08/15/2005    Page 67 of 83

121 S.Ct. 2404                                                                                    Page 32
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
(Cite as: 533 U.S. 525, 121 S.Ct. 2404)

prescribing limitations on the location of signs or billboards. Laws prohibiting a cigarette company from hanging a billboard near a school in Boston in no way conflict with laws permitting the hanging of such a billboard in other jurisdictions. Nor would such laws even impose a significant administrative burden on would-be advertisers, as the great majority of localities impose general restrictions on signage, thus requiring advertisers to examine local law before posting signs whether or not cigarette-specific laws are pre-empted. See *Greater N.Y. Metropolitan Food Council, Inc. v. Giuliani,* 195 F.3d 100, 109 (C.A.2 1999) ("Divergent local zoning restrictions on the location of sign advertising are a commonplace feature of the national landscape and cigarette advertisers have always been bound to observe them"). Hence, it is unsurprising that Congress did not include any provision in the 1965 Act pre-empting location restrictions.

The Public Health Cigarette Smoking Act of 1969 (1969 Act), § 2, 84 Stat. 87, made two important changes in the pre-emption provision. First, it limited the applicability of the advertising prong to States and localities, paving the way for further federal regulation of cigarette advertising. FCLAA, § 4. Second, it expanded the scope of the advertising preemption provision. Where previously States were prohibited from requiring particular statements in cigarette advertising based on health concerns, they would henceforth be prohibited from imposing any "requirement or prohibition based on smoking and health ... with respect to the **2443 advertising or promotion" of cigarettes. § 5(b), 15 U.S.C. § 1334(b). [FN3]

> FN3. In *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 521, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), we held that one of the consequences of this change in language was that after 1969 the statute pre-empts some common-law actions.

*595 Ripped from its context, this provision could theoretically be read as a breathtaking expansion of the limitations imposed by the 1965 Act. However, both our precedents and common sense require us to read statutory provisions-- and, in particular, pre-emption clauses--in the context of both their neighboring provisions and of the history and purpose of the statutory scheme. See *supra,* at 2441-2442. When so viewed, it is quite clear that the 1969 amendments were intended to expand the provision to capture a narrow set of content regulations that

would have escaped pre-emption under the prior provision, not to fundamentally reorder the division of regulatory authority between the Federal and State Governments.

All signs point inescapably to the conclusion that Congress only intended to pre-empt content regulations in the 1969 Act. It is of crucial importance that, in making modifications of the pre-emption provision, Congress did not alter the statement laying out the federal policies the provision was intended to serve. See 15 U.S.C. § 1331. To this day, the stated federal policies in this area are (1) to inform the public of the dangers of cigarette smoking and (2) to protect the cigarette companies from the burdens of confusing and contradictory state regulations of their labels and advertisements. See *ibid.* The retention of this provision unchanged is strong evidence that Congress' only intention in expanding the pre-emption clause was to capture forms of content regulation that had fallen through the cracks of the prior provision--for example, state laws prohibiting cigarette manufacturers from making particular claims in their advertising or requiring them to utilize specified layouts or include particular graphics in their marketing. [FN4]

> FN4. Because of the nature of magazine publishing and distribution, it is conceivable that a State or locality might cause the kind of regulatory confusion the statute was drafted to prevent by adopting a law prohibiting the advertising of cigarettes in any publication distributed within its boundaries. There is at least a modicum of support for the suggestion that Congress may have intended the pre-emption of such restrictions. See *id.,* at 515, n. 11, 112 S.Ct. 2608 (noting that California was considering such a ban at the time Congress was considering the 1969 Act). However, the concerns posed by the diverse regulation of national publications are not present with regard to the local regulation of the location of signs and billboards.

*596 The legislative history of the provision also supports such a reading. The record does not contain any evidence that Congress intended to expand the scope of pre-emption beyond content restrictions. [FN5] To the contrary, the Senate Report makes it clear that the changes merely "clarified" the scope of the original provision. S.Rep. No. 91-566, p. 12 (1969). Even as amended, Congress perceived the

121 S.Ct. 2404                                                                    Page 33
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

provision as "narrowly phrased" and emphasized that its purpose is to "avoid the chaos created by a multiplicity of conflicting regulations." *Ibid.* According to the Senate Report, the changes "in no way affect the power of any state or political subdivision of any state with respect to ... the sale of cigarettes to minors ... or similar police regulations." *Ibid.*

> FN5. At one point, the Court briefly argues that it would be wrong to conclude that Congress intended to preclude only content restrictions, because it imposed a location restriction (a ban on television and radio advertising) in another provision of the same bill. See *ante,* at 2418. This argument is something of a non sequitur. The fact that Congress, in adopting a comprehensive legislative package, chose to impose a federal location restriction for a national medium has no bearing on whether, in a separate provision, the Legislature intended to strip States and localities of the authority to impose location restrictions for purely local advertising media.

**\*\*2444** In analyzing the scope of the preemption provision, the Courts of Appeals have almost uniformly concluded that state and local laws regulating the location of billboards and signs are not pre-empted. See *Consolidated Cigar Corp. v. Reilly,* 218 F.3d 30, 39-41 (C.A.1 2000) (case below); *Greater New York Metropolitan Food Council, Inc. v. Giuliani,* 195 F.3d 100, 104-110 (C.A.2 1999); **\*597***Federation of Advertising Industry Representatives, Inc. v. Chicago,* 189 F.3d 633, 636-640 (C.A.7 1999); *Penn Advertising of Baltimore, Inc. v. Mayor and City Council of Baltimore,* 63 F.3d 1318 (C.A.4 1995); contra, *Lindsey v. Tacoma-Pierce Cty. Health Dept.,* 195 F.3d 1065 (C.A.9 1999). The decisions in those cases relied heavily upon our discussion of the same pre-emption provision in *Cipollone,* 505 U.S., at 515- 524, 112 S.Ct. 2608. In *Cipollone,* while the Members of the Court expressed three different opinions concerning the scope of pre-emption mandated by the provision, those differences related entirely to which, if any, of the plaintiff's claims based on the *content* of the defendants' advertising were pre-empted by § 5. Nary a word in any of the three *Cipollone* opinions supports the thesis that § 5 should be interpreted to pre-empt state regulation of the location of signs advertising cigarettes. Indeed, seven of the nine Justices subscribed to opinions that explicitly

tethered the scope of the pre-emption provision to Congress' concern with "diverse, nonuniform, and confusing cigarette labeling and advertising regulations." *Id.,* at 519, 112 S.Ct. 2608; *id.,* at 534, 541, 112 S.Ct. 2608 (opinion of Blackmun, J., joined by KENNEDY and SOUTER, JJ.).

I am firmly convinced that, when Congress amended the pre-emption provision in 1969, it did not intend to expand the application of the provision beyond content regulations. [FN6] **\*598** I, therefore, find the conclusion inescapable that the zoning regulation at issue in this suit is not a "requirement or prohibition ... with respect to ... advertising" within the meaning of the 1969 Act. [FN7] Even if I were not so convinced, **\*\*2445** however, I would still dissent from the Court's conclusion with regard to pre-emption, because the provision is, at the very least, ambiguous. The historical record simply does not reflect that it was Congress' " 'clear and manifest purpose,' " *id.,* at 516, 112 S.Ct. 2608, to pre-empt attempts by States to utilize their traditional zoning authority to protect the health and welfare of minors. Absent such a manifest purpose, Massachusetts and its sister States retain their traditional police powers. [FN8]

> FN6. Petitioners suggest in passing that Massachusetts' regulation amounts to a "near-total ba[n]," Brief for Petitioners Lorillard Tobacco Co. et al. in No. 00-596, p. 22, and thus is a *de facto* regulation of the content of cigarette ads. But we need not consider today the circumstances in which location restrictions approximating a total ban might constitute regulation of content and thus be pre-empted by the Act, because petitioners have failed to introduce sufficient evidence to create a genuine issue as to that claim. Petitioners introduced maps purporting to show that cigarette advertising is barred in 90.6% of Boston proper, 87.8% of Worcester, and 88.8% of Springfield. See App. 165-167. But the maps do not distinguish between the area restricted due to the regulation at issue here and the area restricted due to pre-existing regulations, such as general zoning requirements applicable to all outdoor advertising. Nor do the maps show the percentage (with respect to either area or population) of the State that is off limits to cigarette advertising; they cover only three cities containing approximately 14% of the State's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                Page 34
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

population. See U.S. Census Bureau, Statistical Abstract of the United States 28, 47, 49 (1999) (providing population figures for 1998). The area in which cigarette advertising is restricted is likely to be considerably less in less densely populated portions of the State. And even on the interpretation of this data most favorable to petitioners, the Massachusetts regulation still permits indoor and outdoor cigarette advertising in at least 10% of the geographical area of the State. In short, the regulation here is not the equivalent of a total ban on cigarette advertising.

FN7. Hence, while I agree in large part with the substance of the arguments proffered by the respondents and the United States on the pre-emption issue, I reject their conclusion that the content/location distinction finds expression in the limiting phrase "based on smoking and health." See Brief for Respondents 20; Brief for United States as *Amicus Curiae* 5; accord, *Penn Advertising of Baltimore, Inc. v. Mayor and City Council of Baltimore, 63 F.3d 1318 (C.A.4 1995).* Instead, I would follow the First, Second, and Seventh Circuits in concluding that a statute regulating the location of advertising is not a "requirement or prohibition ... with respect to ... advertising" within the meaning of the 1969 Act. See *Consolidated Cigar Corp. v. Reilly, 218 F.3d 30, 39-41 (C.A.1 2000)* (case below); *Greater N.Y. Metropolitan Food Council, Inc. v. Giuliani, 195 F.3d 100, 104-110 (C.A.2 1999); Federation of Advertising Industry Representatives, Inc. v. Chicago, 189 F.3d 633, 636- 640 (C.A.7 1999).*

FN8. The Court's holding that federal law precludes States and localities from protecting children from dangerous products within 1,000 feet of a school is particularly ironic given the Court's conclusion six years ago that the Federal Government lacks the constitutional authority to impose a similarly motivated ban. See *United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).* Despite the absence of any identified federal interest in creating "an invisible federal zone extending 1,000 feet beyond the (often irregular) boundaries of the school property," as the majority

construes it today, the "statute now before us forecloses the States from experimenting and exercising their own judgment in an area to which States lay claim by right of history and expertise," *id., at 583, 115 S.Ct. 1624* (KENNEDY, J., concurring). I wonder why a Court sensitive to federalism concerns would adopt such a strange construction of statutory language whose quite different purpose Congress took pains to explain.

*599 II

On the First Amendment issues raised by petitioners, my disagreements with the majority are less significant. I would, however, reach different dispositions as to the 1,000-foot rule and the height restrictions for indoor advertising, and my evaluation of the sales practice restrictions differs from the Court's.

The 1,000-Foot Rule

I am in complete accord with the Court's analysis of the importance of the interests served by the advertising restrictions. As the Court lucidly explains, few interests are more "compelling," *ante,* at 2426, than ensuring that minors do not become addicted to a dangerous drug before they are able to make a mature and informed decision as to the health risks associated with that substance. Unlike other products sold for human consumption, tobacco products are addictive and ultimately lethal for many long--term users. When that interest is combined with the State's concomitant concern for the effective enforcement of its laws regarding the sale of tobacco to minors, it becomes clear that Massachusetts' regulations serve interests of the highest order and are, therefore, immune from any ends-based challenge, whatever level of scrutiny one chooses to employ.

Nevertheless, noble ends do not save a speech-restricting statute whose means are poorly tailored. Such statutes *600 may be invalid for two different reasons. First, the means chosen may be insufficiently related to the ends they purportedly serve. See, *e.g., Rubin v. Coors Brewing Co., 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995)* (striking a statute prohibiting beer labels from displaying alcohol content because the provision did not significantly forward the government's interest in the health, safety, and welfare of its citizens). Alternatively, the statute may be so broadly drawn

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                                          Page 35
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

that, while effectively achieving its ends, it unduly restricts communications that are unrelated to its policy aims. See, e.g., _United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 812, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000)_ (striking a statute intended to protect children from indecent television broadcasts, in part because it constituted "a significant restriction of communication between speakers and willing adult listeners"). The second difficulty is most frequently encountered when government adopts measures for the protection of children that impose substantial restrictions on the ability of adults to communicate with one another. See, e.g., _Playboy Entertainment Group, Inc., supra; Reno v. American Civil Liberties Union, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997);_ **\*2446** _Sable Communications of Cal., Inc. v. FCC, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989)._

To my mind, the 1,000-foot rule does not present a tailoring problem of the first type. For reasons cogently explained in our prior opinions and in the opinion of the Court, we may fairly assume that advertising stimulates consumption and, therefore, that regulations limiting advertising will facilitate efforts to stem consumption. [FN9] See, e.g., _Rubin, 514 U.S., at 487, 115 S.Ct. 1585; United States v. Edge Broadcasting Co., 509 U.S. 418, 434, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993);_ ante, at 2423. Furthermore, if the government's intention is to limit consumption by a particular segment of the community--in this case, minors--it is **\*601** appropriate, indeed necessary, to tailor advertising restrictions to the areas where that segment of the community congregates--in this case, the area surrounding schools and playgrounds.

> FN9. Moreover, even if it were our practice to require a particularized showing of the effects of advertising on consumption, the respondents have met that burden in this suit. See ante, at 2423-2425 (summarizing the evidence).

However, I share the majority's concern as to whether the 1,000-foot rule unduly restricts the ability of cigarette manufacturers to convey lawful information to adult consumers. This, of course, is a question of line-drawing. While a ban on all communications about a given subject would be the most effective way to prevent children from exposure to such material, the State cannot by fiat reduce the level of discourse to that which is "fit for children."

_Butler v. Michigan, 352 U.S. 380, 383, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957);_ cf. _Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 74, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983)_ ("The level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox"). On the other hand, efforts to protect children from exposure to harmful material will undoubtedly have some spillover effect on the free speech rights of adults. See, e.g., _FCC v. Pacifica Foundation, 438 U.S. 726, 749-750, and n. 28, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978)._

Finding the appropriate balance is no easy matter. Though many factors plausibly enter the equation when calculating whether a child-directed location restriction goes too far in regulating adult speech, one crucial question is whether the regulatory scheme leaves available sufficient "alternative avenues of communication." _Renton v. Playtime Theatres, Inc., 475 U.S. 41, 50, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 819, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)_ (Brennan, J., dissenting); accord ante, at 2426. Because I do not think the record contains sufficient information to enable us to answer that question, I would vacate the award of summary judgment upholding the 1,000-foot rule and remand for trial on that issue. Therefore, while I agree with the majority that the Court of Appeals did not sufficiently consider the implications of the 1,000-foot rule for the lawful communication of adults, see ante, at 2425-2427, **\*602** I dissent from the disposition reflected in Part III-B-2 of the Court's opinion.

There is no doubt that the 1,000-foot rule prohibits cigarette advertising in a substantial portion of Massachusetts' largest cities. Even on that question, however, the parties remain in dispute as to the percentage of these urban areas that is actually off limits to tobacco advertising. See ante, at 2425. Moreover, the record is entirely silent on the impact of the regulation in other portions of the Commonwealth. The dearth of reliable statistical information as to the scope of the ban is problematic.

More importantly, the Court lacks sufficient qualitative information as to the areas where cigarette advertising is prohibited and those where it is permitted. The fact that 80% or 90% of an urban area is **\*\*2447** unavailable to tobacco advertisements may be constitutionally irrelevant if the available areas are so heavily trafficked or so central to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                    Page 36
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

city's cultural life that they provide a sufficient forum for the propagation of a manufacturer's message. One electric sign in Times Square or at the foot of the Golden Gate Bridge may be seen by more potential customers than a hundred signs dispersed in residential neighborhoods.

Finally, the Court lacks information as to other avenues of communication available to cigarette manufacturers and retailers. For example, depending on the answers to empirical questions on which we lack data, the ubiquity of print advertisements hawking particular brands of cigarettes might suffice to inform adult consumers of the special advantages of the respective brands. Similarly, print advertisements, circulars mailed to people's homes, word of mouth, and general information may or may not be sufficient to imbue the adult population with the knowledge that particular stores, chains of stores, or types of stores sell tobacco products. [FN10]

> FN10. As the above observations indicate, the analysis as to whether the 1,000-foot rule impermissibly curtails speech between adults will require a particularized analysis that may well ask slightly different questions--and conceivably could reach different results--with regard to the constitutionality of the restrictions as applied to manufacturers and retailers.

**\*603** In granting summary judgment for the respondents, the District Judge treated the First Amendment issues in this suit as pure questions of law and stated that "there are no material facts in dispute concerning these issues." 84 F.Supp.2d 180, 183 (Mass. 2000). With due respect, I disagree. While the ultimate question before us is one of law, the answer to that question turns on complicated factual questions relating to the practical effects of the regulations. As the record does not reveal the answer to these disputed questions of fact, the court should have denied summary judgment to both parties and allowed the parties to present further evidence.

I note, moreover, that the alleged "overinclusivity" of the advertising regulations, *ante*, at 2434 (THOMAS, J., concurring in part and concurring in judgment), while relevant to whether the regulations are narrowly tailored, does not "beli[e]" the claim that tobacco advertising imagery misleads children into believing that smoking is healthy, glamorous, or sophisticated, *ibid.* See Brief for American Legacy

Foundation as *Amicus Curiae* 4-5, and nn. 9, 10; Brief for City of Los Angeles et al. as *Amici Curiae* 4 (documenting charge that advertisements for cigarettes and smokeless tobacco target underage smokers). For purposes of summary judgment, the State conceded that the tobacco companies' advertising concerns lawful activity and is not misleading. Under the Court's disposition of the cases today, the State remains free to proffer evidence that the advertising is in fact misleading. See Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) ("[M]uch commercial speech is not provably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem"). I would vacate the grant of summary judgment to respondents on this issue and remand for further proceedings.

**\*604** The Sales Practice and Indoor Advertising Restrictions

After addressing petitioners' challenge to the sales practice restrictions imposed by the Massachusetts statute, the Court concluded that these provisions did not violate the First Amendment. I concur in that judgment, but write separately on this issue to make two brief points.

First, I agree with the District Court and the Court of Appeals that the sales **\*\*2448** practice restrictions are best analyzed as regulating conduct, not speech. See 218 F.3d, at 53. While the decision how to display one's products no doubt serves a marginal communicative function, the same can be said of virtually any human activity performed with the hope or intention of evoking the interest of others. This Court has long recognized the need to differentiate between legislation that targets expression and legislation that targets conduct for legitimate non-speech-related reasons but imposes an incidental burden on expression. See, e.g., United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). However difficult that line may be to draw, it seems clear to me that laws requiring that stores maintain items behind counters and prohibiting self-service displays fall squarely on the conduct side of the line. Restrictions as to the accessibility of dangerous or legally restricted products are a common feature of the regulatory regime governing American retail stores. I see nothing the least bit constitutionally problematic in requiring individuals to ask for the assistance of a salesclerk in order to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                                                          Page 37
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

examine or purchase a handgun, a bottle of penicillin, or a package of cigarettes.

Second, though I admit the question is closer, I would, for similar reasons, uphold the regulation limiting tobacco advertising in certain retail establishments to the space five feet or more above the floor. [FN11] When viewed in isolation, this provision appears to target speech. Further, to the extent **\*605** that it does target speech it may well run into constitutional problems, as the connection between the ends the statute purports to serve and the means it has chosen are dubious. Nonetheless, I am ultimately persuaded that the provision is unobjectionable because it is little more than an adjunct to the other sales practice restrictions. As the Commonwealth of Massachusetts can properly legislate the placement of products and the nature of displays in its convenience stores, I would not draw a distinction between such restrictions and height restrictions on related product advertising. I would accord the Commonwealth some latitude in imposing restrictions that can have only the slightest impact on the ability of adults to purchase a poisonous product and may save some children from taking the first step on the road to addiction.

> FN11. This ban only applies to stores located within 1,000 feet of a school or playground and contains an exception for adult-only establishments. See *ante,* at 2411.

### III

Because I strongly disagree with the Court's conclusion on the pre-emption issue, I dissent from Parts II-A and II-B of its opinion. Though I agree with much of what the Court has to say about the First Amendment, I ultimately disagree with its disposition or its reasoning on each of the regulations before us. [FN12]

> FN12. Reflecting my partial agreement with the Court, I join Parts I, II-C, II-D, and III-B-1 and concur in the judgment reflected in Part III-D.

533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal. Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333

**Briefs and Other Related Documents (Back to top)**

• 2001 WL 421882, 69 USLW 3656 (Oral Argument) Oral Argument (Apr. 25, 2001)

• 2001 WL 396525 (Appellate Brief) REPLY BRIEF FOR PETITIONER U.S. SMOKELESS TOBACCO COMPANY (Apr. 18, 2001)

• 2001 WL 396529 (Appellate Brief) REPLY BRIEF FOR PETITIONERS (Apr. 18, 2001)

• 2001 WL 410364 (Appellate Brief) REPLY BRIEF FOR PETITIONERS (Apr. 18, 2001)

• 2001 WL 294043 (Appellate Brief) BRIEF OF AMICUS CURIAE AMERICAN LEGACY FOUNDATION IN SUPPORT OF RESPONDENT (Mar. 26, 2001)

• 2001 WL 294273 (Appellate Brief) BRIEF OF THE AMERICAN PLANNING ASSOCIATION AS AMICI CURIAE IN SUPPORT OF RESPONDENT (Mar. 26, 2001)

• 2001 WL 294284 (Appellate Brief) BRIEF FOR THE CITIES OF OAKLAND, CALIFORNIA, AND CHICAGO, ILLINOIS, AS AMICI CURIAE SUPPORTING RESPONDENT (Mar. 26, 2001)

• 2001 WL 294291 (Appellate Brief) BRIEF OF AMICI CURIAE CITY OF LOS ANGELES, AND THE CITIES OF BERKELEY, CAPITOLA, CARLSBAD, CHULA VISTA, HAWTHORNE, HAYWARD, HOLLISTER, INGLEWOOD, LAKEWOOD, LOS GATOS, MARTINEZ, MONTEREY, MOUNTAIN VIEW, OCEANSIDE, PALM DESERT, PALO ALTO, PLEASANT HILL , PLEASANTON, SACRAMENTO, SAN DIEGO, SAN FRANCISCO, SAN LUIS OBISPO, SAN MARCOS, SANTA CLARA, SANTA CRUZ, SARATOGA, TIBURON, TOWN OF DANVILLE, VICTORVILLE, THE COUNTY OF SAN FRANCISCO, AND THE LOS ANGELES COUNTY TOBACCO CONTROL ALLIANCE IN SUPPORT O (Mar. 26, 2001)

• 2001 WL 298553 (Appellate Brief) BRIEF OF THE NATIONAL CONFERENCE OF STATE LEGISLATURES, NATIONAL LEAGUE OF CITIES, NATIONAL GOVERNORS' ASSOCIATION, U.S. CONFERENCE OF MAYORS, COUNCIL OF STATE GOVERNMENTS, NATIONAL ASSOCIATION OF COUNTIES, INTERNATIONAL MUNICIPAL

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                    Page 38
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

LAWYERS ASSSOCIATIO N, AND INTERNATIONAL CITY/COUNTY MANAGEMENT ASSOCIATION AS AMICI CURIAE IN SUPPORT OF RESPONDENT (Mar. 26, 2001)

• 2001 WL 298555 (Appellate Brief) BRIEF AMICUS CURIAE TOBACCO CONTROL RESOURCE CENTER, INC. IN SUPPORT OF RESPONEDENT (Mar. 26, 2001)

• 2001 WL 303032 (Appellate Brief) BRIEF OF AMICI CURIAE AMERICAN MEDICAL ASSOCIATION, AMERICAN HEART ASSOCIATION, AMERICAN LUNG ASSOCIATION, AMERICAN CANCER SOCIETY, CENTER FOR SCIENCE IN THE PUBLIC INTEREST, AND MASSACHUSETTS MEDICAL SOCIETY, IN SUPPORT OF RESPONDENT (Mar. 26, 2001)

• 2001 WL 303035 (Appellate Brief) BRIEF OF AMICI CURIAE STATES OF CALIFORNIA, ALASKA, ARIZONA, ARKANSAS, COLORADO, CONNECTICUT, DISTRICT OF COLUMBIA, FLORIDA, HAWAII, IDAHO, ILLINOIS, INDIANA, IOWA, KANSAS, LOUISIANA, MAINE, MARYLAND, MINNESOTA, MISSISSIPPI, MISSOURI, MONTANA, NEVADA , NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH DAKOTA, NORTHERN MARIANA ISLANDS, OHIO, OKLAHOMA, OREGON, PENNSYLVANIA, RHODE ISLAND, SOUTH DAKOTA, TENNESSEE, TEXAS, UTAH, VERMONT, WASHINGTON, WEST VIRGINIA AND WISCONSIN IN SUPPORT OF RESPO (Mar. 26, 2001)

• 2001 WL 303038 (Appellate Brief) BRIEF FOR RESPONDENT (Mar. 26, 2001)

• 2001 WL 324611 (Appellate Brief) BRIEF OF AMICI CURIAE, CITY OF NEW YORK & PETER F. VALLONE, SPEAKER OF THE CITY COUNCIL, AND THE MAYOR AND CITY COUNCIL OF BALTIMORE, IN SUPPORT OF RESPONDENT (Mar. 26, 2001)

• 2001 WL 324613 (Appellate Brief) BRIEF FOR THE UNITED STATES AS AMICUS CURIAE SUPPORTING RESPONDENT (Mar. 26, 2001)

• 2001 WL 298554 (Appellate Brief) BRIEF OF

AMICI CURIAE STATE'S ATTORNEY OF DUPAGE COUNTY, COUNTY OF DUPAGE, ILLINOIS, NATIONAL SCHOOL BOARDS ASSOCIATION, AND MASSACHUSETTS ASSOCIATION OF SCHOOL COMMITTEES, IN SUPPORT OF RESPONDENT (Mar. 23, 2001)

• 2001 WL 34135254 (Appellate Brief) Brief of Amici Curiae National Center for Tobacco-Free Kids, Public Citizen, Inc., and Nine Other Public Health Groups in Support of Respondent (Mar. 2001)

• 2001 WL 185381 (Appellate Brief) BRIEF FOR PETITIONERS (Feb. 22, 2001)

• 2001 WL 193608 (Appellate Brief) BRIEF OF AMICI CURIAE AMERICAN ADVERTISING FEDERATION AND CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF PETITIONERS (Feb. 22, 2001)

• 2001 WL 193609 (Appellate Brief) BRIEF OF AMICI CURIAE AMERICAN ASSOCIATION OF ADVERTISING AGENCIES, DIRECT MARKETING ASSOCIATION, AND POINT OF PURCHASE ADVERTISING INTERNATIONAL IN SUPPORT OF PETITIONERS (Feb. 22, 2001)

• 2001 WL 193610 (Appellate Brief) BRIEF AMICI CURIAE OF INFINITY OUTDOOR, INC. AND VISTA MEDIA GROUP, INC. IN SUPPORT OF PETITIONERS (Feb. 22, 2001)

• 2001 WL 193613 (Appellate Brief) AMICUS CURIAE BRIEF OF THE NATIONAL ASSOCIATION OF CONVENIENCE STORES (Feb. 22, 2001)

• 2001 WL 193616 (Appellate Brief) BRIEF OF AMICI CURIAE NEWSPAPER ASSOCIATION OF AMERICA, AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF MASSACHUSETTS, DOW JONES & COMPANY, INC., MAGAZINE PUBLISHERS OF AMERICA, INC., and THE REPORTERS COMMITTEE FOR FREEDOM OF THE P RESS IN SUPPORT OF PETITIONERS (Feb. 22, 2001)

• 2001 WL 193618 (Appellate Brief) BRIEF FOR PETITIONERS LORILLARD TOBACCO COMPANY, BROWN & WILLIAMSON TOBACCO CORPORATION, R.J. REYNOLDS TOBACCO COMPANY, AND PHILIP MORRIS INCORPORATED (Feb. 22, 2001)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 2404                                                        Page 39
533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532, 69 USLW 4581, 69 USLW 4582, 29 Media L. Rep. 2121, 01 Cal.
Daily Op. Serv. 5421, 2001 Daily Journal D.A.R. 6699, 14 Fla. L. Weekly Fed. S 470, 2001 DJCAR 3333
**(Cite as: 533 U.S. 525, 121 S.Ct. 2404)**

• 2001 WL 199215 (Appellate Brief) BRIEF OF AMICUS CURIAE ASSOCIATION OF NATIONAL ADVERTISERS, INC. IN SUPPORT OF PETITIONERS (Feb. 22, 2001)

• 2001 WL 199407 (Appellate Brief) BRIEF AMICUS CURIAE OF THE PRODUCT LIABILITY ADVISORY COUNCIL, INC. IN SUPPORT OF PETITIONERS (Feb. 22, 2001)

• 2001 WL 199413 (Appellate Brief) BRIEF FOR PETITIONER U.S. SMOKELESS TOBACCO COMPANY (Feb. 22, 2001)

• (Appellate Petition, Motion and Filing) Brief for Petitioners Lorillard Tobacco Company, Brown & Williamson Tobacco Corporation, R.J. Reynolds Tobacco Company, and Philip Morris Incorporated (Feb. 22, 2001)Original Image of this Document (PDF)

• 2001 WL 34093960 (Joint Appendix) (Feb. 22, 2001)

• 2001 WL 34093963 (Joint Appendix) (Feb. 22, 2001)

• 2001 WL 34135253 (Appellate Petition, Motion and Filing) Brief of Washington Legal Foundation as Amicus Curiae in Support of Petitioners (Feb. 22, 2001)

• 2000 WL 33979553 (Appellate Petition, Motion and Filing) Reply Brief for the Petitioners (Nov. 30, 2000)Original Image of this Document (PDF)

• 2000 WL 33976615 (Appellate Petition, Motion and Filing) Respondent's Brief in Opposition (Nov. 16, 2000)Original Image of this Document (PDF)

• 2000 WL 33979635 (Appellate Petition, Motion and Filing) Motion for Leave to File Brief and Brief of Washington Legal Foundation as Amicus Curiae in Support of Petitioners (Nov. 16, 2000)Original Image of this Document (PDF)

• _____00-596_____(Docket) (Oct. 17, 2000)

• _____00-597_____(Docket) (Oct. 17, 2000)

• 2000 WL 33979541 (Appellate Petition, Motion

and Filing) Petition for a Writ of Certiorari (Oct. 16, 2000)Original Image of this Document with Appendix (PDF)

• (Appellate Petition, Motion and Filing) Petition for a Writ of Certiorari (Oct. 16, 2000)Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

| FSC-24-00 | 1/28/00 |
|---|---|

| SUBJECT: Regulations – Sales and Distribution of Cigarettes – State of Massachusetts (effective 2/1/00) | Distribution for: |

**Distribution for:**

| | | |
|---|---|---|
| x AVP | x RMO | x Sales Rep |
| x AMO | x DM | ___ Retail Rep |
| x AE | x RM | ___ Info Coord |
| x RSM | x KAM | ___ WP Coord |
| x ARSM | x AM | ___ Materials Coord |
| | | x Reg Admin Asst |

**SUBJECT:** Regulations – Sales and Distribution of Cigarettes – State of Massachusetts (effective 2/1/00)

**Why:** Provide Field Sales personnel with an understanding of Regulations Concerning Sales and Distribution of Cigarettes in Massachusetts effective 02/01/00.

**Action Required: IMPORTANT** Managers/Reps - Ensure that RJRT complies with all applicable regulations to the fullest extent possible in retail calls in state of Massachusetts.

**ROU to distribute to:**
___ Sales Rep
___ Retail Rep

**FSC Letter Sent:**
___ U.S. Mail
x Roadside
___ E-Mail

*(All KAMs/AMs with chains who have retail accounts in Massachusetts should review this information as soon as possible.)*

As you may know, the Massachusetts Attorney General announced regulations set to go into effect last August regarding, among other things, the advertising and sampling of cigarettes at retail. RJRT and other tobacco companies filed suit to halt the regulations on the grounds that they violate the U.S. Constitution. On January 24, 2000, the Massachusetts federal court ruled against RJRT and the industry on all but a few claims. The court later denied our motion to have the regulations stayed pending appeal. RJRT and the industry are appealing the unfavorable ruling, but since the regulations have not been stayed, <u>they go into effect, as amended, on February 1, 2000</u>. Thus, we must take steps to comply with these regulations.

The attached <u>Key Points</u> document, while not all encompassing, speaks to the regulations as they may effect RJRT practices at retail. The <u>Key Points</u> document is intended to assist our people when they are talking to accounts, but it is not intended as a statement of legal advice to our customers. It is intended to facilitate awareness of the new regulations and to urge retailers' compliance. The attached <u>Key Points</u> document has been approved to share with our customers. Region Sales managers, at their discretion, may choose to proactively send the <u>Key Points</u> to selected customers in an effort to help them better understand the regulations.

It is critical that RJRT Field Sales personnel not place any new signage that would run afoul of the regulations. The retailer owns the existing signage, and it is the retailer's responsibility to remove signage as necessary to bring his store into compliance. During the course of your normal retail calls, it is important that you urge the retailer to comply with the regulations.

There are many elements of the regulations that are not covered in the <u>Key Points</u>. This communication is intended to focus on the retail trade.

Program Contact:  Tom Fitzin, extension #5952
                           Area Manager of Operations


R. J. REYNOLDS TOBACCO COMPANY

*FSC-24-00*
*1/28/00*
*Attachment A*

**KEY POINTS**
**Massachusetts Cigarette Advertising Regulations**

On February 1, 2000, regulations enacted by the Attorney General of Massachusetts regarding, among other things, the advertising of cigarettes at retail go into effect. R. J. Reynolds Tobacco Company and other tobacco manufactures are continuing their legal case to have the Regulations declared unconstitutional, but most of the Regulations have been upheld by the lower court and will go into effect on February 1. Violation of the regulations can carry severe civil penalties.

The following is a brief overview of some of the parts of the regulations affecting advertising of cigarettes at retail. Specifically, this document addresses:

- Outdoor Advertising
- Non-Self Service Requirements and Adult-Only Retail Facilities
- Sampling and Free Product Promotions

This overview **does not** attempt to cover all of the new Massachusetts Regulations. Other Massachusetts Regulations address other issues that may be of concern to retailers, such as vending machines, secret-shopper programs, and retail employee training. Regulations such as these are not addressed here. For information, the Regulations are contained in the Code of Massachusetts Regulations, 90 CMR § 21.00, or contact the Office of the Massachusetts Attorney General. Additionally, towns or communities within Massachusetts may have regulations or ordinances that are more restrictive than the Massachusetts Regulations. This overview does not attempt to cover such regulations or ordinances.

**<u>Outdoor Advertising</u>**

Outdoor advertising (banners, awnings, ground mounts, pump-toppers, etc.), including advertising in enclosed stadiums and advertising from within a retail establishment that is directed toward or visible from the outside of the establishment, in any location w/in 1000 feet of any public playground, playground area in a public park, elementary school or secondary school is <u>not</u> permitted.

> *Playground is defined as any outdoor premises or grounds owned or lawfully operated by or on behalf of, the State, any State agency, or any political subdivision of the State, or any public, private or parochial school, any child day care center or any youth center, which contains any device, structure or implement, fixed or portable, used or intended to be used by persons under the age of eighteen for recreational or athletic purposes including, but not limited to, play equipment such as a sliding board, swing, jungle gym, sandbox, climbing bar, wading pool, obstacle course, swimming pool, see-saw, baseball diamond, athletic fields, or basketball court.*

Outdoor black and white or tombstone advertising is <u>not</u> permitted if w/in 1000 feet of any public playground, playground area in a public park, elementary school or secondary school.

Signs and PDI on windows and glass doors facing outward are <u>not</u> permitted if w/in 1000 feet of any public playground, playground area in a public park, elementary school or secondary school.

Indoor POS, including canopy signage and other cigarette advertising on racks, and advertising elements on temporary/permanent counter displays are <u>not</u> permitted if w/in 1000 feet of any public playground, playground area in a public park, elementary school or secondary school, <u>if they are directed toward or visible from the outside of the establishment.</u> If cigarette advertising is visible

through an affected store's windows from a normal line of sight, it is in non-compliance. However, the product itself may be visible from outside the retail store, and waterfall cartons are permitted.

Existing signs are not "grandfathered." The retailer should be urged to remove all non-compliant signage. RJRT Field Sales must not place new, non-compliant signage.

***Because 1000 feet is the proscribed distance, it is likely that virtually all retail stores located in metropolitan and most suburban areas will be effected by the outdoor advertising ban.***

## Non-Self Service Requirements and Adult-Only Retail Facilities

In general, retailers <u>may not</u> use self-service displays of cigarettes and must place cigarettes out of the reach of all consumers in a location accessible only by outlet personnel. This regulation applies statewide and is not tied to the 1000-foot requirement relating to outdoor signage.

Displays with plastic shields and back bar displays are permitted. Overhead pack merchandisers are permitted.

Adult-only retail facilities, such as age-restricted CTS stores, tobacco shops, bars, and nightclubs, <u>may</u> use self-service displays.

> *For the purposes of these regulations, adult-only retail facility is defined as a facility where a retailer ensures that no person younger than 18 years old is present or permitted to enter <u>at any time.</u>*

## Sampling and Free Product Promotions

Sampling is permitted only in adult-only retail facilities (defined above), and sampling is limited to one free pack per day to an individual adult.

Buy-Some-Get-Some-Free ("BSGSF") offers do not qualify as sampling, and thus are permitted as they have been in the past.

Cents/Dollars-off packs or carton promotions are permitted as they have been in the past.

Coupons for free packs/cartons are not permitted and should not be redeemed.

*FSC-24-00*
*1/28/00*
*Attachment B*

**Field Sales Involvement**

- Sales Reps review the Massachusetts Cigarette Advertising Regulations with the store manager/owner of independent accounts during normal coverage in **February** to ensure they understand the regulations as they apply to retail.

- KAMs/AMs review the Massachusetts Cigarette Advertising Regulations with the chain headquarters in **February** to ensure they understand the regulations as they apply to retail.

- Sales Reps/Retail Reps during normal coverage in March/April monitor stores for compliance by answering special question available in laptop on 2/28/00.

  > Question: *Has this account refused RJRT's request to comply with the Mass. Cigt. Advertising Regs?*

  > Reply: **Yes or No**

  **If the account is not in compliance with the Regulations, our legal department will then follow up with a letter to the retailers explaining their responsibilities.**

- On an on-going basis, Reps should always keep their POS modules updated for the correct POS items that are in compliance with the regulations for all retail calls in state of Massachusetts.

- As you are aware, displays with plastic shields, non-self service displays, etc. are available to assist you in complying with these regulations.

- Other programs being executed at Retail by outside suppliers (i.e. Event Marketing, Salem SMSi Low Volume Program, 1-Sheets, Awnings, Kelly Services, TelMark) are being notified of these regulations as well. No Field Sales Involvement is required.

| FSC-24-00 Addendum | 2/2/00 | Distribution for: | | |
|---|---|---|---|---|

| FSC-24-00 Addendum | 2/2/00 |
|---|---|

**SUBJECT:** Regulations – Sales and Distribution of Cigarettes – State of Massachusetts (effective 2/1/00)

**Why:** Keep Field Sales apprised of recent developments re: regulations in state of Massachusetts.

**Action Required: IMPORTANT** Managers/Reps - continue normal activities in Massachusetts Review information below for pertinent details.

Distribution for:

x AVP     x RMO     x Sales Rep
x AMO     x DM      ___ Retail Rep
x AE      x RM      ___ Info Coord
x RSM     x KAM     ___ WP Coord
x ARSM    x AM      ___ Materials Coord
                    x Reg Admin Asst

**ROU to distribute to:**
___ Sales Rep
___ Retail Rep

**FSC Letter Sent:**
___ U.S. Mail
x Roadside
___ E-Mail

*(All KAMs/AMs with chains who have retail accounts in Massachusetts should review this information as soon as possible.)*

Monday, January 31, the federal appeals court with jurisdiction over Massachusetts ordered a stay of the Massachusetts Attorney General Regulations concerning outdoor advertising, non-self service requirements, adult-only retail facilities, and sampling. This means that, pending a final decision by the appeals court, RJRT and the industry can continue their normal activities at retail in Massachusetts as they have in the past. **You should consider FSC-24-00 dated 01/28/00 regarding Massachusetts on hold until further notice, and you should conduct your retail activities as you have in the past.**

The appeals court will hear the case in April and reach its decision on the constitutionality of the Regulations sometime thereafter. While we cannot predict what that outcome will be, the decision by the appeals court to stay implementation of the Regulations is obviously a positive development in our legal challenge.

As information certain aspects of the Regulations that do not affect RJRT's practices at retail will still go into effect on February 1, 2000, because they were not part of RJRT's lawsuit. Those provisions concern the following:

1. No breaking up packs to sell cigarettes individually or in groups smaller than 20 sticks.

2. No vending machines in retail outlets; only face-to-face exchange with age verification by photo I.D.

3. The provisions for retailers' in-house secret shopper programs and training programs for employees are in effect.

4. Vending machines are allowed in bars provided they have lockout devices, are in the immediate vicinity and exclusive control of outlet personnel, and they have a sign that says cigarettes not for minors and identifying employee who has control of the lock-out device.

No Field Sales action is required on the above provisions..

Program Contact: Tom Fitzin, extension #5952
Your Area Manager of Operations

R. J. REYNOLDS TOBACCO COMPANY

# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL RODIO,

Plaintiff,

v.

R.J. REYNOLDS TOBACCO COMPANY,

Defendant.

Civil Action No. 04-CV-10006-JGD

## AFFIDAVIT OF GERALD R. DESCHENES

The affiant, having been duly sworn, affirms and states as follows:

1.    My name is Gerald R. Deschenes.  I am currently Senior Manager Training and Skills Development for the Defendant, R. J. Reynolds Tobacco Company ("RJRT").  Formerly, I was Senior Manager Sales Employment Practices for RJRT, and by virtue of such former position, I have personal knowledge of the facts stated herein.

2.    I understand that the Plaintiff, Michael Rodio ("Rodio"), claims he was wrongfully discharged for a number of reasons, some of which have shifted during the course of this litigation.  I believe he has alleged that he was discharged because RJRT wanted to deprive him of pension benefits that were due to vest at some point in the future.

3.    While I understand that Rodio has abandoned this claim now, I wanted to clarify the following factual matters related to his pension benefit:

a.  Rodio is entitled to, and is in receipt of, a vested pension benefit under the terms of the RJRT retirement plan, based on Credited Service through the date of termination of his employment on October 28, 2002.

b.  At the time of the termination of Rodio's employment on October 28, 2002, he was fifty (50) years of age (Date of Birth: August 1, 1952), and he had accumulated just over twenty-six (26) years of Credited Service  (Date of Hire: October 12, 1976).

c.  In accordance with the terms of the RJRT retirement plan, the calculation of Rodio's vested pension benefit includes a reduction factor for each year that Rodio is less than age 65, as of the date of commencement of his pension benefit.

d.  If Rodio had been terminated on or after August 1, 2007 (Age 55), at that time he would have accumulated at least thirty (30) years of Eligibility Service, and under the terms of the RJRT retirement plan the calculation of his vested pension benefit would not have included a reduction factor for each year less than age 65, given the facts that (i) Rodio would have been age 55 and (ii) Rodio would have accumulated at least thirty (30) years of Eligibility Service.

This the _9ᵗʰ_ day of August, 2005.

*Gerald R. Deschenes*

Gerald R. Deschenes


SWORN TO AND SUBSCRIBED BY ME
This the _9_ day of August, 2005

*Joan E. Dalton*

Notary Public
My Commission Expires:_____

OFFICIAL SEAL
JOAN E. DALTON
NOTARY PUBLIC-NORTH CAROLINA
COUNTY OF FORSYTH
My Commission Expires April 4, 2006

3