# EXHIBIT E

ORIGINAL

```
1                              VOLUME   I

2                         PAGES  1 to 243

3                         EXHIBITS 1 to 24

4
          IN THE UNITED STATES DISTRICT COURT
5          FOR THE DISTRICT OF MASSACHUSETTS
               CASE NO. 04-10006-WGY
6
      --------------------------------
7    MICHAEL RODIO,
                        Plaintiff,   :
8
               vs.                   :
9
     R.J. REYNOLDS TOBACCO COMPANY,   :
10                        Defendant.
      --------------------------------
11

12          DEPOSITION OF MICHAEL RODIO, taken in

13    behalf of the Defendant, pursuant to the applicable

14    provisions of the Massachusetts Rules of Civil

15    Procedure, before Sherri A. DeTerra-Medeiros,

16    Shorthand Reporter and Notary Public in and for the

17    Commonwealth of Massachusetts, at the Law Offices

18    of Sahady Associates, 399 No. Main Street, Fall

19    River, Massachusetts, on Tuesday, August 31, 2004,

20    commencing at 10:54 a.m.

21              DETERRA REPORTING SERVICES
                     One Bow Drive
22            Acushnet, Massachusetts 02743
          Tel. (508) 763-2542   Fax (508) 763-3521
23                   1-800-588-8461

24
```

2

```
 1     APPEARANCES:

 2

 3          Sahady Associates, P.C.,
              (by Michael Sahady, Esq.)
 4            399 No. Main Street,
              Fall River, Massachusetts 02720,
 5            for the Plaintiff.

 6          Constangy, Brooks & Smith, LLC,
              (by W.R. Loftis, Jr., Esq.)
 7            100 N. Cherry Street - Suite 300,
              Winston-Salem, North Carolina 27101,
 8            for the Defendant.

 9
       ALSO PRESENT:  Jackson W. Henson and
10                     G.R. (Gerry) Deschenes.

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

3

```
 1                          INDEX

 2      Deposition of:                      Page
        MICHAEL RODIO
 3
            Direct examination by Mr. Loftis       4
 4

 5                        EXHIBITS
           Number                           Page
 6           1   7-pages Area Sales
                 Representatives Sales
 7               Representative, Sales Rep - E    13
             2   9-pages Performance and Career
 8               Management Process              15
             3   Memo 3/1/00                     24
 9           4   Personal Performance Report     26
             5   2-page Letter                   33
10           6   Letter 7/20/00                  42
             7   4-page Performance and Career
11               Management Process              44
             8   2-page Work With                98
12           9   7-page Written Reprimand       102
            10   September 2001 Work Plan
13               Priorities                     133
            11   e-mail 10/10/01                135
14          12   2-page Letter 9/21/01          142
            13   7-page Final Written Reprimand 148
15          14   3-page Response to November
                 reprimand                      154
16          15   2-page Letter 12/6/01          161
            16   e-mail 12/18/01                164
17          17   6-page Performance and Career
                 Management Process             166
18          18   3-page Letter 5/17/02          178
            19   2-page Letter                  186
19          20   Personal Performance Report    191
            21   13-page Memo                   201
20          22   8-page Plaintiff's complaint
                 and demand for jury trial      216
21          23   3-page Standards of Business
                 Conduct                        230
22          24   3-page Standards of Business
                 Conduct Certification of
23               Compliance                     231

24
```

1                    MICHAEL RODIO, a witness called in

2     behalf of the Defendant, first having been duly

3     sworn, on oath deposes and says as follows:

4     DIRECT EXAMINATION BY MR. LOFTIS:

5          Q.     Mr. Rodio, good morning.  We met

6     earlier.  My name is Randy Loftis.

7                    MR. SAHADY:  Can we identify --

8     excuse me, Randy -- the people present, the names

9     of who they are?

10                   MR. LOFTIS:  Sure.

11                   MR. HENSON:  My name is Jack Henson,

12    senior counsel in the law department of

13    R.J. Reynolds Tobacco.

14                   MR. DESCHENES:  My name is Gerry

15    Deschenes.  I am senior manager sales employment

16    practices with R. J. Reynolds Tobacco Company.

17                   MR. SAHADY:  Is he the same Gerry

18    Deschenes that we will be deposing tomorrow?

19                   MR. LOFTIS:  Correct.

20                   MR. SAHADY:  I would ask that he not

21    be present.

22                   MR. LOFTIS:  Let's take an off the

23    record and let's take a quick look at Rule 615.

24                   ( Discussion off the record. )

5

1                    ( Mr. Deschenes left the room and

2      did not return. )

3                    MR. LOFTIS:  Anything else before we

4      get started?

5                    MR. SAHADY:  The rules of the

6      deposition, what do you wish?

7                    MR. LOFTIS:  All objections reserved

8      except as to form of the question.

9                    MR. SAHADY:  And motions to strike

10     reserved until the time of the trial.

11                   MR. LOFTIS:  I am sorry.  What?

12                   MR. SAHADY:  All objections except

13     as to form and motions to strike are reserved to

14     the time of the trial.

15                   MR. LOFTIS:  Except as to form.

16     That is fine.

17                   MR. SAHADY:  Except as to form.

18     Q.     Okay.  Mr. Rodio, ready to go?

19     A.     Yes.

20     Q.     Have you ever done this before?

21     A.     No.

22     Q.     All right.  Let me suggest a couple of

23     things to you that I think will make this go

24     smoother and hopefully quicker.  One, make sure you

```
 1    understand my question.  If you don't, just let me

 2    know that you don't understand it and I will try to

 3    give you a clearer question that you can

 4    understand.  Let me finish my question before you

 5    begin your answer.  Don't let me interrupt you

 6    before you've completed your answer so that we make

 7    sure we're clearly communicating with each other,

 8    and a very important thing you need to only answer

 9    my question.  You may very well have a story that

10    you want to tell, but it is not going to help us in

11    this process if you tell your story instead of

12    answering my question.  Do you understand that

13    point?

14         A.     Yes.

15         Q.     Okay.  Can you do that for me?

16         A.     Yes.

17         Q.     Okay.  So, I mean, I understand you need

18    to get to work today.

19         A.     Well, yes, I have to work today.

20         Q.     What time?  Do you have a time you need

21    to be at work?

22         A.     Well, you know, I have to be there right

23    now, but I will try to work a little bit later

24    today so I can get things done.
```

1       Q.      I promise you if you only answer my

2    question, you will get through a whole lot quicker,

3    okay?

4       A.      Yes.

5       Q.      Fine.  Let me have your full name.

6       A.      Michael Paul Rodio.

7       Q.      And where do you reside?

8       A.      32 Mount Street, Wrentham,

9    Massachusetts.

10      Q.      And how long have you been at that

11   address?

12      A.      Approximately 18 years.

13      Q.      Does anyone live with you at the

14   residence?

15      A.      Yes.

16      Q.      Who would that be?

17      A.      My wife, my daughter and my son.

18      Q.      All right.  And your wife's name?

19      A.      Anne Rodio.

20      Q.      How -- does she work outside of the

21   home?

22      A.      She works, yes.

23      Q.      Where is that?

24      A.      She's a nurse at Health South.

8

```
1        Q.      And your children are how old?

2        A.      17 my son and my daughter is 20.

3        Q.      What is your educational background?

4        A.      I have a degree from the University of

5   Massachusetts and Springfield Community College.

6        Q.      And I believe after completing your

7   education, you went to work for R.J. Reynolds?

8        A.      Yes.

9        Q.      Did you have any other jobs prior to

10  going to work for R.J. Reynolds?

11       A.      Many jobs.

12       Q.      After graduating from college?

13       A.      No.  Not after, no.

14       Q.      Now, I believe you are currently

15  employed at Commonwealth?

16       A.      Brands, yes.

17       Q.      Where are they based?  Where is their

18  home office?

19       A.      Bowling Green, Kentucky.

20       Q.      When did you begin working at

21  Commonwealth?

22       A.      February 3rd of last year, I believe.

23       Q.      That would be 2003?

24       A.      Yes.
```

9

```
 1        Q.      And what is your current position with

 2   Commonwealth?

 3        A.      Northeast military manager Quantico.

 4        Q.      And what is your current compensation?

 5        A.      I think it's 32 or $33,000 a year.

 6        Q.      You get any bonuses?

 7        A.      If we -- if the company makes their

 8   goals, yes.

 9        Q.      And what if the company made its goals?

10        A.      Their goal this year is for 15 percent,

11   but they may not make it.

12        Q.      So you could get a bonus of up to 15

13   percent of your base pay?

14        A.      Yes.

15        Q.      All right.  And --

16        A.      Go ahead.

17        Q.      I want to briefly get your work history

18   at R.J. Reynolds if you could just -- what

19   positions did you hold?

20        A.      Sales rep and area sales rep.

21        Q.      And when you left the company, were you

22   a --

23        A.      Area sales rep.

24        Q.      And during the period of time that you
```

1    worked for the company, did you have multiple

2    territories?

3        A.    Yes.

4        Q.    Okay.  Tell me what -- when did you

5    became an ASR?

6        A.    I think it's maybe in the early '80s,

7    late '80s.

8            MR. SAHADY:  You're using acronyms

9    which I am not that familiar with.

10       A.    Area sales rep.

11           MR. SAHADY:  Just -- I am speaking

12   to Attorney Loftis.  ASR is area sales rep; is that

13   right?

14           MR. LOFTIS:  Right.

15           MR. SAHADY:  Go ahead.

16       Q.    As an area sales rep, what were your

17   responsibilities to the company?

18       A.    Well, it changed from time to time, but

19   when I first started, it was to make your monthly

20   call, to introduce new product, try to maintain

21   existing distribution, make good financial

22   decisions and work on maintaining a good

23   relationship with store owners and contract

24   relations and making sure that the contracts were

1   enforced properly.

2       Q.     All right.  Did that change over time?

3       A.     Well, it might have become more

4   elaborate by the invention of the computer.  It --

5       Q.     Did you get -- I believe you got a lap

6   top with the Introduction of Sales Force 2000; is

7   that correct?

8       A.     I believe so, yes.  Well, we had --

9   there were Norand computers for a while and then

10  went to lap tops.

11      Q.     And the lap tops would do a lot more

12  than the Norands?

13      A.     Yes.

14      Q.     And I assume over the years that the

15  responsibilities and accountabilities of sales

16  reps, area sales reps, became more complex?

17      A.     Yes.

18      Q.     And the contracts became more complex?

19      A.     Yes.

20      Q.     And the contracts they were more

21  numerous contracts?

22      A.     Yes.

23      Q.     And the contracts changed?

24      A.     Yes.

1      Q.      So even the same contract would change --

2      A.      Multiple.

3      Q.      -- multiple times?  As a sales rep, you

4    had to keep up with all of that?

5      A.      Yes.

6      Q.      And that was part of your job

7    responsibility?

8      A.      Right.

9      Q.      And you had with -- both with the

10   hand-held device and the lap top, you could go into

11   the store, one of your retail accounts, and report

12   data back to the company; is that correct?

13     A.      Yes.

14     Q.      Things like you would put in what -- you

15   would enter the product availability, correct?

16     A.      Correct.

17     Q.      And do you know what the company used

18   all that data for?

19     A.      Well, I imagine in making marketing

20   decisions and business decisions.

21     Q.      And to the best of your knowledge, all

22   sales reps were required to submit that data either

23   through the hand held or the computer?

24     A.      Yes.

```
1                    MR. LOFTIS:  Let's mark this as
2     Exhibit 1.
3                    ( Exhibit Number 1 marked for
4                    identification. )
5          Q.     Can you identify what we've marked as
6     Exhibit Number 1?
7          A.     It's area sales representatives, sales
8     representative, sales representative and job
9     responsibility, professional/managerial, technical,
10    business and personal dimensions.
11         Q.     Have you seen that before?
12         A.     Yes.
13         Q.     And the date -- I believe it's on the
14    second page, looks like the date is 1/99.  Do you
15    see on the lower left-hand corner?  Page 2.
16         A.     Yes.
17         Q.     Do you believe this is a listing of all
18    of the responsibilities and accountabilities that
19    you had as an area sales rep during the last
20    several years you worked at the company to the best
21    of your knowledge?
22         A.     Yes.
23         Q.     If there is -- if there was any change,
24    it would have probably been to add something else,
```

1    correct?

2        A.    Yes.

3        Q.    Now, when did Carl Fasciani become your

4    manager?

5        A.    Three-year period.

6        Q.    Do you recall?

7        A.    I would have to look it up.  It was a

8    three-year period, so I would imagine -- I think

9    2000.  You would have it in your records, wouldn't

10   you?

11       Q.    I am sorry.  I get to ask the questions.

12       A.    Do you have that in your -- oh, okay.

13       Q.    Had you known Mr. Fasciani before?

14       A.    Never met the man.

15       Q.    How did you -- was your territory

16   reassigned at some point in time?

17       A.    Yes.

18       Q.    And how -- what was the reason for that?

19       A.    They had a restructuring of the company.

20       Q.    Do you remember when that was?  '99?

21       A.    I think '99, 2000, somewhere around

22   there.

23       Q.    That restructuring had been -- this

24   wasn't the first.  There have been other

1    restructurings over the years?

2        A.    Yes.

3        Q.    And sales reps were realigned based on

4    certain companies?

5        A.    Right.

6        Q.    Let me go ahead and hand you what we'll

7    mark as Exhibit 2.

8                    ( Exhibit Number 2 marked for

9                     identification. )

10       Q.    You can go ahead and take a look at

11   Exhibit 2 which you have got right in front of you.

12   That is the 2000 evaluation which would reflect

13   your performance in 1999; is that correct?  You see

14   the dates?

15       A.    Yes.  It looks to be the same.

16       Q.    It is out of your personnel file if that

17   helps.

18       A.    Yes.

19       Q.    It's dated January of 2000, correct?

20       A.    Yes.

21       Q.    And it's an evaluation of your

22   performance in the calendar year 1999, correct?

23       A.    Yes.

24       Q.    Now, I am going to point out a couple of

16

1    things in this evaluation to you.  You'll probably

2    need to be looking at the exhibit itself.  On the

3    first page -- let me tell you something that may

4    help as we go through.  If you look on the lower

5    right-hand corner, you will see a numbering system,

6    number on the lower right.

7         A.    Yes.

8         Q.    See 42?

9         A.    Yes.

10        Q.    That's a number that was stamped on the

11   documents by my office as they were provided to

12   your attorney, so I will refer to page numbers and

13   I'll use those numbers periodically throughout the

14   day, okay?

15        A.    Okay.

16        Q.    On page 42 the handwritten part the

17   first sentence says "increased RJR exposure and

18   presence in the Fall River market."  Do you believe

19   that to be an accurate statement?

20        A.    Yes.

21        Q.    And I think -- would you view that --

22   that's a positive comment, is it not?

23        A.    Yes.

24        Q.    And then on page 43 where it shows

 1    previous development needs -- and that would be

 2    from last year's plan evaluation, correct -- it

 3    says previous development needs results against

 4    last year's development plan needs.  Do you see

 5    where I am?

 6        A.      Umm hmm.

 7        Q.      One other rule.  You need to say yes or

 8    no.

 9        A.      Yes.

10        Q.      And the first line talks about call

11    count.  What is call count?

12        A.      How many calls you do every day.

13        Q.      And was that something that the company

14    tracked?

15        A.      Hmm.

16        Q.      Is that something the company tracked?

17        A.      Yes.

18        Q.      For you and all other sales reps?

19        A.      Yes.

20        Q.      And it says your average call count was

21    below division average.  Do you have any reason to

22    believe that is not true?

23        A.      If they wrote that, that must be true.

24    Yes.  I mean, I don't know, what was the division

1    average that year?

2        Q.    I am asking whether you've got any

3    reason to believe that is a false statement?

4                MR. SAHADY:  Objection.  Asked

5    through the firm.  You may answer, Mr. Rodio, if

6    you can.

7        A.    I am not sure because I don't know what

8    the average was that year.

9        Q.    How many years have you been -- this was

10   in 2000.  You had been with the company how long at

11   that time?

12       A.    Probably 23 years.

13       Q.    Do you think your call count should have

14   been below the division average --

15                MR. SAHADY:  Objection again.

16       Q.    -- if it was?

17                MR. SAHADY:  You may answer.

18       Q.    If your call count was below division

19   average, do you think that was acceptable?

20       A.    Some of the senior reps had more time

21   off.  By taking more time, you work less days, so

22   sometimes you couldn't stay as high as the rest of

23   them.  I don't believe -- I think the average --

24   the goal that year was seven calls per day.

1       Q.      Might be higher than the less than

2    average?

3       A.      Yes.

4       Q.      On the next line it says "Mike shows

5    highest PMX percentage."  Is that Phillip Morris

6    exclusive?

7       A.      Yes.  I was transferred to this

8    assignment.  The previous assignment I had low PMX.

9    I had good relations with my accounts.  This area,

10   for whatever reason -- I don't know if the salesman

11   had trouble here or what -- was in very poor

12   condition, and it was a very uphill battle.  We had

13   the lowest share in the market, the whole

14   northeast.

15      Q.      I only asked you if PMX meant Phillip

16   Morris exclusive.

17      A.      Oh, okay.  Sorry.

18      Q.      Now, on the bottom of that in this box

19   where it says previous development, the very last

20   paragraph, it says improve administration/knowledge

21   of computer applications.  Mike fails to meet his

22   accountability of handling administration functions

23   and you continue to read the rest of it.

24      A.      This was an opinion of one person.

1        Q.      Was it administrative?

2        A.      I had no problem with administration.

3        Q.      Was administrating responsibility part

4    of your job?

5        A.      Of course, you're assigned.

6        Q.      What was included within the

7    administrating?

8        A.      Reporting of calls, reporting of

9    contracts, upgrading contracts, making sure they

10   are on time, writing them up.

11       Q.      Contract compliance?

12       A.      Compliance, make sure it's done.

13       Q.      Maintaining POS?

14       A.      Maintaining -- POS was very well

15   maintained.

16       Q.      Now, that was also an administrative

17   responsibility?

18       A.      I don't know if they call that

19   administrative but maybe.  POS, yes.

20       Q.      Did you attend training on the lap top?

21       A.      Yes.

22       Q.      Where was that?  Was that in

23   Winston-Salem?

24       A.      We had several classes.  Some were in

21

1    Winston-Salem years ago.  We had some in hotel

2    rooms, casinos.

3         Q.    And effectively utilizing that computer

4    was part of your responsibility as well?

5         A.    Yes.

6         Q.    Okay.  Next page is 43.

7                   MR. SAHADY:  We're on 43.

8                   MR. LOFTIS:  I mean 44.  I am sorry.

9         Q.    You will see the notation -- if you read

10   the summary, it sounds like the review is saying

11   that you made positive interroads.  You've

12   increased RJR exposure, but where I find you

13   deficient is in the area of administration and

14   communication; is that correct?  Is that an

15   accurate assessment?

16                  MR. SAHADY:  Objection.  The

17   document speaks for itself.

18        A.    No.

19        Q.    All right.

20        A.    Actually, I worked very hard on

21   administration and got everything as best I could

22   in on time.  There were times with the computers

23   they were having problems, not up to my abilities,

24   and sometimes the computer communications wouldn't

1      go through.  It wasn't my problem, but I worked as

2      hard as I could to make sure that everything was

3      done properly.

4          Q.      Did everybody have the same computer?

5          A.      Well, some of the people's computers

6      broke down, so they had newer computers, and some

7      of the people had older computers, and the older

8      ones had sometimes a tendency at the end of their

9      life to break down during the day.  The battery

10     would die, whatever, so you would have to try to do

11     things from memory or jot down things.

12         Q.      Did you -- so you got your computer as

13     part of Sales Force 2000?

14         A.      I believe so, yes.

15         Q.      And that was an issue that came out in

16     1995?

17         A.      I couldn't tell you.

18         Q.      Whenever it was, did you get a new

19     computer during the period of time that you worked

20     for the company?

21         A.      I got several computers.

22         Q.      And when batteries broke down, you would --

23     what you would do then or what any sales rep would

24     do when they had a problem with the computer would

1     you make notes of what you were supposed to enter?

2          A.     Try to make notes as best you could,

3     write them down.

4          Q.     When you enter the computer -- let's

5     take product availability, for example, you enter

6     into the computer what brands were available in the

7     store; is that correct?

8          A.     Could be 40 to 50 entries, between 40

9     and 50 entries.

10         Q.     And so when the computer broke down, you

11     had to write down --

12         A.     Yes, so if you had ten calls that day,

13     you had to make 500 notes.  That is just on

14     entries, and you had other notes and questions you

15     had to make notes on so human -- I did as best I

16     could humanly possible to make the notes I could.

17         Q.     But doing as best as you could seemed

18     impossible -- is it not possible that you did make

19     errors when you entered the stuff at home that

20     night?

21                    MR. SAHADY:  Objection.

22         Q.     Do you think you never made a mistake?

23                    MR. SAHADY:  Objection.

24         A.     I couldn't tell you.

1      Q.      Were you ever late in responding to

2    anything?

3      A.      Was I ever late?

4              MR. SAHADY:  Objection.  Too broad.

5      A.      I'm --

6              MR. SAHADY:  Wait until I've

7    finished my reason for the objection.  When you say

8    "anything," that could cover a multitude of things.

9      Q.      Were you ever late in fulfilling any of

10   your responsibilities to the company?

11             MR. SAHADY:  Objection.  What

12   responsibilities?

13             MR. LOFTIS:  I don't think -- object

14   to the form of the question but that is the only

15   thing that is reserved.

16             MR. SAHADY:  Fair enough.  Go ahead.

17   You may have it.  Can you answer that?

18     A.      It's possible I was late on something.

19   I can't tell you exactly what.

20             MR. LOFTIS:  Mark that.

21     A.      I was early on some things, too.

22             ( Exhibit Number 3 marked for

23             identification. )

24     Q.      All right.  Exhibit Number 3, Mr. Rodio,

25

1    is an e-mail.  Did you get e-mails on your lap top

2    as well?

3        A.    Yes.

4        Q.    I believe e-mails read from the bottom

5    up or at least these do, so the original message

6    was from Amy Maguire sent on February 28th.  Do you

7    see that?

8                MR. SAHADY:  March 1st, 2000.  Do we

9    have the same?

10               MR. LOFTIS:  You read from the

11   bottom up.

12               MR. SAHADY:  Oh, bottom up.

13               MR. LOFTIS:  The earliest e-mail

14   would be from Amy Maguire, and it goes out to a

15   bunch of people including Mr. Rodio.

16       Q.    Do you see that, Mr. Rodio?

17       A.    Yes.

18       Q.    And it says "please respond by Friday,

19   3/300 with draft information for the below drafts."

20   Do you see your name below that?

21       A.    Yes.

22       Q.    Do you know why you would have gotten

23   five requests to send this information in?

24       A.    I don't remember getting five requests,

1    but if I would have gotten one request, I would

2    have answered it.  There must have been a reason.

3       Q.    Why you didn't answer?

4       A.    No, because if I received something that

5    is a request, I answered it.  Possibly I didn't

6    receive the previous e-mails.

7       Q.    Who is Amy Maguire?

8       A.    She was Mr. Kane's secretary.

9       Q.    And what is his position?

10      A.    He was the regional manager.

11            MR. LOFTIS:  Mark this.

12            ( Exhibit Number 4 marked for

13            identification. )

14      Q.    One other question about Exhibit 3,

15   Mr. Rodio, why you are looking at it.  If you did

16   get five requests and didn't respond, would that be

17   acceptable?

18            MR. SAHADY:  Objection.

19      Q.    Just -- he's not instructing you not to

20   answer.  That is not for him to say.

21            MR. LOFTIS:  You can't instruct him

22   not to answer.

23            MR. SAHADY:  Well, I can.  I can.

24            MR. LOFTIS:  Only if it's

1    privileged.

2                    MR. SAHADY:  That is not something

3    that he decides, what is acceptable or not.

4                    MR. LOFTIS:  You can't testify

5    either.

6                    MR. SAHADY:  That's a question of

7    law for the jury to decide.

8                    MR. LOFTIS:  Well, you can object to

9    the form of the question but that is it.

10                    MR. SAHADY:  I am not so sure about

11    that.

12                    MR. LOFTIS:  Well, instruct him not

13    to answer.

14                    MR. SAHADY:  It doesn't give the

15    defendant carte blanche to ask any question under

16    the format agreed upon.

17                    MR. LOFTIS:  I am going to ask the

18    question.

19                    MR. SAHADY:  Go ahead.  You have the

20    right to ask the question, and I instruct him not

21    to answer.  Can we hear the question again?

22      Q.    All right.  Let me rephrase it.  This is

23    in 2000, Mr. Rodio, correct?

24      A.    It says -- I don't know.  I cannot see

1    it.  I will look.  Yes.  March 1st, 2000.

2        Q.    You had been with the company for 23

3    years at that time?

4        A.    Yes.

5        Q.    All right.  In your 23 years of

6    experience with the company, did you think it would

7    be acceptable if, in fact, it took five requests

8    before you responded to the regional office?

9              MR. SAHADY:  Objection.

10       Q.    Answer the question.

11       A.    I have no answer to that.

12       Q.    Does that mean you don't know?

13       A.    Hmm.

14       Q.    Does that mean you don't know whether it

15   would be acceptable or not?

16             MR. SAHADY:  It hasn't been

17   established that he, in fact, ignored one, two,

18   three, four.

19             MR. LOFTIS:  I am asking a

20   hypothetical question.  That is all.

21       A.    I never ignored things.  I tried to

22   answer things in a proper time.

23       Q.    If you received these five requests for

24   your responding, would that be acceptable?  Just

1    yes or no.

2                    MR. SAHADY:  Objection.

3         A.    I would answer requests in a reasonable

4    time if I received them.  I wouldn't let them go.

5    I tried to answer every request that comes.  I

6    tried to do the best I could.

7                    MR. SAHADY:  You've answered the

8    question.

9         Q.    Number 4.  Very briefly.  What is a

10   personal performance report?

11        A.    It's the manager's opinion.  It's my

12   manager's opinion about how I did.

13        Q.    Just so we can get some terms straight

14   that will help us going through.  Says activities

15   conducted that line right there.

16        A.    That --

17        Q.    WW is work with?

18        A.    Yes.

19        Q.    AA is what?

20        A.    AA is checking calls.

21        Q.    What does AA stand for?

22        A.    Hmm.

23        Q.    What does AA stand for?

24        A.    Accountability -- I couldn't tell you.

```
 1        Q.     What does TA stand for?

 2        A.     Territory analysis.

 3        Q.     Now, a work with is when your manager

 4     actually goes out and goes into the store with you?

 5        A.     Yes.

 6        Q.     Not coming behind you, correct?

 7        A.     Yes.

 8        Q.     In a TA the manager would come behind

 9     you in a day or so, correct?

10        A.     Yes.

11               MR. SAHADY:  Behind him meaning at

12     another time or physically behind him?

13               MR. LOFTIS:  Physically behind him.

14     Well, not right behind him.  It could be a day

15     later.

16        A.     Could be a week later, a day later.

17        Q.     Right.  But on a work with, your manager

18     would be with you in the store, correct?

19        A.     Yes.

20        Q.     And the very last entry it says "work on

21     improving admin with ROU."  Do you see that?

22        A.     Yes.

23        Q.     An ROU is what?

24        A.     The regional office.
```

1      Q.      That is where Mr. Kane works?

2      A.      Yes.

3      Q.      And what would be included within

4   administration?

5      A.      It's a general statement.

6      Q.      Do you know what was included?

7      A.      It could be a wide range of things.

8      Q.      Part of the --

9      A.      It wasn't explained.  This

10   administration includes a lot of things.

11      Q.      If you go back to Exhibit 1, go to the

12   second page, left-hand column, you see where it

13   says managing administration?  Again, yes or no.

14      A.      Yes.

15      Q.      Is it your understanding that those were

16   your administrative responsibilities?

17      A.      Yes.

18      Q.      Okay.  Did you ever -- now, I am going

19   to flip you back and forth on that, and I apologize

20   for that, but if you go to Exhibit 4 --

21      A.      Yes.

22      Q.      Do you see that one?

23      A.      Yes.

24      Q.      I believe you are looking at one?

1       A.      This is four.

2       Q.      Right.  Did Mr. Fasciani give you a copy

3   of that or show it to you?

4       A.      It's four years ago.  I honestly

5   couldn't tell you.

6       Q.      Had you ever seen it before?

7       A.      Again, this is four years ago.

8       Q.      So you don't know whether you got it or

9   not?  If you don't, that is fine.

10      A.      It's something that happened four years

11  ago.

12      Q.      I understand, Mr. Rodio.  I am just

13  asking you whether or not you got a copy of it?  If

14  you don't remember --

15      A.      To be honest with you, I don't.  I can't

16  recall.

17      Q.      Did you ever tell Mr. Fasciani that you

18  didn't understand what was included within your

19  administrative responsibilities?

20      A.      Not that I recall.  Maybe I asked him a

21  question.  I might have asked him for help on

22  something.

23      Q.      Do you recall that specifically?

24      A.      Might have been a new program, might be

1    uncertain of a new program, so I'd asked for

2    clarification.

3        Q.    Did he provide the clarification when

4    you did?

5        A.    Sometimes you would have to wait.

6        Q.    Did he eventually provide the

7    clarification?

8        A.    Majority of times, yes?

9              MR. LOFTIS:  Mark 5.

10             ( Exhibit Number 5 marked for

11             identification. )

12       Q.    That's Exhibit 5.  Do you see the

13   subject of this document is personal progress

14   report?

15       A.    Yes.

16       Q.    What is the purpose of this document?

17             MR. SAHADY:  Objection.

18       Q.    Do you know?

19       A.    The purpose?

20       Q.    Did you ever get these during the course

21   of your 23 years with the company or 26 years?

22       A.    Yes.

23       Q.    You got personal progress reports?

24       A.    Yes.

34

1        Q.      Why did you get them?  What was the

2    purpose of it --

3                    MR. SAHADY:  Objection.

4        Q.      -- if you know?

5        A.      I couldn't tell you.  It's the company

6    who wrote it for their information.

7        Q.      Did they give you a copy of it?  It says

8    Dear Mike.

9        A.      I don't have a copy of it.

10       Q.      So you don't know whether you got it or

11   not?

12       A.      Well, it says Dear Mike so I really

13   couldn't tell you.

14       Q.      Mr. Rodio, you received personal

15   progress reports from other managers other than

16   Mr. Fasciani; is that correct?

17       A.      Yes.

18       Q.      On the bottom again it mentions -- did

19   you ever tell any of your managers you didn't

20   understand why you were getting these personal

21   progress reports or say what are they for?

22       A.      I don't believe I ever said that.

23       Q.      Now, the administrative communication at

24   the bottom of the page it says "you are not

1     updating your master list on a call by call basis

2     as instructed at our last two meetings."  What does

3     that refer to?  What is your master list?

4          A.     As far as I know, I always updated my

5     master list.

6          Q.     Do you see where I was reading?

7          A.     Yes.

8          Q.     Where was it?  It's on the first page.

9                 MR. SAHADY:  Very last line,

10    Mr. Rodio.

11         Q.     What is the master list?

12         A.     It's your list of calls.

13                MR. SAHADY:  I am sorry.  I didn't

14    hear that.

15         A.     It's a list of your accounts.

16         Q.     So it's a list of all of your accounts

17    within your territory?

18         A.     Yes.

19         Q.     And you were suppose -- how did you

20    update that?

21         A.     Well, if the volume is changed, you

22    change the volume.  If the phone number changed,

23    you change the phone number.  If the name of the

24    account changed, you change the name of the

1    account.  Whatever you had to do.

2        Q.    And if the company believed that you

3    were not updating your master list, how would they

4    know that?

5        A.    This isn't the company.  This is

6    Mr. Fasciani.

7        Q.    He was your manager; he worked for the

8    company?

9        A.    As far as I know, I updated my master

10   list to the best of my ability.

11       Q.    To the best of your ability?

12       A.    Yes.

13       Q.    So how would Mr. Fasciani -- when you

14   updated your master list, would that be something

15   you sent in to the company?

16       A.    No.  It was something you do on the

17   computer.

18       Q.    With your lap top?

19       A.    Yes.

20       Q.    So when you'd update it, you would go

21   into the store and you would update everything in

22   the store, and then you would go home at night --

23       A.    Communicate.

24       Q.    -- and communicate which would down load

1     all of that information into a master computer,

2     correct?

3          A.     Yes.

4          Q.     And then Mr. Fasciani would check the

5     master computer to see if you were updating your

6     master list on a call by call basis, correct?

7          A.     That is correct.  I --

8                 MR. SAHADY:  Just wait.

9          Q.     Were you aware that Mr. Fasciani -- did

10    he ever comment to you or do you ever recall being

11    told that your master list was not being updated on

12    a call by call basis?

13         A.     I don't recall that.

14         Q.     On the second page -- let me ask you

15    this.  Back on that master list on a call by call

16    basis, would you believe that would be

17    administrative in nature?

18         A.     Yes, it's administrative.  Actually,

19    it's not my opinion.  It's the company's opinion.

20         Q.     Okay, but they viewed it as an

21    administrative function --

22                MR. SAHADY:  Objection.

23         Q.     -- to the best of your knowledge?

24                MR. SAHADY:  Objection.

1      Q.      You can answer.

2              MR. SAHADY:  You are asking him what

3   is in the mind of the company.

4      A.      It's not my opinion.  It's the company's

5   opinion.

6      Q.      So as we sit here today, after 26 years

7   with the company, you do not have an understanding

8   that updating the list was part of your

9   administrative responsibilities?

10              MR. SAHADY:  He answered that

11   question.

12      A.      I did.  I said I updated the master list

13   every time.

14      Q.      That isn't what I asked you.  Did you --

15   did you consider that part of your administrative

16   responsibilities?

17              MR. SAHADY:  He answered that

18   question.

19      A.      That --

20      Q.      What was the answer?

21      A.      -- I did to my best ability.

22      Q.      That wasn't the question.

23              MR. LOFTIS:  I don't think he's

24   answered the question.

1            MR. SAHADY:  You went back to

2    Exhibit 1 and he answered at that time he

3    recognized that to be part of his --

4            MR. LOFTIS:  I am asking him a

5    different question now.

6            MR. SAHADY:  Not quite.  Same

7    question.  Different form.

8        Q.    Did you view updating your master list

9    to be part of your administrative duties?

10       A.    I updated the master list to the best of

11   my ability.

12       Q.    That is not what I asked you.  I will

13   ask you the question over and over again until you

14   answer it.  Did you view updating your master list

15   as part of your administrative responsibilities?

16   Just a yes or no.

17       A.    Yes, I updated my master list.

18       Q.    Did you view that as an administrative

19   responsibility of your job?  Yes or no.

20       A.    Upgrading the list, yes.

21       Q.    Okay.  Thank you.  The second page

22   refers to the folder program.  What is that?

23       A.    At that time we had folders that we

24   would give to the stores with all their contract

1     information and what their responsibilities were.

2         Q.      And is that something that you would

3     leave in the store?

4         A.      Yes.

5         Q.      Would you report in your lap top that

6     you had left it in the store?

7         A.      I don't think -- I don't believe.  I

8     don't recall.  I think you would just -- obviously

9     if you had a contract, you had to report the

10    contract in your computer.

11        Q.      And that would be administrative in

12    nature?

13        A.      Yes.

14        Q.      Number 3 says "you are not, as I

15    requested, submitting a bi-weekly status report

16    every two weeks."

17        A.      I don't recall ever seeing that.

18        Q.      Do you recall being asked to submit

19    bi-weekly status reports every two weeks?

20        A.      If I was requested to do it, I did it.

21        Q.      And how would you submit those?

22        A.      I don't recall.  It's four years ago.  I

23    couldn't tell you.

24        Q.      Via a lap top?

41

1       A.      If it was requested in lap top, I did

2   it.

3       Q.      How else would you submit bi-weekly --

4   how else would you submit status reports to Mr.

5   Fasciani?

6       A.      I don't know.  If he asked on the

7   computer, it was by computer.  I don't recall this

8   statement.

9       Q.      Do you recall being asked to submit

10  bi-weekly status reports?

11      A.      Again, it's four years ago.  I don't

12  recall.

13      Q.      During the entire time you worked with

14  the company, do you ever recall being asked to

15  submit bi-weekly status reports to keep your

16  manager apprised of progress in your assignment?

17      A.      I don't recall.

18      Q.      Okay.  And Number 4 refers to call count

19  is below division average, references your planning

20  calendar.  What is that?

21      A.      The planning calendar is a calendar

22  where what calls you were going to.

23      Q.      And would that be something that was on

24  your lap top?

42

```
 1        A.      Yes.  We also had a physical one.

 2        Q.      Did you keep both?

 3        A.      I think I helped develop the program.

 4        Q.      Did you keep both?

 5        A.      We were only requested to keep a

 6   physical one if I remember.

 7        Q.      So not in the lap top?

 8        A.      I believe.  To be honest, I don't

 9   recall.  I think I may have had one in the lap top,

10   but I don't recall.

11        Q.      Did you share that with Mr. Fasciani,

12   your planning calendar?

13        A.      If he asked for it, I shared it with

14   him.

15                    MR. LOFTIS:  Mark 6.

16                    ( Exhibit Number 6 marked for

17                    identification. )

18        Q.      All right.  Exhibit 6.  All right.

19   Showing you Exhibit 6.  Do you recall receiving

20   this document, Mr. Rodio?  It says Dear Mike.

21        A.      Again, it's four years ago.  I don't

22   recall.

23        Q.      Do you recall receiving mid year

24   performance reviews on occasion?
```

1      A.      Yes.

2      Q.      Product availability, do you see that

3   one?

4      A.      Yes.

5      Q.      That was very complimentary, correct?

6      A.      Yes.

7      Q.      "Presence - very good use of temporary

8   displays."  Again that's complimentary, correct?

9      A.      Yes.

10      Q.      "Promotion - very good implementation."

11   Complimentary?

12      A.      Yes.

13      Q.      On the bottom of the page call --

14   coverage/call account and that is positive,

15   correct?

16      A.      Yes.

17      Q.      And administrative/organization it says

18   you have improved on handling of the administrative

19   organization very well in 2000, continued to

20   improve on the use of lap top tools.  Do you notice

21   that?

22      A.      That was his opinion.

23      Q.      That you need to continue to improve on

24   the use of lap top tools.  I know that was his

1    opinion.  Were you aware of that opinion?

2         A.     I worked very hard on always reporting

3    accurately, and this report was his opinion.  His

4    opinion at that time was positive.

5         Q.     The overall opinion was positive, wasn't

6    it?

7         A.     Yes.

8         Q.     And at least at the time of this mid

9    year review on July 20, 2000, in Mr. Fasciani's

10   opinion, your administrative functions were being

11   handled satisfactory.  Would you agree?

12        A.     According to this document.

13        Q.     And other than the information that you

14   submitted to the company, would Mr. Fasciani have

15   any way of knowing whether or not your

16   administrative responsibilities were being properly

17   performed or not?

18        A.     I can't really tell you that.  Mr.

19   Fasciani would know.

20                    MR. LOFTIS:  Mark that.

21                    ( Exhibit Number 7 marked for

22                    identification. )

23        Q.     Number 7, Mr. Rodio, I believe that's an

24   evaluation you received in January of '01

1    reflecting the company's evaluation of your

2    performance for calendar year 2000; is that

3    correct?

4         A.    It's interesting.  Our goal was to make

5    100 percent coverage each month but I was below the

6    goal --

7                   MR. SAHADY:  Michael, wait for the

8    question.

9                   THE DEPONENT:  It's interesting.

10        Q.    I just ask you if you can identify the

11   document?

12        A.    Yes.  I have a copy.

13        Q.    Now, you were talking about call count.

14   You made some comment about that.  Was that on the

15   second page?

16        A.    I don't know.

17        Q.    Was that where you were reading?

18        A.    Yes.

19        Q.    And what it says is you achieved 100

20   percent only three of the 11 months, correct?

21        A.    Yes.

22        Q.    It didn't say the goal was 100 percent,

23   did it?

24        A.    You could go 99 percent but you didn't

46

1      achieve 100 percent.

2          Q.      Do you see the very next point number 2?

3      What was the goal?

4          A.      I believe the goal that year was around

5      92 percent, 95 percent coverage.  I believe I was

6      in that range.  I didn't achieve 100 percent.

7          Q.      I believe it says that yours was 8.65.

8          A.      Yes.  That is calls per day.

9          Q.      Okay.  Well, what was the coverage goal?

10         A.      Usually goals are somewhere between 92

11     percent and 95 percent so you --

12         Q.      And where were you -- where do you

13     recall that you were on coverage?

14         A.      As far as I know, I was in the 90s.

15     Sometimes would be at 100.  That's hard.  I cannot

16     remember four years ago.

17         Q.      I noticed on your evaluation in January

18     of 2000 which was Exhibit 2 you wrote a response

19     that you disagree with that evaluation.  Did you

20     write a response -- did you disagree with anything

21     on Exhibit Number 7?

22         A.      I showed up at meetings always at the

23     time Mr. Fasciani told me to be there.

24         Q.      I am sorry.

1      A.      It says I was late for meetings.  I

2    showed up when he told me to be there.

3      Q.      All right.  Do you recall my question?

4      A.      Disagree?  Yes, I definitely disagree.

5      Q.      Now, I asked you if you had written

6    anything that stated that you disagreed with that

7    evaluation?

8      A.      Well, I think you would sit down and we

9    could agree or disagree, and I said I would

10   disagree.

11     Q.      Go back to Exhibit 2.  Go to page 46 on

12   that document.

13     A.      Okay.

14     Q.      So you wrote a written response

15   explaining why you disagree with the evaluation,

16   correct?

17     A.      Obviously, yes.

18     Q.      All right.  On page 42 which is the

19   cover of that document --

20     A.      Yes.

21     Q.      -- you refused to sign it because you

22   disagreed with it, correct?

23     A.      Yes.

24     Q.      And that was your right to do that?

1       A.      Yes.

2       Q.      All right.  Again, don't go away yet.

3    Page 46 of that document --

4       A.      Oh, there is another addendum to it,

5    too.

6       Q.      I'm aware of that.  Page 46.

7               MR. SAHADY:  Of exhibit what?

8               MR. LOFTIS:  Two.

9       Q.      In the middle of that sentence it says

10   "my paperwork was on time unless there were a

11   problem in the system."  Do you see that?

12      A.      Where?

13      Q.      It's right in the middle.

14      A.      Yes.  They had times when there was no

15   communication at all.

16      Q.      So it was your -- were you explaining

17   that you weren't responsible for any of the

18   administrative deficiencies that were noted?

19      A.      If I had to get something in, I got it

20   in to the best of my ability unless there was

21   something wrong with the system.  There were times

22   when the computers went down.

23      Q.      Down in what sense?

24      A.      You couldn't communicate.

49

1      Q.      Was that because the battery was dead or

2   just because?

3      A.      No, because the system.

4      Q.      The whole system was down so that would

5   have impacted every sales rep?

6      A.      Yes.  Well, it depends on if that

7   salesman had to report certain things.

8      Q.      But if the entire system was down,

9   nobody could communicate?

10      A.      Makes sense.

11      Q.      All right.  Now we can go back to

12   Exhibit 7.  First page of that document you signed,

13   right?

14      A.      Yes.

15      Q.      You didn't refuse to sign it?  You

16   didn't say that you disagreed with it?

17      A.      Yes.

18      Q.      All right.  And did -- to the best of my

19   knowledge, you had no response that was attached to

20   it expressing your disagreement.  Are you aware of

21   any kind?

22      A.      Again, this is something that happened

23   four years ago.  I cannot tell you what I was

24   thinking four years ago.

50

1      Q.     Do you have any document that was a

2   response to this evaluation?

3      A.     There is nothing here, so I imagine

4   there isn't.

5      Q.     Do you personally have anything?

6      A.     Response to this?

7      Q.     A written response.

8      A.     I don't believe so.  I don't know.

9      Q.     And your overall rating that year was

10  overall Number 7?

11     A.     That is what it says.

12     Q.     Was that consistent with the evaluation

13  that you were to receive in the past when you

14  received others actually?

15     A.     Yes, from different division managers.

16     Q.     And this evaluation was from your

17  manager, Mr. Fasciani, and it was signed off by his

18  manager Mr. Kane, correct?

19     A.     Yes.

20     Q.     And those were the same people that

21  evaluated you as needs improvement the prior year,

22  correct?

23     A.     Yes, the same people.

24     Q.     All right.  Did you believe your

1    performance had improved over the course of that

2    year?

3    A.    I performed the same all the time.  I

4    did the best I could all the time, and there were

5    some people's opinion that thought it was good and

6    some people thought it was bad, so it's their

7    opinion.

8    Q.    And so why do you think Mr. Fasciani

9    disagreed with you over your performance?

10    A.    Because we sat in a car one day and he

11    said he didn't like me, and if I didn't do what he

12    said, he was going to terminate me.

13    Q.    And when did this take place?

14    A.    2001.  He also stood out in the parking

15    lot and threatened me, said he was going to ruin my

16    career, going to ruin me.  At that time, I called

17    Mr. Kane, and that is when all hell broke out.  He

18    said he was going to go out and TA me every week.

19    He was going to destroy me.  I called the office

20    and told them what he said, and the way they

21    handled it is they came out and reprimanded me.

22    Q.    Let's back up and get through this a

23    little bit at a time so I understand it.  You

24    understand I need to be able to put timing,

1    sequence, location and other things so that I will

2    understand.  The conversation where he said -- when

3    Mr. Fasciani told you he didn't like you did that

4    take place in a car?

5        A.    Yes.

6        Q.    Was that in the same part of the

7    conversation that you later talked about taking

8    place in a parking lot?  Was that all the same?

9        A.    No.  That was a different occurrence.

10       Q.    Two different conversations?

11       A.    Yes.

12       Q.    All right.  When did the conversation --

13   when was this conversation when you said Mr.

14   Fasciani said he did not like you?  When did that

15   take place?

16       A.    I believe it was in 2000.

17       Q.    Do you have any notes or records

18   anywhere that you could reflect when that was?

19       A.    Yes.  They are all written notes.  I

20   have all written notes.

21       Q.    Where are your notes?

22       A.    I don't have them with me.  I would have

23   to look for them.

24       Q.    All right.  Did you make notes as you

1     went along during the course of your employment

2     with the company?

3          A.     Different notes, yes.

4          Q.     And did you provide those to your

5     attorney?

6          A.     He's seen them, I believe.

7          Q.     Did you turn them over to him or did you

8     keep them?

9               MR. SAHADY:  Objection.  Don't

10    answer.  That's privileged.

11              MR. LOFTIS:  I don't know whether

12    it's privileged.

13              MR. SAHADY:  When he and I get

14    together it's absolutely privileged.

15         A.     I think you have copies.

16              MR. SAHADY:  Objection.  Don't

17    answer.

18              THE DEPONENT:  Okay.

19         Q.     Were these notes you made

20    simultaneously?  Do you understand what I am asking

21    you?  In other words, did you make the notes

22    shortly after an event took place?

23         A.     I kept the notes, yes.

24         Q.     That is not -- when did you make them?

1      If this conversation took place in a car, when

2      would you have made the notes?

3          A.     I don't know the exact date.

4          Q.     Would it have been within a day or two?

5          A.     Possibly.

6          Q.     I am just trying to understand.  Were

7      you making notes as you were working for the

8      company or is it something like after you were

9      terminated you sat down and wrote the history?

10     Which is it?

11         A.     I mean -- no.  I kept the notes during

12     the company.

13         Q.     Now, how many pages of notes do you

14     think that is?

15         A.     I couldn't tell you.

16         Q.     More than ten?

17         A.     Possibly.

18         Q.     And if you had those notes --

19         A.     Actually --

20         Q.     If you had those notes in front of you --

21     were they dated?

22         A.     Yes.  I believe I sent them to the

23     company anyway.

24         Q.     Okay.  Let me finish about these notes.

1    If you had those notes in front of you, you could

2    tell me when that conversation took place, couldn't

3    you?

4         A.    Approximately.

5         Q.    And you could give me a better idea,

6    probably be able to testify more fully about what

7    you recall from the conversation, correct?

8         A.    That would make sense.

9         Q.    But you believe it was sometime during

10    2000?

11        A.    I believe.

12        Q.    What do you recall being -- how did the

13    subject come up?  What were you and Mr. Fasciani

14    doing together that day?

15        A.    We worked on some calls, and it was near

16    the end of the day and the comment came out of his

17    mouth.

18        Q.    Had he been dissatisfied with some of

19    the calls?

20        A.    Which comment are you talking about?

21        Q.    When you said you had a conversation

22    when you were in the car, you said he told you he

23    did not like me.

24        A.    Yes.

56

1       Q.      And that was at the end of a work with?

2       A.      Yes.

3       Q.      Had he been dissatisfied with some of

4    your calls?

5       A.      No.  He said he didn't like my attitude.

6       Q.      And why do you think he didn't like your

7    attitude or didn't like you?

8       A.      I think he may have been pushed from

9    above because previous management told me that the

10   regional manager was looking very closely at my

11   calls which means they were looking for something

12   to terminate me over.  This is what my previous

13   manager told me.

14      Q.      And who was your previous manager?

15      A.      Art Scott.

16      Q.      Who did Art Scott tell you -- who did he

17   tell you was looking at your calls?

18      A.      Mr. Kane.  He would look very closely at

19   my calls looking for anything he could find and

20   other assignments he would overlook things.  If

21   something was out of place, he would overlook it.

22      Q.      Is that exactly what Art told you?

23      A.      Exactly.

24      Q.      Did you make a note of that

```
 1    conversation?

 2         A.      It could be in the notes.

 3         Q.      You have those notes with you today,

 4    right here on you, don't you?

 5         A.      I am not sure.

 6         Q.      What do you have in front of you -- that

 7    notebook that is opened up --

 8         A.      It's different things, government

 9    actions, contract, state minimum pricing laws,

10    things.

11         Q.      When did you put that together?

12         A.      Kept it over the years.

13         Q.      It relates all to your employment at

14    R.J. Reynolds?

15         A.      Some of it does, yes.  A lot of it does.

16    Some doesn't.

17         Q.      Does any of it have anything to do with

18    your claims in this lawsuit?

19         A.      I believe so.

20         Q.      Okay.  So you think Mr. Kane didn't like

21    you?

22         A.      For some reason, yes.

23         Q.      Do you know why?

24         A.      No.
```

1      Q.      Do you have any reason -- any fathomable

2      reason in the world that you believe either Mr.

3      Fasciani or Mr. Kane didn't like you?

4      A.      I have no idea.  Mr. Fasciani would do

5      whatever Mr. Kane told him.

6      Q.      Do you think Mr. Fasciani was being

7      ordered to do all of this?

8      A.      I have no idea.  It's possible.

9      Q.      But you don't know?

10     A.      Only Mr. Kane and Mr. Fasciani.

11     Q.      And what about the conversation in the

12     parking lot?  Let me --

13     A.      There's a long story.

14             MR. SAHADY:  Just wait for the

15     question.

16     Q.      When did it take place?

17     A.      Early -- late July or early August of

18     2001.

19     Q.      And was that after a work with as well?

20     A.      No.  We had a meeting previous, and

21     Mr. Fasciani wanted to know who was taking vacation

22     in August, and people raised their hands, and he

23     went into a rage and started saying this isn't

24     right, this isn't fair, right in front of the whole

1    division.

2        Q.        What was not right?  What was not fair?

3        A.        That is what we were trying to figure

4    out.

5        Q.        Who was present for this?

6        A.        Our division.

7        Q.        So all the sales reps would have been

8    there?

9        A.        Most of them.  Mr. Fasciani pointed to

10   me, said I want to work with you Tuesday.  He

11   singled me out.  At that time, he asked me if I was

12   going to take a vacation.  I said, I would like to

13   take a week off in August.  He got upset about it.

14   I said, Well, if it's going to upset you, how about

15   if I take Fridays and Mondays?  I will be around

16   during the week if something comes up and still

17   have time with my family, and he would voice mail

18   me while I was gone on my vacation.  He would voice

19   mail me saying I want to see you Tuesday to do your

20   evaluation.  When I came back on Tuesday, I had to

21   take time off the job, take time away from my

22   calls, distribution.  We were working a new brand

23   at the time, trying to introduce it, so if you take

24   a person away from his call count, it makes it much

1    more difficult to get the distribution.  We met

2    that day, and I asked him, Do you have the

3    evaluation?  He says, I forgot it in my car.  I

4    said, Go to your car.  When he got to his car, he

5    said, I must have left it home, so I asked him --

6    well, if we're meeting to do my evaluation, why

7    would you leave the thing at home?  At that time he

8    blew in a fit in the parking lot, said I am going

9    to ruin you.  I am going to destroy your career.

10    He started yelling at me.  At that time I called

11    Mr. Kane's office and said that Carl was out in the

12    parking lot yelling at me saying he was going to

13    destroy me and was there anyway we could work

14    things out, if we could meet to shakes hands and go

15    to work with each other, and so I went away that

16    weekend.  I was trying to -- I had -- I was trying

17    to enjoy my time with my family, and he voice

18    mailed me again, said he was sorry about the blow

19    out on voice mail and would like me to meet with

20    him again to go over things, and then what he did --

21    we met that day.  I waited for him, waited for him.

22    He didn't show up on time.  I finally voice mailed

23    him.  Carl, where are you?  You're suppose to meet

24    me.  He showed up a little late, then we went out

61

1    and looked at calls, and the calls were in good

2    shape.  Basically, he looked for any little thing

3    he could find to make me look -- to downplay me and

4    then reprimanded me that day.

5          Q.    Did you get a reprimand the same day as

6    you did the work with?

7          A.    No.

8          Q.    Two days later?

9          A.    No.  We -- first time I called Mr. Kane.

10   The second meeting is when he went out -- after I

11   talked to Mr. Kane, asked if we could work things

12   out and have a meeting, Mr. Fasciani came out and

13   did a work with and then reprimanded me after that,

14   after the first call.

15         Q.    Now, how much time was between the

16   conversation in the car and the conversation in the

17   parking lot?

18         A.    It's about a year.  I was always working

19   under duress, kind of like that.

20         Q.    Let me take you back to Exhibit 7.  Is

21   that the evaluation?  What exhibit are you looking

22   at?

23         A.    7.

24         Q.    Now, was this evaluation before or after

62

```
 1    the conversation in which you were sitting in the
 2    car?
 3        A.      This was after.
 4        Q.      And did you ever get any insight as to
 5    why you thought Mr. Fasciani and Mr. Kane didn't
 6    like you or were out to get you?
 7        A.      I don't know.  I worked hard, went to
 8    the jobs every week all the time.  I know they were
 9    giving other reps in my category -- age category a
10    hard time.
11        Q.      Who were those?
12        A.      Mr. Pondelli and Mr. Debugue that I know
13    of.
14        Q.      I am sorry.
15        A.      Mr. Pondelli.  Mr. Debugue.  I heard
16    that Mr. Fasciani gave some reps down in Louisiana
17    a very difficult time.
18        Q.      Where did you hear that?
19        A.      I met the reps.
20        Q.      Who were they?
21        A.      Forget his name.  Dean.  I cannot think
22    of his last name.
23        Q.      Why do you think you were terminated?
24              MR. SAHADY:  Objection.
```

1              MR. LOFTIS:  He can answer that.

2              MR. SAHADY:  There was no reason for

3    his termination.  That is the answer.

4              MR. LOFTIS:  Well, then he's got no

5    lawsuit.

6      Q.      You are saying there was no motive of

7    any kind for your termination?

8      A.      I really can't answer that.

9              MR. SAHADY:  No.  He's saying there

10   was no good reason, but there were motives for his

11   termination.

12             MR. HENSON:  Who are we deposing

13   here?

14             MR. SAHADY:  I am not here as a wall

15   flower.

16             MR. HENSON:  You are not here to

17   answer questions either.

18             MR. SAHADY:  I have a right to

19   intervene when I think those questions are unfair.

20             MR. HENSON:  I see completely

21   through this.

22     Q.      What is the basis for your lawsuit?

23             MR. SAHADY:  That is a legal

24   question again.

```
 1      A.      I am not a lawyer.

 2      Q.      So you don't even know why you sued the

 3   company?

 4      A.      Again, you have to talk to my attorney.

 5      Q.      No.  I am talking to you.  Why do you

 6   believe the company terminated you?

 7      A.      Why do I believe?  It's improper.

 8      Q.      What was improper about it?

 9      A.      I did my job well.  I went to work every

10   day.  I did it to my best ability and two

11   individuals --

12      Q.      What law do -- why do you think the

13   company violated some legal obligation to you when

14   you were terminated?

15              MR. SAHADY:  You don't expect him to

16   answer that, do you?

17      A.      I don't have an answer to that.  You

18   would have to talk with my attorney.

19      Q.      What is the basis for your lawsuit?

20      A.      They definitely harmed me.

21      Q.      Well, why are you suing the company?

22   What did they do wrong to you?

23              MR. SAHADY:  Objection.  You are

24   asking for a legal basis.
```

1               MR. LOFTIS:   I think he should know

2    that.

3         A.     I have a claim against R.J. Reynolds.

4         Q.     And what's the claim?  What is the

5    claim?  Why do you think you were terminated?

6         A.     It's improper.

7         Q.     What was improper about it?

8         A.     I don't know.  That's for legal people

9    to say.  I just present the case.

10        Q.     You just what?

11        A.     I am just presenting the case.  That is

12   why I have an attorney.

13        Q.     Do you think it was because of your age?

14        A.     I don't know what the reason is.

15        Q.     So you don't have any idea why the

16   company terminated you?

17        A.     It could have been age.

18        Q.     It could have been they just didn't like

19   you?

20        A.     I really don't know.

21        Q.     It could have been they didn't like you

22   because they didn't like your attitude, correct

23        A.     I have no idea.

24               MR. LOFTIS:   Let's take a break.

1                    MR. SAHADY:  Sure.

2                    ( Short break taken. )

3        Q.    Mr. Rodio, in this lawsuit do you have

4    any understanding of what you claim the company did

5    that was unlawful?

6        A.    Well --

7                    MR. SAHADY:  I object to that but

8    you may answer.  I object.

9        A.    Possibly.  I think they terminated me to

10   deny me my future benefit.

11       Q.    Have you ever testified to that effect

12   before?

13       A.    I've never been in a court before.

14       Q.    Have you ever testified under oath

15   before?

16       A.    Never been in court before, no.

17       Q.    That is not -- have you ever testified

18   under oath before?

19       A.    I've never been in a court.  I've never

20   testified under oath.

21       Q.    Do you recall testify about your

22   unemployment?

23       A.    Oh, yes.

24       Q.    Were you under oath?

1        A.      Yes.  That's right.  It was on a

2    telephone.

3        Q.      But you were under oath?

4        A.      Yes, sir.  I've never seen that.  Can I

5    see that?

6                    MR. SAHADY:  Just wait for the

7    question.

8        Q.      Let me -- I am going to direct your

9    attention to page 66.  There is -- you will see on

10   the left-hand column there are line numbers.  Do

11   you see there is a question again there line 10.

12   Do you see that?

13       A.      Yes.

14       Q.      What is the question?

15       A.      "What do you think happened?"

16       Q.      Go on.

17       A.      "Why were they all of a sudden

18   dissatisfied with you?"

19       Q.      What was your answer?

20       A.      "Well, I was a grandfathered employee

21   from 1988.  I had 26 years.  In four more years, I

22   would have 30.  I would get insurance for the rest

23   of my life at the going rate and my pension, and

24   also if there was some sort of buy-out package, we

68

1    get two weeks' pay severance package for each year.

2    I am not the only employee.  There were other

3    people that were kind of treated the same way as I

4    was, and they were all in the same category of my

5    age in years.  And I believe that's what a lot of

6    this is about."

7        Q.    Now, this took place -- well, it's

8    whenever it took place.

9        A.    There was a strong rumor of a buy-out

10   coming out.

11       Q.    I am sorry.  What?

12       A.    Nothing.

13       Q.    What did you say?

14       A.    I said there was a rumor that we were

15   going to be merging.  There was a buy-out in the

16   works.

17       Q.    What was the rumor?  Who was rumored --

18   who was supposed to buy out the company?

19       A.    There was -- we had a meeting and people

20   rumored that there was another restructuring

21   company coming.  That is all.

22       Q.    Was there?  Do you recall?

23       A.    There ended up being a merger.

24       Q.    And when did that take place?

1        A.      I believe just a few months ago.

2        Q.      Two years later?

3        A.      Yes.  There were rumors.

4        Q.      So at the time of this testimony

5    whenever it was -- this will be dated --

6                    MR. SAHADY:  It was January 29,

7    2003.

8        Q.      -- was that your opinion at that time as

9    to why you were terminated?

10       A.      They asked me for an opinion.  That was

11   the best I could come up with at that time.

12       Q.      Well, was that what you believed at that

13   time?

14       A.      I said that.  I must have believed it.

15       Q.      Well, did you believe there was any

16   other reason at that time?

17       A.      That was my best knowledge.

18       Q.      Is what you just read from your prior

19   testimony is that what you believe today?

20       A.      That is part, yes.

21       Q.      Do you believe there were any other

22   reasons other than that as you sit here today?

23       A.      I don't know the other reasons.  The

24   only people that know -- the other reasons are

1    Mr. Fasciani and Mr. Kane.

2        Q.    Do you have an opinion yourself as to

3    whether there was any other reason other than what

4    you just read as to why you were terminated?

5        A.    It was probably denying me of my future

6    benefits.

7                MR. LOFTIS:   Can you read back the

8    question, please.

9                    ( Record read. )

10       Q.    Is that what you believe today?

11       A.    Yes.

12       Q.    Do you believe there was any other

13   reason as you sit here today?

14       A.    The only people that know is

15   R.J. Reynolds.

16       Q.    I am asking your opinion.  You have sued

17   the company.

18       A.    Yes.

19       Q.    Are you claiming there was anything

20   other than to deny you your pension as the reason

21   you were terminated?

22       A.    My insurance, my pension, the proper

23   amount of pension and any future packages.

24       Q.    Anything else?  Any other reason that

1    you believe that you were terminated other than to

2    deny you those benefits?

3        A.    I don't recall anything else.

4        Q.    So your claim against the company is

5    that you were terminated because you were

6    approaching age 55 and 30 years of service,

7    correct?

8        A.    Is that what it says?

9        Q.    It says in four more years, I would have

10   30 years.

11       A.    That is what I said.

12       Q.    And that is it?

13       A.    That is -- that is what I said.  It's

14   right there.

15       Q.    And you have nothing else to say today

16   as to that issue?

17       A.    No.  It's just what I said.  That is all

18   I can say.

19       Q.    Okay.  Now, in your answer at the

20   unemployment hearing you said there were other

21   people --

22                    MR. SAHADY:  What page?

23                    MR. LOFTIS:  Same page 66.

24       Q.    It said that other people that were kind

72

1    of devoid the same way as I was.  Who were you

2    referring?

3        A.     There was Ken Pondelli in Boston, Paul

4    Debugue.  There is a fellow in California whose

5    name I don't know.  I heard reports of other

6    people.

7        Q.     Why would you get those reports?

8        A.     Just word-of-mouth.

9        Q.     From whom, directly from the division?

10       A.     I am not -- come from other reps.  I

11   cannot remember.

12       Q.     Do you have -- do you understand the

13   difference between firsthand and secondhand?

14       A.     Hmm.

15       Q.     Did Mr. Debugue -- did you have a

16   conversation with Mr. Debugue about that issue?

17       A.     These are just comments that I heard.

18       Q.     No, sir.  That is not what I asked you.

19   Did you and Mr. Debugue talk about what was

20   happening to him with respect to the company trying

21   to get rid of him because he was approaching 30

22   years?

23       A.     He may have mentioned something in

24   passing.  I don't recall.  It was four or five

73

1    years ago.  I cannot recall.

2        Q.    Why do you think he was someone that was

3    treated the same way as you were?

4        A.    I just heard that through the grapevine.

5        Q.    You don't know whether that was true or

6    not?  It was through the grapevine?

7        A.    Right.

8        Q.    So you don't know whether it is true or

9    not, do you?

10       A.    I didn't.  Only he knows if it is.

11       Q.    Mr. Pondelli?

12       A.    Mr. Pondelli.

13       Q.    Is that more grapevine?

14       A.    Yes.

15       Q.    And I'd have to ask him if he felt the

16   same way that you did?

17       A.    I guess you would.

18       Q.    Do you have a list of these people

19   somewhere?

20       A.    No.

21       Q.    Do you have them written down in your

22   notes?

23       A.    Just words that people -- things I heard

24   through the grapevine.

1      Q.     Is all of this stuff you heard through

2      the grapevine?  To the extent that you remember

3      today or later a name of someone --

4      A.     Something happened four years ago -- I

5      cannot remember exactly what happened four years

6      ago.

7      Q.     Did you ever talk to any of these people

8      personally?

9      A.     I worked with them, yes.

10     Q.     Did you ever talk to them about the

11     issue that the company was trying to get rid of

12     them before they got their 30 years in?

13     A.     That might have come up in conversation

14     at a party or something.  I don't know.

15     Q.     Do you remember as you sit here today?

16     Yes or no.

17     A.     I don't recall.

18     Q.     Okay.  Did you -- how did you hear about

19     the person in California?  Did you actually talk to

20     that person or was that grapevine as well?

21     A.     We were talking amongst some reps, and

22     one of reps had mentioned a person in California

23     was going through something similar.

24     Q.     Who were you talking to?