# EXHIBIT E
## (continued)

75

```
1        A.      I don't know.  It's a big meeting at a
2   casino, a lot of reps there.
3        Q.      How did you -- were you telling people
4   how you were treated?
5        A.      I kept it most to myself.
6        Q.      Do you recall how the conversation even
7   came up?
8        A.      No.
9        Q.      Can you think of any individuals that
10  could testify on your behalf as to why the company
11  was -- as to the fact the company was trying to get
12  rid of you before you hit 30 years?
13       A.      I don't know.  Former manager.
14       Q.      Would it be Art Scott?
15       A.      Yes.
16       Q.      Have you talked to him about this?
17       A.      Yes.  He's aware of this, yes.  Mr.
18  Deschenes calls him quite often, I guess.
19       Q.      I am sorry.  What?
20       A.      Mr. Deschenes has called him and told
21  him, I guess, what is going on.
22       Q.      Have you talked to him?
23       A.      I have talked to him, yes.
24       Q.      Since your termination?
```

1        A.      Yes.

2        Q.      Have you told him why you thought you

3    were terminated?

4        A.      No.  No.

5        Q.      What have you talked about?

6        A.      Going golfing, going fishing.

7        Q.      Have you talked about your losing your

8    job at Reynolds?

9        A.      Well, he knows I lost my job.  Yes.

10       Q.      Have you talked to him about it?

11       A.      Yes.  Obviously I said I lost my job at

12   Reynolds.

13       Q.      What was his response?

14       A.      I don't know.  You would have to talk to

15   him about it.

16       Q.      Do you know what he said to you or you

17   just don't want to tell me?

18       A.      He said that is too bad.

19       Q.      You understand I am not asking you only

20   one side of a conversation.  You understand that?

21       A.      Yes.

22       Q.      What else do you recall that Mr. Scott

23   said to you?

24       A.      That is all I recall.  Realistically, I

1    cannot remember who I talked with about a month,

2    two years ago, three years ago.  I can remember

3    certain things.

4        Q.    Is there anything that you could do to

5    improve your memory?

6        A.    I think we all try to do that.

7        Q.    Is there anything that would help, if

8    you review your notes and stuff?

9        A.    I have told you what I know.

10       Q.    Please answer my question.

11              MR. SAHADY:  He's answered.

12              MR. LOFTIS:  He did not.

13       Q.    I asked you would it help you to review

14   your notes?

15              MR. SAHADY:  Objection.

16       Q.    Now you can still answer the question.

17       A.    I have tried to answer to the best of my

18   ability.

19       Q.    Would it help you to review your notes?

20              MR. SAHADY:  Objection.

21       A.    I have answered all the questions as

22   best I can.

23              MR. LOFTIS:  That question has not

24   been answered.  You can instruct him not to answer,

1    and I will file another motion or he can answer the

2    question and we'll go on until the cows come home.

3                 MR. SAHADY:  That is a good way to

4    do it.  Let the cows --

5         Q.    Do you think it would help your memory

6    to review these notes that you had failed to

7    provide us?

8                 MR. SAHADY:  Objection.

9         Q.    Answer my question.

10                MR. SAHADY:  Objection.

11        A.    I answered your question.

12        Q.    You did not.  It is a yes or no

13   question.  You got notes, right?

14                MR. SAHADY:  Objection.

15        Q.    Yes or no you have notes?

16                MR. SAHADY:  Objection.

17        Q.    Are you going to answer?

18        A.     I don't have any notes.

19        Q.    You never made any notes of things that

20   happened to you at the company?

21                MR. SAHADY:  Objection.

22        Q.    Would it help your memory today to

23   review those notes or have them in front of you?

24                MR. SAHADY:  Objection.

1                    MR. LOFTIS:   What is the basis for

2       the objection?

3                    MR. SAHADY:   He's answered that

4       previously.

5                    MR. LOFTIS:   He has not.

6                    MR. HENSON:   What was his answer?

7       Was it yes or no?   Would it help his memory to

8       review his notes?

9                    MR. SAHADY:   We're objecting to the

10      question.

11                   MR. HENSON:   He didn't answer the

12      question.

13                   MR. LOFTIS:   He can answer the

14      question.

15         Q.      Are you going to answer the question?

16         A.      I don't recall.

17         Q.      Don't recall what?

18         A.      I don't recall the answer to your

19      question.

20                   MR. HENSON:   I don't either.

21         Q.      My was question was would you --

22                   MR. SAHADY:   Mr. Henson, I would

23      appreciate it if you do not make any comments.   You

24      have not entered your appearance on behalf of the

1    defendant, and I've allowed you to be here on a

2    professional courtesy.

3                    MR. LOFTIS:  He's entitled to be

4    here.

5                    MR. HENSON:  I am a representative

6    party.

7                    MR. SAHADY:  You haven't entered

8    your appearance.

9                    MR. LOFTIS:  He doesn't have to

10   enter his appearance.

11                   MR. SAHADY:  He's here as an

12   attorney.

13                   MR. LOFTIS:  He is my representative

14   at this deposition.

15                   MR. SAHADY:  Senior counsel.

16                   MR. LOFTIS:  That does not say

17   general counsel, and there is a big difference.

18                   MR. SAHADY:  I made a mistake an

19   accident, and, counsel, we have every right to

20   assume you are here in your legal capacity.

21                   MR. LOFTIS:  No, he's not.

22                   MR. SAHADY:  Until you've entered

23   your appearance, you should not be here, but I

24   didn't make an objection over that and I won't, but

1    I would like you to respect the rules and not

2    intervene when Mr. Loftis is asking questions.  Got

3    it?

4                    ( Mr. Henson gave the thumbs up

5    sign. )

6                    MR. SAHADY:  Let's proceed.

7         Q.    Would having your notes in front of you

8    help your memory on any of the subjects that we

9    talked about?

10                   MR. SAHADY:  Objection.

11        A.    I don't recall that.

12        Q.    What don't you recall?  That is the

13   question.

14        A.    I have answered your question.

15        Q.    No, you haven't.

16        A.    Yes, I have.

17        Q.    What don't you recall?

18        A.    I told you I answered your question.

19        Q.    What don't you recall?

20                   ( Short pause. )

21                   MR. SAHADY:  It's one o'clock.  It

22   would be a good time to break for lunch.

23                   MR. LOFTIS:  I want an answer to the

24   question and then we can take a break for lunch and

1    we're going to be going until we finish.

2        Q.    Will you answer my question?

3        A.    I have answered your question.

4                MR. SAHADY:  Obviously, he's

5    answered your question in his own way.  If you want

6    to stay here until the cows come home, as you say,

7    that is fine, but I would suggest if you think he

8    should be compelled to answer, file a motion.

9                MR. LOFTIS:  Would that mean you

10   would be instructing him not to answer anything

11   further?

12               MR. SAHADY:  I am suggesting the way

13   out of this impasse.  He's tried to answer your

14   question, maybe not to your satisfaction I can

15   agree to that, but he's tried in his own way.

16               MR. LOFTIS:  I don't think he's

17   satisfied the rules.

18               MR. SAHADY:  Maybe not.  If it

19   doesn't, why don't you file the motion.  Let's go

20   off the record.

21               ( Discussion off the record. )

22       Q.    Back to the reason you think you were

23   terminated that is on page 66 that we read earlier.

24   Do you have any documents that would support that

1    view in your opinion?

2        A.        That was my opinion.

3        Q.        Do you have --

4        A.        They asked my opinion.  That was my

5    opinion.

6        Q.        All right.  We've gone over that.  My

7    question was do you have any documents that you

8    know of that supports that opinion?

9        A.        What type of documents are you looking

10   for?

11       Q.        Any piece of paper, an e-mail?

12       A.        I have got my pension, my insurance.

13   I've got my health care, got the formula.

14       Q.        What formula?

15       A.        For --

16       Q.        For the pension and stuff?

17       A.        Yes.

18       Q.        What other documents would support that?

19       A.        Those are the documents I know of.

20       Q.        All right.  And during all the confusion

21   of the last 15 or 20 minutes I asked you this but

22   bear with me and I'll ask you again because I've

23   simply forgotten are you aware of any individuals

24   other than Mr. Kane and Mr. Fasciani who would

84

```
 1    provide any information as to the reason for your

 2    termination?

 3         A.    Possibly Mr. Kane's boss Mr. Wilmisher.

 4         Q.    Anyone else?

 5         A.    I guess that is it.  I only work on the

 6    street.  I don't know.

 7         Q.    The ones you got on page 66, that is

 8    really just your opinion, correct?

 9         A.    Someone asked me why and that was my

10    answer.

11         Q.    And can you base that on anything other

12    than the fact that you were approaching 30 years?

13         A.    That was my opinion.

14         Q.    Let me --

15         A.    I can't.

16         Q.    I understand that it's your opinion, and

17    we all have opinions, and we base those opinions on

18    facts.  Do you understand that?  Do you know what I

19    am saying?

20         A.    Yes.  That was my opinion.

21         Q.    All right.  If I think it's cloudy

22    outside, that may be my opinion.  I can look and

23    see that it is.  I am asking you if you are aware

24    of any facts that support your opinion or is it
```

1    simply your opinion based on the fact that you were

2    approaching 30 years?

3        A.      Someone asked my opinion, and that is my

4    opinion.

5        Q.      Why is that opinion -- what do you base

6    that opinion on?

7        A.      That was my opinion.

8        Q.      What did you base it on?

9        A.      That somebody asked my opinion.

10       Q.      What did you base it on?  Why do you

11   believe that?  Just answer the question and we'll

12   go to lunch.  Why do you believe that is why you

13   were terminated?

14              MR. SAHADY:  He's not going to stop

15   until you answer.

16       Q.      Why do you believe that is your --

17       A.      Well, the rumor was is that they were

18   giving other reps a hard time in my age bracket.

19   That was a rumor.  That was through the grapevine.

20       Q.      Anything else that forms the basis for

21   that opinion?

22       A.      There was a --

23       Q.      Any other reason?  I am trying to find

24   out why that was your opinion.

1       A.      I cannot give you -- that was my opinion

2    and that is it.

3       Q.      Do you have any other reason, other than

4    what you heard was happening to other sales reps,

5    that you believe that is what was happening to you?

6       A.      Really don't.  I tell you that is my

7    opinion.

8       Q.      Do you think you ever will be able to

9    tell us why you have that opinion?

10      A.      No.

11      Q.      Is there anything that you could do to

12   help -- do you think if your attorney asked you

13   that question you could tell him?

14      A.      I am not a professional attorney.

15      Q.      No.  If your attorney asked you why,

16   could you tell him?

17      A.      Two of you are hitting me from both

18   sides.  I can only give the best answer I can.

19   That is it.

20      Q.      And do you think that is the best answer

21   you will be ever able to give to that question?

22      A.      I really can't tell you.

23      Q.      So it's possible you could show up

24   tomorrow and have a completely different answer to

1    that question; is that right?

2        A.    I don't know.  Tomorrow is not here.

3        Q.    Has that been your opinion since you

4    gave that testimony?

5        A.    I can only give you what I saw.

6        Q.    Anything other than what you heard about

7    happening to other sales reps that as you sit here

8    today is the reason you believe that --

9        A.    I just gave you my opinion.

10        Q.    I am not asking your opinion.

11        A.    That is all I can tell you is what I

12    hear through the grapevine.

13        Q.    And that is all you know of today that's

14    the basis for that opinion?  Just say yes or no and

15    we're done.

16        A.    I don't know what you are talking about.

17        Q.    I am still talking about the reason why

18    you say you were terminated.

19        A.    That was my opinion.  You asked my

20    opinion.  That is my opinion.

21        Q.    I keep trying.

22        A.    I don't want to give you a history.

23        Q.    You've got to give me a history of why.

24    I am sorry.  That is what we're here for.  Do you

88

```
 1    understand that?

 2         A.     All I can say is I was very close to 30

 3    years.

 4         Q.     Any other reason why that is your

 5    opinion?  You base that opinion on something you

 6    heard, stuff about what was happening to other

 7    sales reps around the country.  Is there any other

 8    reason that you formed that opinion?  Just yes or

 9    no.  If there was, tell me.  If there wasn't, let's

10    go to lunch.

11         A.     Well, I have been around for 26 years,

12    seen how they treated other employees, felt I would

13    be treated similar to the other employees, the same

14    way, gave them a hard time before the last couple

15    of years.

16         Q.     Who were those people that you

17    personally saw?

18         A.     Al Lynick (phonetic) and George Rizzo.

19         Q.     Were those people terminated?

20         A.     They were given a hard time in the last

21    few years.

22         Q.     Where were they located?

23         A.     In the Boston area.

24         Q.     Any other reason for that opinion,
```

1    things that you heard and saw happen to other sales

2    reps?

3        A.      Yes.   That is -- you asked me for my

4    reason.  I gave you a couple of reasons.  I am not

5    going to write a book.  I gave you the best answer

6    I can and that is all.

7        Q.      Are you telling me that as you sit here

8    today you've got no other reasons?  That is all?  I

9    want to know.  You are not going to get by saying I

10   gave you a couple.  I am not going to write a book.

11   I am entitled to know why you brought it up and are

12   going to tell me?

13                MR. SAHADY:  He has told you.

14       Q.      Any other reasons that you have the

15   opinion that you were terminated because you were

16   getting close to 30 years of service?

17                MR. SAHADY:  How many times has this

18   question been asked?

19                MR. LOFTIS:  Zero.   It's been asked

20   100 times and answered none.

21       A.      I just gave you an answer.  That is my

22   opinion.  You want me to list every person and what

23   their problems were?

24       Q.      Tell me every reason that you believe

1    that the company terminated you because you were

2    about to reach 30 years.  That is all I am asking.

3         A.    I gave you an answer.

4         Q.    Did you give me a complete answer?

5         A.    I gave you as best an answer as I could.

6         Q.    Okay.  So you cannot think of any other

7    reasons other than what you've already given me why

8    that is your opinion?

9              MR. SAHADY:  I think he is being

10   badgered.

11             MR. LOFTIS:  I don't think he's

12   answering my question.

13             MR. SAHADY:  He's answered it as

14   best as he is able to.

15             MR. LOFTIS:  All right.  Assuming

16   that Mr. Sahady has no interest in getting his

17   client to answer a fair question --

18        A.    I gave you an answer to every question.

19             MR. SAHADY:  It's a false

20   assumption.

21        Q.    You gave me the answer you wanted me to

22   have.  What I am going to do -- you can talk about

23   it at lunch.  What I am going to do is I am going

24   to file a motion with the court to compel you to

1     answer that question, and if I have to come back up

2     here to do it, I am going to ask the court that you

3     personally have to pay or Mr. Sahady has to pay all

4     of the expenses for me coming back up because of

5     your refusal to answer that question.

6                 MR. SAHADY:  Now wait.  That is

7     intimidation.

8                 MR. LOFTIS:  That is a fact.

9     A.     What about my expenses?

10                MR. SAHADY:  That is intimidation.

11    A.     Are you going to pay for today?

12    Q.     You sued the company.

13    A.     You are not paying me.  I had to take

14    time from work to meet with you.

15    Q.     This is not a meeting.  Let's go to

16    lunch.  If you've got anything further to add, then

17    add it.  If you want to leave your answer the way

18    it is, that is up to you, so let's go to lunch.

19                ( Lunch recess. )

20    Q.     Mr. Rodio, is there anything you would

21    like to add to or change to your testimony so far?

22    A.     No.

23    Q.     Okay.  Let me ask you --

24                MR. SAHADY:  The famous question.

1             MR. LOFTIS:  I asked it.

2             MR. SAHADY:  Yes.

3     Q.    I hope this isn't going back over some

4     stuff.  I need to get my memory going again.  The

5     conversation in the parking lot where you say

6     Mr. Fasciani said he did not like you --

7     A.    No.  That wasn't in a parking lot.

8     Q.    I mean a car.

9     A.    Yes.  That was in the car.

10    Q.    What had the two of you been doing that

11    day?

12    A.    We worked the calls.

13    Q.    All right.  And would there have been a

14    work with that day?

15    A.    Yes, so I tried to do the best I could

16    after he said that.  I tried to work even harder,

17    and this was my area right here, and it was a hard

18    area to work.

19    Q.    Had there been -- had Mr. Fasciani noted

20    any problems in any of your accounts that day?

21    A.    Not that I can recall.

22    Q.    And I believe he said -- did he say why

23    he didn't like you?  Did you ask him why?

24    A.    I just said okay.  I wasn't going to

94

1      Q.      Had he done a work with recently with

2   you?

3      A.      No.  We met previously, went to discuss

4   me taking vacation time.

5      Q.      So where did you meet?  Where was that

6   parking lot?

7      A.      It was in Taunton, Mass.  It was a

8   little restaurant.  I cannot remember exactly the

9   name of the restaurant.

10      Q.      Now, assuming when the two of you were

11   in a car about a year earlier no one was present

12   other than the two of you?

13      A.      No.

14      Q.      What about the conversation in the

15   parking lot?  Was anyone else present?

16      A.      He was out in the parking lot yelling,

17   and I called immediately Mr. Kane and told him what

18   had happened.

19      Q.      What led up to the comments in the

20   parking lot?

21      A.      Well, you know, he had taken me off the

22   job to do my evaluation that day, and I drove out

23   of my way, took my time, and there is no

24   evaluation, so I think he was just trying to

93

1    debate him.

2        Q.    Was there anything else that he said

3    other than he didn't like you?

4        A.    That was the thing that stuck in my

5    mind.

6        Q.    What was the conversation leading up to

7    that?

8        A.    I really can't tell you.  It's the type

9    of thing that would stick in your mind.

10       Q.    All right.  And do you have notes of

11   that conversation?

12       A.    No.  I gave all my notes to my attorney,

13   Attorney Sahady.

14       Q.    Did you make notes of that conversation?

15       A.    I think I wrote something down, yes.

16                  MR. SAHADY:  I am sorry.  What was

17   the answer?

18                  THE DEPONENT:  I may have wrote

19   something down.

20       Q.    And then the conversation in the parking

21   lot was that after a work with as well?

22       A.    No.  That was no work with.  We were

23   supposed to meet to go over my evaluation, but he

24   said he forgot the evaluation.

1    intimidate me not to take my vacation, and at that

2    point, he exploded.

3        Q.    So you think that is why he was telling

4    you so you wouldn't take your vacation?

5        A.    He was trying to intimidate me not to

6    take time off.

7        Q.    Do you know why?

8        A.    Probably because we wouldn't make his

9    goals or whatever.  I have no idea.  You would have

10   to ask him.  He had other events where he exploded.

11       Q.    With other sales reps?

12       A.    Well, I heard he had one recently,

13   started yelling at a meeting in January of this

14   year.

15       Q.    Where did you hear that?

16       A.    From other sales reps.

17       Q.    Well, who?

18       A.    I am not going -- gee, I just heard.

19       Q.    Who told you?  Do you know?

20       A.    It was one of the sales reps.

21       Q.    Do you know who it was?

22       A.    No.  I just heard that from another

23   sales rep from another company.

24       Q.    Who was that?

96

1       A.      Hmm.

2       Q.      Who was the sales rep of another company

3   that you heard it from?

4       A.      I don't know.

5       Q.      Do you not know or you won't tell me?

6       A.      I do not know who it was.

7       Q.      Any other occasion you have heard of

8   Mr. Fasciani losing his temper?

9       A.      We have a Christmas party and some --

10  one of the girls made cookies, and each cookie was

11  for each rep, and so we had a nice time and he sent

12  an e-mail out that -- I think a voice mail too that

13  he had a good time at the party but very upset that

14  somebody stuck a toothpick in the eye of his

15  cookie.  I said it wasn't me.  I didn't stick the

16  toothpick in the cookie.

17      Q.      What made you think he thought it was

18  you?

19      A.      I don't know.  He seemed to insinuate

20  that.

21      Q.      And this was in an e-mail?

22      A.      I believe it was an e-mail and voice

23  mail.

24      Q.      Was the e-mail to all sales reps?

```
 1        A.      Yes.  Yes.

 2        Q.      What made you think it was focused at

 3    you?

 4        A.      I don't know.  I don't know.

 5        Q.      Do you have the e-mail?

 6        A.      Do I have it?

 7        Q.      Yes.

 8        A.      No.

 9        Q.      Did you keep any of the e-mails that

10    went back and forth from the company?

11        A.      I don't believe I have any.

12        Q.      Did you keep any?

13        A.      No, I don't believe so.

14        Q.      During the -- strike that.

15                Have you ever tape recorded any

16    conversations with anyone at R.J. Reynolds?

17        A.      No.

18        Q.      Has anyone ever done that on your

19    behalf?

20        A.      Not that I know of.

21        Q.      Are you aware of any tapes that exist

22    that record conversations or record statements that

23    anybody --

24        A.      I guess there was a -- voice mail
```

98

```
 1    conversations were recorded.  Conference calls were

 2    recorded.

 3         Q.    Did you record those?

 4         A.    No.

 5               MR. LOFTIS:  Mark that 8.

 6               ( Exhibit Number 8 marked for

 7               identification. )

 8         Q.    It's Number 8, I believe.  That is a

 9    work with August 9, 2001.  Do you recall seeing

10    that document, Mr. Rodio?

11         A.    Yes.  This was right after the time that

12    we had a conversation in the parking lot.

13         Q.    Do you recall this work with?

14         A.    Yes.

15         Q.    Now, he was with you that day?

16         A.    Yes.

17         Q.    All right.

18         A.    That was after the parking lot incident.

19         Q.    Now, in the first column Weir Exxon --

20         A.    Yes.

21         Q.    -- the product availability was recorded

22    incorrectly; was that true?

23         A.    I cannot honestly tell you because he

24    had the records, so as far as I know, I recorded
```

1    everything to the best of my ability.

2        Q.    Is it possible you made mistakes?

3            MR. SAHADY:  Objection.

4        A.    I worked to the best of my ability that

5    day.

6        Q.    Well, you say none of this happened.

7    Are you saying you did the best you could that day?

8        A.    Yes.  I did the calls.  I recorded it as

9    best I could.

10       Q.    Well, can you tell me what on here is

11    just an out and out fabrication that you know for a

12    fact?

13       A.    I made every effort I could make to

14    place displays all the time.  We had a sign in the

15    window.

16       Q.    Was it placed according to contract?

17       A.    Yes.  As far as I know it was.  I think

18    it's still there.

19       Q.    Same sign?

20       A.    They might have cleaned it up a little.

21       Q.    I spoke to the matter that Monarch had

22    to be same price or less than --

23       A.    I don't remember seeing this piece of

24    paper.  There was another version of it.

1     Q.    Do you have it?

2     A.    Yes.  I think you probably have it, too.

3  There was -- I've never seen this paper.

4     Q.    You were looking at the written

5  reprimand?

6     A.    Yes.  This is like another version of

7  something I have never seen.

8     Q.    So you are saying that Mr. Fasciani

9  never showed this to you?

10     A.    I have -- this -- I never received this.

11          MR. SAHADY:  You are talking about

12  Exhibit 8?

13          THE DEPONENT:  8.

14          MR. SAHADY:  This is what you mean

15  by you never received?

16          THE DEPONENT:  I received this

17  exhibit here, same theory.

18          MR. SAHADY:  Did you receive Exhibit

19  8?  That is the question.

20          THE DEPONENT:  Not to my knowledge.

21     Q.    Where did you get -- when you were given

22  things, where did you put them?

23     A.    Given what?

24     Q.    Well, when your managers gave you

101

1    something, what did you do with it?

2       A.     What did he give me?

3       Q.     Well, you got some things that you were

4    given.

5       A.     Paper?

6       Q.     Paper, yes.

7       A.     Kept in a file.

8       Q.     Where is the file?

9       A.     Right here.

10      Q.     That is you've got everything that you

11   were ever given by any manager over the 26 years

12   that you worked at R.J. Reynolds?

13      A.     I wouldn't have a file.  I kept as much

14   pertinent information as I could over 26 years,

15   kept all my books, everything.

16      Q.     Books?  I am sorry.  What books?

17      A.     Company procedures, books and things.

18      Q.     Do you still have those?

19      A.     Yes.

20      Q.     Where are they located?

21      A.     With Attorney Sahady.

22      Q.     But you do recall calling on these

23   accounts?

24      A.     Yes.  This is the same report.  This is

102

1    a different version.

2         Q.       This is a document --

3         A.       Which I never received.

4         Q.       All right.

5         A.       Seems like a different version, too.

6         Q.       We'll get to the written reprimand which

7    would be Number 9.

8         A.       Yes.  Again, this was in response to the

9    argument in the parking lot.  Mr. Fasciani said he

10   was going to destroy me, and I called Mr. Kane.

11   Mr. Fasciani voice mailed me this week and he went

12   to those calls.  Basically, he looked for anything

13   he could find.

14                      ( Exhibit Number 9 marked for

15                        identification. )

16        Q.       Let's go to Exhibit 9.  Now, that

17   document you do have?

18        A.       Yes.

19        Q.       All right.  There's a paragraph that

20   begins "on Thursday, August 9."  Do you see that

21   paragraph?

22        A.       Yes.

23        Q.       "I contacted two retail accounts located

24   in your assignment and worked with you contacting

1    another three retail accounts," and I believe that

2    was the work with that I showed you as Exhibit 8

3    was August 9, correct?

4        A.    Yes.

5        Q.    "On Friday, August 10, 2001, I conducted

6    a training analysis of the six calls that you

7    reported contacting on Wednesday."

8        A.    Excuse me.  No.  He worked with me that

9    day.  We went to those calls.

10       Q.    On the 9th?

11       A.    I couldn't tell you the exact date, but

12   we worked together and went to those calls.

13             MR. SAHADY:  I don't see any date on

14   it.  Do you see August 8th?

15       A.    Yes.  There is no date on it, Exhibit 8.

16             MR. LOFTIS:  It says work with of

17   8/9/2001.

18             MR. SAHADY:  Thank you.  This is not

19   necessarily the date it was authored.

20             MR. LOFTIS:  I have no idea.

21             MR. SAHADY:  Okay.  It reflects the

22   work with of that day.  Okay.  Thank you.

23       Q.    Back to Exhibit 9, Mr. Rodio, after

24   referencing the work with on August 9, it says that

1    "on Friday, August 10, 2001, I conducted a training

2    analysis of the six calls you reported contacting

3    on Wednesday, August 8."  Do you see that?

4        A.      Yes.  All I remember is we worked

5    together and then he wrote that up.

6        Q.      What is a training analysis?

7        A.      See if I was doing the job properly, I

8    guess.

9        Q.      Do you know?

10       A.      What?

11       Q.      Do you know?

12       A.      Training analysis, TA, is checking my

13   calls.

14       Q.      And that would be going in after you had

15   been at the store?

16       A.      No.  We went in together.

17       Q.      On two days in a row?

18       A.      No.  We went in to these calls, and at

19   the end of the day he reprimanded me.

20       Q.      What is the date on the reprimand?

21       A.      9/5.

22       Q.      All right.  And this reflects in part

23   the same calls that were reflected on Exhibit 8,

24   correct?

```
 1          A.      Yes.  I've never seen this before.

 2          Q.      I am saying it reflects on the same

 3      calls?

 4          A.      Not all the calls.

 5          Q.      No?  Some of them were TAs.  Some of

 6      them were work withs.  Do you understand the

 7      difference?

 8          A.      I can understand.  How can you do the

 9      same thing at the same time?  We both worked that

10      same day together.  How can you be doing --

11          Q.      This refers to two different dates in

12      the past.

13          A.      All I know is we went together the day

14      after the argument -- a week after the argument we

15      went out to those calls and he went through them.

16      He was very nervous.  Some of the retailers were

17      asking if there were something wrong with him.

18      Example, one call he bought me a coffee, Legal

19      Liquors, so I was working and he -- at some time he

20      started drinking the coffee.  I said, Carl, thanks

21      for the coffee.  He was very nervous at the time

22      and was pacing back and forth.  Yes.  Regal

23      Liquors.  Here it is.

24          Q.      You are saying all this happened on one
```

1    day not two?

2        A.    We went to these calls together, and he

3    made notes on each call, and at the end of the day

4    he said he was reprimanding me.

5        Q.    When did you actually get the document?

6        A.    Probably got the document a week later

7    or something.

8        Q.    Okay.  So this document, Exhibit 9, was

9    not given to you on the same day that you had the

10    calls?

11        A.    He had to write it up.

12        Q.    Correct.  Do you understand the

13    difference between a work with and a training

14    analysis?

15        A.    Work with you work with the person.

16    Training analysis he checks the calls.

17        Q.    But not necessarily with you?

18        A.    He was with me.

19        Q.    Do you know if he checked any of your

20    calls between the time he worked with you and the

21    time he gave you the formal written reprimand?

22        A.    I don't believe so because he made the

23    notes on the calls while we were there.

24        Q.    Could he -- there was a week or two

1    between the time of the work with and the time you

2    got Exhibit 9.

3         A.    He made the notes on the calls when we

4    were there.

5         Q.    So it's impossible for him to have gone

6    into any of your other accounts a day later?

7         A.    Oh, the day after he could have done

8    something.  I don't know.  This particular day we

9    went to these calls.

10        Q.    Every one of them?

11        A.    As far as I know, yes.  Yes.

12        Q.    And how do you know that?

13        A.    Because he was with me.

14        Q.    How do you remember exactly which

15    accounts you went into?

16        A.    Because I wrote next to them an

17    accounting.

18        Q.    You wrote next -- you are talking about

19    the notes you made on Exhibit 9?

20        A.    All these notes, yes.

21        Q.    When did you make those notes?

22        A.    When he sent me this.

23        Q.    How did you know that you went into all

24    of these stores on the very same day?

108

1      A.      Because we were right next to each

2    other.  I was driving the car, and he was sitting

3    with me, and we went into the calls.

4      Q.      So -- and I guess your lap top would

5    reflect exactly where you were on that day,

6    wouldn't it?

7      A.      No.  We may not -- he said he just

8    wanted to check the calls, so we may or may not

9    have reported them.  I am not sure.  I cannot

10   positively tell you.  He said he just wanted to go

11   look at some calls is when we went to these calls.

12     Q.      How long were you gone?

13     A.      How long?  I would say almost the whole

14   day.

15     Q.      And as you sit here today, do you have a

16   specific memory of going in each one of these

17   stores?  It had to be two years ago.

18     A.      I thought he bought me a coffee then.

19     Q.      As you sit here today, your memory is

20   now clear enough that you can remember specifically

21   one day you went into each one of these stores as

22   listed on Exhibit 9?

23     A.      Yes.

24     Q.      Have you read them all?

1       A.      Not essentially.

2       Q.      You're telling me you hadn't looked at

3  the document?

4       A.      We went to these calls.

5       Q.      Which ones?

6       A.      Okay.  I drove him to Weir.  I drove him

7  to Regal Liquors.

8       Q.      How can you remember that as you sit

9  here today the exact names of the stores?

10      A.      Well, if a man threatens you and then

11  took you out the next week to look at the calls and

12  wrote something, I think it would stick in your

13  mind.

14      Q.      Is that --

15      A.      I got this report.  These are the calls

16  we did that day.

17      Q.      All right.  So you are saying all of

18  this happened on one day?

19      A.      Yes.  We drove to the -- cause he took

20  notes on each call and then he wrote this.

21      Q.      Did you make notes of what happened that

22  day?

23      A.      Right here.  There's notes.

24      Q.      You made those after you got the

```
 1    reprimand?

 2        A.      After I got this back, yes.

 3        Q.      Did you make any notes other than what

 4    is on Exhibit 9 about what happened on this day?

 5        A.      Not immediately, just from memory.

 6        Q.      I am sorry.  What?

 7        A.      No.

 8        Q.      Town Food Market on the first page of

 9    this document --

10        A.      Yes.

11        Q.      -- it said "you failed to record product

12    availability."  Is that true or false?

13        A.      As far as I know, I recorded all

14    availability here.

15        Q.      How would one know whether or not you

16    accurately recorded product availability?

17        A.      You have to check on the computer and

18    see.  That could be inaccurate too because the guy

19    might have sold the two packs over the weekend and

20    the brand known to be there on Friday is now gone

21    on Monday.

22        Q.      When your manager worked with you, do

23    they look at your lap top at what you are doing at

24    the time?
```

111

1  A.  Yes.

2  Q.  So if Mr. Fasciani looked at your lap

3 top and noted the product availability wrong, he

4 could have made a note of it, correct?

5  A.  I cannot remember every single thing

6 that happened that day, okay.  I believe they were

7 just checks, the calls.  He wanted to see the

8 calls.  I am not sure if he recorded them or not

9 that day, but you are talking something that

10 happened four years ago, three years ago.

11  Q.  But you can remember specifically being

12 at each of these stores?

13  A.  Can you tell me what happened three

14 years ago?  I can't remember.

15  Q.  You put this in that same category.

16  A.  I try to remember as best I can.  I did

17 the job as best I could.  I did the calls as best I

18 could.  I had very good relations in all of these

19 accounts.

20  Q.  You are response to Town Food Market,

21 did you note anywhere in your response that what

22 Mr. Fasciani said was wrong?

23  A.  I don't know I would have to look at it.

24 Said failed PRP.  We did have PRP.

1       Q.      I am asking you.

2       A.      Yes, we did.

3       Q.      Where does he say that?

4       A.      It says right here.

5       Q.      I am looking at your response.  Well,

6    just read your response.  It's in your handwriting.

7    What was your response to that comment about Town?

8                    MR. SAHADY:  Objection.  Wait.

9    Wait.  Wait.  How did you come to the term

10   response?  This is your response.

11                   MR. LOFTIS:  That is what he said.

12                   MR. SAHADY:  These are notes he made

13   at the time.  They are not a response to what --

14                   MR. LOFTIS:  Well, thanks for

15   testifying yet again.  Look, object but don't put

16   words in the man's mouth.

17                   MR. SAHADY:  You are the one who is

18   putting words.

19                   MR. LOFTIS:  I am asking questions.

20   If you don't understand my question, ask me to

21   clarify it.  Let me start again.

22       Q.      You got this document after it was

23   written up Exhibit 9?

24       A.      Yes, and I made note of these calls to

1    the best of my ability.

2        Q.    Let's go slow.  Okay?  When you received

3    Exhibit 9, it had no handwritten comments on it,

4    correct?

5        A.    Yes.

6        Q.    Fine.  And you made handwritten notes on

7    the document?

8        A.    Right.  There is no space provided on

9    the sheets.  There is no space so I had to write

10   handwritten notes.  I took a sheet on the end and

11   typed it out.

12       Q.    What was your purpose in writing those

13   things out?

14       A.    Well, I know Mr. Fasciani.  I was

15   working under a threat.  He had threatened me a few

16   weeks ago, and I knew I was under attack from him

17   and that I was just trying to protect myself

18   against him.

19       Q.    All right.  With respect to Town Food

20   Market, in your notes at any time did you say this

21   is wrong, I disagree, product availability was

22   correct?

23       A.    As far as I know, we had all our

24   products in that store.

1       Q.      I'm asking about your notes.

2               MR. SAHADY:  The notes speak for

3       themselves.

4       A.      The notes speak for themselves.

5       Q.      Thank you.  I appreciate both of you

6       giving me an answer.

7               MR. SAHADY:  Any time.

8       Q.      Read what you wrote in response to the

9       Town Food Market?

10      A.      Well, you can see it.

11      Q.      Just read it out loud.

12      A.      This is one of the highest accounts in

13      Taunton.  We have gone from 5 to 7 feet of RBT.

14      This is no Phillip Morris account at all.  We have

15      a 35 percent of the business in that store.

16      Q.      That was the extent of that response?

17      A.      Well, on that particular one, yes.

18      Q.      All right.  Are you saying on this day

19      you made note there were no errors that you made in

20      reporting?

21      A.      I really can't tell you, you know.

22      Q.      Did you ever apologize for making

23      errors?

24      A.      Yes.  I never did any intentionally.

1      Q.     All right.  The next one, Amaro's

2   Market, on the next page read your response.

3      A.     This is a former lockout account, which

4   meant we were thrown out of the account, with a 60

5   percent RSR.  Okay.  Our share now more than

6   doubled and PM is locked out of this store.  Store

7   is moving to new location, and it's cutting

8   inventory.

9      Q.     I am asking you to read it.

10      A.     It says when you -- I cannot read the

11   last three words anyway.

12      Q.     When you walked in, is that it?

13      A.     Oh, yes.  Store was cutting back on

14   inventory when you walked in.

15      Q.     It doesn't say when we -- when we walked

16   in?

17      A.     No, it doesn't say that.

18      Q.     Next one, Girlies Variety, read you

19   response.

20      A.     I drove 35 miles with RBR fixtures in my

21   car, felt the time should be accounted for.  Maybe

22   not a good decision.

23      Q.     You reported time -- did you report

24   calling Girlies Variety on that occasion?

1    A.    We went to the store.  The store was

2    locked and I looked in.  It's the best I have to

3    account for the time and that was it.

4    Q.    All right.  And you say that, according

5    to your earlier testimony, Mr. Fasciani was with

6    you when you drove that 35 miles?

7    A.    He wasn't with me that day, no.

8    Q.    So this is a different day?

9    A.    Not on this call.  Look at -- you are

10   looking at something that happened four years ago.

11   I cannot remember exactly to the T everything.  I

12   realize you are trying to trick me into something,

13   and I only can give you a clear answer to the best

14   of my knowledge.

15   Q.    All I am looking for is an honest

16   answer.  Don't tell me you went into every store

17   when you didn't.

18   A.    Well, I just told you.

19   Q.    Okay.

20   A.    We did not go into that store that day.

21   Q.    Right.  But you have --

22   A.    You know what --

23   Q.    You had reported contacting that store?

24   A.    No.  We didn't go in that day.

1       Q.      I know that.  You had reported

2   contacting that store?

3       A.      Did I go to that store that day, yes.

4       Q.      But it was locked?

5       A.      It was locked.

6       Q.      And you had reported that you had called

7   on the account?

8       A.      I reported, to the best that I could,

9   that I was there, yes.  Well, the only way you can

10  report a call is report in the computer a call.

11  That is all I could do.

12      Q.      What did you put?

13      A.      Drove and took, the best of my

14  knowledge, what was in there, reported it, and that

15  was it.

16      Q.      So you were reporting product

17  availability?

18      A.      To the best of my knowledge.

19      Q.      But you couldn't see --

20      A.      You could see it through the window.

21  It's right in the window.

22      Q.      Have you ever done that before?

23      A.      No.  I rarely do.  You go to a store and

24  a man is on vacation.  I've seen a store that's

118

1    closed.   There is one.

2        Q.      Have you ever reported on an account

3    when you never went in a store?

4        A.      We were -- yes.  All the reps were -- we

5    were told to tell what market, told to call the

6    store on the phone, and to report them on many

7    occasions.

8        Q.      So you would -- telemarketing is

9    different; isn't it?

10       A.      No.  You don't go to the store.  You

11   call them on the phone.

12       Q.      Had you ever driven to a store to call

13   on the account and the store was closed and you

14   reported the call?

15       A.      Not that I recall.  This is the only one

16   I can recall.

17       Q.      All right.  Why was it not a good

18   decision?

19       A.      Well, you know, it really wasn't

20   physically a call, but I had to account for the

21   time if somebody asked me where were you during

22   this time.  What I did is I put the call in there

23   to account for the time.

24       Q.      So why was it not a good decision?

1       A.      Because I wasn't in the call.

2       Q.      You're at home.  What is the next one?

3       A.      Home Plate.

4       Q.      What was your response to Home Plate?

5  Just read your response.

6       A.      This is another lockout account, another

7  account that we had been thrown out of, that I had

8  been working on for over a year.  I could use some

9  help.

10       Q.      What help were you referring to?

11       A.      Well, instead of Mr. Fasciani opposing

12  me, if he could help me get into the call.  He

13  knows we are very short of help and had to rely on

14  your manager and had to trust your manager to work

15  with you and help you, but if you had someone that

16  was working against you, it's pretty hard to work

17  with him.

18       Q.      All right.  Now, under Home Plate it

19  refers to misreported product availability.

20       A.      Yes.

21       Q.      It says "when I questioned you about the

22  misreporting of product availability, you again

23  stated:  Quote, "With all the brands which we need

24  to record, only these errors, I thought was pretty

1    good."

2        A.      I don't remember saying that.

3    Mr. Fasciani had a way with words.

4        Q.      Are you denying that you said it or

5    anything like that?

6        A.      I don't think I said that, no.

7        Q.      Do you know -- do you remember what you

8    said when he told you the product availability was

9    misreported?

10        A.      Probably said sorry.  I tried the best I

11    could.

12        Q.      So you are not denying that the product

13    availability was misreported?

14        A.      I have no idea.  As far as I know, I

15    reported it properly.

16        Q.      What proof do you have of that?

17        A.      I am saying I go on calls and try to

18    report as best I could and what someone else says

19    is what they want.

20        Q.      If you made a mistake, would you have

21    known it?

22        A.      No.

23        Q.      Because you wouldn't have done it

24    intentionally?

121

1       A.      The only way to find out is if you gave

2    me a report a week from now of what I did last

3    week, that guys had 20 books on the shelf but he

4    only has 19, but I wouldn't know that for a week

5    from now or two weeks, maybe longer.

6       Q.      If Mr. Fasciani was with you in the

7    store and he looks at your lap top, he can tell

8    whether or not you've accurately recorded product

9    availability, right?

10      A.      Yes.

11      Q.      And do you know -- do you recall him

12   ever telling you that your product availability was

13   misreported when he was with you in the store?

14      A.      I don't recall.  I don't know.

15      Q.      You don't recall?

16      A.      No.

17      Q.      So you say that never happened or you

18   just don't recall it?

19      A.      I don't recall.

20      Q.      Park News, again misreporting of product

21   availability, failed to place and maintain VAP,

22   failed to properly merchandise, failed to report

23   PRP pricing, failed to change over POS, failed to

24   address noncompliance and what did you write?

122

```
 1        A.      This was another lockout account,
 2    another account that we had been thrown out
 3    previously.  I secured a contract with the store.
 4        Q.      MPG --
 5        A.      Again, this call here was a live.  We
 6    did have a communication.  He said no.  That is not
 7    true.  We had it right on the front corner.
 8        Q.      Where did you write that?
 9        A.      I am saying he wrote that it wasn't
10    there and we did have it.
11        Q.      You can remember that from four years
12    ago?
13        A.      It's still probably there today.
14        Q.      You can remember four years ago?
15        A.      That store always had it.  See, he
16    counted -- unless you had -- he said to me once
17    that I want you to go in people's Dumpsters to get
18    the advertising.  Because we used to ship those
19    promotions via wholesaler, Mr. Fasciani told me to
20    look in the dumpsters to get the advertising to put
21    in the display.  That was his comment to me and
22    then even if I did have advertising, if I didn't
23    have two backup pieces, it was considered no
24    advertising.  All that was required was one piece
```

1    of advertising.  His rule is if you didn't have

2    backup, there was no advertising.  He told me to go

3    look in the man's Dumpster.

4        Q.    Whose responsibility was it to make sure

5    that the retailer didn't throw that stuff away?

6        A.    Who is responsibility?  The company sent

7    them letters, I guess.  I asked them not to throw

8    it away, but they still throw it away.

9        Q.    So that is your responsibility?

10       A.    To ask them.  I asked them.  I try to

11   ask the stores not to throw the advertising away.

12       Q.    And if the store did it, then you should

13   not be held accountable for that?

14       A.    I would hope so, yes.

15       Q.    MPG #150.

16       A.    Yes.  I believe that was a chain

17   account.

18       Q.    Again, just read your response.

19       A.    "This is a chain account in which

20   manager (RSR) and RS sales rep have failed to

21   secure a contact and I will attempt to contract on

22   my own."

23       Q.    Gas 44, your response?

24       A.    "Two by two sign has been ordered,

124

1     request to retail rep to place signs.  PM is

2     removing much of our former POS.  I will get it

3     up."

4          Q.    So it was down at that time?

5          A.    Well, you could have put something up

6     and Phillip Morris guys come back tonight and just

7     take it down.

8          Q.    And again, you would view that as not

9     your responsibility?

10                    MR. SAHADY:  To what, stop someone

11    from taking the signs down?

12         A.    I asked him not to do it, but he kept

13    doing it.

14         Q.    So you're only responsible for the time

15    you are in the store?

16         A.    That is all I could do.

17         Q.    All right.  Now, your response to

18    Grampy's Route 44?

19         A.    This was a former exclusive Phillip

20    Morris account.  No previous RJR rep was able to

21    contract this store.  I was successful in gaining

22    space and a contract.  Our share is back in double

23    digits rather than in single digits.

24         Q.    Why don't we skip all the way to page

125

```
1      28.

2            A.      28.

3            Q.      What is your comment at the right as to

4      the first paragraph?

5            A.      "I'm sorry I didn't sign in the proper

6      box but I will work to do a better job."

7            Q.      What did you do wrong there?

8            A.      I have no idea.

9            Q.      Well, what was -- what were you

10     referring to?

11           A.      I don't know.

12           Q.      Failed to administer procedures --

13           A.      There may have been a box that says is

14     there a VAP promotion in here and maybe I forgot to

15     fill -- check the box.  I have no idea.

16           Q.      Did you know at the time --

17           A.      I stated I never recorded voucher number

18     and payment.  I can't remember what that is really.

19           Q.      Do you know whether or not you made a

20     mistake as we sit here today?

21           A.      I don't know.

22           Q.      You don't know?

23           A.      It could have been a mistake.  Maybe

24     not.  Maybe the computer didn't record it properly.
```

1    All I know is I tried my best to record every call

2    as best I could.

3         Q.    Okay.  To the extent you made mistakes,

4    they were unintentional?

5         A.    Unintentional.

6         Q.    But you are not saying you made a

7    mistake?

8         A.    I am human.  I never did anything

9    intentionally.

10        Q.    Now, in this one where it talks about

11   Guimond, G U I M O N D, Farms --

12        A.    Guimond Farms, yes.

13        Q.    This one I really cannot read your

14   handwriting very clearly but if you can tell me

15   what you wrote.

16        A.    There was no policy on reporting of

17   making -- I cannot read that.  Slow promotion.

18   There is one now and I will follow what was not

19   mentioned that in some accounts we underpaid or

20   quite accurate pricing was placed.  Some of it is

21   Digital.  May have missed a few pieces, but all in

22   all they look pretty good, and with a little help,

23   they could be better.

24        Q.    So you acknowledge that you made a --

1   may have missed a few pieces?

2                   MR. SAHADY:   Objection.

3       A.    No.  I said there is a few pieces

4   missing.  I said I reported the best I could.

5       Q.    Now, you said may have missed a few

6   pieces but all in all they look pretty good.  What

7   did you mean?  Who missed a few pieces?

8       A.    I have no idea.

9       Q.    Were you referring to yourself?

10      A.    Maybe the computer missed a few pieces.

11  I don't know.

12      Q.    Then what's the significance of the next

13  statement?  Read that.

14      A.    Okay.  Failed to report.

15      Q.    Now, did you see where it says "with a

16  little help they could be better"?  Do you see

17  that?

18      A.    That is a different account.

19      Q.    What is right after with a little help

20  they could be better?

21      A.    Town Food.  He's talking about a

22  different account.  Town Food.

23      Q.    Just asking you to read your notes.

24      A.    Maybe the advertising could look a

1    little better.

2        Q.    In which store?

3        A.    Well, it looks like we're talking about

4    Guimond Farms.

5        Q.    Do you know that for a fact today or

6    just assuming?

7        A.    Just trying to --

8        Q.    Don't guess.  If you don't know, you

9    don't know.

10       A.    I can't remember what happened back

11    then.

12       Q.    What is the next thing you wrote after

13    that?

14       A.    "This was an area that I should improve

15    in.  The account received the three-month payment."

16       Q.    What is the area that you should improve

17    in?

18       A.    I don't know.  Failed to accurately

19    report Winston.  In one account, incorrectly

20    placing three displays, in another account, Home

21    Plate, incorrectly reported six displays being

22    placed.  However, in both above listed accounts

23    only one display was observed.

24       Q.    I am just asking what was the area that

1    you should have improved in?

2        A.    When asked about these reporting

3    discrepancies, you stated it was for Winston S2

4    issuing payment for the $95 bonus.  There was a

5    bonus payment for the Winston.

6        Q.    What is the area that you should have

7    improved in?  What were you referring to?  Do you

8    know?

9        A.    I have no idea.  Placing more displays.

10   I don't know.

11       Q.    All right.  The next paragraph talks

12   about "failed to place and maintain VAP

13   communication vehicles in all accounts."  What is

14   VAP?

15       A.    Well --

16       Q.    Just what does it mean?

17       A.    There are promotions that we send to

18   stores.

19       Q.    Does VAP stand for something?

20       A.    It's been a long time.

21       Q.    Do you know?

22       A.    It was our promotions that we sent to

23   stores.

24       Q.    But you do not know what VAP stands for?

1       A.      I have many things on my mind from other

2    jobs.  It's four years ago.

3       Q.      Okay.  Your notation on that was "it's a

4    problem to get retailer to place POS."

5       A.      Yes.  Everybody had that problem.

6    R.J. Reynolds would ask them to place the POS.

7    They wouldn't do it, no POS on the counters, so it

8    was always a constant battle.  You can go out right

9    now and they are still having trouble.

10      Q.      The last comment that you wrote on that

11   page what is that?  "I apologize for the reporting

12   errors and will work to perfect reporting in the

13   future."

14      A.      Right.  These were errors that

15   Mr. Fasciani said I did.  I said I was sorry.

16      Q.      What area were you referring to?

17      A.      Whatever he reported.  I really have no

18   idea whether they were errors or not.  It's just

19   what I wrote.  I tried to be as nice as I could to

20   Mr. Fasciani.

21      Q.      Page 30 of this document.  Are you with

22   me?

23      A.      Yes.

24      Q.      It looks like probably the third

1    paragraph down.

2         A.      Third paragraph.

3         Q.      "Apologize for the errors in reporting."

4    Do you see that?

5         A.      Yes.  That is what Mr. Fasciani said.  I

6    had errors.  I told him I was sorry.

7         Q.      "But the bottom line is that sales

8    distribution and share have increased in most of my

9    accounts since I have taken over the assignment."

10        A.      That is true.

11        Q.      Did you believe that to the extent you

12   had made errors in reporting that those should be

13   discounted or forgiven because your sales

14   distribution and share have increased?

15        A.      I don't really -- you really don't know

16   if you are making errors or not.  When you are

17   punching a computer, you don't know until the

18   report comes out, so I didn't do it intentionally.

19   I told him if there were errors, I was sorry about

20   it.  Nothing was done intentionally.

21        Q.      All those reporting things that we

22   talked about those were all administrative duties?

23        A.      Yes.  You have to report, yes.

24        Q.      And the next -- the end of that long

132

1    paragraph --

2        A.      Last page, yes.

3        Q.      The end of the paragraph that starts off

4    I apologize for the errors --

5        A.      Well --

6        Q.      -- "There is a better way to work the

7    street than we currently do."

8        A.      Where is that?

9        Q.      It's the end of that paragraph that

10   begins with I apologize.

11       A.      Apologize for the error.

12       Q.      The last -- bottom of that paragraph

13   "There is a better way to work the street than we

14   currently do it."

15       A.      Yes.

16       Q.      Did you disagree with the company with

17   the way the company was handling the sales

18   function?

19       A.      No.  I worked their program.  I said

20   there are better ways to do things.  That is all.

21   I wanted to see if they were interested in

22   listening to suggestions.  That is all.

23       Q.      Do you know whether or not Mr. Fasciani

24   made notes when he gave you the reprimand?

1        A.      I imagine he did.  He wrote these.  He

2    must have made notes.

3        Q.      Do you know if he made any notes of the

4    conversation where the two of you talked?

5        A.      I have no idea.

6        Q.      Do you recall telling him that your

7    lawyer says you are harassing me?

8        A.      I don't recall that.

9                    MR. LOFTIS:  Exhibit 10.

10                   ( Exhibit Number 10 marked for

11                   identification. )

12                   MR. LOFTIS:  Withdraw Number 10.

13   Okay.  That's Exhibit 10.

14                   ( Exhibit Number 10 marked for

15                   identification. )

16       Q.      Exhibit 10, Mr. Rodio, September 2001

17   work plan priorities.  Do you recall receiving

18   documents like this?

19       A.      Yes.

20       Q.      What was the purpose for these

21   documents?

22       A.      Well, we had a goal of achieving 85

23   percent distribution of Camel Turkish Jade.

24       Q.      Now, that is on product availability?

134

1      A.      Yes.

2      Q.      And how would someone check?  You would

3  record your product availability, right?

4      A.      Yes.

5      Q.      So you would go into a store and

6  specifically look for Camel Turkish Jade which is a

7  specific brand, right?

8      A.      Yes.

9      Q.      Was there a new brand introduction?

10     A.      Yes.

11     Q.      So the objective for -- was to get 85

12  percent availability?  Was that all your accounts?

13     A.      Actually, the objective changed.  It was

14  around 65 and then they changed to 85.

15     Q.      So but that was 85 percent of all sales

16  reps?  It wasn't just for you?

17     A.      Yes.  It was a lower and then they

18  changed it to a higher, I believe.

19     Q.      But it was for all sales reps, and 85

20  percent does that mean 85 percent in all of your

21  accounts or 85 percent of your accounts?

22     A.      85 of your higher volume accounts.

23     Q.      Were those to have availability of Camel

24  Turkish Jade?

135

```
 1      A.     That was the goal.

 2      Q.     And the only way that Mr. Fasciani would

 3   know whether or not you achieved that was based on

 4   what you entered in the lap top?

 5      A.     Yes.

 6               MR. LOFTIS:  Number 11.

 7               ( Exhibit Number 11 marked for

 8               identification. )

 9      A.    I had problems with this introduction.

10   Mr. Fasciani kept calling me for meetings which was

11   taking me off the street which made it more

12   difficult.

13      Q.     Exhibit 11, Mr. Rodio.

14      A.     Right.  Part of the problem was --

15               MR. SAHADY:  Just wait for the

16   question.  The attorney has no question.  You don't

17   have an answer.

18               THE DEPONENT:  Okay.

19      Q.     Do you recall receiving this e-mail?

20      A.     Yes.  I don't recall but I recall I

21   think --

22      Q.     I think you said earlier that you came

23   up low?

24      A.     Well, we had already introduced a brand
```

1    then they started a new -- we had already had the

2    brand in a lot of stores, but the period didn't

3    start until a later time, so you really couldn't

4    take credit for the stores it was in.  The other

5    thing was that was a vacation month, and I had

6    taken some time trying to take my weekends.  In

7    addition, Mr. Fasciani kept calling me to these

8    meetings and that was taking away from my street

9    time.  Seven calls could have made a difference of

10   7 percent, so when he called me into those

11   meetings, it took away from my percentage on the

12   Jade distribution.  Most introductions I did well.

13   This particular one was a little bit low.  He told

14   me on the phone as long as I have 65 percent it was

15   fine with him.

16      Q.      You recall that.  Do you have a record

17   of that conversation?

18      A.      I don't believe so, but he kept taking

19   me out of the assignment making it impossible for

20   me to achieve a high share of that month.

21      Q.      Which month was that?

22      A.      I believe it was August.

23      Q.      That's the September priority.

24      A.      Is it?  Could have been September.  I

1    don't know.  It was two, three years ago.

2         Q.    I know it's been two or three years ago.

3         A.    So it may have been August, may have

4    been September.

5         Q.    How could you have been held accountable

6    for -- in August for a September work plan?

7         A.    Maybe it was a September work plan.

8         Q.    What does it say it is?

9         A.    It says September work plan, yes, so

10   maybe it was September.

11        Q.    All right.  Do you know whether or not

12   you were vacation in September 2001?

13                  MR. SAHADY:  Are we talking about

14   Exhibit 11?

15                  MR. LOFTIS:  We're back to 10.  They

16   both relate.

17                  MR. SAHADY:  Thank you.

18        Q.    Do you know whether you were on vacation

19   in September of 2001?

20        A.    I don't believe I was, no.  I believe I

21   took the weekends off in August.

22        Q.    Do you know when it was that you were

23   called out of your territory to attend meetings?

24        A.    Maybe once.  The dates you have listed.

1      Q.      What dates?

2      A.      September 5th was there -- there were

3   days.

4      Q.      What are you referring to?  I don't have

5   anything that lists dates.

6      A.      I think we had a meeting, Mr. Fasciani,

7   Mr. Kane and myself.  They rented a room and put me

8   in a room and questioned me.  You don't have that?

9      Q.      No.  Do you?

10      A.      No, but I guess you could go to the

11   hotel and look if they rented a room.  They rented

12   a room.  They locked me in a room and questioned me

13   for two hours.

14      Q.      About what?

15      A.      They would ask me what I was doing three

16   months ago on a specific day.  I had no idea.

17      Q.      When was that, in September of 2001?

18      A.      I believe it was at that time, yes, and

19   by them taking me off the street, it made it harder

20   for me to make the calls.

21      Q.      Was that when you were given the written

22   reprimand?

23      A.      No.  That was after.  When I called

24   Mr. Kane in the parking lot that day, I told him I

1    wanted to arrange a meeting so we could resolve the

2    issue, and this meeting came afterwards, and

3    Mr. Kane said I can't do anything.  I had asked him

4    before the reprimand to see if we could resolve it.

5         Q.    Who was meeting in the room?

6         A.    Mr. Kane, Mr. Fasciani and a young lady,

7    Pam Nelson.

8         Q.    Who is Pam Nelson?

9         A.    She was a retail manager for

10   R.J. Reynolds.

11        Q.    And what was the purpose of the meeting?

12        A.    I had no idea.  They were just

13   questioning me.  Where were you on June 13th?  I

14   have no idea.  This is the middle of September.

15   You are asking me where I was on June 13th.  I have

16   no idea.

17        Q.    Did you have a calendar?

18        A.    Yes.  I don't mark every single thing I

19   do every day.

20        Q.    How do you keep up with it?

21        A.    Well, when you do -- when you work your

22   calls, all you do is pull the list, tells you what

23   calls you've got to make and you go make your

24   calls.

1      Q.      Don't you report all the calls you would

2   have made?

3      A.      On the computer, yes.

4      Q.      So you would know where you were at on

5   any given day, wouldn't you?

6      A.      He would know.  He could look it up in

7   the computer.  He could tell.

8      Q.      Could you look it up?

9      A.      No.

10     Q.      Your lap top didn't show you where you

11  had been?

12     A.      I cannot recall.  It's possible.  It may

13  be possible.  I can't recall.  I am under a

14  different system now.  I am working so I am not

15  sure.

16     Q.      What else was pulling you out of those

17  calls?

18     A.      Well, they pulled me into a meeting.

19  They pulled me into meetings.

20     Q.      What meetings were you pulled into other

21  than the one you just told me about?

22     A.      I think Mr. Fasciani did a TA or

23  something, work with with me.

24     Q.      Do you know that for a fact?

1       A.      No.  I couldn't tell you for a fact, no.

2       Q.      All right.

3       A.      I can just tell you I did the best I

4    could with Camel Jade.  That is it.

5       Q.      But came up short?

6       A.      There are some assignments where full

7    price brands are very hard to introduce because

8    most of the generics reps can do a very good job

9    and other reps would have a hard time with

10   generics.  This particular full price didn't sell

11   very well, might be more difficult.

12      Q.      Are you disputing the fact that you came

13   up short as opposed to thinking you got a reason

14   for it?

15      A.      Mr. Fasciani said as long as I was

16   around 65 percent he was happy.  I had asked him

17   about Camel Jade and he said as long as you are

18   around 65 percent, you are okay.

19      Q.      Okay.  One you're 51 percent and another

20   54.9, correct?

21      A.      On the 100s, yes.  Well, I don't think --

22   I believe the goal was 85 on a king size not on the

23   100s.

24      Q.      It was 85 percent of all four brand

1    styles?

2        A.    Yes.  All I can say is on some

3    introductions I came up very high and then when I

4    didn't do as well I tried the best I could.

5        Q.    You did the best you could but you are

6    not disputing where you came out?

7        A.    I didn't come out high on that one, no,

8    but there were other introductions I was very high.

9        Q.    And there were some times that you had a

10    work with with Mr. Fasciani and everything was

11    perfect, right?

12        A.    I don't ever remember having a perfect

13    day with him.

14        Q.    There were other times -- do you recall

15    ever having a good day?

16        A.    With Mr. Fasciani?

17        Q.    Yes.

18        A.    No.  Seemed always to find something to

19    criticize you about.

20        Q.    Okay.  I thought we were moving on but

21    we're not.

22                    MR. LOFTIS:  11 or is that 12?

23                    THE STENOGRAPHER:  12.

24                    ( Exhibit Number 12 marked for

1             identification. )

2        Q.    That's a work with on September 21.

3        A.    Was that during the Camel Jade

4   introduction?

5        Q.    Probably.

6        A.    So it took more time away.  Correct.

7        Q.    I'm assuming --

8        A.    Yes.  When you only have 90 calls, if

9   you miss 10 calls, that's a 12 percent increase in

10  distribution, so by taking me away for a day, that

11  cost me possibly a 12 percent decline.

12       Q.    He wasn't taking you away.  He was

13  working with you.

14       A.    Yes, he did.  He took me away from the

15  calls I wanted to do that day.  I may not have

16  wanted to do these calls that day.  I may have had

17  calls where I had to get distribution in and by him

18  taking me away, lowered my percentage.

19       Q.    You had said earlier that you don't ever

20  remember having a good day with Mr. Fasciani on a

21  work with.  The Plymouth Avenue account was a PMX

22  account.  Skip that one.  Pleasant Liquor EDLP

23  contract was excellent.

24       A.    I have never seen this document.  There

1    is no date on it.   Is there a date?

2        Q.      September 18th.   You said you had a work

3    with him later that month.

4        A.      I never got this document.

5        Q.      He commented about Pleasant Liquor the

6    EDLP contract was excellent.   You did a nice job

7    with filling out stocks, great job of securing a

8    home for VAP.   Texaco Gas Mart, EDLP was excellent.

9    Emily's Market, very nice job in selling EDLP,

10   signage, everything.   I mean, he just goes on and

11   on about those accounts were in good shape.

12       A.      These are nice comments but I've never

13   seen it.

14               MR. SAHADY:   This was manufactured

15   after the firing.

16       A.      Yes.   This could have been manufactured

17   any day of the week.   I've never seen this

18   document.

19               MR. LOFTIS:   Now we've got two

20   people testifying again.

21               MR. SAHADY:   No.   I am not.

22               MR. LOFTIS:   You asked me if it was

23   manufactured after the firing?

24               MR. SAHADY:   Yes.

1              MR. LOFTIS:  What a crazy question.

2              MR. SAHADY:  It may be a crazy

3    question but it's deserves an answer.

4              MR. LOFTIS:  Nothing was

5    manufactured after the firing.  I can assure you.

6              MR. SAHADY:  He's never seen this

7    before.

8              MR. LOFTIS:  He says he hasn't seen

9    it.

10             MR. SAHADY:  But -- off the record.

11   Well, never mind.

12        Q.    How do you know you've never seen it?

13        A.    Because I just told you I've never seen

14   it.

15        Q.    How do you know?

16        A.    I --

17        Q.    It was three years ago.

18        A.    I've never seen it.  Normally I would

19   get something like this that would describe the

20   calls.  This is not a normal type of form.

21        Q.    Do you know if -- but you do recall

22   Mr. Fasciani worked with you in September?

23        A.    I can't tell you exact dates.

24        Q.    Okay.  If he worked with you and he was

1    out to get you, can you tell me what motive he

2    would have had for writing a very positive report

3    on what you had done?

4        A.    Again, I've never seen this report.

5        Q.    Do you know why he would have written a

6    positive report?

7        A.    Maybe because --

8              MR. SAHADY:  It hasn't been

9    established that Fasciani wrote this report nor do

10   we know when he wrote it if he did write it.  All

11   right?

12             MR. LOFTIS:  I can still ask him a

13   question about it.

14             MR. SAHADY:  But your assumption --

15       A.    You are asking me a question of

16   something I've never seen.

17             MR. SAHADY:  Mr. Rodio, let me

18   finish.  The factual ground of your question has

19   not been established.

20             MR. LOFTIS:  Therefore, we're

21   wasting our whole day because I couldn't ask him

22   about anything unless he created the document or

23   has a copy of it, and you won't give me the

24   documents that he created so let's move on.

1              MR. SAHADY:  Every document that he

2      has seen he has made notes on.  It is significant

3      that this document Exhibit 12 he testified that he

4      has never seen it and there are no notes made in

5      his own handwriting on it.

6              MR. LOFTIS:  Which means nothing.

7              MR. SAHADY:  Which raises a

8      reasonable suspicion.

9              MR. LOFTIS:  I am not going to sit

10     here and be insulted.  You can stop the insults.

11             MR. SAHADY:  I am not insulting you.

12     I am insulting R.J. Reynolds.

13             MR. LOFTIS:  With no basis in fact.

14             MR. SAHADY:  Neither do you have a

15     basis in fact to assume when it was authored, do

16     you?

17             MR. LOFTIS:  I can't tell you the

18     exact day.  I will tell you for a fact that it was

19     done in close proximity to the date of it.

20             MR. SAHADY:  Do you know that for a

21     fact?

22             MR. LOFTIS:  Yes.

23             MR. SAHADY:  Personally know that?

24             MR. LOFTIS:  Let me ask the

148

1       questions.

2                           MR. SAHADY:  Okay.

3                           MR. LOFTIS:  Mark 13.

4                           ( Exhibit Number 13 marked for

5                           identification. )

6       Q.      Before I get to Number 13, you were

7       familiar -- you know that during the period of time

8       you worked with R.J. Reynolds you had work withs

9       with a variety of different managers, correct?

10      A.      Yes.

11      Q.      And the same for the TA?

12      A.      Yes.

13      Q.      You know that managers did TAs on you?

14      A.      Yes.

15      Q.      How did you know that?

16      A.      They would do the TA and they would

17      report it to you.

18      Q.      How would it be reported to you?

19      A.      Sent you a form.

20      Q.      Show me one.  What exhibit are you

21      looking at?

22      A.      This one.

23      Q.      Show me a -- you show me a form for a

24      TA.

1       A.      I don't have one.

2       Q.      How do you know that TAs were done?

3       A.      The manager sends you the report.

4       Q.      What did the report look like?  What is

5    the exhibit number on it?

6       A.      You may have received an e-mail or

7    whatever.

8       Q.      About the TA?  Now, just so we're clear,

9    a TA is done without -- not in your presence,

10   correct?

11      A.      Correct.

12      Q.      And you knew that managers did TAs,

13   right?

14      A.      Oh, yes.

15      Q.      How did you know they did TAs?

16      A.      They would report to you the calls they

17   went into.

18      Q.      How would they report it?

19      A.      Went into such and such a call and

20   reported what they saw.

21      Q.      Did you get those documents?

22      A.      TAs?

23      Q.      Yes.

24      A.      I don't have every single document.  I

1    kept the documents that I could.  I don't have

2    every single document for 26 years, no.

3        Q.    Fine.  When a manager did a training

4    analysis, they sent you something to let you know

5    it had been done, right?

6        A.    Sometimes, and sometimes they would go

7    out and wouldn't send you anything.

8        Q.    How did you know they had done a

9    training analysis?

10        A.    My retailer would tell me your boss was

11    in here looking at your work.

12        Q.    Did you sometimes get follow-up about

13    that training analysis?

14        A.    Sometimes you did.

15        Q.    In what form would that be?

16        A.    Reported on such and such a call and

17    found this and this.

18        Q.    Do you have any of those?

19        A.    I don't believe so.  I don't know.  I

20    don't believe so.

21        Q.    And when you do a work with, would your

22    manager write up the work with?

23        A.    Yes.  He's got them right here.  This

24    one right here.  We did a work with that day.

1      Q.      That was a written reprimand.  That's

2   not a work with.

3      A.      No.  He took some of the calls, wrote

4   them down.  Some of the calls he had seen before.

5      Q.      I am just talking about work withs.  You

6   know that your manager worked with you, right?

7      A.      Right.

8      Q.      Do you know if that was ever documented?

9      A.      I didn't write the reports out.  The

10   only person that would know would be the manager.

11      Q.      Did the manager write a report?

12      A.      I would think he did.

13      Q.      Did you ever see those reports?

14      A.      On some of them.  Some reports they

15   would come out on e-mail.

16      Q.      What did they look like?

17      A.      Similar to this, get a call and tell you

18   what --

19      Q.      So the written report of a work with

20   looks similar to Exhibit 12?

21      A.      Again, it's four years ago.  I can't

22   remember exactly what everything looked like.

23      Q.      Can you remember what you received and

24   what you didn't receive?

1       A.      Not exactly everything, no.

2       Q.      Okay.

3       A.      I cannot.

4       Q.      Exhibit 13.  Do you recall receiving

5    that one?

6       A.      I don't have a copy of this.

7       Q.      What is that?

8       A.      I don't seem to have a copy.

9       Q.      Of the final written reprimand?

10      A.      I don't have a copy of this.

11      Q.      Have you ever seen it before?

12      A.      I don't recall this.

13      Q.      Do you recall getting a final written

14   reprimand?

15      A.      I don't recall.

16      Q.      So that is a document --

17      A.      But it may have been sent to me, but I

18   don't remember.

19      Q.      Have you looked in your file?

20      A.      I don't have a copy of this.

21      Q.      Having looked at it now, do you recall

22   having seen it before?

23      A.      I may have seen this, yes.

24      Q.      But --

153

1      A.      Again, I don't know.  What year is this?

2      2001.  It's three years ago.  I don't remember

3      three years ago.

4      Q.      Do you remember getting a final written

5      reprimand?

6      A.      There is a page here -- I don't remember

7      seeing this stuff.  This looks like it was added to

8      it.

9      Q.      What page?

10     A.      The last page.

11     Q.      Where it's just a place for the

12     signature?

13     A.      Yes.

14     Q.      That's the standard format, isn't it?

15     It ends with the manager's signature and there's a

16     place for you to sign.  My question is do you

17     remember getting a final written reprimand?

18     A.      I don't recall this.

19     Q.      Do you recall getting a final written

20     reprimand?

21     A.      I don't recall.  No.

22     Q.      Do you recall writing a response?

23     A.      Again, this is three years, four years

24     ago, three years ago.  I cannot remember everything

1    that I did three years ago.

2        Q.    And you can't remember everything you

3    received three years ago, can you?

4        A.    I can try to remember.  Every single

5    document?  No.  I can try to remember as best I

6    can.  I try to do the best I can.

7        Q.    And to the extent you made mistakes,

8    they were unintentional, correct?

9        A.    Nothing was intentional.

10            MR. LOFTIS:  Let's mark this.

11       A.    I didn't make any mistakes

12    intentionally.

13            MR. LOFTIS:  Let's mark this one

14    Number 14.

15            ( Exhibit Number 14 marked for

16              identification. )

17       Q.    All right.  Look at Number 14 and tell

18    me what that document is.

19       A.    It's a response.

20       Q.    To what?

21       A.    It looks like to this document.  Yes.

22       Q.    So you did receive the final written

23    reprimand?

24       A.    I received this document.  Doesn't mean

1    that the last page was there.  Last page may not

2    have been there.  I don't know.  I received this

3    document and I responded to it.

4        Q.    All right.  And is what we've marked as

5    Exhibit 14 your response to that document?

6        A.    Let me see.  I will have to read it.

7                    ( Short pause. )

8        Q.    Can you identify this document,

9    Mr. Rodio?

10        A.    Yes.

11        Q.    Is that a document that you prepared?

12        A.    Yes.

13        Q.    And it was in response to the final

14    written reprimand?

15        A.    I don't remember seeing a reprimand

16    sheet.  This part here.

17        Q.    You don't remember --

18        A.    Seeing this blank sheet.

19        Q.    For your signature?

20        A.    I've never seen that.  No.

21        Q.    How do you know you never saw it?

22        A.    I just told you.

23        Q.    And you're positive you never saw it

24    even though it's been all these many years ago?

1    A.    I've seen the report, and I responded to

2    the report.  We were given the wrong contracts, so

3    we had to go out and rewrite them again.  It caused

4    a problem in the payment system.  I picked up on

5    the problem.  It had been prepared wrong, and I got

6    in touch with my manager.  By us aggressively

7    correcting the system and the problems, we were

8    able to save the company $1,000.

9    Q.    Do you know whether or not those

10   administrative problems occurred?

11   A.    Well, that was not me.  That was the

12   person that wrote up the pay register.

13   Q.    So none of it was your fault?

14   A.    I don't know if it was my fault.  The

15   person that put the pay register together, paid the

16   stores, was incorrect, and I contacted the manager

17   to let him know.

18   Q.    Which manager?

19   A.    Mr. Fasciani, and we corrected it, and

20   we saved the company approximately $1,000.

21   Q.    Were you given a copy of the final

22   written reprimand?

23   A.    I remember seeing this, yes.  I didn't

24   have a file big enough for all of the paperwork

1    Mr. Fasciani sent to me.

2       Q.    And you can't remember -- make it hard

3    for you to look at a document today and say yes

4    that one I didn't get.  That one I did get.

5       A.    Mr. Fasciani sent more reports to me in

6    three years than the previous 23 yarrs so.

7       Q.    And you didn't keep it all?

8       A.    I kept as much as I could.

9       Q.    Did you make any handwritten notes on

10    the document?

11       A.    Again, it's three years ago.  I couldn't

12    tell you.  Possibly.  Possibly not.  I don't

13    remember.

14       Q.    Would this be reviewed with you before

15    you saw it?

16       A.    I don't even know what you are talking

17    about.  I don't even know what document you are

18    looking at.

19       Q.    Okay.  Are you saying that the

20    administrative errors that are referenced in this

21    file written reprimand did or did not occur?

22       A.    I would have to look at something that

23    happened three years ago.  I will read it.  Where

24    is it?  Right here?

1    Q.    Yes.  What are you reading now?

2    A.    I was just looking at it.

3    Q.    Do you know today whether or not the

4    problems that were noted actually occurred?

5                MR. SAHADY:  What problems are you

6    referring to?

7    A.    What problems are you talking about?

8    Q.    The final written reprimand.

9    A.    Is there a particular question you have?

10   Which one?

11   Q.    Well, let's do that.

12   A.    This is Common Place.  What does it say

13   here?  Contract was originally submitted a month

14   earlier in RJR triplicate form which is no longer

15   acceptable.  Contract was returned, had to be

16   reprinted on a computer metro form resulting in

17   late return of contract.

18   Q.    Okay.  So the contract was late?

19   A.    We reported on one particular form and

20   then they said that form was no good.  We had to

21   rewrite it again.  It wasn't my fault we had the

22   wrong forms.  They gave them to us.

23   Q.    All right.  Common Place -- the next one

24   New World Metro.  New World contract submitted by

1    you signed by you on July 12.

2        A.    Right.  What happened the store when it

3    was written was open and the store closed down.

4    When it was on the pay register, I called the

5    office and said the store is no longer in

6    business and the store never got paid.  I told them

7    they should not be paid.

8        Q.    So why would you not submit the contract

9    until October 24th?

10       A.    October 24th?  I have no idea what you

11   are talking about.

12       Q.    Read the first sentence under Common

13   Place.  You are reading under Lovetts Market.

14       A.    I sent in --

15       Q.    You are reading the wrong one.

16       A.    Which one you want?  Common Place or

17   Lovetts Market?

18       Q.    I never mentioned Lovetts Market.

19       A.    Okay.  You want Common Place.  Your

20   failure to accurately complete the contract --

21       Q.    Read the first sentence.

22       A.    I cannot read it.  It's blacked out.

23       Q.    You cannot read any of the first

24   sentence?

1      A.      Oh, okay.  I can see it.

2                MR. SAHADY:  Looking under Common

3      Place; is that right?  Common Place?

4                THE DEPONENT:  Yes.

5      Q.      Why was the contract not submitted until

6      after October 24th?

7      A.      There was a -- at this time there was a

8      problem with some of the contracts.  We had to

9      rewrite them.  It is possible -- we had a lot of

10     contracts.  We had to rewrite 60 or 70 -- that this

11     particular contract was missing and we had to get

12     it in at a later time.  I don't know.  I really

13     cannot give you an honest answer.  There may have

14     been one contract that I was late and had to get it

15     in or something.  I don't know.

16     Q.      Fine.

17     A.      We were rewriting all our contracts, and

18     I guess something was wrong with the forms.  We had

19     to do it over twice, so it caused a lot of

20     problems.  I did pick it up on the pay register,

21     and nobody was paid that shouldn't have been paid.

22     Q.      All right.  So if you made a mistake, it

23     was not intentional?

24     A.      No.

```
 1                    MR. SAHADY:  Didn't cause no harm.

 2                    MR. LOFTIS:  You know what, you do

 3    not need to testify.  Okay?

 4                    MR. SAHADY:  You are making

 5    comments.

 6                    MR. LOFTIS:  I am asking questions.

 7                    MR. SAHADY:  Without completing

 8    them.

 9                    THE DEPONENT:  You make comments,

10    too.

11                    MR. SAHADY:  What is good for you is

12    good for me.

13                    THE DEPONENT:  This is a fair

14    country.  We can make comments.

15                    MR. LOFTIS:  I asked him questions.

16                    MR. SAHADY:  You are making

17    gratuitous comments.  You are characterizing his

18    evidence which is not your place to do now.  All I

19    am trying to do is complete the thought that you

20    left out about the store not getting hurt.

21                    MR. LOFTIS:  Okay.  Mark 15.

22                    ( Exhibit Number 15 marked for

23                       identification. )

24        Q.    Just have you seen 15 before or do you
```

162

1    recall seeing 15?

2         A.    This Texaco Gas one of the problems --

3              MR. SAHADY:    There is no question.

4    Did I hear a question?

5              THE DEPONENT:    All right.

6         Q.    Well, there was one.  Do you recall is

7    this a document you received or do you recall

8    receiving it?

9         A.    I remember working these calls.  I don't

10   remember seeing the document, though.

11        Q.    So you remember working those calls with

12   Mr. Fasciani?

13        A.    Yes.

14        Q.    And you were going to say something

15   about the Texaco Gas?

16        A.    Yes.  The manager reports that the board

17   of health didn't want us putting advertising next

18   to the cash register because young kids would see

19   it and didn't want them to become addicted to

20   smoking, but Mr. Fasciani didn't care.  He wanted

21   me to make sure that we had advertising on all the

22   VAP counter displays.

23        Q.    On the what?

24        A.    The little things on the counter, the

1    VAP displays.  The board of health person had told

2    the manager not to put the advertising in the VAP

3    displays which would put the store out of

4    compliance, and Mr. Fasciani sort of ignored that

5    and said he wanted me to put the advertising in the

6    VAP displays.

7         Q.     Is that what this says?

8         A.     No.  I just brought that memory, though.

9         Q.     This basically is saying cancel contract

10   if you can't get the merchandise in where it's

11   supposed to be, right?

12        A.     The store was in the process of getting

13   new racks.  We were waiting to get the racks.

14        Q.     Okay, but if a store cannot put or does

15   not want to put the merchandise where the contract

16   calls for --

17        A.     He did.  It's just that he wanted to put

18   it and we were waiting for the rack.

19        Q.     Did that problem eventually get

20   rectified with Texaco Gas?

21        A.     Yes, but even though the board of health

22   person didn't want to put the advertising,

23   he still wanted me to put it up.

24        Q.     Was there anything unusual about where

1    it was in that store?

2        A.    What's that?

3        Q.    The advertising?

4        A.    It's right at the register in the VAP

5    communicator, the thing that is in question in a

6    lot of these contracts.

7        Q.    Is that where it's supposed to be?

8        A.    Yes.  I put it where it's supposed to

9    be, and I did what I was told.

10                    MR. LOFTIS:  Mark 16.

11                    ( Exhibit Number 16 marked for

12                    identification. )

13        Q.    Number 16 have you seen that document?

14        A.    This is --

15        Q.    Said to be an e-mail to all managers and

16    all sales representatives.

17        A.    Actually, I don't remember seeing this.

18    This is 2002.  It's almost three years ago.  2001.

19        Q.    Do you recall being advised that

20    accurate reporting is mandatory?

21        A.    Yes.  We always tried to report

22    accurately.

23        Q.    But you recall there being a special

24    emphasis of that coming out sometime in late 2001?

1       A.      There was also a special interest.

2       Q.      Are you saying you never received this

3   or are you saying you just don't remember seeing

4   this?

5       A.      I don't remember seeing this, no.

6       Q.      If this was sent via e-mail to all sales

7   reps, you should have received it, right?

8       A.      That is very possible, yes.  We received

9   a lot of e-mails.

10      Q.      Did you read them?

11      A.      Yes.

12      Q.      Always when you were supposed to?

13      A.      Yes.

14      Q.      You were never late reading an e-mail?

15      A.      I may have been late.  I don't know.  I

16  cannot backtrack.

17      Q.      The record would reflect -- the computer

18  reflects when you open an e-mail, doesn't it?

19      A.      There was a lot of problems with the

20  computer, sometimes couldn't communicate properly.

21      Q.      If you received this, if this was sent

22  to you, you would be responsible for complying,

23  wouldn't you?

24      A.      If it was sent to me and I saw it, yes.

1       Q.      And you saw it?

2       A.      Well, yes.

3       Q.      If it was sent to you, you were supposed

4    to see it, right?

5       A.      If it was sent to me.

6               MR. LOFTIS:  Mark 17.

7               ( Exhibit Number 17 marked for

8               identification. )

9       Q.      Exhibit 17, Mr. Rodio, that's the

10   evaluation -- performance evaluation dated January

11   of '02 for calendar year '01.

12      A.      Yes.  This is when they said they

13   wouldn't pay me my bonus.  I asked them why, and

14   they wouldn't give me an answer.

15      Q.      I asked you if you recognized the

16   document.

17      A.      Yes.

18      Q.      And that is your evaluation that was

19   dated in 2002?

20      A.      Right.  Yes.

21      Q.      Please look at the exhibit and not your

22   documents.  I cannot ask you questions about

23   documents I cannot see.

24              MR. SAHADY:  He's talking about

1    Number 17.

2                     MR. LOFTIS:  Yes.  He's looking at

3    another document.  I cannot ask him questions about

4    documents that I cannot see.

5        A.     Tell me what document to look at.

6        Q.     I told you.  Exhibit 17.  I am not

7    asking you to look at anything that you've brought.

8                     MR. SAHADY:  Just for clarification

9    you said an evaluation for 2002, Number 17, an

10   evaluation from '01.

11                    MR. LOFTIS:  That is not what I

12   said.

13                    MR. SAHADY:  Maybe I misunderstood

14   you.

15                    MR. LOFTIS:  You did.  I said the

16   evaluation is dated in January of 2002.

17                    MR. SAHADY:  Sorry.  Go ahead.

18       Q.     And this evaluation has some very

19   positive comments, does it not, Mr. Rodio?

20       A.     Lots of negatives, too.

21       Q.     Will you answer my question?

22       A.     I haven't read it yet.

23       Q.     You want to read the whole thing?

24       A.     Sure.

168

1     Q.     When you read a positive comment, let me

2     know.

3                ( Short pause. )

4     A.     Yes.  The tone had changed more positive

5     at this time for a reason.

6     Q.     What was that reason?

7     A.     I spoke to Mr. Wilmisher, Mr. Kane's

8     boss, and I told him I worked hard for many years.

9     I've always been out there giving you 180 percent.

10    I don't deserve to be treated the way Mr. Fasciani

11    is treating me, and Mr. Wilmisher must have talked

12    to him, and it seems like the tone turned more

13    positive towards me after that.

14    Q.     But you don't know that Mr. Wilmisher

15    talked to him?

16    A.     I would imagine he did.

17    Q.     Do you know?

18    A.     No, I don't know what Mr. Wilmisher

19    does.

20    Q.     But there were very positive comments in

21    every other evaluation that Mr. Fasciani gave you;

22    is that right?

23    A.     This particular one was after we talked

24    to Mr. Wilmisher.

1      Q.     But there -- weren't there positive

2    comments in the other evaluations?

3      A.     Seemed to be a lot of negative.

4      Q.     You said a lot of negative in this one.

5    Do you agree with the positive comments?  Let me

6    direct your attention -- let me get it this way.

7    On top of page 33 -- can you turn to page 33?

8      A.     Yes.

9      Q.     Current accountabilities.  "ASR Rodio

10   maintains good working relations with key decision

11   makers in the key accounts in his assignment.  He

12   builds solid trade relations with retailers and

13   wholesalers.  He is well respected by his accounts

14   for his knowledge of the category.  He has a drive

15   to grow RJR business in his assignment."  Is that a

16   positive comment?

17     A.     Yes.

18     Q.     And then on page -- do you agree with

19   that?

20     A.     Yes.

21     Q.     All right.  On page 34 in the overall

22   performance summary second paragraph -- well, let

23   me see.  Those are negative comments, correct?

24   Overall performance summary is negative?

1       A.      That was his opinion, yes.

2       Q.      And it's all based on administrative

3   functions, correct?

4       A.      That was the man's opinion.

5       Q.      And it was based on that data that -- in

6   part on data that you would have sent him?

7       A.      That is based on his opinion.

8       Q.      Do you disagree with his opinion?

9       A.      Sure.  The facts are on the back page.

10      Q.      But only with respect to the negative

11  comments.  You agree with him on the positive and

12  disagree with him on the negative, correct?

13      A.      Look, I went in this area.  I had

14  nothing.  I built the business up.  I more than

15  doubled it.  I did the best I could.  I had no

16  help.  The only help I had was Mr. Fasciani, and he

17  was basically not working -- really working with

18  you.  I did the best I could.  I worked as hard as

19  I could.  We more than doubled our share of the

20  market out here, okay, and lowered cost.  I was

21  very careful with the contract payment.  I did my

22  best every day.  I was honest.  I went to work

23  every day.  Never cheated anybody.  Never tried to

24  cheat R.J. Reynolds.  I was maybe not the top

1    ranked rep in some areas.  In other areas I was the

2    top ranked area rep.  There were different things

3    we were judged on, and they just said they were not

4    going to pay me my bonus.  The whole division they

5    singled me out.  When I asked him why, he said they

6    wouldn't talk about it.  They wouldn't give me an

7    answer.  I asked in a nice way.  Could you please

8    explain why you are not going to give me my bonus?

9    No.  I won't talk about it.  The other answer I got

10   from Mr. Kane was if you make one mistake, I will

11   fire you.  How would you like it if I told you, you

12   make one mistake, you are fired?  How would you

13   like to work like that every day.  That is what he

14   said to me.  I am sorry to be so rude.

15        Q.     That's okay.  Is it possible that you

16   could increase your market share and still fail on

17   your accountabilities?

18        A.     You can do anything.  You can tie your

19   right shoe and forget to tie your left shoe.  If I

20   want to follow you every day of the week, I can

21   find a mistake in anything you do.  We had very

22   little help out here.  It was very difficult to

23   keep everything perfect, especially in an area that

24   had been let go.  What about the person before me?

1    Why wasn't that person reprimanded?  This whole

2    area was let go.  There was no reprimand to that

3    person.  I came in, worked hard, tried to build the

4    business up.

5        Q.    Who preceded you?

6        A.    There was a fellow name Bob Silva,

7    another fellow by the name of Ray Terragosa

8    (phonetic).

9        Q.    Have you seen their personnel files?

10       A.    No.  I am not interested in their files.

11       Q.    My question to you is isn't it possible

12    that you could increase your share and still be

13    failing in some administrative accountabilities?

14       A.    Anything is possible, sir.  I tried the

15    best I could.  I did not do anything intentionally.

16    That is all.  Anything is possible.

17       Q.    And your response to this evaluation is

18    on page 36 and 37?

19       A.    Yes.  I have another response.  I have a

20    packet.

21            MR. SAHADY:  He didn't ask you about

22    the other response.

23       Q.    Okay.  What is your other response?

24       A.    We had a program.  It was a prebooked

1    Doral, and it had to be in on a certain time.  I

2    sent it certified to Mr. Fasciani because I had to

3    send things certified because things seem to

4    disappear.  It was due on a certain date.  He said

5    he never received it.  So we had a meeting, and

6    they were counting up all the reps who prebooked

7    what.  He said I never received yours.  I sent it

8    certified to his house.  The post office would have

9    the date.  I had copies paid so I had copies and in

10    that prebook he knew I was doing well.  I did 35

11    percent of the whole division sales of that Doral

12    prebook.

13        Q.    Where is that reflected on the reprimand --

14    on the evaluation?  I am sorry.

15        A.    I don't even think he mentioned.  It was

16    a big program we had.  We were reintroducing Doral.

17    I did 35 percent of the total division sales.

18    There were nine reps.  35 percent out of nine reps

19    isn't that bad.  It took a lot of hard work.  I

20    worked very hard and basically he tried not to --

21    he tried to basically not show my reports.  I sent

22    them two weeks before they were due.  That's

23    straight from my house which is only 50 miles.  It

24    takes less than two weeks to get there.

174

1     Q.    So that is not -- the Doral is not

2   anything that is mentioned as a negative in your

3   evaluation, is it?

4     A.    See, what Mr. Fasciani did is if I did

5   something good, he rarely mentioned it.  He would

6   look for any mistake he could and depict it, and at

7   this point in time -- I don't know.  This is what I

8   accomplished.  Okay?  I wasn't a bad rep.  I ranked

9   in the top one, two, three reps in the many

10  categories.  Maybe I made a mistake.  It wasn't

11  intentional.  I worked very hard for this company.

12  I did things for this company, programs that helped

13  build their business dramatically nationwide.

14  Okay?

15     Q.    Let's stick to questions and answers,

16  okay?

17     A.    Well, you are getting to me.

18     Q.    I am sorry.  I am trying to ask you

19  questions.  If you'll answer my questions, we get

20  through this.

21     A.    What time are we going to get out of

22  here?  I've got to go to work.

23     Q.    I can't help it.

24     A.    I think I have been very fair.  I've

175

1    given you six hours.  That is what you said.  Six

2    hours.  You've got six and a half hours right now.

3    See that.

4        Q.    Six hours of actual testimony.

5        A.    We've been -- it's 4:30.  You said six

6    hours.

7        Q.    We didn't start till almost noon.

8        A.    Well, I was here at ten.

9        Q.    That doesn't count.

10        A.    It does count.  It was my time.  I have

11    given you two -- six and a half hours.

12        Q.    Are you through?

13        A.    Hmm.

14        Q.    Are you through?  Are you telling me you

15    are leaving?

16        A.    I think I have been more than fair with

17    you.

18        Q.    Are you going to leave?

19        A.    No.

20        Q.    Will you answer my questions and then

21    we'll be done?

22        A.    What is your question?

23        Q.    We may be here another hour.  I just

24    want you to know that.

176

1                    THE STENOGRAPHER:  I need to change

2      my paper.

3                    MR. LOFTIS:  Okay.

4                    ( Short break taken. )

5          Q.      On Exhibit 17, Mr. Rodio, did you say

6      you had some additional documents that were

7      responsive to that evaluation?

8          A.      Right here.

9          Q.      I think you said the Doral program and

10     looked down at your box.

11                    MR. SAHADY:  When I stopped you.

12         A.      I saved the prebooks.  I don't have them

13     with me.

14         Q.      But you still have them?

15         A.      Yes.

16         Q.      And they would be responsive to this

17     evaluation?

18         A.      Yes.  I did 35 percent of the division.

19     It is a big program.

20         Q.      What part of the evaluation would that

21     be responsive to?

22         A.      Well, to do your evaluation -- to do

23     your bonus, they pick and choose what they want.

24     They may pick call count.  They may pick the CIV.

1    They may have picked how many displays you put up.

2    For every category we were being judged.  I listed

3    all the categories for the year and how I came out,

4    and these were based on Mr. Fasciani's numbers.

5        Q.    His numbers?

6        A.    Numbers that -- well, computer numbers,

7    generated numbers.

8        Q.    All right.  Some of which you would have

9    seen?

10       A.    In other words, I didn't have a half bad

11   year.  I had a pretty good year, and just to tell a

12   person we're not going to pay your bonus I thought

13   was pretty cruel.

14       Q.    So you think everybody should have

15   gotten a bonus?

16       A.    Everybody did get a bonus.

17       Q.    Everybody did?

18       A.    Did.

19       Q.    Except you?

20       A.    Well, yes.  They should give you a

21   reason why.

22       Q.    You are saying you are the only sales

23   rep for the entire country that didn't get a bonus?

24       A.    I have no idea.  I only know about my

1    division.

2                    MR. LOFTIS:  Mark 18.

3                    ( Exhibit Number 18 marked for

4                    identification. )

5        Q.    Have you seen Number 18 before?

6        A.    This one?

7        Q.    Yes.

8        A.    I will have to check.

9        Q.    With all these exhibits you are checking

10    other documents to see if you have this one; is

11    that what you are doing?

12        A.    Yes.  I tried to save as many as I

13    could.  Has there ever been a sales rep that had as

14    many documents as this?  This is unbelievable.  I

15    think the state sums up the man wrote a book on

16    you.

17        Q.    Can you remember anything independently

18    without looking through your file?

19        A.    I just want to see if it's legitimate.

20        Q.    And the only way you can tell to see if

21    it is legitimate is to see if you have a copy of

22    it?

23        A.    I am seeing if I have a copy.  Is it all

24    right if I look to see if I have a copy?

1        Q.      If you want to look through your

2    documents that I haven't seen, that is fine.  Do

3    you have a copy of it?

4        A.      I don't believe I do.

5        Q.      Did you receive it?

6        A.      This?

7        Q.      Yes.

8        A.      I remember doing the calls.  I don't

9    remember receiving this.

10       Q.      Do you think this is something that was

11   made up after the fact?

12       A.      I have no idea.  I am saying I made

13   these calls.

14       Q.      This is a personal progress report,

15   correct?

16       A.      Yes.  It looks that way, yes.

17       Q.      Did you respond -- well, if you didn't

18   recall seeing this, did you ever get any feedback

19   on this?

20       A.      What is the date on this?  May 17th,

21   2002.  Well, there's no rebuttal to those things.

22       Q.      What do you mean?

23       A.      The man wrote what he wanted but like

24   this one here it says "PRP pricing was weak."  The

1    man didn't allow advertising in store.  Of course

2    it's going to be weak.

3        Q.    Who is that?  Which one?

4        A.    Cloverdale Farms.

5        Q.    And if they won't allow advertising in

6    the store --

7        A.    Of course it's going to be weak.  You

8    can have the greatest display in the store but you

9    are weak because they don't allow advertising.  It

10    doesn't allow it for other companies either.  It

11    doesn't say that, though.

12        Q.    Did they have a contract?

13        A.    Yes.

14        Q.    They wouldn't allow advertising in the

15    store they can't have a contract, right?

16        A.    Oh, no.  As long as you had a displayer

17    on the counter, yes.  If other -- all they ask for

18    is parity.  If other companies didn't have

19    advertising, then we'd go along with it.  There are

20    a lot of chains that don't allow advertising.

21        Q.    In every one of these --

22        A.    Do you see any signs in Stop & Shop's

23    windows advertising Winstons?

24        Q.    You cannot ask me questions.  I am

1    sorry.

2        A.    All I am saying is there are a lot of

3    chains that don't allow advertising, and there's

4    also independents that don't allow it.

5        Q.    What about reporting product

6    availability?

7        A.    That is what I said.  This man only kept

8    a few packs of some brands, so if you record them,

9    it's possible they could have been sold out a few

10   minutes after you left the store.

11       Q.    This is on every single one of these

12   accounts?

13       A.    No.  This particular store there's only

14   some brands.  Like Winstons, sometimes he may only

15   keep a couple packs of the soft pack.  I don't

16   know.

17       Q.    Every single one of these accounts the

18   product availability is reported as not being

19   accurate.  Do you see that?  It's the first

20   sentence and beside each one of those stores.

21       A.    There could have been a computer problem

22   that day.

23       Q.    Would you have remembered at the time?

24       A.    There were times where there were

1      computer problems.  All the computers were breaking

2      down.

3          Q.    Do you know whether your computer broke

4      down on that day?

5          A.    What could happen sometimes is we had to

6      check each box, other brands.  Sometimes you rushed

7      in a call quickly and didn't check all the boxes.

8      I was not the only one that did that.  Other reps

9      did the same thing.  You could easily miss a box.

10     You could easily miss a check mark.  There was

11     nothing done intentionally.

12                    MR. LOFTIS:  Off the record.

13                    ( Discussion off the record. )

14         A.    I am just looking at something, some of

15     your exhibits.

16         Q.    What are you looking at now?

17         A.    I am just looking at a document.  Oh,

18     it's the termination.  We didn't get to that one

19     yet, the termination documents.

20         Q.    We're going to get through it a lot

21     quicker if you will focus on what I am asking.

22         A.    I am focused.

23         Q.    Good.  A priority at this time was

24     accurately reporting product availability, was it

183

1    not?

2        A.    It was always a priority --

3        Q.    And --

4        A.    -- when we're fighting broken computers,

5    so in other words, if your computer was working

6    well that day, you maybe had good distribution.  If

7    your computer died on you and you had to do it from

8    memory, it didn't come out good.  It was no fault

9    of mine.  They were in the process of buying new

10   computers.

11       Q.    You said you got several new computers.

12       A.    Yes, because it died.

13       Q.    And they gave you another one, and that

14   happened to every sales rep out there?

15       A.    Some reps had new computers.  If you

16   took care of your computer, it will last a long

17   time.  Yours is older than the other guy.  Another

18   reps computer may have broken down six months ago

19   and they gave him a brand-new one so his computer

20   is like new.  Mine I might have taken care of, had

21   it for two, three years.  It's older.  It's not

22   holding up as well.  The batteries are dying.

23       Q.    Did you have a cord?

24       A.    Yes.  I asked for an extra cord.  They

1    wouldn't give it to me.

2        Q.    Did you have a cord?

3        A.    I had a cord at home.

4        Q.    Could you carry it with you?

5        A.    Yes, and many times I did.

6        Q.    Okay.  So if -- are you denying that you

7    didn't accurately report profitability in those

8    stores or you just don't know?

9        A.    I did the best I could.  It's possible

10   there was a computer error that day.

11       Q.    What about a human error?

12       A.    Could have been a computer error, too.

13       Q.    What about a human error?

14       A.    I really couldn't tell you.  It's three

15   years ago.  Again --

16       Q.    So you can't tell whether it's computer

17   either, can you?

18       A.    It could have been computer.

19       Q.    You can't tell me that, can you?  You

20   don't know that for a fact, do you?

21       A.    I can't remember what I did three years

22   ago.

23       Q.    So -- but you -- are you saying clearly

24   it wasn't a human error?

185

1      A.      It may have been.  It may not have been.

2      Q.      Thank you.  That is all I want to know.

3      A.      It could have been a computer error,

4    too.

5      Q.      Did you ever send a response to that?

6      A.      This right here?

7      Q.      Yes.

8      A.      I don't know.  You've got the paperwork.

9      Q.      Do you recall sending a response?

10     A.      If you were working in a normal

11   situation, you didn't have to respond.  For years,

12   I worked --

13     Q.      Please.  Hold on.  Just answer my

14   question.

15     A.      This particular man was on me like a

16   cat.  Look at the paperwork.  Have you ever seen

17   this much paperwork in one year on a particular

18   rep?  This is more than I received in 23 years.

19   This man was constantly on me.

20     Q.      You think it could have been because you

21   weren't doing your job?

22     A.      I did a very good job.

23     Q.      And never made any mistakes --

24     A.      You can ask any retailer.

1    Q.    -- with a rep checking your product

2  availability?

3    A.    They know what you are doing.  They see

4  the calls.

5    Q.    They go into your calls, too?

6    A.    Reps live in different areas, yes.

7    Q.    And they check on your product

8  availability and compare that with what's in the

9  computer?

10    A.    I had a record though with this company

11  that was very good.

12    Q.    Do you recall sending in a response to

13  this PPR?

14    A.    No, I don't recall.  Maybe I did.  I

15  can't tell you.

16            MR. LOFTIS:  Mark 19.

17            ( Exhibit Number 19 marked for

18            identification. )

19    Q.    Number 19.

20    A.    Is there a question?

21    Q.    I was waiting for you to finish reading

22  or to finish reading what you wanted to read.

23    A.    Fire away.

24    Q.    Is that your response to the PPR that we