# EXHIBIT E
## (continued)

1    marked as Exhibit 18?

2        A.    Yes.  Those are my words.

3        Q.    Under Globe Wine -- it's on page 1 -- I

4    am sorry.  I am looking at your response,

5    Mr. Rodio.  You can forget about that other exhibit

6    for now.  Let's just focus on 19.  Under Globe Wine

7    do you see that?

8        A.    Yes.  Which one?  Which one?

9        Q.    I am only talking about Exhibit 19.  I

10   moved on from 18.

11       A.    Okay.

12       Q.    Globe Wine the last sentence.  Just read

13   that and tell me what you mean?

14       A.    "A mistake was made on PA availability

15   in that after taking the Winston distribution, the

16   Winston box may have been rehit causing the total

17   Winston distribution to be removed after the proper

18   distribution was recorded."  Okay.  If you hit a

19   key twice, it would cause all the distribution to

20   be wiped out, so it's possible I may have hit

21   another key wiping out my distribution, so I was

22   thinking that everything was done properly and it's

23   possible I hit a second key that wiped it out.

24       Q.    And that would be a human error?

1      A.      Computer does it, too.  Yes.  Well --

2      Q.      But you are the one that hit the key

3   twice?

4      A.      I am not sure.  I am saying that is a

5   possibility.  That may have happened.

6      Q.      But --

7      A.      This is three years ago.

8      Q.      Did you know at the time what was wrong?

9      A.      Well, if I did, I would have corrected

10   it.

11      Q.      Would you in your response have wrote to

12   the best of your recollection what may have gone

13   wrong?

14      A.      I am trying to figure out.  If you get a

15   computer printout and it's wrong, you felt that you

16   did it right, you try -- I have no idea.  Maybe the

17   computer didn't communicate well that day.  Maybe

18   there was something wrong.  Maybe there was an

19   electrical problem in the system.  I have no idea.

20      Q.      Do you believe that you did make

21   distribution errors?

22      A.      I tried to do the best I could.  I never

23   intentionally made a mistake.

24      Q.      Did you think you did make mistakes?

1        A.      Do I think I did?  I never intentionally
2    made a mistake.
3        Q.      I never said it was intentional.  Nobody
4    ever said it was intentional.  Are you willing to
5    admit that you made mistakes?
6        A.      I don't know of any intentional mistake
7    I made.
8        Q.      Are you willing to admit that you may
9    have made unintentional mistakes?
10                   MR. SAHADY:  Objection.  Objection.
11       A.      It's possible.
12       Q.      All right.  Flip to the next page.  The
13   first full paragraph one, two, three, four lines
14   down.  Can you count down?
15       A.      Yes.  Four lines down.  Which one?
16       Q.      First full paragraph.
17       A.      Yes.
18       Q.      It begins "I did make distribution
19   errors."
20       A.      Where does it say that?
21       Q.      What?  Do you see that?
22       A.      It says that I apologized for doing
23   that.
24       Q.      Did you write that?

1    A.    Did I write this?

2    Q.    Yes.  Did you prepare this document?

3    A.    Looks like I did.

4    Q.    All right.  What distribution errors did

5    you make?  Do you know?

6    A.    Say that I had an emergency at home, and

7    I voicemailed the office that I have a problem I

8    need to take care of at home.  The easy approach

9    may have been to take a vacation day, but I decided

10   to handle the situation and make the 140 mile round

11   trip to Fall River.  I was rushed and I tried to do

12   my best.

13   Q.    "I did make distribution errors.  There

14   was one in which I accidently wiped out Winston

15   distribution after properly taking distribution."

16   A.    Maybe this was something I thought of

17   that may have happened afterwards.  I was trying to

18   figure out what caused all the distribution to be

19   wiped out, maybe my accident that happened or

20   something, so I apologized to Mr. Fasciani and told

21   him there was nothing I could do about the past but

22   would try to do a better job in the future.

23   Q.    But in this document you did acknowledge

24   that you made mistakes?

1          A.      Well, no.  I was trying to just explain

2     how the incident possibly happened.

3          Q.      What did you mean by "I did make

4     distribution errors"?

5          A.      Well, I put down -- he was asking me why

6     it came out?  I said possibly I pushed the wrong

7     button or maybe the computer --

8          Q.      That is what it says, is it?

9          A.      I accidently wiped out Winston by --

10         Q.      That says you did that?

11         A.      That was one in which I accidently wiped

12    out distribution.

13         Q.      That was your response at the time,

14    right?

15         A.      Yes.

16         Q.      Did you give Mr. Fasciani any other

17    response?

18         A.      I have no idea.  This is the only one I

19    can see.  Mr. Fasciani wrote so many letters.  I

20    couldn't keep track of them.  I would have had to

21    hire a private secretary.

22                      MR. LOFTIS:  20.

23                      ( Exhibit Number 20 marked for

24                      identification. )

1          Q.      That's another PPR, I believe, Number

2    20.  Is that one you have seen before?

3          A.      I don't remember seeing this.

4          Q.      Under significant strengths it says "as

5    per your request, I assisted you with 2 RBI

6    installs today."  Do you remember requesting

7    Mr. Fasciani to assist you?

8          A.      There were two times I think he helped

9    me.  This may have been one of them.

10         Q.      Do you recall asking him to help you?

11         A.      I just told him there was no help, and

12   if he could help me out, I would appreciate it.

13         Q.      Right and he did?

14         A.      Yes, on this one.

15         Q.      And on development needs he talks about

16   new EDLP guidelines.  Was it your understanding

17   that if the account couldn't meet the guidelines

18   they were to be removed from the EDLP program?

19         A.      Yes.  They all met the guidelines, but a

20   lot of the problem was because of competition.  You

21   could be lowest price today and somebody could walk

22   in tomorrow afternoon after I left and could be

23   lower.

24         Q.      And if somebody -- the last sentence

1    says "should they be selling brands below EDLP, the

2    compliance report should read EDLP requirement not

3    met"?

4        A.    Yes.

5        Q.    Is that what you were supposed to do?

6        A.    Well, I told Mr. Fasciani a lot of his

7    pricing was illegal.  We were coercing to break the

8    state law.

9        Q.    When did you tell him that?

10        A.    Well, when I was working with him.  I

11    said, You realize we are breaking the state law

12    with these prices because we were encouraging the

13    retailers to go below the state minimum with the

14    EDLP.  If you would like a copy of the state

15    minimums, I have that.

16        Q.    A copy of what?

17        A.    The state minimum pricing.

18        Q.    Oh, the regulation?

19        A.    No.  The state law.  What the law says.

20        Q.    That's okay.

21        A.    Mr. Fasciani encouraged me to enforce

22    the EDLPs at a lower price than state minimum.

23        Q.    Now, if the --

24        A.    I told him that was wrong.

194

1      Q.      If the -- if there is a brand that is

2    selling below Monarch --

3      A.      Yes.  We were supposed to match that

4    brand.

5      Q.      And that could be done by either

6    lowering the price of Monarch or raising the price

7    of the competitive product, correct?

8      A.      The other prices had state minimum

9    pricing on it, too.

10     Q.      But they could raise it.

11     A.      Hmm.

12     Q.      They could raise it.

13     A.      Most retailers wouldn't do that.

14     Q.      Then you canceled the EDLP contract?

15     A.      There wouldn't be any contract.

16     Q.      Correct.  You could have done that,

17   couldn't you?

18     A.      When they wouldn't match the price, I

19   did cancel them, yes, if they didn't match it, but --

20              MR. SAHADY:  There are no further

21   questions.  Wait for the question.

22     Q.      So you are saying that there were EDLP

23   contracts that you canceled?

24     A.      Probably over the years, yes.

1      Q.      And you canceled them because of the

2   price issues?

3      A.      It's possible, yes.  I can't tell you

4   the reason I canceled every one.

5      Q.      But you were not supposed to tell the

6   account how they were supposed to price their

7   products?

8      A.      In the contract it stated that the

9   account had to match the lowest price in the store.

10      Q.      And that could be done by raising the

11   lowest price?

12      A.      It didn't say that.  It said you had to

13   match the lowest price.  Didn't say anything about

14   raising the price.

15      Q.      How -- well, you weren't suppose to tell

16   the retailer how to do you it, were you?

17      A.      We were supposed to tell them if you

18   match the lowest price, then we'll pay you the

19   extra --

20      Q.      How could the two be at parity?

21      A.      He would have to lower the price of

22   Monarch to the lowest price in the store.

23      Q.      They could raise -- let's use the

24   example you've got Monarch and USA.

1    A.    Yes.

2    Q.    Is USA a Commonwealth brand?

3    A.    Yes.

4    Q.    If USA is below Monarch, the EDLP
5    program the only thing it said was that to get the
6    benefits of that program Monarch has to be the
7    lowest or parity with the lowest price brand in the
8    store?

9    A.    That is correct.

10    Q.    That's the only thing it said?

11    A.    Yes.

12    Q.    And if USA is ten cents below Monarch,
13    that could be accomplished by lowering Monarch or
14    raising USA, couldn't it?

15    A.    It didn't say that in the contract.

16    Q.    How could you get them at parity?

17    A.    Hmm.

18    Q.    There are two ways you could get them at
19    parity, right?

20    A.    We encouraged most of the retailers to
21    drop the price.  It was done all over the country.

22    Q.    How did you know that?

23    A.    Just drive down the street.  You can see
24    the prices all over Massachusetts not just this

1    area.  You could drive through many areas.  You

2    could go to New Bedford which is a different area.

3        Q.    Are you saying that's just a natural

4    function of the EDLP contract?

5        A.    No.  We were encouraging the retailer to

6    break the law.  That is basically it.

7        Q.    Who told you that you were supposed to

8    get the retailer to go to the Monarch price?

9        A.    It was right in the contract, and

10    Mr. Fasciani wanted -- he was always -- if off by

11    ten cents or if I was off by price, he would

12    reprimand me.

13        Q.    Was he reprimanding you because the

14    contract was not in compliance?

15        A.    No, because we didn't match the price.

16    Okay.  If we didn't match the price, it wasn't in

17    compliance.  If we matched the price, it was

18    breaking the Massachusetts state law.

19        Q.    And if it's not in compliance, you

20    cancel the contract?

21        A.    Correct.  You cancel it, yes.

22        Q.    And that is what you were supposed to

23    do, isn't it?

24        A.    Well, what happened is a lot of the

1    contracts were in compliance.  When I walked out of

2    the door somebody else -- I am not there for 30

3    days.  Within those 30 days, another company could

4    walk in and the price would be below mine.  He

5    would be out of compliance, and I would have no

6    idea about it.

7        Q.    Did you have any -- did you ever go into

8    a store that had an EDLP contract and find that it

9    was out of compliance on the price issue?

10       A.    I would just tell them you have to lower

11   the price.

12       Q.    Doesn't have to lower the price.  That

13   wasn't what the contract said.

14       A.    They would have to match the price.

15       Q.    And you were specifically trained by

16   Reynolds that you are not supposed to tell the

17   retailer how to get to parity?

18       A.    Just tell him he had to match the price.

19       Q.    That is what you were supposed to tell

20   the retailers, right?

21       A.    Right.

22       Q.    And that is what you told them, correct.

23       A.    I told them they had to be at parity.

24       Q.    And if they couldn't get to parity, you

1    were supposed to cancel the contract, right?

2        A.    If they couldn't, right.  Yes, I could

3    cancel.  To be at parity though, it's

4    below state minimum pricing.

5        Q.    Then you were supposed to cancel the

6    contract?

7        A.    No.  The retailers would lower it.

8        Q.    If they wanted to?

9        A.    We encouraged them to.

10        Q.    How would you encourage them to lower it

11    below state minimum?  You told them they had to be

12    in compliance with the contract.

13        A.    They had to match the lowest price.

14        Q.    And that is all you ever told them?

15        A.    It said right in the contract they had

16    to be at parity at the lowest price in the store,

17    and many times it was breaking Massachusetts state

18    law, and I told Mr. Fasciani that.

19        Q.    That the retailer was breaking the state

20    law?

21        A.    He was aware of it and ignored it.

22        Q.    You told Mr. Fasciani that the retailer

23    was breaking the state law?

24        A.    I am saying the pricing that we were

1    encouraging is below state minimum.  Do you realize

2    that.

3        Q.    The pricing you were encouraging was

4    simply telling the retailer they had to comply with

5    this contract, right?

6        A.    It had to be at parity, the lowest

7    price.

8        Q.    And if USA is ten cents below Monarch,

9    couldn't parity be achieved by raising USA ten

10   cents?

11       A.    We told the retailer he had to be

12   parity.  We didn't say anything by raising prices.

13       Q.    I know, but couldn't the retailer

14   achieve -- this a simple math question.  I probably

15   shouldn't even have to ask it.

16       A.    The simple answer was the contract had

17   to be at parity.

18       Q.    And that was it?

19       A.    That is what the contract said.

20       Q.    And you never told the retailer to do

21   anything different to get to parity?

22       A.    Said you have to be equal with the

23   lowest price in the store.  That's what I was told.

24       Q.    And you never told the retailer anything

1    different?

2        A.    As far as I know, I just tried to word

3    it the proper way.

4        Q.    And you were trained on how to word it?

5        A.    The contract?

6        Q.    No.  You were trained on what to tell

7    the retailer?

8        A.    No.  We weren't trained.  We were given

9    a piece of contract paper, said this is the

10    contract and this is what you had to do.

11        Q.    You never got a CD?

12        A.    An EDLP?

13        Q.    Yes.

14        A.    I cannot remember if we did or not.

15        Q.    If you had, would you have looked at it?

16        A.    Of course.  I looked at everything.

17        Q.    And if you looked at it, you would have

18    been responsible for abiding by it?

19        A.    I tried to abide by all contract rules.

20            MR. LOFTIS:  21.

21            ( Exhibit Number 21 marked for

22            identification. )

23        Q.    I will run down the hall real quick

24    because I am sure you want to check that I didn't

1    slip something in on you.  You can compare.

2                    ( Short pause. )

3        A.    Oh, there's a difference already.

4    Somebody wrote something different.

5        Q.    Have you had a chance to look at it?

6        A.    Yes.  Somebody wrote some things.  That

7    I didn't do.

8        Q.    What is that?

9        A.    Some of the writing is not mine.  This

10   is not mine.

11       Q.    Oh, I am sorry.  Where is that?  I

12   apologize.  That should not be there.  That was a

13   note I made.

14       A.    Okay.

15       Q.    Let me have that back.  I think, if you

16   don't mind, somehow that got put in there with my

17   notes on it.

18                    THE DEPONENT:  Should I give him it

19   back?

20                    MR. SAHADY:  Yes.  It's fair to give

21   him back his notes.

22       Q.    All right.  Exhibit 21 is that the

23   termination document, Mr. Rodio?

24       A.    Yes.

1     Q.     And you did receive a copy of that,

2    correct?

3     A.     Yes.

4     Q.     All right.  In looking on the second

5    page of the document --

6     A.     Yes.

7     Q.     -- Cloverdale Farms again that's noted

8    "failed to accurately record product availability,"

9    correct?

10     A.     On that particular day, I told

11   Mr. Fasciani the computer had died.  He went out on

12   two days, a Monday and a Tuesday.  Monday I think

13   we only had four errors.  Tuesday my computer had

14   broken down, and I had told him that I had to do a

15   lot of things from memory.

16     Q.     How many errors were there the second

17   day?

18     A.     I really don't know.

19     Q.     But there were four the first day.

20     A.     Second day I told him the computer was

21   broken and had some things to do from memory.

22   Cloverdale Farms did have Winstons.  They only had

23   a few packs.  They used to keep the box in the back

24   stock mixed together.  Not all brands were required

1    for contract payment, so just to say blatantly that

2    the store was paid because of missing brands they

3    had to be requited brands.

4        Q.    But you were supposed to record product

5    availability on all the brands that were in your

6    lap top, correct?

7        A.    I did the best I could.  My computer had

8    broken down that day.

9        Q.    But the day you had four wrong, it

10   wasn't broken?

11       A.    I had a cord that day.

12       Q.    You had what?

13       A.    I had a cord.  Actually, the second day

14   I didn't have it.

15       Q.    What kind of cord does the lap top --

16       A.    You have to bring the whole electrical

17   cord out of your house.  You have to take it out of

18   your house.

19       Q.    Okay.  Is it just a standard electrical

20   cord?

21       A.    Yes.  I asked the company if they would

22   give me another one for the road and they said no.

23       Q.    Do they sell those things at places like

24   Radio Shack?

1      A.      They wouldn't let you charge it, no.

2      Q.      Wouldn't let you charge it?

3      A.      They wouldn't let you buy one.

4      Q.      How much does one cost?

5      A.      I have no idea.  Like one hundred and

6   something dollars.

7      Q.      For a cord?

8      A.      I believe so.

9      Q.      In Cloverdale Farms what was noted as

10   being incorrect was the EDLP contract?

11      A.      There was no pricing in the window.  If

12   you would like, I can show you a picture of the

13   store.  He doesn't allow pricing in the windows.

14      Q.      Then he shouldn't have an EDLP contract,

15   should he?

16      A.      EDLP contract says you can have one of

17   four things.  You can have a two by two sign in the

18   window.  You can have a shelf sign on the pack

19   rack.  We had a shelf sign on the pack rack.

20      Q.      So you are saying the signage was

21   proper?

22      A.      It was proper.  It wasn't proper to

23   Mr. Fasciani because we didn't have a two by two

24   sign in the window.

206

```
 1        Q.      Do you have pictures of the store
 2    showing that you were right and he's wrong?
 3        A.      Um hmm.
 4        Q.      That is a yes?
 5        A.      Yes.
 6        Q.      Were they taken at this same time?
 7        A.      Yes.
 8        Q.      Where are those pictures?
 9        A.      I have them at home.
10        Q.      Do you know why they were not provided
11    to me?
12        A.      You didn't ask for them.
13        Q.      Would they support your claims?
14        A.      Um hmm.
15        Q.      That is a yes, isn't it?
16        A.      Yes, I have a picture of that store.
17        Q.      Do you have pictures of other stores --
18        A.      Yes.
19        Q.      -- that would show that you were right
20    and the company was wrong?
21        A.      You would have to look at the pictures
22    and decide for yourself.
23        Q.      When did you take the pictures?
24        A.      Right after this.
```

1      Q.      Did you go around to each one of these

2   stores and take pictures?

3      A.      Most of them.

4      Q.      Did you do that on your own or anybody

5   tell you to do that?

6      A.      I felt that I needed some proof of what

7   I was saying.

8      Q.      Did you send letters to the company?

9      A.      I wasn't working for the company

10  anymore.

11     Q.      You could have appealed your

12  termination.  You could have asked for an open

13  door.  You could have requested for somebody to

14  review this.

15     A.      I tell you what after what I went

16  through with Mr. Fasciani I don't know if I would

17  want to work --

18              MR. SAHADY:  Appeal within the

19  company; is that what you meant, Mr. Loftis?

20              MR. LOFTIS:  I am sorry.  I just

21  asked the question.

22              MR. SAHADY:  You don't want us to

23  understand what you are asking?

24     A.      I spoke to Mr. Fasciani.

```
 1                  MR. LOFTIS:  I am asking the
 2     questions.  I am not going to answer any questions
 3     from you.
 4                  MR. SAHADY:  You don't want us to
 5     understand what you are asking?
 6                  MR. LOFTIS:  I am not going to
 7     answer questions from you.
 8                  MR. SAHADY:  I am not asking you a
 9     question.  I am asking you to clarify your
10     question.  When you said --
11                  MR. LOFTIS:  He answered my
12     question.  Let me finish.  Okay?  I don't need to
13     be interrupted any more.
14                  MR. SAHADY:  I am going to interrupt
15     each and every time I consider it necessary to
16     interrupt, and I will not take instructions from
17     you or co-counsel sitting there.
18                  MR. LOFTIS:  I am not going to take
19     instructions from you either.
20                  MR. SAHADY:  If you don't wish to
21     answer my inquiry as to what you meant, that is
22     fine.  We'll have it on the record.
23                  MR. LOFTIS:  That is fine.
24          Q.     You could have requested that your
```

1     termination be reviewed by someone above

2     Mr. Fasciani, couldn't you?

3          A.     Yes.  I talked to everybody.  I went to

4     the president of the company.

5          Q.     You did?

6          A.     Yes.

7          Q.     When did -- how did you do that?

8          A.     I called Mr. James Maguire.

9          Q.     Did you talk to Mr. Maguire?

10         A.     Yes.

11         Q.     And did you document that conversation?

12         A.     No, but probably on his phone records

13    that I called.

14         Q.     Did you document it?  Did you write down

15    what you said and what he said?

16         A.     No.

17         Q.     What did Mr. Maguire say?

18         A.     I asked him why you are doing this to

19    me, and he said it was out of his control.

20                    MR. SAHADY:  He said what?

21                    THE DEPONENT:  It was out of his

22    control.

23         Q.     He wasn't the president of the company,

24    was he?

210

```
 1       A.      Yes.

 2       Q.      Was president of R.J. Reynolds Tobacco

 3   Company?

 4       A.      He and I started off together.

 5       Q.      And he was the president of

 6   R.J. Reynolds Tobacco Company?

 7       A.      Yes.  We started together in 1976.

 8       Q.      When you started together doesn't

 9   necessarily mean he would be president of the

10   company, does it?

11       A.      No.

12       Q.      What made you think he was the president

13   of the company?

14       A.      He was president of sales.

15       Q.      Is he president of the company or head

16   of sales?

17       A.      He was head of sales.

18       Q.      So he's a vice-president of the company?

19       A.      I really don't know what the terminology

20   is.

21       Q.      Then why did you say you called the

22   president of the company?

23       A.      I said I called the president of sales.

24       Q.      So you didn't say you called the
```

211

```
 1    president of the company?

 2         A.     I'm sorry.  I made a terminology

 3    mistake.

 4         Q.     You made a mistake?

 5         A.     I am sorry.  I thought I was flawless

 6    but I am not.

 7                     MR. SAHADY:  That's another error

 8    you have made.

 9         Q.     Which one of these stores do you have

10    pictures of?

11         A.     Cloverdale Farms.

12         Q.     Just tell me every one.

13         A.     I really don't know.  I would have to

14    look at my pictures.

15         Q.     What kind of camera did you use?

16         A.     Could have been a Pentax.  I'm not sure.

17         Q.     And do the pictures show the dates on

18    them, when they were taken?

19         A.     I couldn't tell you.  I really don't

20    know.  I would have to go look at the pictures.

21         Q.     Is it normal when you set the picture --

22    do you set the camera so it would record the date

23    the picture was taken?

24         A.     I couldn't tell you.  I couldn't give
```

212

1    you an honest answer.

2         Q.    Look at Assonet Star.  The stamp number

3    on the lower right is page 6.  Do you see that one?

4         A.    Yes.

5         Q.    That is one where the EDLP contract was

6    not in compliance because you -- actually, USA was

7    ten cents below Monarch?

8         A.    Yes.

9         Q.    Do you know what the state minimum was

10   at that time?

11        A.    I believe it was -- for Monarch, $4.01.

12        Q.    For Monarch?

13        A.    Yes.

14        Q.    And Monarch was at $3.95?

15        A.    There just had been a major -- the

16   reason we were out there that day there had been a

17   major tax increase, and I think in Massachusetts 75

18   cents.  There was a lot of confusion on pricing.

19   The retailers -- all the prices were scrambled, so

20   we were out here trying to straighten them out.

21   There were EDL prices that were incorrect because

22   the retailer wasn't sure what it was themselves

23   anymore.  There was a big price change, so we were

24   trying to go through and straighten them out, and

213

1    previous to this, all the pricing was correct, but

2    there was a -- at that particular time we were

3    trying to get the pricing back to the correct

4    amount.  I told the retailer they had to have the

5    same price as the lowest price in the store.

6        Q.    Prior to that 75 percent increase, was

7    everybody in compliance with state minimums?

8        A.    What do you mean?  With Monarch?

9        Q.    Yes.

10       A.    No.  They were below.

11       Q.    Before the 75 percent increase?

12       A.    Right.

13       Q.    And you would have told this retailer

14   they had to be at parity if you want to get the

15   EDLP contract?

16       A.    You have to be at parity.

17       Q.    Now, I believe there were only two.

18       A.    I was not the only rep doing this.  It

19   was state-wide, so basically, state of

20   Massachusetts was moving on tax revenue because the

21   prices were below state minimum.  If they were

22   priced properly, the state would have gotten their

23   5 percent on the proper price.

24       Q.    So every sales rep had the same issue to

1    deal with?

2        A.    Oh, yes.  There was one in New Bedford

3    who had even more than me.

4        Q.    And every sales rep was to supposed to

5    tell the retailer either get it to parity or cancel

6    the contract?

7        A.    Some of the reps weren't like that.

8    They were very aggressive.  Some reps said you

9    match the lowest price or you're going to lose your

10   contract.  Some reps were very aggressive.  I just

11   said had to be at parity.

12       Q.    Who did you hear being very aggressive?

13       A.    There was an aggressive rep in New

14   Bedford.

15       Q.    How do you know that?

16       A.    Because I heard some of the prices over

17   here.  Retailers will tell you the pricing.

18       Q.    How did you know what the sales reps

19   were communicating?

20       A.    Just from meetings here and one rep

21   would talk about how he did things.

22       Q.    But you never observed how sales reps

23   did it in the store?

24       A.    I didn't follow reps around, no.

1        Q.      Did you prepare a response to the

2    termination document?

3        A.      I believe I did.  I don't know.

4        Q.      Did you send it to the company?

5        A.      I think I did.  I don't know.  Do you

6    have it?

7        Q.      No.

8        A.      You know what?  I was terminated that

9    day so there was no response any more after that

10   day.

11       Q.      Did you not prepare a response?

12       A.      It's possible.  I am not sure.

13       Q.      But if you prepared a response, you

14   wouldn't have sent it to the company?

15       A.      Well, I was fired so what good would it

16   have done?

17       Q.      I didn't ask you that.  I didn't ask you

18   what good it would have done.  I just want you to

19   answer.  I just want to know if you sent a response

20   to the company or not?

21       A.      I believe I did.

22       Q.      But you believe you possibly prepared

23   one?

24       A.      There were so many files from

1    Mr. Fasciani.  I can't remember exactly every

2    response I did.

3         Q.    Your attorney showed me one this

4    morning.

5         A.    Yes.

6         Q.    And he asked me to give it back to him.

7         A.    Yes.

8         Q.    It was handwritten notes.

9         A.    Maybe there were some notes I made on

10   this.  I don't know.

11        Q.    Then there was a typed version of it.

12        A.    Possibly.  I don't know.  There's a lot

13   of files.

14                    MR. LOFTIS:  Mark 22.

15                    ( Exhibit Number 22 marked for

16                    identification. )

17        Q.    Have you seen that document before?

18        A.    Oh, yes.  The state of Massachusetts,

19   yes.

20        Q.    And if you go to page 3 --

21        A.    There's no numbers on the page.

22        Q.    You just kind of got to count.  See

23   where it says Count III?

24        A.    Yes.

217

1        Q.      And it talks about the pedaling of

2    cigarettes for a minimum price.  Do you see that in

3    Paragraph 13?

4        A.      Yes.

5        Q.      Is that what we've been talking about,

6    the EDLP program?

7        A.      We were below the legal price on full

8    price, too.

9        Q.      Was that unrelated to EDLP?

10       A.      That was a different issue, yes.  That

11   was -- basically told the retailer you had to price

12   your product the same as the others.

13       Q.      Price your product the same as what?

14       A.      We wanted to be at the same price as our

15   competition.

16       Q.      Give me an example.  Give me a brand

17   example.

18       A.      I will get the state.

19       Q.      No, I am not interested in what the

20   state law is now.

21       A.      I am just giving you an example.

22       Q.      I can't tell what you are looking at.

23       A.      These were -- at this time, these were

24   the state minimums in Massachusetts, okay, so you

```
 1    may go into a store state minimum was 5.49 and

 2    there might be a 70 cent buy down and state minimum

 3    should be 4.79 legally, might be 4.69, so we

 4    encouraged the retailer he had to match that price

 5    by contract.

 6         Q.    What's he matching?

 7         A.    Competition's price.

 8         Q.    Give me a brand example.

 9         A.    Marlboro is 4.69 and Winston would have

10    to be 4.69.  If it's 4.69, Winston have to be 4.69

11    so 70 cents off.

12         Q.    In order to get the contract?

13         A.    Yes.  We just wanted to be treated

14    parity.

15         Q.    But the only thing you would tell the

16    retailer is if you want the contract, you've got to

17    be at parity?

18         A.    Correct.

19         Q.    All right.  Anything else you are

20    talking about selling cigarettes below minimums?

21         A.    Well, on Monarch we told the retailer he

22    had to match the lowest price, and many times -- if

23    you look here Wave the minimum price is 3.53.

24    Monarch the minimum price was 4.01.  If he was part
```

1    of the program, he got a 25 cent buy down which

2    would bring it legally to 3.76, but we told the

3    retailer that he had to match the lowest price in

4    the store which was 3.53 which was below state

5    minimum pricing for Monarch.  It was not just me.

6    It was state-wide.  I believe there were other

7    states, too.

8         Q.    You are telling the retailer they had to

9    be at parity the lowest price in the store if they

10   wanted the EDLP or if they wanted the contract?

11        A.    That is what the contract stated.  They

12   had to be at parity.

13        Q.    But they didn't have to have a contract,

14   did they?

15        A.    Hmm.

16        Q.    You could cancel the contract if they

17   couldn't do it?

18        A.    You could cancel it.  You could cancel

19   the contract any time you want.

20        Q.    It wasn't the retailer's option to get

21   to parity?

22        A.    We told him he had to match the lowest

23   price in the store.

24        Q.    Correct, and that is all you ever told

1    him?

2      A.     Correct.

3      Q.     On page 2 of this document, Paragraph 8

4    says you were discharged in violation of the

5    covenant of good faith and fair dealing.  Do you

6    see that?

7      A.     What count?

8            MR. SAHADY:  Page 2.

9      A.     On October 28, 2002 R.J. Reynolds --

10    yes, that is what it says.

11      Q.     Is that what you were referring to

12    earlier because you were getting close to 30 years

13    of service to deny you your pension and benefits?

14      A.     Yes.

15      Q.     Is that what you are talking about

16    there?

17      A.     Well, me not being able to make my 30

18    years denied me --

19      Q.     Is that what you are talking about in

20    Count II?

21      A.     No.  It just says I was discharged after

22    26 years.  That is all it says.  It says on October

23    28 in violation of of covenant of good faith and

24    fair dealing wrongfully discharged Michael Rodio

1    from its employ after 26 years of good and faithful

2    service.

3        Q.    What is the -- what was wrong about your

4    termination other than the fact that you were

5    almost at 30 years in getting your pension?

6        A.    I believe it was unfair.  I did my best,

7    did the job properly, and they terminated me

8    possibly to deny me of my 30-year pension.

9        Q.    Okay.  That is fine.

10              MR. LOFTIS:  Mark 23.

11              MR. SAHADY:  Mr. Loftis just gave me

12   a copy of what he wanted to use as Exhibit 23 which

13   were answers of the plaintiff, I believe, to the

14   defendant's interrogatories and then to be

15   absolutely fair to him, because he had some notes

16   on it, I gave it back to him, and I asked him to

17   give it to me.  He declined.  Is that accurate, Mr.

18   Loftis?

19              MR. LOFTIS:  I am not answering

20   questions at this time.

21              MR. SAHADY:  Of course not.  I would

22   not have expected you to.

23              MR. LOFTIS:  Actually, you gave me

24   documents earlier and I gave them back to you.

222

1                    MR. SAHADY:  Yes, so now we are

2    even, are we not?

3                    MR. LOFTIS:  I wouldn't say we are

4    even because you've got lots of documents that I'm

5    entitled to that you refuse to give me.

6        Q.    Let me ask you this.  I will make this

7    simple.  Here's what I wanted to show you.  It says

8    plaintiff's answers to defendant's second set of

9    interrogatories.  Have you ever seen that document

10   before?

11                   MR. SAHADY:  Are you entering this

12   as an exhibit?

13                   MR. LOFTIS:  No.  I am just showing

14   him what you provided me --

15                   MR. SAHADY:  All right.

16                   MR. LOFTIS:  -- as a pleading in the

17   case.

18                   MR. SAHADY:  This is the document

19   that you took back from me?

20                   MR. LOFTIS:  It's the same document,

21   yes, without any notes on it.

22                   MR. SAHADY:  Go ahead.

23       Q.    Have you seen that document before?

24       A.    I believe so.  I am not sure.

223

1     Q.     Do you recall --

2     A.     Is that called an interrogatory?

3     Q.     Yes.

4          MR. LOFTIS:  Mr. Sahady, one thing

5  you could do I believe Mr. Rodio is supposed to

6  verify answers to interrogatories.  That was not

7  done.  Can you have that done?

8          MR. SAHADY:  Verify his answers?

9  Verify what?

10         MR. LOFTIS:  Verify his answers to

11  interrogatories.  Can you do that?

12         MR. SAHADY:  The answers don't

13  contain that?

14         MR. LOFTIS:  No.  They were not

15  verified.  Can you do that?

16         MR. SAHADY:  Yes, I will do that.

17     Q.     What is the video you are referring to?

18     A.     It was a video targeting Senator Kennedy

19  as a enemy of the tobacco industry.  May have been

20  before your time.

21     Q.     What do you mean before my time?

22     A.     How many years have you got?

23     Q.     Got what?

24     A.     With the company.

224

```
 1        Q.      I don't even work for Reynolds.

 2        A.      Oh, you don't, so you weren't around

 3   when he was around.  He probably knows about it.

 4        Q.      How long ago was that?

 5        A.      Quite a few years ago.  He had a video

 6   targeting Senator Kennedy, that he was their Number

 7   1 enemy.

 8        Q.      Was that more than ten years?

 9        A.      I really couldn't tell you.

10        Q.      Did that have anything to do with your

11   termination?

12        A.      I had mentioned it to Mr. Fasciani.

13        Q.      Do you think that it had anything to do

14   with your termination?

15        A.      I have no idea.  I don't know why I was

16   terminated.

17        Q.      When did you see the video?

18        A.      Oh, we had it in a meeting.

19        Q.      Who was your manager at the time?

20        A.      I can't remember if it was -- who it

21   was.

22        Q.      Was it Art Scott or before his time?

23        A.      Might have been before his time.

24                MR. SAHADY:  Was that the time the
```

1    president of the company was before Congress and

2    raised his right hand?  Was that --

3                    MR. LOFTIS:  It's not your turn.

4                    MR. SAHADY:  I am just asking him.

5                    MR. LOFTIS:  You can't ask questions

6    here.

7                    MR. SAHADY:  I was just jogging his

8    memory.

9                    MR. LOFTIS:  This whole thing is

10   problematic.

11                   THE DEPONENT:  It's a problem.

12                   MR. SAHADY:  It's a big problem.

13                   MR. LOFTIS:  It's going to be a big

14   problem.

15        Q.    Company reps were made to sit through

16   promotional tapes.  What promotional tapes are you

17   talking about?

18        A.    We were told that 3,000 people a day

19   died from smoking and that, you know, we had to go

20   out and find more smokers.

21        Q.    What promotional tape?

22        A.    This came from the chairman of the

23   company, I think, Jim Johnson at the time.  We lose

24   3,000 people a day smoking.  I think it was on the

226

1    National news, too.

2        Q.      When did you look at it?

3        A.      This is when we were in a meeting at one

4    time.

5        Q.      Who was your manager at the time?

6        A.      I think it was Mr. Lowsher (phonetic)

7    maybe Mr. Scott or Mr. Lowsher.

8        Q.      And was it a video tape of Mr. Johnson --

9    something Mr. Johnson had said publicly?

10       A.      It was in our meeting.

11       Q.      But you were shown a tape?

12       A.      Yes, like a video that we lose 3,000

13   people per day.

14       Q.      I'm trying to get you to tell me who was

15   on the video.

16       A.      I believe it was Mr. Johnson, Jim

17   Johnson.

18       Q.      To whom was he speaking?

19       A.      To a sales force.

20       Q.      Okay.  And that was shown to all of the

21   sales reps?

22       A.      I believe so.

23       Q.      And that would have been, what, roughly

24   ten years ago?

1      A.      It's possible.

2      Q.      Did you keep a copy of the tape?

3      A.      It's possible.  I don't know.  I am not

4    sure.  I would have to look.

5      Q.      Where would you look to get it?

6      A.      Hmm.

7      Q.      Where would you look to get it?

8      A.      Look where I keep tapes.

9      Q.      Do you have any tapes that you were

10   shown while you worked for the company?

11     A.      Hmm.

12     Q.      Do you have any tapes at home that you

13   were shown why you worked for the company?

14     A.      At home?

15     Q.      Or anywhere.  Gave them to your

16   attorney.  Put them in your dog's house?  Where?

17     A.      It could be in the dog's house.

18     Q.      Did you keep any tapes?

19     A.      I have video tapes.  Yes.  Some things.

20   I am not sure what I have.

21     Q.      You have videos that were related --

22   that you were shown why you worked for Reynolds?

23     A.      It's possible I may have some.  I am not

24   sure.  I may have to look.

228

1     Q.     Have you done that?

2     A.     I will have to look.

3     Q.     And the instructions that you were given

4   regarding the EDLP contract, were those the same

5   instructions that all other sales reps were given

6   to the best of your knowledge?

7              MR. SAHADY:  Objection.

8     A.     I followed the contract to what it was

9   written.  I tried to meet parity.

10    Q.     And in your termination, there were only

11  two instances where it was noted that it wasn't at

12  parity?

13    A.     Again, we were in the middle of a tax

14  change.  There was a lot of confusion on pricing.

15  The retailers were confused.  We were trying to get

16  the pricing straightened out.  It was out of my

17  control at that time.

18    Q.     I am sorry.  What was out of your

19  control?

20    A.     There was a tax increase, a lot of

21  confusion on pricing.  We were trying to get the

22  pricing straightened out at that time.

23    Q.     And I believe -- you did have a copy of

24  the field sales employee handbook?

229

1        A.      Yes.  I guess so.  I believe so.  Yes.

2    Which one?  I've got many of them.

3        Q.      The one that was in effect at the time

4    of your separation.

5        A.      Which year was it printed?

6        Q.      I don't know which year it was printed.

7    Do you have one with you?

8        A.      Different years.

9        Q.      Did you get -- did you keep all the

10   versions that you got?

11       A.      I tried to kept most of them, yes.

12       Q.      All right.  Are you familiar with the

13   company standards of business conduct?

14       A.      I didn't read it this week but --

15       Q.      What is that?

16       A.      At the time -- I was aware at that time

17   but I haven't read it recently.

18       Q.      You have not read it recently?

19       A.      No.  I work for another company now.

20       Q.      Were you aware the company had a hot

21   line that you could call in any irregularities?

22       A.      I did call in.  I called in about

23   Mr. Fasciani.

24       Q.      All right.  And what did you say when

1    you called in?

2         A.      That Mr. Fasciani was threatening me.

3         Q.      Did you identify yourself?

4         A.      Yes.  I called Mr. Deschenes.

5         Q.      Is that the hot line?

6         A.      Well, I didn't know there was a hot

7    line.  What I did is I called my immediate superior

8    Mr. Kane, and I believe I talked to Mr. Deschenes,

9    also.

10        Q.      But my question was were you aware that

11   there was a hot line that you call in for any or

12   what you believe to be irregularities?

13        A.      I didn't know about any hot lines.

14        Q.      Did you read the Standards of Business

15   Conduct?

16        A.      At that time, yes, probably.

17                  MR. LOFTIS:  Mark 23.

18                  ( Exhibit Number 23 marked for

19                  identification. )

20        Q.      Exhibit 23.  If you look at the bottom

21   of the second page you see a 1-800 number.

22        A.      Okay.  Maybe I didn't have that one.

23        Q.      What is that?

24        A.      Maybe I didn't have the 800 number.

1      Q.      This from the Standards of Business

2      Conduct.

3      A.      I did call Mr. Deschenes in human

4      resources.

5      Q.      My question was did you ever call that

6      1-800 number that is listed in the Standards of

7      Business Conduct?

8      A.      Possibly.  I am not sure.  I did call

9      the office a couple of times.

10      Q.      Do you specifically recall calling that

11      1-800 number?

12      A.      I said I don't know.  Might have been a

13      different 1-800 number.

14      Q.      Where would the other number have been?

15      A.      Might have picked it up on the human

16      resources.  I am not sure.

17                  MR. LOFTIS:  Let's mark this Number

18      24.

19                  ( Exhibit Number 24 marked for

20                  identification. )

21      Q.      Just to verify your signature for me,

22      Mr. Rodio.

23      A.      That is my signature.

24      Q.      Do you recognize the second page?

232

1       A.      I think we were just sent this and told

2    to sign it.

3       Q.      The second page I think you did it

4    electronically.  Do you recall that?

5       A.      I don't recall.

6       Q.      But where your signature appears that is

7    your signature?

8       A.      I think these were faxed to me.  We just

9    had to sign it.

10       Q.      And it just says that you certify that

11    you understand the Standards of Business Conduct,

12    correct?

13       A.      That is what it says.

14       Q.      Did you do that?

15       A.      I signed this.

16       Q.      Had you read it?

17       A.      I read my whole book.

18       Q.      Understood it?

19       A.      I understood to the best of my ability.

20       Q.      And agreed to comply with it?

21       A.      Yes, I agreed to comply, agreed to

22    comply with what I understood.

23       Q.      But just read what it says.  Read the

24    first paragraph.

1    A.    It says "I certify that I have read and

2    understand the Standards of Business Conduct and

3    acknowledge that it is my responsibility to comply

4    with these Standards and to assure that those

5    reporting to me also comply."

6    Q.    And what is the next paragraph?

7    A.    Except as noted below, I confirm that I

8    have no knowledge or information of any violations

9    of the Standards of Business Conduct that have not

10    been corrected or previously reported."

11    Q.    And what did you fill in?

12    A.    There is nothing there.

13    Q.    And then go to the last page.  "Except

14    as noted below, I confirm that I have no knowledge

15    or information of any violations of the Standards

16    of Business Conduct that have not been corrected or

17    previously reported."  And did you fill anything

18    in?

19    A.    But see the business misconduct happened

20    in August of that year, not in April.  Mr. Fasciani

21    threatened me in August not April.  This is dated

22    April.

23    Q.    I am talking about violations of the

24    Standards of Business Conduct.

234

```
 1      A.     Oh, what are you talking about?  What
 2    business?
 3      Q.     Well, you signed the statement that says
 4    you read and understood the Standards of Business
 5    Conduct.  I'm just asking you to verify for me --
 6      A.     That is my signature.
 7      Q.     I am asking you to verify that you did
 8    not note any violations of the Standards of
 9    Business Conduct; is that correct?
10      A.     Well, you know, you are not going to say
11    something against your own company.  Of course not.
12      Q.     But it was your job to.
13      A.     I would be fired if I did.  I said one
14    thing to Mr. Fasciani, told him it was illegal
15    about pricing, and I got fired.
16      Q.     When did you tell him the pricing was
17    illegal?
18      A.     I think it was 2001, early 2001.
19      Q.     What's that?
20      A.     Maybe early in 2001.
21      Q.     And what was his response?
22      A.     Went in one ear and out the other.
23             MR. SAHADY:  It's by my watch six
24    o'clock, and we have been here since eleven.
```

1                    MR. LOFTIS:  We didn't start until

2      almost noon.

3                    THE STENOGRAPHER:  It was 10:54.

4                    MR. SAHADY:  That would make it

5      seven hours.  I think enough is enough at seven

6      hours at a stretch.  If you wish to examine him

7      further, we can make other arrangements.  Fair?

8                    MR. LOFTIS:  I am not sure I have

9      anymore questions.  I may have more questions after

10     we move to compel the documents that have not been

11     produced.

12                    MR. SAHADY:  Off the record.

13                    ( Discussion off the record. )

14                    MR. SAHADY:  Go ahead, Mr. Loftis.

15                    MR. LOFTIS:  We asked for documents

16     that would be supportive of his claims.  You

17     responded to that interrogatory without objection.

18     You will have to say yes or no.  Mr. Rodio said

19     numerous times today that he had documents that

20     would be supportive of his claims which have not

21     been produced.

22                    THE DEPONENT:  You are putting words

23     in my mouth.

24                    MR. SAHADY:  Just wait.

1            MR. LOFTIS:  And he has photographs

2     which would be highly relevant.

3            MR. SAHADY:  You make a request for

4     those.

5            MR. LOFTIS:  I have made a request.

6            THE DEPONENT:  I said I might have

7     photographs.

8            MR. SAHADY:  Just wait.  Do you want

9     to act as your own counsel?

10            THE DEPONENT:  No.

11            MR. SAHADY:  Depositions in a

12     discovery process are just for that purpose, so

13     that if anything is missed, it can be supplemented.

14            MR. LOFTIS:  I am perfectly willing

15     to supplement if you will tell me what you will

16     supplement.

17            MR. SAHADY:  If you tell me what you

18     want supplemented as a result of this --

19            MR. LOFTIS:  Mr. Sahady, I have told

20     you in three phone conversations and at least two

21     letters what I wanted supplemented, and I have yet

22     to get it.

23            MR. SAHADY:  You tell me what you

24     want supplemented, and if I deem it to be something

237

1    you ought to have, I will give it to you.  If not,

2    I will so answer you, and then we can have the

3    court decide.

4            MR. LOFTIS:  I will renew the

5    request if you want to make a note of it.

6            MR. SAHADY:  Go ahead.  Let me hear

7    you.

8            MR. LOFTIS:  Plaintiff's answers to

9    defendant's first set of interrogatories Number 1,

10   Number 2 and Number 3.  Specifically as related to

11   Mr. Rodio's deposition testimony today, Number 1,

12   identify all documents which relate to or support

13   any of the allegations contained in plaintiff's

14   complaint.  He has testified today that he has

15   documents that he believes relate to or support the

16   allegations in his complaint.

17           MR. SAHADY:  He didn't say he

18   believes they support or relate.  This was your

19   conclusion from his testimony.

20           MR. LOFTIS:  I asked him a question.

21   He said yes, they did support his claims.

22           MR. SAHADY:  This is what you

23   concluded after you asked him if he had pictures.

24           MR. LOFTIS:  Will you supplement

238

1    that?

2                MR. SAHADY:  You make the request.

3                MR. LOFTIS:  I just made it.

4                MR. SAHADY:  I will have to consider

5    it.

6                MR. LOFTIS:  When will you let me

7    know?

8                MR. SAHADY:  Within a reasonable

9    time in due course.

10                MR. LOFTIS:  Which means you will

11    not.

12                MR. SAHADY:  No, it doesn't mean

13    that.  It means I will respond to you within a

14    reasonable time and reasonable request.

15                MR. LOFTIS:  What is a reasonable

16    time?

17                MR. SAHADY:  What a reasonable

18    attorney will take to answer a request such as

19    this.

20                MR. LOFTIS:  You have already

21    answered it.

22                MR. SAHADY:  I will answer again

23    upon your further request.

24                MR. LOFTIS:  I am not making another

239

1    request.  I made multiple requests.  I have been

2    blind sided by documents that you knew existed and

3    deliberately did not produce and I did not object.

4                    MR. SAHADY:  This is the first I

5    heard of pictures.

6                    MR. LOFTIS:  It's not my fault.

7                    MR. SAHADY:  It's not my fault

8    either.

9                    MR. LOFTIS:  There are other

10   documents that you were aware of.

11                   MR. SAHADY:  I would love to see

12   those pictures, and I would love to use them in

13   court.  I have not seen them.

14                   MR. LOFTIS:  And I will not see them

15   until you tell me you are ready to show them to me,

16   right?

17                   MR. SAHADY:  And you will not see

18   them until I see them first and I decide whether

19   you should see them.  Isn't that how it works?

20                   MR. LOFTIS:  Nope.

21                   MR. SAHADY:  All right.

22                   MR. LOFTIS:  Then we'll file a

23   motion to compel.

24                   MR. SAHADY:  That's what you will

1    have to do, and I am confident the court will do

2    what is right.

3                    MR. LOFTIS:  And then we'll decide

4    what we need to do to finish up this deposition.

5                    MR. SAHADY:  So you are done today

6    with the exception of --

7                    MR. LOFTIS:  I am done today because

8    you said I was done.

9                    MR. SAHADY:  No.  I didn't say you

10   were done.  I was reminding you that it's been

11   seven hours.  You want to go further?

12                    MR. LOFTIS:  I don't have anything

13   further at this time until we resolve the discovery

14   issues.  If we are going to have to come back, I

15   would only want to have to do it once.

16                    ( Whereupon the deposition suspended

17   at 5:55 p.m. )

18

19

20

21

22

23

24

CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.


I, Sherri A. DeTerra-Medeiros, Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:

That MICHAEL RODIO, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the said witness.

IN WITNESS WHEREOF, I have hereunto set my hand and notarial seal this 24th day of September, 2004.



Sherri A. DeTerra-Medeiros

Shorthand Reporter

and Notary Public

1

**VOLUME:    II**
**PAGES:    1 - 78**
**EXHIBITS:  SEE INDEX**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

CASE NO. 04-10006-JGD


MICHAEL RODIO,
            plaintiff,

        vs.

R.J. REYNOLDS TOBACCO COMPANY,
            Defendant.



        **DEPOSITION OF MICHAEL P. RODIO**, a witness

called on behalf of the Defendant, pursuant

to the Federal Rules of Civil Procedure, before

Linda A. Menard, a Registered Professional Reporter

and Notary Public in and for the Commonwealth of

Massachusetts, at Sahady Associates, P.C., 199

North Main Street, Fall River, Massachusetts, on

Tuesday, June 14, 2005, commencing at 9:05 p.m.

**DeTerra Reporting Services**
**One Bow Drive**
**Acushnet, Massachusetts 02743**
**Tel. (508) 763-2542 Fax (508) 763-3521**

1   you wrote it, or were you just guessing?

2       A.   We were sent reports from Mr. Fasciani.

3   It may have come off one of his reports.

4       Q.   But do you believe -- and could you see

5   how many EDLP accounts you had sold versus other

6   sales reps in the division?

7       A.   It changed.  I could have been first,

8   second or third.  I could have been one of three.

9   Maybe at that time I might have been first, but it

10  could have changed.

11      Q.   In any event --

12      A.   The other person may have sold two this

13  week, so he might have 53, I don't know.

14      Q.   But is it your understanding that during

15  this period of time you were one of the top in

16  selling numbers of EDLP accounts in your division?

17      A.   I worked in one of the poorest areas of

18  the state, so people look for -- they look to save

19  money.  The poor people --

20          MR. SAHADY:  Did you listen to the

21  question?

22          THE WITNESS:  Okay.

23          MR. SAHADY:  Answer the question as asked.

24  If you don't remember the question, ask Mr. --

1    that?

2        A.    2002?

3        Q.    Yes.

4        A.    I don't have it in front of me, so I

5    can't --

6        Q.    If that's what it was, if it was, fails to

7    meet expectations, did you understand the company

8    policy was that if you were rated as fails to meet

9    expectations you were not entitled to a bonus?

10       A.    That was something that Mr. Kane and Mr.

11   Fasciani wrote, yeah.

12       Q.    Did you understand that was company

13   policy?

14       A.    Hm?  Yeah.

15       Q.    And on Fax Page 10, you reference two

16   other grandfathered employees?

17       A.    Yes.

18       Q.    Ken Pondelli and Paul --

19       A.    Dabouqe.

20       Q.    And what was the significance of you

21   making that notation, the fact that you were

22   grandfathered as well?

23       A.    Yes.  The three of us were grandfathered

24   employees.  There were only a few of us in the

1    Boston area, and it seemed like all of us were

2    having problems with management.

3        Q.    And the grandfather simply means that you

4    had a pension that a lot of other people didn't

5    have?

6        A.    It meant that if there was a merger or

7    a company reduction, that we had a good chance of

8    being offered our pension and insurance, health

9    insurance, under the old policies of the company.

10       Q.    As opposed to if you were terminated?

11       A.    Yeah, yeah.

12       Q.    And did you believe that just because you

13   would have been offered a package that you would

14   have received your grandfathered pension plan?

15       A.    Well, that's if it was offered, yeah.

16       Q.    Didn't you also understand that in order

17   to receive that grandfathered pension, you had to

18   be age 55 and have 30 years with the company?

19       A.    I guess it depends on what the merger

20   policy was.  I don't know what the policy was going

21   to be.

22       Q.    But you had a copy of the document that

23   described the pension plan, did you not?

24       A.    Yeah, I've got original documents of the

1    pension plan, yeah.

2         Q.    Now I assume that not all of the

3    grandfathered employees were in the Boston region,

4    were they?

5         A.    What, nationwide?  No, I don't think so.

6    There was a good number, though.

7         Q.    And do you know how many other employees

8    in the Boston region that were -- let me ask you

9    this.  Do you know who else in your division was

10   grandfathered?

11        A.    In my division?  There may have been three

12   others.

13        Q.    In addition to Mr. Pondelli and Mr.

14   Dabouqe and yourself?

15        A.    Yeah.

16        Q.    And just, you've got a notation November

17   2001, so we're still in 2001; is that the way you

18   would read this document?

19        A.    Yes.

20        Q.    Fax Page 11, we have no date; so again I'm

21   assuming that we're -- well, no, I'm confused

22   because earlier we were in 2002 and then we

23   reverted back to 2001.

24        A.    These are just notes.

```
 1        A.    Right.   It was an older model.   At that
 2   time it was outdated.
 3        Q.    Did you provide either Exhibit 28 or 29 to
 4   the company prior to this lawsuit?
 5        A.    I couldn't.   I wasn't with the company
 6   anymore.
 7        Q.    You just need to answer my question.   You
 8   could have mailed it to them; you could have sent
 9   it to them.   I'm just verifying that you didn't.
10        A.    No, no.   I couldn't.   I was fired; I was
11   terminated.
12        Q.    On the last page of Exhibit 29 --
13        A.    Yeah.
14        Q.    -- where it says miscellaneous, you say
15   stock thing.   What are you referring to?
16        A.    I had mentioned to Mr. Fasciani in January
17   of 2001 that Reynolds had announced they were going
18   to earn $8 a share; in the previous year they
19   earned $4 a share.   And I had mentioned that it
20   didn't seem to be totally honest.   In June, I think
21   in June of 2001, Reynolds announced they were going
22   to change their accounting system.
23        Q.    June of 2000 --
24        A.    2001, I believe, yeah; and during the
```

```
 1    conference call, Mr. Fasciani said I had mentioned

 2    that.

 3         Q.   I'm sorry, what conference call are you

 4    talking about?

 5         A.   There was a conference call in 2001.

 6         Q.   When was the conference call?

 7         A.   2001.

 8         Q.   I mean, what month?

 9         A.   June.

10         Q.   June of 2001?

11         A.   June or July.  I believe July.  I believe

12    it was July, June or July.

13         Q.   Let me back you up.  You said January of

14    2001 --

15         A.   Um-hm.

16         Q.   -- the earnings were $8 per share?

17         A.   I believe they announced they were going

18    to come out at $8 per share.

19         Q.   Do you know what the fiscal year of the

20    company was at the time?

21         A.   It was January, for the year.  I don't

22    know what their fiscal year is, no.  Usually when

23    you figure stock, it's January to December.

24         Q.   But are you aware of the fact that some
```

1    companies have a fiscal year which is different

2    from a calendar year?

3        A.    That's possible, yeah.

4        Q.    And are you aware of the fact that most

5    companies announce their earnings based on either

6    fiscal quarters or fiscal years as opposed to

7    calendars?

8        A.    Fiscal quarters, yes.

9        Q.    But you don't know what Reynolds' year is?

10       A.    The projection was, I think they were

11   projecting $8 a share for the year.

12       Q.    And for the prior year it was $4 a share?

13       A.    Approximately, yeah.

14       Q.    Did you say anything to Mr. Fasciani at

15   that time about that?

16       A.    I just said that seemed kind of odd.

17       Q.    And what did he say?

18       A.    He said -- he just kind of nodded.

19       Q.    Anything else?

20       A.    Nothing I can remember.

21       Q.    And then you say in July, June or July of

22   2001, there was a conference call?

23       A.    Yes.   And I guess at that time Reynolds

24   had made an announcement in the Wall Street Journal

1    they were changing their accounting system; and Mr.

2    Fasciani said that I had told him this was going to

3    happen.

4        Q.   So he was just acknowledging that you had

5    predicted this was going to happen?

6        A.   That's what he said, yeah.

7        Q.   Was anything else said?

8        A.   I guess that's it.  I just mentioned that.

9    That's all I know.

10       Q.   So does the stock thing have anything to

11   do with this case, this litigation, or were you

12   just making some notes?

13       A.   I really don't know.  I don't know what --

14   as far as I know, what I was terminated for was not

15   selling Monarch below the state minimum price and

16   the other thing was not advertising at a level

17   exposed to children.

18       Q.   Which is nothing you testified about last

19   time, right?

20       A.   Hm?

21       Q.   Which is not why you said you were

22   terminated last time you were deposed?

23           MR. SAHADY:  Was he asked that?

24           MR. LOFTIS:  Yes.

1      A.    I don't think I was asked that.

2      Q.    Oh, you were.

3      A.    I don't believe so.

4      Q.    Just to refresh your recollection, last

5  time you were deposed, you said it was to deny you

6  your pension?

7           MR. SAHADY:  In fairness to him, that was

8  the consequence, not the reason, the consequence.

9      A.    It was the consequence, yeah.

10     Q.    Okay.  So why do you think you were

11 terminated?

12     A.    For not selling Monarch below the Mass.

13 state minimum price.  And one of the things that

14 was mentioned to us, they lose 3,000 people a day

15 to smoking and we have to replace those people.

16 One way we put advertising at four feet high and

17 people four feet high can view that.  So I refused

18 to put that advertising up, and I was terminated

19 for that.

20     Q.    When did you refuse to put it up?

21     A.     It's in Mr. Fasciani's statement that I

22 didn't put it up in many accounts.  In his

23 termination paper he lists all the accounts I

24 didn't put it up in.

1       Q.   Did you ever have any conversation with

2  Mr. Fasciani about you can't put it there?

3       A.   Yes.  Two people from the Board of Health

4  in Fall River told the manager who told Mr.

5  Fasciani that they were requesting us not to put

6  the advertising on the counter in that store.

7       Q.   And which stores were those?

8       A.   It was the Texaco station up on New Boston

9  Road.

10      Q.   What was the other one?

11      A.   It was owned by the Crosson Oil Company,

12  so whatever stores they had.

13         MR. SAHADY:  C-R-O-S-S-O-N Oil Company.

14      Q.   Is that the same as the Texaco?

15      A.   Yeah.  They owned several stations in

16  town.

17      Q.   And I believe you testified about this

18  before.  You said that someone at the Board of

19  Health --

20      A.   Two representatives from the Board of

21  Health told an area supervisor not to place the

22  advertising on the counter.

23      Q.   Told an area supervisor for who?

24      A.   Crosson Oil.

1    responsibility and Mr. Fasciani's responsibility.

2        Q.   So if there was no regulation that

3    prohibited it, there wouldn't have been a problem

4    with putting advertising there?

5            MR. SAHADY:  I object.  This is a matter

6    of law that he would not be competent to give you

7    the citation chapter on this action.

8        Q.   Was there only one Texaco?

9        A.   They owned other stations.

10       Q.   Did you ever hear this from anyone other

11   than -- is it Crosson Oil?

12       A.   Crosson Oil.

13       Q.   Did you ever hear it from anyone other

14   than Crosson Oil?

15       A.   No.  He was the one that made the comment

16   to us, the area supervisor.

17       Q.   And what was Mr. Fasciani's comment, if

18   you recall?  Do you recall him having any reaction?

19       A.   No, no reaction; but if I didn't put the

20   advertising up, he would reprimand me.

21           MR. SAHADY:  I'm sorry, I didn't hear

22   that.

23           THE WITNESS:  If I didn't put the

24   advertising in the stores, he would reprimand me.

1    Q.    Is that what he said to you?

2    A.    That's what he did.

3    Q.    But as far as Mr. Fasciani saying anything

4    back to you, you don't recall any response that he

5    had?

6    A.    Not that day, no.

7    Q.    Do you recall any other day?

8    A.    No.

9    Q.    And with respect to the EDLP -- and did

10   that Board of Health issue ever come up in any

11   other accounts?

12   A.    No one said anything to me, no.

13   Q.    And with respect to the EDLP -- I think we

14   have been through this the last time you were

15   deposed, but you had indicated that what you were

16   supposed to do is tell the retailer that Monarch

17   had to be at parity with or lower than the lowest

18   brand in the store; is that correct?

19   A.    Correct.

20   Q.    And you never told the retailer anything

21   other than that?

22   A.    That's what the contract stated.

23   Q.    And you never told the retailer anything

24   other than what the contract said they had to do?

1      A.    As far as I know.

2      Q.    So you now think those were the two

3  reasons you were terminated?

4      A.    Yes.

5      Q.    Any other reason you can think of?

6      A.    No.

7      Q.    Other than what you have already told me,

8  do you have any facts that you can point me to that

9  cause you to come to that conclusion?

10      A.    If I didn't sell below the state minimum,

11  Mr. Fasciani would reprimand me.

12      Q.    If Monarch wasn't at parity?

13      A.    If I didn't advertise towards children, he

14  would reprimand me.

15      Q.    But Mr. Fasciani never said those things

16  to you?

17          MR. SAHADY:  He was reprimanded.  He's

18  been saying that.

19      A.    Mr. Fasciani admitted that I told him --

20          MR. SAHADY:  Wait until Mr. Loftis asks

21  you a question.

22      Q.    Have you told me every conversation you

23  had with Mr. Fasciani about the advertising to

24  children?

1  A. Hm?

2  Q. Have you told me about every conversation

3 that you or Mr. Fasciani had or participated in

4 that related to advertising to children?

5  A. I told you all I know.

6  Q. And what you were told to do with respect

7 to EDLP was to tell the retailers that Monarch had

8 to be at parity or lower than the other brands in

9 the store if they wanted to have an EDLP contract.

10  MR. SAHADY: By EDLP you mean state

11 minimum pricing?

12  MR. LOFTIS: No.

13  A. That's what the account stated.

14  Q. And you never told a retailer anything

15 other than what the contract stated?

16  A. As far as I know.

17  Q. If a retailer was not pricing Monarch at

18 parity or lower than any other brand in the store,

19 then you had the right to cancel that contract?

20  MR. SAHADY: If the price was not below

21 state minimum; is that what you mean?

22  MR. LOFTIS: No, not at all.

23  MR. SAHADY: What was the question?

24  A. What's the question?

1    verify.  I believe that's what it was.

2            MR. SAHADY:  So I sent you 36, but you

3    were smart enough to segregate them.

4            MR. LOFTIS:  Not you, but somebody in your

5    office was smart enough to segregate them before

6    they sent them to me.

7            MR. LOFTIS:  That's exactly what this is.

8            MR. SAHADY:  You got them all?

9            MR. LOFTIS:  Simple explanation, they're

10    36; but they're duplicates, so I've got all 18.

11            MR. SAHADY:  If we duplicate these again,

12    you'll have 72.

13        Q.    Mr. Rodio, you mentioned that there was a

14    supervisor for -- is it Crosson Oil?

15        A.    Yeah.

16        Q.    Which?

17        A.    Crosson.

18        Q.    I probably still won't get it right.  --

19    that made the comment about the Board of Health had

20    said they didn't want the VAP POS on the counter?

21        A.    On the counter facing children.

22        Q.    Do you know who that supervisor was?

23        A.    Al Roulette.

24        Q.    Spell that last name for me.

1        A.   R-O-U-L-E-T-T-E.

2        Q.   And have you talked to him since this

3  lawsuit was filed?

4        A.   Yes.  I asked him.

5        Q.   When did you talk to him?

6        A.   Months ago.  Probably four months ago,

7  five months ago.

8        Q.   After your deposition in August?

9        A.   Yes.

10       Q.   And what was the purpose of that

11  conversation?

12       A.   I just asked him, is that what he said to

13  us and he said yeah.

14       Q.   And what stores was he responsible for?

15       A.   The chain, Crosson Oil.

16       Q.   What names did they operate under?

17       A.   Texaco.  At that time it was Texaco, I

18  believe.  It either said Crosson Oil or Texaco at

19  that time.

20       Q.   There was also a Crosson Food Market.  Is

21  that the same?

22       A.   Same people, yeah.

23       Q.   And in your -- let me read some names of

24  some stores to you and see if you can tell me if

```
1        any of those were affiliated with Crosson.

2    Cloverdale Farms?

3        A.    No.

4        Q.    Globe Wine?

5        A.    No.

6        Q.    Crosson Food Market?

7        A.    Yeah.

8        Q.    New England Farms?

9        A.    No.

10       Q.    Assonet Store?

11       A.    No.

12       Q.    Sterling Package?

13       A.    No.

14       Q.    Lucky Dollar Store?

15       A.    No.

16       Q.    Red's Dairy Store?

17       A.    No.

18       Q.    Swidey's Variety?

19       A.    No.

20       Q.    Bellencourt's Variety?

21       A.    No.

22       Q.    And the exhibits, Exhibits 28 and 29, were

23   those prepared shortly after your termination?

24       A.    Yeah.  I tried to put the positive things
```

1    in here that they did and things that were illegal

2    such as not putting the pricing below state minimum

3    and advertising to children, I didn't put in here.

4        Q.    So if we go to Exhibit 28, Fax Page 9,

5    Crosson Food, third sentence:  VAP pricer was in

6    proper location with proper pricing when I left the

7    store.  Is that true?

8        A.    According to Mr. Fasciani, no.  He said he

9    didn't put it in.

10       Q.    No, no.  When you left the store, the VAP

11   was there?

12       A.    The pricer was there, yes.

13       Q.    The VAP pricer was in the proper location

14   with proper pricing in it.  Do you see that?

15       A.    The pricing was there, yeah.  The pricing

16   was there, yeah.

17       Q.    With the proper pricing in it?

18       A.    The pricing was there, yes.

19       Q.    And the pricing that's in it is the POS?

20       A.    Just the prices there.

21            MR. SAHADY:  What does POS stand for?

22            THE WITNESS:  The advertising.

23            MR. SAHADY:  POS, is it?

24            MR. LOFTIS:  Yes.

# Termination Document

September 4th Reprimand- Manager ran into calls quickly. The contract status and positioning in the calls were good considering that some of the store previously had nothing. There was competitive pressure from Philip Morris, which made some situations in flux. Basically the calls looked good, relations had improved, and most of the work was by myself. Mr. Fasciani looked for any little detail that he could find to down play any accomplishment that I had made.

Mr. Fasciani said to me that calls he looked at on Monday only had four distribution errors.

We were in the process of changing prices on the week and for the most the changes were correct with the exceptions of a few stores.

The laptops were several years old and were going to be replaced in another week or so. The problem was that the computer were usually die in the morning do to the batteries were weak. On Monday I had my extension cord and was able to properly record the calls. I did not make a lot of calls that day due to the fact that I had to make a presentation with a small chain which took several hours. We only had one cord it was a pain to disconnect and then reconnect at night. I asked the company for a spare cord, but the would not give us one for the car. In addition at the time the fuse was blown in the car so that I could not recharge in the car even if I had a cord.

October 9th When Mr. Fasciani came to out to check he voice mailed me to meet him. I was already on the trade and l was very busy, but I tried to backtrack and work with him. The store we were in that morning was sunnyhill farm. Philip Morris had just changed our merchandising and they had moved my counter displays and removed the prices on the RJR pack rack. I spent several hours and tried to replace the prices the best of my ability and make sure all the pricing was proper on all the racks. This store had a monarch edlp contract with a monarch



display on the counter and monarch sign in the window, but this was not
mentioned in Mr. Fasciani's report.

Cloverdale Farm- Winston light soft may have been hidden behind the Winston
light box. There may have only been a few packs left in the store. It is common
that on some marginal brands stores may only have a few packs of that brand. It
customer could easily come in and buy those two packs with in hours of being in
the store. Since the owner and the manager were not in the store the clerk asked
me not to touch any pricing. I told him that I would return in a few days to change
the prices. There was a vap-pricing card on the counter and there were digital
prices on the rack itself, which could easily be viewed by the consumer.

Monarch was in a prime position and properly priced at the lowest price.
The retailer did not allow signs in the window for cigarettes and I was going to
address placing a Monarch sign on the counter as soon as I could meet with the
manager. The manager was not in the last few times I had stopped by. It was
difficult to place signs on the counter do to the Philip Morris contract, which
would not allow competitors to place signage on the counter.

Mr. Fasciani said that I said the owner was difficult to deal with and I did not want
to rock the boat. I did not say that in this manor when in fact the owner is a
gentlemen, but is older and not in the store regularly.

Globe Wine Store- This store was a metro contract. I spoke to the owner
about placing a slim line display and vap age communicator. The owner did not
want either. Due to the 75-cent mass tax increase. The store volume was dropping
and I informed Mr. Fasiciani that we would probably have to lower the contact
payment in the future. We had digital pricers on the counter displays informing the
consumers of the discounted price of Winston, Salem, and Camel. We had a Doral
counter display on the second counter of the store for years. Previously Mr.
Fasciani had told me that it was a good-looking display shot. He was aware we
had a display in there. The Doral display had been recently taken down due to
pilferage along with all other displays. The Dorals and Salems were placed on a

shelf behind the counter with pricing. There was little space to merchandise products in this store. It was to RJR advantage to keep the existing unit because it held more products to merchandise a larger number of products. The owner was not in and mentioned to Mr. Fasciani the ramifications of the lower volume and not having a Doral display on my next visit.

Crosson Food Mart- This was a regular contract. Under this kind of contract two designated RJR products have to be missing in order to be in violation. Vap pricer was in proper location with proper pricing in it when I left the store. Monarch was in a prime location with advertising and the lowest price. We had a pole side in front of the store advertising the prices of Winston. We had digital pricers on the rack itself. We had an enhanced Doral sign on the counter. We controlled 60% of the rack space in this store. In most stores if you can control 25% you are doing well. RJR controlled approximately 95% of signage in the store due to my efforts. It is possible that some of the paper signage on the counter could be removed after I left the store.

New England Farm- The Camel wide full flavor was not a designated brand and did not effect the contract. Camel wide light was in stock. Vap pos were in display and all pricing was correct. There were three price dials on the rack. I had placed the fourth for Salem when I was in the call with twin stick, but the twin stick obviously didn't hold so that when Mr. Fasciani came into the store the price dial was missing. The pricing on the brand is computerized so that even if a customer bought a pack of Salem he would still receive the discount.

There had 75-cent state tax increase in the previous month and which the owner took all prices off the rack. This happened in many assignments not just mine. I order four new pricer dials and placed them on the rack as previously requested. There was a price dial on Salem but the channel stick, which originally held it on, let go. I tried to restick it as best as possible, but it also fell off. There was monarch signage below the rack advertising the monarch price. In this chain we were only authorized one sign in the window. There was another store in this

chain in Middleboro in which the owner requested the monarch contract. The rep
never followed through, but was not reprimanded.


Assonet Star- Camel wide light was in stock, but is not a required brand.
That pos card was placed in the communicator before I left the store. A clerk or
competitive sales rep may have removed it after I left the store. Monarch was in a
prime position on the rack with signage. During the tax increase it is possible that
the monarch pricing was misalign. I spoke to the owner and he said he would
change it in his computer as soon as possible. He said he had forgot about the
change, but was in the process of completing this task. All prices were
communicated on the fixture with digital pricers. There were a new light boxes in
the back room to be installed, but I also had approximately 10 to 12 much larger
installations to do before hand. I had little to no extra help and was trying to do the
installations in an orderly manor myself. I would eventually get to this installation.

Sterling Package- None of the three brands miss reported were designated
brands. I mistook Salem ultra king for Salem ultra 100 and reported it. There were
vap pos in the communicator when I left the store. There are digital pricer on the
counter display advertising Winston, Salem and camel. The RJR vap promotion
had it's own four foot section that I had secured to be displayed. Monarch display
was on the counter in a prime position. The owner did not want displays in the
window. This store previous had no RJR contract and I was able to build trust and
agreement with the retailer to gain two new counter displays and a four-foot carton
rack. Two existing overhead racks with advertising. A four foot hanging from the
ceiling and two temporary counter displays. I was also in the process of
negotiating for a third counter display.

Lucky Dollar Store- This is retail assist account. They only receive $25 a
month contact money. It was a very low volume and low payment store. The
distribution requirements are not as strict. RJR controlled over 50% of the signage

and merchandising in this store. There were three vap displays visible to the customer. My computer battery had gone down in this store which made it difficult to report. I tried to make mental and paper notes to be reported later. I didn't say that I forgot. Monarch pos on the front rack were in prime position and I did not say I had too much to do.

Reds Dairy Store- My computer was down so I tried to make reports as best I could from the front counter with mental and paper notes. We have no contract in this store. I had spent months trying to negotiate a contract with the manager and was very close.

Swidey's Variety-Some of the Dorals were in stock in Doral full flavor box 100, but there were only a few packs left. This store only carries small amounts of packs on low sale brands. Vamp POs was in display. Vap display was in prime position. 100% of the counter displays were RJR. We had two generic displays on back bar. We had two vap displays on back bar, both in prime visible location. We had a Doral enhanced display in the window. Temporary sale and display on the counter and RJR overhead display. Monarch was advertised and displayed on back bar. The price was at parity with the lowest price when I left the store.

Vallencourt Variety- Camel wide and Doral 100 were not required for contract payment. The store was in transition. Philip Morris had just removed a three-foot RJR fixture leaving RJR in a two-foot fixture without proper pricing. I had told Mr. Fasciani of this problem, and he was totally aware of the situation. The three foot rack was suppose to be placed back with all its pricing and pos with Monarch on it in a few weeks or less.

Summary-The main goal of this particular week was to change the price of Winston, Salem and Camel and Doral by a nickel. When changing prices one has to rush to try to get as many stores done. None of the errors reported were intentional, but the combination of the computer going down the second day, plus rushing may have been some of the causes to my errors. There was a part timer who was Mr. Fasciani responsibility. She told me that she was confused because

Mr. Fasciani trained her. I told her she could work with me part of the day and I would try to help her learn the business. I've always tried to report on the computer as accurately as possible, but I am only human and make mistakes, though not intentionally. As for the vap backup cards we are not given these cards, they come in a box with the display from the wholesaler. Most retailers put the displays up and throw away the advertising. Mr. Fasciani suggested that I got though retailers dumpsters to find the advertising and then place it in stores.

I spent 26 years building respect with my customers and this assignment there was little to know merchandising in the stores listed. Most of the racks we are speaking of were placed by myself along with gsw AL Gonsalves who once commented to me that I did more work in this assignment then previous reps. Some of the stores were new accounts or were stores in which RJR had no contracts I recent years. It takes a long time to rebuild a company business in an area that was let go. I took on the challenge and placed a great number of new units along with the responsibility of maintaining them. In the mean time Philip Morris was trying to tear out or remove the RJR units in some of the stores which made maintenance much more difficult.

I enjoyed working with my customers and built good working relations with them. I always showed respect to my customers and counter parts. I've always tried to be honest and to work hard. I feel terrible about Mr. Fiscaini report. He tries to make me look like criminal, when in fact I am nothing like that.

Anyone can go to my customers and ask the way l acted with them. Mr. Fasciani has tried to tear me apart for quite some time weather he was told to do it or took it on himself was somewhat of a mystery to me. I had recently informed Mr. Fasciani that I was receiving heavier than normal competitive activity in stores with our racks. I asked if he could give a little help, instead he came out and looked for any little error he could find in my reporting to make the situation worse.

Mr. Fasciani trained her. I told her she could work with me part of the day and I would try to help her learn the business. I've always tried to report on the computer as accurately as possible, but I am only human and make mistakes, though not intentionally. As for the vap backup cards we are not given these cards, they come in a box with the display from the wholesaler. Most retailers put the displays up and throw away the advertising. Mr. Fasciani suggested that I got though retailers dumpsters to find the advertising and then place it in stores.

I spent 26 years building respect with my customers and this assignment there was little to know merchandising in the stores listed. Most of the racks we are speaking of were placed by myself along with gsw AL Gonsalves who once commented to me that I did more work in this assignment then previous reps. Some of the stores were new accounts or were stores in which RJR had no contracts l recent years. It takes a long time to rebuild a company business in an area that was let go. I took on the challenge and placed a great number of new units along with the responsibility of maintaining them. In the mean time Philip Morris was trying to tear out or remove the RJR units in some of the stores which made maintenance much more difficult.

I enjoyed working with my customers and built good working relations with them. I always showed respect to my customers and counter parts. I've always tried to be honest and to work hard. I feel terrible about Mr. Fiscaini report. He tries to make me look like criminal, when in fact I am nothing like that.

Anyone can go to my customers and ask the way I acted with them. Mr. Fasciani has tried to tear me apart for quite some time weather he was told to do it or took it on himself was somewhat of a mystery to me. I had recently informed Mr. Fasciani that I was receiving heavier than normal competitive activity in stores with our racks. l asked if he could give a little help, instead he came out and looked for any little error **he could find in my reporting to make the situation worse.**



# Termination Document.

Dept 4 Reprimand - Manager Run into call's quickly. The contract status and positioning in the call's were good considering that some of the store previously had Nothing. There was competetive pressure from Philip Morris which made some situation's in flux... Basically the call's looked good, Relations had improved, most of work was by myself. Mr. Fasciani looked for any little detail that he could find to downplay any accomplishment's that I had made.

Mr. Fasciani said to me that call's he looked at on Monday only had 4 distribution errors.

We were in the process of changing prices on this week and for most the change's were correct with the exception of a few Stores.

~~Glovedale Tooms~~

The laptop's were several year old and were going to be replaced in another week or so. The problem was that iComputer would usually die around 10 or 11 Am because batteries

Ⓟ

OCT 8    Were weak. That Tuesday I did not
have my cord so that I had to
make notes in some of the call's near
the end of the day. We only had 1
cord. It was a pain because you
would have to disconnect from home
the reconnect at Night. I asked
company for a spare but they would
not give us one for the car. In addition
fuse was blown in car so that I
could not recharge in the car even
if I had a cord. Replaced fuse to
25 amp from 15 amp Near the end.

OCT 9     When Mr. Fasciani came out to check
he voicemailed me to meet him. I was
already on the trade and very busy, but
I tried to backtrack and work with him.
The 1st store Sunnyhill farm was a mess.
Philip Morris had changed our merchandising
all around. I spent hours to get it back
into shape. Philip had Riped R.S.R. pricers
off of the RSR Rack. They also unloaded
our counter displays, Placeing Racks out
of compliance.

    We were possibly Mr Fasciani Met
me at this store but did not mention it

(5)

IN his Report.

Cloverdale Farm - Winston light Soft
may have been hidden or the few pack's
that were left sold out. Sometime soft pack's
might be hidden behind box.

The manager was not in when I made
this store. The clerk asked me not to touch
anything until I could contact manager. I
informed the clerk that we were changing
our discount from 60¢ to 75¢ and would
return to call in a couple of day's.

There was a Vap Pricing card on
Counter. There were digital pricers on the
Rack itself. again clerk did not want
me to change prices until manager
was Contacted. Port -

Monarch was in a prime position and properly
priced. There are many stores in Boston
area with no sign's, but it was ongoing
that as long as Brand was in prime position
it was ok. Owner did not want signs
in his windows.

We only had 2 shelves to work
with in this store. If a light Box were
placed we would loose ability to advertise
products including Monarch. There are stores

④

*Store Sell about 16 ctn wk*

*RSR*

*$20-30*

with no light boxes that we promote in. Mr. Fasciani has a chain Vere Petroleum in Raynham. The store has little to no RSR merchandising, vap card may or may not be on counter but he is buying down RSR products. The cost to the company may be $20-30 dollars

*all Requests were premised*

Globe Wine - I talked to owner about placing a new slimline display & VAP and, owner did not want either. Store volume had dropped to 40 cartons per week. This was a Metro contract of which VAP display was not required. We had digital pricers on the counter display. RSR was 1 of the 2 only permanent display in this store. I was going to cut back on this contract in the Near Future. Fasciani made a suggestion to replace rack which I followed up on. There was little space to merchandise RSR products in this store. It was to RSR's advantage to keep existing unit because it held more product & made it possibly to merchandised a large number of products.

(5)

Crosson Food Mart - There were 2 packs of Camel light soft in the Store on my previous visit possibly they were not visible. One Brand out of stock does not affect contract dollars. Vap pricer was in proper location when I left. I placed whatever pos that was present in the store and in my Car. We had pricers on the rack's with the proper pricing. I alway try to change pricer to special offer But sometime clerk may change to Plus Tax. We had only sign in store, a pole sign and paper sign in window. We had the only signage. We had the sole clocal display in store. No other company had signage in windows.

New England Farm sis 01740
1. Missing B.S.R. Brand does not affect contract. I believe wide FF in stock but maybe the light was mistake for Full Flavor.
Vap pos pricing was in display. Owner threw away back up cards so I could not place them. I did ensure all pricing was correct.
There had been a 75 State Tax increase in previous month's in which owner took all digital pricers off of the rack. I ordered

(2)  4 New Pricers and placed them on
the Rack as Requested. There was
a pricer dail on salem but the channel
strip that originally held it on let go.
I restuck it up but possible it Fell
off.

Assonet Star.
    Camel Wide possible mistake but not
a required brand. Had not effect on
contract.
    Vap Pos was in holder when I
left the store. Possible Back up cards
were thrown out of store.
    I had spoke to owner previously about
monarch pricing. He said he forgot about
the change and was in the process of changing
that week.
    Owner places Vap on 1 shelf. We have
1 of 2 permenant Signs in window. The
owner advertise his price with Tax included.
And #
    I ordered New light Boxes and had the
store light to be installed as soon as possible.
I had larger sets to be done with greater priority.

①

Sterling Package — Not of the 3 brands were required so had not Effect on contract I Never went to this Store with Carlo on that day.

Pos was in Vap communicator When I left Store.

There are also digital price's on the counter Displays.

Again owner threw out Pos but RSR had it's Top Shelf Section on a 4 Foot Carton section.

Monarch display was on counter in a prime position. Store owner did not want Cigarette Signs in window.

This store previously had no RSR Contract. I was able to build New Trust and agreement with Retailer to gain a New counter display, a 4 Foot carton Rack, 2 existing overhead's Rack's with advertising and was in process of Negociating a 3rd counter Rack.

Lucky Dollar Store — 25 per month payment There is no distribution requirement.

We control over 50% of Pos in this Store Vap on back bar visible to customer. Vap display on Back visible to customer. Computer Battery was down.

⑤

I didn't say I forgot. Had to make note's
in call and as far as I remember I
placed the displays in the computer.
Monarch Pos on Rack in Front of
Consumer in Prime position. I did
not say I had to much to do. Carlo
putting word's in my mouth.

Bed's Dairy.
     Computer was down. I tried to
Report as best I could From Front of
counter. We have not contract in
this store. I was trying to work a
contract with the manager. There is not
Financial impact because there was No contract

possibly
$15 $20.       Sunley's - Some of the Doral Styles were in
               Stock ie Doral Full Flavor 100 Box but there were
               only a few packs left. Possibly sold out.
               Vap Pos was in display. Vap display's in
               Prime location
               Pricing on Winston - Camel - Doral - Monarch
               Salem had a display pricing was missing but
               owner conveyed discount.
               When I left store Monarch was 3.52
               Metro Contract - No distribution requirement

(9)

Vaillencourt's - Camel Wide not a required brand
No effect on Contract Doral light 100 not required
Doral light 100 may ~~~~~ no display.

Philip Morris Took out ~~B~~ 3 foot Rack
along with all prices, Mr. Fasciani
was aware of the situation. The Prices were
always there but since Philip Morris Removed
Rack we were left with a 2 foot Rack with
No prices. Mr. Fasciani was Totally aware.
We had paper Monarch sign in Window. There
are no window with Pos in this Store. Store
was in the middle of a major Change over
and RJR was in Process of Placing 3 Foot
Rack Back with prices.

Summary
        I was helping to Train part-timer
who was Mr Fasciani's Responsibility. He
did not Train her. She said she was confused
so for part of the day I said I would
help her out. Again my Computer went
down making it a little more difficult
to report: possibly causing some of the Errors.
   I felt Reporting was very important
but Mr. Fasciani would put words in
my mouth to make me sound bad.

(10)

I spent 26 years building respect with my customer's. In this asignment there was little to no merchandising in many of the Store's listed. Most of the Rack's were speaking of were placed by myself or along with GSW Al Gonsalves who commented that I did more work in this assignment than any other Rep. Some of the Store were New account's or were Store's line which RSR had "O" contracts in Recent years. It take's a long time to Rebuild a companies business in an area that was let go. I took on the challage and placed a great # of New units along with the responsibility to maintain them. In the meantime Philip Morris was try to tear out or Remove some of the RSR units in some Store. I enjoyed working with my customer and built good working Relations with them. I always showed Respect to my customer's and counterparts. I've always tried to be honest and to work hard. I feel terrible about Mr. Fasciani tReport making me look like a CRIMINAL when actually I'm honest.

ONE can go to my customers and ask the way I acted with them. Mr. Fasciani tried to tear me apart for quite some time. Whether he was told to do it or took it on himself was somewhat of a mystery. At one time there was a small scratch on my car fender. He said did your son do that. I couldn't believe the hate comments he would DIRECT towards me.

Mr. Fasciani has harrassed me and made me ill.

He was tried to ruin my future with his bad words.

Recieved Call Friday NOV 22 That RSR Took Back thier Half of Scholastic Saving
            RSS gave        Should be
17869 -        7584          8934

12

## Misc

Stock Thing

Kennedy Thing

Summer Vacation

When I asked if OK to take
week this Summer Mr.
Fasciani said you don't
want to go thru what you
did last summer.

Can't collect because
Mr. Fasciani wrote
misconduct. I was always
a gentleman to people. I tried
to treat people fairly.

# EXHIBIT F

VOLUME:    I
PAGES:    1 – 80
EXHIBITS:  SEE INDEX

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

CASE NO. 04-10006-JGD


MICHAEL RODIO,
            plaintiff,

        vs.

R.J. REYNOLDS TOBACCO COMPANY,
            Defendant.



        **DEPOSITION OF RICHARD F. KANE**, a witness

called on behalf of the Plaintiff, pursuant to the

Federal Rules of Civil Procedure, before Linda A.

Menard, a Registered Professional Reporter and

Notary Public in and for the Commonwealth of

Massachusetts, at Sahady Associats, P.C., 199 North

Main Street, Fall River, Massachusetts, on Tuesday,

June 14, 2005, commencing at 1:10 P.M.


        **DeTerra Reporting Services**
            **One Bow Drive**
        **Acushnet, Massachusetts 02743**
    **Tel. (508) 763-2542 Fax (508) 763-3521**

1    Exhibit 2.

2          MR. LOFTIS:  You can mark it as Exhibit 2

3    I don't think it's ever been authenticated.  I

4    don't know what it is either.

5          MR. SAHADY:  For identification.

6          (Marked for identification, Exhibit 2,

7    List of Prices.)

8      Q.   So the state, as we were saying, then

9    relies on the -- I'm quoting, by the various

10    manufacturers to wit in order to set the minimum

11    price?

12      A.   That would be my assumption.  I have never

13    seen correspondence from RJ Reynolds to the state,

14    but I would assume that that is how the state

15    establishes its state minimum pricing.  I'm not

16    involved in that process.

17      Q.   And the state minimum pricing varies from

18    time to time?

19      A.   That is correct.

20      Q.   And it would be important to Phillip

21    Morris or to RJR to maintain either the lowest

22    price or price at parity with other competitors in

23    a given area?

24      A.   I can't speak to Phillip Morris.

| | | | |
|---|---|---|---|
| ✓ FULL MARGIN | $ 43.92 | $ 54.90 | $ 5.49 |
| ✓ GENERIC | $ 41.15 | $ 51.44 | $ 5.15 |
| LIGGETT SELECT | $ 27.74 | $ 34.68 | $ 3.47 |
| AMERICAN SPIRIT | $ 43.85 | $ 54.82 | $ 5.49 |
| MONARCH | $ 32.06 | $ 40.08 | $ 4.01 |
| MONTCLAIR | $ 33.03 | $ 41.28 | $ 4.13 |
| SPORT | $ 28.06 | $ 35.08 | $ 3.51 |
| PRIVATE STOCK | $ 30.57 | $ 38.22 | $ 3.83 |
| ✓ GPC AND VICEROY | $ 32.41 | $ 40.52 | $ 4.06 |
| ✓ PALL MALL AND MISTY | $ 32.41 | $ 40.52 | $ 4.06 |
| ✓ U.S.A .95 | $ 29.90 | $ 37.38 | $ 3.74 |
| WAVE | $ 28.18 | $ 35.23 | $ 3.53 |
| RIVIERA | $ 29.90 | $ 37.38 | $ 3.74 |
| MALIBU | $ 33.03 | $ 41.28 | $ 4.13 |
| POINT 3/17 +75¢ | $ 24.97 | $ 31.22 | $ 3.13 |
| NATURAL BLEND | $ 33.59 | $ 41.99 | $ 4.20 |
| PYRAMID | $ 29.90 | $ 37.38 | $ 3.74 |



EXHIBIT
6-14-05

# EXHIBIT G

**CHARGE OF DISCRIMINATION**

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

- [ ] FEPA
- [ ] EEOC

**Massachusetts Commission Against Discrimination** and EEOC
*(State or local Agency, if any)*

| NAME *(Indicate Mr., Ms., or Mrs.)* | HOME TELEPHONE NO. *(Include Area Code)* |
|---|---|
| Mr. Michael Rodio | 508-520-0561 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 32 Mount Street | Wrentham, MA 02093 | Norfolk |

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME** *(If more than one list below.)*

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| R.J. Reynolds Tobacco Company | 1,000 or more | 508-870-2211 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 1500 West Park Drive, Suite 203, Westborough, MA 01581 | |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| | |

**CAUSE OF DISCRIMINATION BASED ON** *(Check appropriate box(es))*

- [ ] RACE
- [ ] COLOR
- [ ] SEX
- [ ] RELIGION
- [ ] NATIONAL ORIGIN
- [X] AGE
- [ ] RETALIATION
- [ ] OTHER *(Specify)*

**DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE** *(Month, day, year)*
10/28/02

**THE PARTICULARS ARE** *(If additional space is needed, attached extra sheet(s))*:

On October 28, 2002, I was terminated from my position as an area sales rep. for R.J. Reynolds tobacco Company. I believe that the reason for my termination was because of my age, (d.o.b. 8/1/52) fifty years old. Therefore, I charge the Respondent with unlawful termination against me in violation of Massachusetts General Laws, Chapter 151B, Section 4, Paragraph 1 and Title VII of the 1964 Civil Rights Act & the Age Discrimination in Employment Act of 1967, as amended, 29 USC 621, et seq., ADEA.

. I was an employee of R.J. Reynolds Tobacco Company for 26 years and my discharge was because of my age and was to deny me benefits such as pension and other benefits that would have been due me had I completed another four years with R.J. Reynolds Tobacco Company.

[ ] I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

4/22/03

*Michael Rodio*
Charging Party *(Signature)*

NOTARY *(When necessary to meet State and Local Requirements)*

My commission expires: 7/05/07

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Day, month, and year)* 22nd day of April, 2003

*Michael Rodio*

FORM 5
MAR 84

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED