**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

**CASE NO. 04-10006-JGD**

| | |
|---|---|
| **MICHAEL RODIO** | ) |
| **Plaintiff** | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| **R.J. REYNOLDS TOBACCO COMPANY** | ) |
| **Defendant** | ) |
| | ) |

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Now comes the plaintiff in the above-entitled matter and, through his attorney n    es
the Honorable Court to deny defendant's Motion for Summary Judgment and enter judg    nt
for the plaintiff

As reasons therefor the plaintiff states that the material facts, when viewed in the    ght
most favorable to the plaintiff and non-moving party, give rise to genuine issues for the    r
of fact and, therefore, as a matter of law, the defendant's motion must be denied. In sup    t
hereof, and pursuant to L.R. 7.1 (A)(2), the plaintiff attaches hereto his response to
defendant's Statement of Facts, a concise statement of additional material facts not cited
the defendant, along with his statement of the legal elements which apply hereto, his
discussion, and accompanying affidavits and other documents.

WHEREFORE, the plaintiff respectfully requests that the Honorable Court de     the

defendant's Motion for Summary Judgment, requests that the Honorable Court grant     earing

on Defendant's Motion, and further requests that the Honorable Court enter Judgmen     r the

plaintiff.

Respectfully submitted

By his attorney,

Sahady Associates, P.C.

Michael S. Sahady
399 North Main Street
Fall River, MA 02720
(508) 674-9444
(508) 674-8430 Fax
BBO#437820

Dated: September 15, 2005

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

**CASE NO. 04-10006-JGD**

| | |
|---|---|
| **MICHAEL RODIO** | ) |
| **Plaintiff** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| | ) |
| **R.J. REYNOLDS TOBACCO COMPANY** | ) |
| **Defendant** | ) |
| | ) |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF**
**HIS OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**BACKGROUND**

Plaintiff's action against R.J. REYNOLDS TOBACCO COMPANY (hereinafter refer     to

as Reynolds, is based on his wrongful termination (1) contrary to the public policy doctrine,

(Plaintiff's Complaint, Count III-Exhibit A) and (2) contrary to the covenant of good faith and     r

dealing.  (Id., Count II)

**Discharge contrary to Public Policy:**

The Commonwealth of Massachusetts, under its authority to administer the governmen     d

its power to regulate taxation, has enacted Chapter 64C of the General Laws, which regulates t

minimum prices at which different brands of cigarettes can be sold in the Commonwealth, and

makes it a criminal offense to violate the minimum pricing laws as established.

The defendant Reynolds was at all relevant times the manufacturer of a brand of ciga    es
called Monarch, the minimum price for which it could legally be sold in the Commonwealth
October 2002 was $4.01 per pack. (Rodio's Affidavit—Exhibit B) The competitive branc to
Monarch was a brand called Wave. The State minimum price for Wave in October 2002 was    53
per pack. (Id. and Chart--Exhibit C). The plaintiff as a sales representative was urged and di    ted
at all times to maintain the price for Monarch, at or below the price of its competitor Wave ev    if
that price was to violate the State minimum pricing laws. (Rodio's Affidavit—Exhibit B) Tl
defendant masked its violation of the minimum pricing law by camouflaging this violation ur
the acronym of EDLP or Every Day Low Price. This illegal conduct by the defendant not onl
unfairly injured its competitor, but evaded the payment of many millions of dollars in tax reve    e to
the Commonwealth.

The defendant twists and spins its argument to the Court by indicating that its sale con    :ts
did not state what that "lowest price should be", but admits that it required the Monarch brand    be
sold at the lowest price cigarette brand in the store, (defendant's Brief, p. 11) even if that price    is
below the State minimum. It was precisely because the plaintiff failed to cause the retailer to
maintain the price below the State minimum that he was terminated. Reynolds' own Letter of
Termination contains a clear, unambiguous, and unequivocal admission of its violation of the :    e
minimum pricing laws. Reynolds fired the plaintiff for

> "...failing to maintain the everyday lowest price for Monarch in this account.
> Wave (competitive product) cigarettes retailed for $3.52 per pack, while
> RJRT's Monarch retailed for $3.62 per pack.". Letter of Termin-
> ation, p. 8--Exhibit D).

No small wonder that in all of its submissions to the Court, the defendant has not addre    i
this blindingly plain admission of its own misconduct. The termination of the plaintiff was,
therefore, against the law. Monarch's retail price as established by the Commonwealth was $4

2

per pack, and the plaintiff was discharged by Reynolds for failing to maintain the price at or    ow

$3.52 per pack . Reynolds' use of these predatory practices has the goal of addicting young    ple

who gravitate to the lower price brands because they cannot yet afford the higher price branc

selling at $5.00 and over per pack. (Rodio's Affidavit—Exhibit B) Rodio's failure to sell bel    the

State minimum is statutorily protected. See Wright v. Shriners Hosp. for Crippled Children,    ?

Mass 469, 472; 589 N.E.2d 1241, 1244 (1992). Whether public policy exists, which shields

plaintiff, is a matter of law for the trial court to decide and is not an issue of fact. King v. Dr.    ll,

418 Mass.576, 638 N.E.2d 488 (Mass. 1994); Wright v. Shriners Hosp. for Crippled Childrer    ipra

at 472. In GTE Prods Corp. v. Stewart, 421 Mass. 22; 653 N.E.2d 161 (1995), the Supreme

Judicial Court considered public policy claims and endorsed them when the conduct depende    1

"(1) explicit and unequivocal statutory or ethical norms (2) which embody policies of importa    ? to

the public at large in the circumstances of the particular case..." The particular circumstance    this

case is that a 26-year employee was discharged for failing to maintain cigarette prices below t

minimum mandated by law. Defendant's conduct is, therefore, in open disregard of the law a

renders it liable to this plaintiff. The nature of defendant's business and its conduct in this

circumstance is, in and of itself, a violation of established ethical norms even absent a statutor

prohibition. Who in our society would condone setting out to addict young people to cancer

causing products?

The defendant keeps repeating in its Brief to the Court that to sell below State Minimu    s

for the retailer, not Reynolds. If, indeed, that was the case, why did this defendant fire the plai    ff

for "...failing to maintain the everyday lowest price for Monarch in this account."? (Exhibit D

8) If this defendant wishes to give its Letter of Termination torturous and untenable twists of

meaning, it should save this for the jury. If this Letter of Termination has no meaning, then the    ry

will have to say so.

3

Defendant's Motion for Summary Judgment on this ground is, therefore, inappropria    nd
must be denied.

### Health Code Violations and their implication of Public Policy:

The defendant bundles its seduction of children to smoking under the heading of

"advertising theory", which is topic 3 of its Brief. In the same way that the defendant violate    ıe

State minimum pricing laws by terming its action as Every Day Low Price (EDLP), it defend    s

violation of the health code as a First Amendment right, and gives this right to advertise to ch    ·en

the acronym of POS communicator. It again tries to fly under the Court's radar by not disclo    ∃

the complete meaning of these POS communicators. On page 7, paragraph 3 of its Letter of

Termination (Exhibit D), Reynolds terminates the employee because:

> "You failed to place and maintain a VAP communicator on the *front counter*
> and place the appropriate VAP POS advertising and PRP discounting cards."
> *(*Exhibit D, p. *7)* "… *as instructed by management. "* (Id. p. 2, 3, 6, and 11)

All of these counters are below the minimum 5 feet in height required by the health co    ınd

all, or substantially all are within 1,000 feet of a school or a playground. (Rodio's Affidavit—

Exhibit B).

Reynolds, on pages 14 and 15 of its Brief admits its conduct in positioning advertising    ver

than 5 feet from the floor, but justifies it under a First Amendment right and further says that t    ∋

had never been a valid law prohibiting counter top advertising and that the plaintiff should hav

known this. This is another predatory practice with its own serious implications of public pol

and the public-be-damned attitude. The purpose of 940 CMR, § 21.04 (5)(b) can only be to pr    ∶t

children from having shoved in their faces advertisements glamorizing cigarette smoking and

thereby addicting them at an early age and causing havoc to their health. Neither the State

minimum pricing laws, nor the health code is an internal company regulation not worthy of

recognition as public policy, as the defendant contends. Can there be a more vital public intere

4

than the protection of children's health?  It is difficult to imagine anything redeeming about    les
pitch to children which will probably result in their death at an early age.  The defendant bra    ly
argues that if it can do it, it will do it no matter the consequences to the children affected.  Re    olds
terminated the plaintiff in October 2002.  940 CMR, § 21.04 (5)(b) was promulgated in Janu
1999.  The defendant argues that for there to be a public policy implication, that public polic    ust
be grounded in a relevant statute or other source of law.  Even by its own very restrictive
interpretation, Reynolds has plainly demonstrated a violation of public policy through its
termination of the plaintiff for failing to place and maintain a VAP communicator on a count
lower than 5 feet off the ground.

The defendant brandishes Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 121 S. Ct 24
150 L.Ed.2d 532 (2001), as a badge of honor giving it license to violate a clearly established    lic
policy.  In finding that 940 CMR violated the First Amendment, neither Chief Justice Young    he
Federal District Court, nor the U.S. Supreme Court directly, or impliedly, approved the practi    of
advertising cigarettes to children as good public policy.  Public policy is not easy to define, ar    ie
Courts have had to grapple with this concept.  Public policy is much like pornography: you
recognize it when you see it.  In Council v. Cohen, 303 Mass. 348, 352, 21 N.E.2d 967, 969 (1    9),
the Supreme Judicial Court accepted the definition of public policy as expressed in Egerton v.
Brownlow:

"public policy is that principle of law which holds that no subject can lawfully
do that which has a tendency to be injurious to the public or against the public
good.  The Court should proceed with extreme caution when called upon to
declare a transaction void on grounds of pubic policy, and prejudice to the
public interest should clearly appear before any such declaration is made."

The plaintiff submits that the public interest in not inducing children to smoke does not    :d
a statute or a rule to validate it or give it vitality.  In Mello v. Stop & Shop Cos.,  402 Mass. 35
556, 524 N.E.2d 105, 106 (1988), the Court said "an employee must be able to point to some

5

clearly-defined and well-established public policy that is threatened by the employer's actio     The

public policy against advertising to children was here threatened and undermined by Reynol     The

defendant had the choice to abide by this public policy and be a good citizen, or to violate it     l

cause massive harm to children and hide behind the First Amendment. This defendant chose

injure the children and hide behind the First Amendment. The case before the Court does no

involve a breach of an internal company policy, as defendant contends, but affects the public

large. In its violation of the minimum pricing laws, Reynolds deprived the State of tax reven     (to

be used in part for public health care for smoking-related diseases, G.L. c. 64C, §7A), and in

advertising policy, it gravely endangered the health of the children.

This is not a case of a breach of an overbroad administrative regulation as in *Wright*, :     ·a,

where the code of professional ethics was privately adopted. This case rather presents a viola     1 of

a policy embedded in the health code of the Commonwealth, and intended to protect the entir

public, and so carries the imprimatur of public policy. The issue before the Court is whether·

striking down of 940 CMR, § 21.04 (5)(b) renders its violation a protective conduct as Reyno

contends.

In the case of DeRose v. Putnman Management Co., Inc., 389 Mass. 205, 210-211, 49

N.E.2d 428, 431-432 (Mass.1986), the Court affirmed a public policy verdict, stating that

"the jury could have found that DeRose had been fired for
refusing to testify falsely against a co-worker in a criminal trial."

As in *DeRose*, the jury can here find that the employee was fired for failing to maintair

tobacco prices below the State minimum, and for failing to post advertising inducing children

smoke. See also Cort v. Bristol-Myers Co., 385 Mass. 300, 302-303, 306-307, 431 N.E.2d 90£

910, 912 (1982). Again, this is not a case of infraction of the company's own internal policies.     t

concerns  statutes and regulations implicating vital public interests, and is clearly distinguishab

6

from Smith-Pfeffer v. Superintendent of the Walter E. Fernald State School, 404 Mass. 145,

533 N.E.2d 1368, 1372 (Mass.1989).  The case of this plaintiff furthers a policy affecting the  blic

at large and is embodied in two separate sources of law:  one in the General Laws, and the otl  in

the health code.  The *Smith-Pfeffer* case involved no such implication and involved a mere di  te

over the internal direction of the institution, and because of this, the Court said that it did not  e

rise to a public policy claim.  Can this tobacco company seriously argue that its cheating the

Commonwealth of taxes and imperiling the health of children is merely an internal company  cy

not to be disturbed by the Courts?      In Wright v. Shriners Hosp. for Crippled Children, supra  ie

Court held that the discharge of the employee was a lawful exercise of her employer's manage  nt

prerogative, the Court refusing to accept regulations issued by the Board of Registration in Nt  ıg

as a potential source of public policy, the Court noting that regulations "governing a particular

profession" had not, and would not, be accepted as a basis for a public policy claim.  Unlike *ht*,

the case before the Court does not implicate rules of a particular profession, but implicates a

General Law and a health code applicable to the entire population.  One would shudder to thin  ıat

health consequences to the citizens of the Commonwealth are best left to the tender mercies of  ·

tobacco companies.

Lorillard Tobacco Co. v. Reilly, supra, on which Reynolds relies for its violation of 94(

CMR, itself contains the principles and laws that are wholly destructive to Reynolds' position.

Reynolds argues that its violation of 940 CMR regarding the POS advertising the sale of cigare  ·

does not implicate public policy, as if cigarettes were no more harmful than a bottle of spring w  r.

The Supreme Court did not invalidate 940 CMR because it was not good public policy, the Cot

merely held that Congress had enacted a comprehensive scheme that addressed cigarette smoki

and health in advertising and thereby preempted State regulation of cigarette advertising and 94

CMR was not the least restrictive of the First Amendment.

7

If this defendant is, indeed, looking for a statutory nexus as a source of public policy, certainly the acts of the Congress of the United States in drastically limiting the advertising o cigarettes is in itself a national demonstration of public policy. In the Federal Cigarette Label and Advertising Act, (FCLAA) 15 U.S.C.S., sec. 1331, et seq., the Court said that Congress h drafted a comprehensive federal scheme governing the advertising and promotion of cigarette ut the Court took pains to note that the F.C.L.A.A. does not preempt State laws *prohibiting* cigar sales to minors, and that Congressional policy supports State law prohibiting cigarette sales to minors. Indeed, Congress had made the prohibition of cigarette sales to minors as a condition receiving a block grant funding for substance abuse treatment activities. 106 Stat. 394, 388, 42 U.S.C.S., §§ 300x-26(a)(1), 300x-21. To protect its own children and in furtherance of Nation public policy, Massachusetts enacted G.L. c. 270, § 6 (2000) prohibiting the sale and distributi of tobacco products to minors. The U.S. Supreme Court in its analysis in L*orillard* said that "the te may prohibit common inchoate offenses that attach to criminal conduct, such as *solicitation,* conspiracy, and attempt." This tobacco company having been prohibited from selling its produ to minors by G.L. c. 270, §6, wants to retain the right and practice of soliciting minors by placi ts advertising displays at heights less than 5 feet where the young can most effectively be seduced it. Can there be a clearer nexus between a statutorily prohibited conduct and the practice of this defendant, when the U.S. Supreme Court itself has said that such practices are common inchoat offenses that attach to criminal conduct?

In Lorillard Tobacco Co. v. Reilly, supra, the U.S. Supreme Court said that in enacting ℂ CMR, § 21.04, (5)(b), Attorney General Scott Harshbarger had announced

"that as one of his last acts in office, he would create consumer protection re-
gulations to restrict advertising and sales practices for tobacco products. He
explained that the regulations were necessary in order to 'close holes' in the
settlement agreement and '*to stop Big Tobacco from recruiting new customers
among the children of Massachusetts.* '

8

One can see why, therefore, the big tobacco companies, including this defendant, rush   to
quash this regulation. To survive in their grim business, big tobacco found it necessary to ad   t the
young while still impressionable. Can there be a practice more repulsive and injurious to put
policy than what this defendant is claiming it has the right to do under the First Amendment?

This tobacco company continued its practice of advertising to children and unabashed
fired Rodio because he

> "...failed to place and maintain a VAP communicator on the *front counter*
> and place the appropriate VAP POS advertising and PRP discounting cards."
> (Exhibit D, p. 7) "... *as instructed by management.*" (Id. p. 2, 3, 6, and 11)

On page 16 of its Brief, the defendant argues that where the law is involved only incir   y,
"the connection between the law and the protected activity must not be remote or speculative."   he
law that 940 CMR, sec. 21.04, (5)(b) helps enforce is the law that forbids the sale of tobacco
products to children. In Lorillard Tobacco Co. v. Reilly, 84 F.Supp.2d 180; 2000 U.S.Dist.. C   f
Justice Young stated that neither the tobacco companies, nor the Attorney General disputed the
underlying public policy goals of the regulations the tobacco companies were seeking to suppr
It is perverse for this tobacco company to admit that there is good public policy in the enactne   if
940, but not in its enforcement. Judge Young using the Central Hudson framework determined   at
the subject regulation was not sufficiently narrowly tailored to effectuate the governmental pur   e.
The good public policy underlying the regulation was, however, unquestioned and unchallenge
Having stipulated to the good public policy of the regulation, this defendant should now be
precluded from challenging it. The Court in Lorillard Tobacco Co. v. Reilly, Id., found that the
Attorney General's intention in enacting the regulation was to "target the prevalence of an illeg
activity—underage smoking..." Judge Young went on to say that "This Court agrees with the
Fourth Circuit that a state has a *substantial* interest in promoting compliance with one of its own
valid laws."

9

The public policy implications of *940*, therefore, appear to be incontrovertible.

**Reynolds' Affidavits**

The Affidavits by Carlo Fasciani, Richard Kane, and Robert Deschenes contain little        tual statements and are primarily a diatribe in defense of their illegal conduct which is better save     )r the jury. Mr. Deschenes in paragraph 2 of his Affidavit states that Mr. Rodio believed he wa discharged because the tobacco company wanted to deprive him of his pension benefits. Tha        a misstatement of the facts. Mr. Rodio believed then and believes now that the consequence ol       : wrongful termination was depriving him of his heightened pension benefits which were large earned over 26 years of service. (Rodio's Affidavit—Exhibit B). The analysis is not what R(       ) believed, it is what Reynolds gave as reasons for the firing.

Fasciani is forced to admit in paragraph 41 of his Affidavit that he told or instructed R        o "to put the advertising on the counter notwithstanding the alleged instructions of the person fr the Board of Health." This is a clear admission that Reynolds instructed Rodio to disregard th Board of Health regulations and instructions.

Kane is at pains in paragraph 3 of his Affidavit, to spin, twist. and turn in explaining hi instructions to the plaintiff regarding violation of 940 CMR §21.04, (5)(b). Kane finally settle     1 the contention that there had never been a law in effect in Massachusetts requiring cigarette advertisements to be 5 feet off the floor or higher and he learnedly cites Lorillard Tobacco Co. Reilly, supra. Kane also admits to instructing Mr. Rodio to disregard the applicable regulation because it was "not upheld by the Courts". Within the four corners of Kane's own Affidavit, th is an affirmation of plaintiff's contentions that he was terminated because of his failure to comp with management's instructions regarding violations of the State minimum pricing laws and of       ) CMR §21.04, (5)(b). Neither Fasciani, nor Kane, nor Deschenes address the unvarnished larg     e they used on page 8 of their Termination Letter (Exhibit D). All of them knew, or should have

10

known, that the minimum State price for Monarch in October of 2002 was $4.01 per pack, ar  ·ach

and everyone of them knew what their Letter of Termination to Rodio said. It stated, on pag·

> "You failed to execute the Every Day Low Price (EDLP) contract requirements
> in this account by not placing signage and failing to maintain the everyday
> lowest price for Monarch in this account. Wave (competitive product)
> cigarettes retailed for $3.52 per pack, while RJRT's Monarch retailed for
> $3.62 per pack."

In his Affidavit, Kane says that he had "instructed my sales staff to completely refrain  ·m

having any discussion with retailers about setting prices or price levels for tobacco products ii  eir

stores." If Kane's Affidavit is truthful and prices are indeed set by the retailer and sales

representatives are instructed to completely refrain from having any discussion with retailers ɛ  ɹt

prices, why then is Kane terminating Rodio because he "failed to <u>execute</u> the Every Day Low  ɔe

(EDLP) contract requirements in this account by not placing signage and <u>failing to maintain</u> tr

everyday lowest price for Monarch in this account."? Either the reason given on page 8 of tɔe

Termination Letter is false, or Kane's Affidavit is false. That, certainly, is a question of fact fɔ  ɪe

jury to decide.

On page 62 of his deposition, (Exhibit E) Kane was asked that if it is the decision of thɛ

retailer to set the price, why he then puts the burden on the sales rep to maintain the lowest pric

Kane's answer was

> "Because the sales rep – by signing the retailer up on this program, the retailer
> has to adhere to the requirements of the program; and the sales rep's job is
> ensure that the retailer adheres to the contractual requirements that he signed
> off on." (Exhibit E, p. 62, lines 22-24, p. 63, lines 1-3).

What Kane is saying in plain English is that if the contract that Reynolds induced the ret  ·r

to sign requires the sale of the defendant's brand below State minimum, then it is the sales rep's  )

to insure that the retailer adheres to the contractual price even when it is below the State minim

When Reynolds is caught selling below the State minimum, it then evades responsibility by sayi

11

"it is not us, it is the retailer". One has to question Kane's credibility in his deposition under

when he says on page 64 that he did not know that the State minimum price of his brand, Monarch,

was $4.01 per pack. This is coming from the Region Manager for the Boston Region. When he

is asked whether selling his company's cigarettes below the State minimum price is evading a

lawful tax, Kane at page 60 of his deposition answers: "I can't answer that question. I don't-

mean, I don't understand the nature of your question." (Id., lines 15-20). And when asked if h

indifferent to the State minimum pricing laws, he also states: "I can't answer that." (Exhibit E

78, lines 5-9).

When asked if he is aware of a Massachusetts health regulation that prohibits the displ f

cigarette advertising below a certain level on a counter, Kane answers that he is not aware of a

such regulation. (Id., p. 16, lines 20-24, and p. 17, lines 1-2.) Kane in his deposition brazenly

admits that in effect he did not give a damn where the POS advertising was placed so long as it s

placed "as close to the point of sale as possible" on the store's counter and did not matter to hir

what height the counter was as long as it was most visible to the public. (Id., p. 51) Kane does t

deny that Rodio was terminated for failing to place and maintain the appropriate POS advertisin n

counters less than 5 feet high. Kane testified that placing the POS advertising 6 feet high woulc t

be desirable, but placing an advertisement 3 ½ to 4 feet high would be just fine, and that he did

care at what height below six feet the advertisement was placed so long as it was not inches off

floor. (Id., pages 52 and 54.)

The Affidavits of the three executives, Fasciani, Deschenes, and Kane are merely a thick

coat of whitewash. Not one of these three executives approaches the incriminating language on

page 8 of their Termination Letter where they state clearly and unequivocally that this 26-year

employee is being terminated for failing to maintain the price of Monarch below the State

minimum, nor do they explain the language throughout the letter wherein this employee is

terminated for failing to maintain the appropriate VAP POS advertising on the counters less    ɩ 5
feet in height.  This reason is given five times in the Letter of Termination.

The Court has granted relief for employees who are fired for reporting violations of cr    nal
law.  In Shea v. Emmanuel College, 425 Mass. 761, 682 N.E.2d 1348 (1997), the Court ass.in
without deciding, that discharging an employee for reporting criminal activity within the emp    ng
unit violates public policy (dictum), citing with approval Smith v. Mitre Corp., 949 F.Supp. 9ₑ
950 (D.Mass. 1997)  The Court has granted relief for employees who cooperated with law
enforcement agencies because, although such cooperation is not legally required, "the Legislat
had clearly expressed a policy encouraging such cooperation."  Wright v. Shriners Hosp. for
Crippled Children, supra at 473, citing Flesner v. Technical Communications Corp. 410 Mass.    5,
810, 575 N.e.2d 1107, 1110 (1991)

The good public policy, which should here shield the employee, has its genesis in two
legislative sources, state and federal, and complies with the doctrine of Wright v. Shriners Hosj    ɔr
Crippled Children, supra.

Defendant's Motion on this ground must, therefore, be denied

### Covenant of good faith and fair dealing:

There adheres in every at-will employment relationship a  covenant of good faith and fa
dealing that is violated when the employer terminates an at-will employee in order to avoid pay.    ɩt
to the employee of compensation earned or 'almost earned' through services already rendered tc    ᵊ
employer.  Such termination is in 'bad faith' because it unjustly enriches the employer and deɔrɩ    ɨ
the employee of compensation which he either has earned or is 'on the brink' of earning.  The
remedy is to award damages to the discharged employee for "the loss of compensation that
is…clearly related to an employee's past service…" Fortune v. National Cash Register Co., 373

13

Mass 96, 364 N.E.2d 1251; Gram v. Liberty Mut.Ins. Co., 384 Mass. 659, 672, 429 N.E.2d 2

29(1981); Harrison v. NetCentric, 433 Mass. 465, 475-476, 744 N.E.2d 622, 631 (2001)

In a 2005 case, the Supreme Judicial Court amplified on the issue of damages due the

employee for termination contrary to this doctrine. In Ayash v. Dana-Farber, 443 Mass. 367,

N.E.2d 667 (2005), the Court said:

> "in awarding damages for breach of the implied covenant of good faith and
> fair dealing, the goal is to compensate an employee for past services and to deny
> the employer 'any readily definable, financial windfall' resulting from the
> breach." (emphasis supplied) favorably citing McCone v. New England Tel.& Tel. Co
> 393 Mass. 231, 234, 471 N.E.2d 47 (1984); Gram v. Liberty Mut.Ins. Co.,
> supra at 335. King v. Driscoll, supra at 5; Maddoloni v. Western Mass. Bus Lines, Inc.,
> 386Mass. 877, 881, 438 N.E.2d 351 (1982)

Here Reynolds discharged this employee after 26 years of service and at a time when he  as

on the brink of harvesting a life's labor.

## Decision of the Mass. Department of Labor and Work Force Development, Division of Unemployment and Training

Following his termination, the plaintiff applied to the Division of Unemployment and

Training for unemployment benefits and was awarded them. Reynolds appealed and challenged  s

right to collect unemployment benefits claiming that it fired him for "misuse of company

resources". The tobacco company relied on M.G.L. c. 151A, §25(e)(2) in charging the employe

with deliberate misconduct in willful disregard of the employing unit's interest, and requested th

Department to deny him unemployment benefits. A Hearing was held before a Review Examine  f

the Hearings Department where the tobacco company was represented, and a Decision was rende  l

on 1/31/03, a copy of which is hereto annexed and marked Exhibit F.

In a well-reasoned opinion and decision, the Review Examiner analyzed the facts and the

evidence presented and concluded that the discharge was not attributable to deliberate misconduc

in willful disregard of the employing unit's interest, and that, therefore, the employee "is not subj

14

to disqualification under §25(e)(2) of the Law." (Exhibit F, p. 4) The tobacco company foun  self
in an exquisite dilemma before the Division of Employment and Training. Unable to disclose
real reasons for plaintiff's termination, i.e. his failure to maintain prices below the State minu  n,
and his failure to display advertising at counters lower than 5 feet, the tobacco company had t
content itself with the generic accusation of "misuse of company resources". The Review Exa  ner
found the company's position to be so vague that it does not define the type of behavior that is
prohibited and stated that "As a result, they cannot be fairly considered rules or policies." (Id.
The Review Examiner affirmed the initial determination and decided that the claimant was ent  d
to unemployment benefits under the laws of the Commonwealth. Reynolds did not appeal to t
Courts from this determination, and it remained final.

Plaintiff submits that the finding by the Review Examiner that he was terminated witho
deliberate misconduct on his part is *res judicata* on the issue of his firing against the standard c
good faith and fair dealing.

That the tobacco company had "a full and fair opportunity to litigate the issues in questi
is amply supported by the record before the Department of Labor and Workforce Development.  n
page 9 of the transcript of the hearing proceedings, (Exhibit G) the Review Examiner, afforded
tobacco company, the full opportunity for cross-examination, and full opportunity to directly
examine its own witness, Mr. Carlo Fasciani, who testified on behalf of the tobacco company  I
undeniable that the purpose of the hearing before the Review Examiner was to provide for an
adjudicatory hearing of the very issue of whether the firing fell within the standard of good fa th  d
fair dealing. Having had, therefore, a full and fair opportunity to cross-examine before the
adjudicatory Review Examiner, the tobacco company is now precluded and collaterally estopped
from claiming that its decision to fire him did not contravene the good faith and fair dealing
standard, the Review Examiner having found that his discharge was "not attributable to deliberat

15

misconduct in willful disregard of the employing unit's interest". Commissioner of the Depa    ent
of Employment and Training v. Dugan, 428 Mass. 138, 697 N.E.2d 533; Alba v. Raytheon, 4
Mass. 836, 809 N.E.2d 516 (2004). The issues decided by the Review Examiner and the issue
termination against the good faith and fair dealing standard are identical, but "even if there is    ck
of total identity between the issues involved in two adjudications, the overlap may be so subst    al
that preclusion is plainly appropriate." Commissioner of the Department of Employment and
Training v. Dugan, supra.

Defendant's own Statement of Undisputed Material Facts contains contradictions which    n
and of themselves, raise disputes as to issues of material fact. Reynolds accuses the plaintiff o    ot
mentioning in his private notes the two reasons for which he was fired. Reynolds, however, is
forced to admit that Rodio, in his deposition, did state his failure to maintain prices below the S    e
minimum and his failure to maintain advertising on counters below 5 feet as reasons for his firi
(¶65 of Defendant's Statement of Undisputed Material Facts). If Reynolds is contending that th    is
a contradiction in Rodio's position, then that contradiction is for the jury to resolve.

Reynolds complains that Plaintiff, in his complaint, did not enumerate the reasons that h
later gave for his termination. The Federal Courts are 'notice pleading' jurisdictions and not 'fa
pleading'. (Rule 8, F.R.C.P.). Discovery is the vehicle through which the evidence is developed
and fleshed out. In its own Affidavits, the defendant does not deny a violation of 940 CMR, but
justifies its conduct as being permitted under the First Amendment. Reynolds is placing the bur    t
on the employee to explain why he was fired when Reynolds in its own words, above the signatu
of Mr. Fasciani, clearly, unambiguously, and unequivocally stated the two reasons for which he    s
fired, both of which were against the law and public policy.

On the issue of advertising to minors, where Reynolds has admitted its conduct, but hides
behind the First Amendment, Summary Judgment is appropriate to be granted against Reynolds,

16

having admitted to its conduct, leaves the Court with only a question of law to decide and that whether Reynolds violated public policy by terminating the plaintiff for failing to advertise cigarettes to children and minors. The Letter of Termination (Exhibit D) is in itself sufficient evidence upon which a jury could reasonably find in plaintiff's favor. Anderson v. Liberty Lc 7, Inc., 477 U.S. 242, 248-52, 106 S.Ct. 2505, 2510-12, 91 L.Ed.2d 202 (1986). Therefore, the C rt *must* deny Defendants Motion for Summary Judgment. In ruling on a Motion for Summary Judgment, the Court does not weigh the evidence or find the facts, rather the Court's role is to assess whether a genuine issue exists as to material facts requiring trial. Anderson v. Liberty Lobby, Inc., supra.

## DAMAGES

The plaintiff seeks damages under the theory of the covenant of good faith and fair deal and under the public policy doctrine.

Plaintiff's complaint sounds in tort under Count III, where he alleges a violation of publ policy, and in contract under Count II, where he alleges a violation of the good faith and fair de ig standard. In Flesner v. Technical Communication Corp., supra, the Court noted that the majorit f jurisdictions considering the question of whether a violation of public policy sounds in tort or contract, have decided that it sounds in tort. In King v. Driscoll (King II), 424 Mass 1, 673 N.E 859, (1996), the Court noted that Count I of King's complaint had alleged wrongful termination violation of both the covenant of good faith and fair dealing and in violation of public policy. Ki II, supra at 2, 673 N.E.2d at 859. It then stated, "It must be remembered that two very different theories of recovery, implicating different measures of damages (contract and tort) were asserted Count I." King II, supra at 8, 673 N.E.2d at 863. The Court's remark suggests that the public policy doctrine sounds in tort for the purposes of assessing damages. Conversely, the Court in S v. Fordham, 420 Mass. 178, 194, 648 N.E.2d 1261, 1271 (1995), held that a claim for breach of t

17

covenant of good faith and fair dealing sounds in contract for purposes of calculating prejudgr    it
interest.

The plaintiff's monetary damages, exclusive of his emotional distress damages, are as
follows:

**Loss of income:** Michael Rodio earned $59,906.60 for the last full year that he worke⸱    ⸱r
Reynolds. Michael Rodio became troubled about finding other work because of his advanced
and finally found work some four months after his termination at a job making $33,956.00. He    s
in addition to the $33,956.00 been receiving a 15% bonus. His net loss due to his firing by
Reynolds would, therefore, have been $20,856.60 a year.

At the time of his termination, Michael was 50 years old and having two young childrer
intended to work so long as his health permitted or until the age of 70, or for an additional 20 y    s.
Michael Rodio would therefore have lost **$417,132.00** for this 20-year period, without consider    n
for raise and bonuses, which he would have been entitled to receive.

For the 4 months that Michael Rodio was out of work after his termination and before
finding other employment, he lost **$19,968.00** at the rate of $4,992.00 a month.

**Loss of pension:** Had Michael Rodio worked for this defendant until he reached the age
64, or until 2016, he would have worked for 40 years for this defendant, and he would have beer
entitled to a pension of $57,218.78 a year or $4,768.23 a month. He is now receiving $604.98 a
month or $7,259.76 annually. He would, therefore, receive $49,959.02 less a year. With his life
expectancy of 13.9 years from the year 2016, he would have collected $49,959.02 a year for that
number of years, or **$694,430.37.**

**Social Security benefits;** Michael Rodio was earning $59,906.00 a year from which soc
security retirement taxes were being withheld and upon which his social security benefits would
have been calculated when he would have become eligible for retirement at the age of 65. He is

18

now earning $33,956.00 a year from which social security retirement taxes are being withheld. The
social security retirement benefits would, therefore, be substantially less at his current rate of
than they would have been had he remained in the employ of Reynolds making nearly twice a
much.

Michael Rodio intended to retire at age 70 or work till his health permitted.

**Loss of Scholarship Program account:**  Michael Rodio had subscribed to a scholarsh
fund where he contributed $18.00 a week per child or $36.00 for both of his children a week, v
the defendant matching this amount.  At the time of his termination, the defendant Reynolds to
away about **$10,000.00** from the $17,402.00 that was in the account.  This scholarship fund acc    nt
would have belonged entirely to the plaintiff and his children had he not been terminated.

**Health Insurance:**  Michael Rodio's present health insurance plan with his employer (    s
not afford him any benefits whatsoever should he be terminated, laid off, or retire, but allows h
to buy into that employer's program at a much higher rate per month than the plan that was affc    d
him by Reynolds.  It is estimated that the cost of maintaining his present plan would be about
$500.00 more per month.

**Bonus loss:**  Because of Michael Rodio's termination in October 2002, he was denied a
bonus of **$6,000.00**.

**Other insurance:**    Michael Rodio also lost the following insurance coverages: basic gr    p
life insurance, accidental death insurance, optional group life insurance; optional death and
dismemberment insurance; life insurance for his dependents; insurance for travel, accident
insurance and insurance for long term disability benefits, and managed choice plan and dental
expense plan, as listed in Annual Statement of Employee Benefits issued by Reynolds and dated
1/1/02, a copy of which is attached hereto and marked Exhibit H.

19

**Health:** Michael Rodio suffered a deep depression following his wrongful terminatio: which has only recently begun to recede, and for which he is entitled to monetary damages.

**Loss of automobile:** Michael Rodio also has been denied the use of a motor vehicle v    :h was provided by Reynolds and for which the defendant paid all costs and expenses.

**Total losses:** His monetary losses would, therefore, have amounted to **$1,147,530.37.**

## CONCLUSION

For the reasons stated above, this is a case, clearly, not appropriate for Summary Judgn against the plaintiff, the defendant having admitted in its own Letter of Termination a violation the health code and the State minimum pricing laws. "A district court has the legal power to re    :r summary judgment in favor of the party opposing a summary judgment motion even though ne    ; made no formal cross-motion under Fed.R.Civ.P.56" Lorillard v. Reilly, 76 F.Supp.2d 124

Discovery has been completed, and further discovery will clearly be of no further benefi the defendant. The Court may, therefore, *sua sponte* grant Summary Judgment to the plaintiff. Bank v. International Bus. Machs. Corp., 145 F.3d 420, 431 (1st Cir. 1998), Ramsey v. Coughlii    4 F.3d 71, 74 (2d. Cir.1996); Berkovitz v. Home Box Office, Inc., 89 F.3d 24, 29 (1st Cir.1996)

Respectfully submitted,

By his attorney,

Michael S. Sahady
Sahady Associates, P.C.
399 North Main Street
Fall River, MA 02720
(508) 674-9444
(508) 674-8430 fax
BBO#437820

Dated: September 15, 2005

## CERTIFICATE OF SERVICE

I, the undersigned, attorney for the plaintiff hereby certify under the penalties of perju     that

I have this day served the following documents on defendant's counsel: Plaintiff's Oppositio.

Defendant's Motion for Summary Judgment, Plaintiff's Memorandum in Support of his Oppc     on

to Defendant's Motion for Summary Judgment, and Plaintiff's Appendix of his Exhibits in iis

Opposition to Defendant's Motion for Summary Judgment. Said service was made by mail n

postage prepaid, a copy of same to:

Mark H. Burak, Esquire
Morse, Barnes-Brown & Pendleton, P.C.
Reservoir Place
1601 Trapelo Road
Waltham, MA 02451

Michael S. Sahady
Sahady Associates, P.C.
399 North Main Street
Fall River, MA 02720
BBO#437820
508-674-9444

Dated: September 15, 2005