# EXHIBIT E

```
                    VOLUME:    I
                    PAGES:     1 - 80
                    EXHIBITS:  SEE INDEX


         UNITED STATES DISTRICT COURT

       FOR THE DISTRICT OF MASSACHUSETTS

            CASE NO. 04-10006-JGD



MICHAEL RODIO,
           plaintiff,

     vs.

R.J. REYNOLDS TOBACCO COMPANY,
           Defendant.
```

**DEPOSITION OF RICHARD F. KANE**, a witness called on behalf of the Plainiff, pursuant to the Federal Rules of Civil Procedure, before Linda A. Menard, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at Sahady Associates, P.C., 199 North Main Street, Fall River, Massachusetts, on Tuesday, June 14, 2005, commencing at 1:10 P.M.

DeTerra Reporting Services
One Bow Drive
Acushnet, Massachusetts 02743
Tel. (508) 763-2542  Fax (508) 763-3521

```
 1
 2                     APPEARANCES:
 3     SAHADY ASSOCIATES, P.C.
           Michal S. Sahady, Esquire
 4         199 North Main Street
           Fall River, MA 02720
 5         For the Plaintiff
 6
       CONSTANGY, BROOKS & SMITH, LLC
 7         W.R. Loftis, Jr., Esquire
           100 N. Cherry Street, Suite 300
 8         Winston-Salem, NC 27101
           For the Defendant
 9
10     ALSO PRESENT:
11         Jackson Henson, Esquire
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1
 2                          I N D E X
 3
                 DEPONENT                           PAGE
 4
                 Richard F. Kane
 5               Examination by Mr. Sahady            4
 6
 7
                              INDEX
 8
 9
                 Exhibit          Description                 Pa
10
                 1        Letter from C. Fasciani to
11                        M. Rodio, 10-28-02..................... 50
12
                 2        List of Prices ........................ 75
13
14
15
16
17
18
19
20
21
22
23
24
```

16

1  handbook that there were certain things that the
2  company would adhere to as far as advertising
3  codes.
4      Q.   What does MSA stand for?
5      A.   Master -- I believe Master Settlement
6  Agreement.
7      Q.   And that is the agreement reached as a
8  result of the various states suing the tobacco
9  companies?
10     A.   That in layman's terms would be my
11 understanding, correct.
12     Q.   What were you told or instructed as to the
13 health codes in that regard, of Massachusetts?
14     A.   I'd have to clarify again because my
15 understanding is that the health codes of
16 Massachusetts are not necessarily the same as what
17 was in the Master Settlement Agreement. I'm not
18 really sure what you're talking about on health
19 codes.
20     Q.   Do you know that there is a Mass. health
21 regulation that prohibits the display of cigarette
22 advertising below a certain level on a counter,
23 below a certain height?
24     A.   I'm not aware of any such regulation in

1    the State of Massachusetts from a height
2    perspective.
3        Q.   And you supervise sales reps in
4    Massachusetts?
5        A.   I supervise managers who supervise sale
6    representatives. They do not report directly to
7    me.
8        Q.   We should get to that before I ask you
9    about this. After '81, what did you do for the
10   company?
11       A.   I was promoted to a position called
12   assistant division manager in Albany, New York.
13       Q.   What were your duties as such?
14       A.   To assist the division manager on managi
15   the sales force within the geographic boundaries
16   the Albany division.
17       Q.   So that was strictly in New York?
18       A.   Yes.
19       Q.   You didn't cover Massachusetts?
20       A.   No, I did not.
21       Q.   Was New York a fair trade state, do you
22   know, at the time?
23       A.   I do not recall that New York was a fair
24   trade state at that time.

```
 1        Q.   Do you see that: "You failed to place  nd
 2   maintain the appropriate VAP point-of-sale, POS
 3   advertising and back-up discounting cards in the
 4   VAP communicator, as instructed by management."
 5   What does this mean?
 6        A.   The sales rep would be responsible for
 7   placing point of sale to support a VAP promotion
 8   which is a buy-some, get-some-free offer.
 9        Q.   And where would this be placed?
10        A.   As close to the point of purchase as
11   possible.
12        Q.   On a counter?
13        A.   If possible.
14        Q.   The counter is the best place?
15        A.   In most stores it is.
16        Q.   And regardless of the counter's height?
17        A.   What do you mean by "regardless of the
18   counter's height"?
19        Q.   Whether the counter is six feet high or
20   three feet high off the ground, it didn't matter,
21   did it?
22        A.   It would be in a good visible location,
23   visible to the adult smoker.
24        Q.   That wasn't my question.  Did the height
```

```
 1    of the counter matter?
 2         A.   I don't really understand your question
 3    "did the height matter".
 4         Q.   Did it make a difference to you in making
 5    this instruction whether the point-of-sale
 6    advertising is going to be on a counter that is six
 7    feet high or a counter that was four feet high?
 8         A.   It would be placed on whatever the counter
 9    was in the store.
10         Q.   Right, and it didn't matter to you what
11    height that counter was?
12         A.   As long as it was not in inches, if that
13    is what your question is.
14         Q.   Inches, they'd step on it, right?
15         A.   Inches or feet.
16         Q.   So did you take into consideration the
17    height of the counter?
18         A.   We did not measure the heights of the
19    counters, no.
20         Q.   I understand you didn't measure. That
21    wasn't my question, sir. Let's not play games with
22    words because I can play the same game. My
23    question wasn't a measurement. I know you didn't
24    go and measure. Nobody measured. But did you take
```

```
 1    into account the height of the counter in
 2    determining the position of the advertising?  It
 3    a simple question.
 4        A.   I still don't understand your question;
 5    because when you use the word "height" to me, th
 6    denotes a measurement.
 7        Q.   Yes, it denotes feet.  Okay?
 8        A.   Right.
 9        Q.   Let me repeat it again.  If you don't
10    understand it, don't answer it; ask me to repeat
11    it.
12             If a counter is six feet, would that be
13    okay to place your point-of-sale sign on?
14        A.   That in my judgment would be too high.
15    would want to place it in a good visible location
16    to the adult consumer.
17        Q.   How about three and a half, four feet?
18        A.   In my judgment, that would be fine.
19        Q.   And if the sales rep violates this after
20    warning after warning, it would be grounds for
21    dismissal?
22        A.   Violates what?
23        Q.   Your rule about placing the point-of-sal
24    advertising at three and a half or four feet?
```

1    A.   I didn't have a rule for three and a ha[lf]
2    or four feet.
3    Q.   But it was perfectly okay to place the
4    advertising three and a half to four feet; six fe[et]
5    was too high.  Is that what you said?
6    A.   It would be on the normal counter in th[e]
7    store.
8    Q.   If that normal counter in this store, M[r.]
9    Kane, is three and a half to four feet, that woul[d]
10   be visible to everybody, that would be okay with
11   you, would it not?
12   A.   That is correct.
13   Q.   Okay.  Thank you.  And do you know in th[e]
14   Cloverdale Farms -- we're on Page 2 of Exhibit 1 [to]
15   your deposition -- what the height of that
16   point-of-sale counter would have been?
17   A.   I would have no idea.
18   Q.   And it really didn't matter to you as lo[ng]
19   as it was above inches and below six feet?
20   A.   As long as it was placed on the counter [of]
21   the store.
22   Q.   Regardless of that counter's height as
23   long as it isn't too high?
24   A.   As long as it was visible to the consumer

```
 1   question.
 2           MR. SAHADY:  If he knows.
 3       A.  I cannot speak to --
 4           MR. LOFTIS:  I'm just saying I just obje
 5   to the form of the question to the sense he
 6   wouldn't know what someone else's state of mind
 7   would be.
 8           MR. SAHADY:  It's not state of mind.  It
 9   the law.
10       Q.  So, if a brand of cigarettes is sold bel
11   the state minimum, the state is being cheated out
12   of its taxes; is it not?
13           MR. LOFTIS:  Again, objection to the for
14   of the question.  But you can answer it, if you
15   know.
16           MR. SAHADY:  It's evading a lawful tax.
17       Q.  Yes or no, Mr. Kane?
18       A.  I can't answer that question.  I don't -
19   I mean, I don't understand the nature of your
20   question.
21       Q.  The nature of my question is, if a
22   cigarette is sold for $5, there's a five-percent
23   tax on that -- if a pack of cigarettes, rather, an
24   if it sold for $4, there's a five-percent sales ta
```

```
 1   on that.  So if you sell your cigarettes below t
 2   state minimum, which is contrary to the law, you
 3   are paying less in taxes in Massachusetts than y
 4   should?
 5            MR. LOFTIS:  When you said "you are
 6   selling", who are you talking about?
 7            MR. SAHADY:  I mean RJR, not Mr. Kane
 8   personally.
 9            MR. LOFTIS:  But again you are implying
10   that RJ Reynolds sells the cigarettes to the
11   consumer.
12       Q.   You're saying RJR does not sell to the
13   consumer, all right.
14            Let's see if we can clarify this.  Let's
15   turn to Page 8, Mr. Kane.  The very last paragrap
16   on Page 8 under Swidey's Variety Store:  "You
17   failed to execute the everyday low price, EDLP,
18   contract requirements in this account by not
19   placing signage and failing to maintain the
20   everyday lowest price for Monarch in this account.
21            You are saying to him he has failed to
22   maintain the everyday lowest price for Monarch in
23   this account; is that what that says?
24       A.   You read it exactly the way I've read it
```

```
 1        Q.   And this was written by Mr. Fasciani,
 2   reviewed by Mr. Deschenes, and the allegations we
 3   reviewed by you --
 4        A.   That is correct.
 5        Q.   -- prior to the delivery of this letter
 6   Mr. Rodio, right?
 7        A.   Correct.
 8        Q.   What did you mean when you said he fail
 9   to maintain the everyday lowest price, he failed
10   were you urging him to sell cigarettes at a certa
11   price or not?
12        A.   The everyday low price program when
13   presented to the retailer, which it's the
14   retailer's option to accept or not, states that R
15   Reynolds' brand -- and I have to refer here --
16   which would be Monarch, there can be no brand in
17   the store sold to the consumer for a lower price
18   than Monarch.
19        Q.   If it's the decision of the retailer, th
20   why do you put the burden on your sales rep to
21   maintain the lowest price?
22        A.   Because the sales rep -- by signing the
23   retailer up on this program, the retailer has to
24   adhere to the requirements of the program; and the
```

63

```
 1    sales rep's job is ensure that the retailer adhe  s
 2    to the contractual requirements that he signed o
 3    on.
 4        Q.   Which is to sell your cigarettes below
 5    state minimum?
 6        A.   There is nothing here in this sentence
 7    that you read to me that speaks anything to state
 8    minimum.
 9        Q.   Let's go back and read the rest of this
10    maybe that will help: "Wave, competitive product
11    cigarettes retail for $3.52 per pack while RJRT's
12    Monarch retail for $3.62 per pack."
13        A.   Okay.
14        Q.   You were blaming Rodio and firing him fc
15    not selling your Monarch brand at 3.52 or below.
16    Isn't that what this plain English means?
17        A.   This is saying that Monarch was not the
18    everyday-low-price brand in the store. The
19    retailer signed up for a program that would requir
20    Monarch to be the everyday-low-price brand,
21    regardless of what -- the retailer establishes the
22    price.
23        Q.   Regardless of what the state minimum was,
24    yes or no.
```

34

1  A.  I don't know what the retailer did
2  regarding state minimum.  I do not know what the
3  state minimum price was at that time.
4  Q.  Shouldn't you have known, Mr. Kane, wi[th]
5  all your experience and long standing with this
6  company that the price, minimum price was 4.01 a[nd]
7  you are urging this guy to sell it below 3.62?
8  A.  No, I would not; because I do not know
9  that the price that you are referring to, 4.01, [i]s
10 in fact the state minimum at the time.
11 Q.  You don't think the Attorney General ha[s]
12 the state minimums for every year?
13 A.  I would assume they would.
14 Q.  Did you ever check on that to see what [th]e
15 minimum was in 2002?
16 A.  Was it part of my role to check what th[e]
17 state minimum price was with the Attorney General[?]
18 Q.  You were firing Mr. Rodio for failing t[o]
19 sell Monarch below 3.62 when the minimum price se[t]
20 by the state was 4.01.  Isn't that what you were
21 doing here in your own words, the words of your
22 company?
23     MR. LOFTIS:  Objection to the form of th[e]
24 question.

1    long as the price is established by the retailer
2    Is that what you're saying?
3        A.   It is not my role to get involved in a
4    state minimum pricing discussion with a retailer
5        Q.   So you're indifferent as to what the st  te
6    minimum is and you want to sell your cigarettes
7    that lowest price in the store regardless of
8    whether it is within the state minimum or not?
9        A.   I can't answer that.
10       Q.   Of course. Thank you. I'll be asking    ou
11   about that in the future. That's it.
12            MR. LOFTIS:   Let me take a break. I ma
13   or may not have questions.
14            MR. SAHADY:   Sure. Whatever you want.
15            (Break.)
16            MR. LOFTIS:   We have no questions.
17            (Deposition concluded at 3:05 p.m.)
18
19
20
21
22
23
24