UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL RODIO,

        Plaintiff,

v.                               Civil Action No. 04-CV-10006-JGD

R.J. REYNOLDS TOBACCO COMPANY,

        Defendant.

## DEFENDANT'S REPLY MEMORANDUM TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

The Plaintiff's Memorandum in Support of His Opposition to Defendant's Motion for Summary Judgment (hereinafter, "Pls' Opp.") is so full of hyperbole and emotionalism, and so utterly lacking in logic, that one scarcely knows where to start.  Suffice it to say that his Opposition is procedurally defective on multiple levels, it misinterprets the applicable law, and includes "evidence" that conflicts with Rodio's own prior testimony, which was already in conflict with itself.  For all of these reasons, as well as the reasons set forth in Reynolds's original summary judgment materials, Reynolds submits that its Motion for Summary Judgment should be granted in its entirety.

Simultaneously with the filing of this Reply, Reynolds is filing a Defendant's Motion to Strike Portions of Affidavit of Michael Rodio and a Defendant's Motion to Strike Portions of Plaintiff's Summary Judgment Opposition, each with a supporting Memorandum of Law. Defendant's Motion to Strike Affidavit of Michael Rodio is based on the fact that certain key portions of his affidavit directly conflict with his deposition testimony or mischaracterize exhibits that should speak for themselves.  Defendant's Motion to Strike Portions of Plaintiff's

Summary Judgment Opposition pertains to Rodio's inappropriate use of evidence from his unemployment hearing. All issues related to these two Motions to Strike will be fully addressed in the accompanying Memoranda in support of the Motions to Strike.

I.  The Facts Set Forth in Reynolds's Statement of Material Facts Should Be Deemed Admitted.

Rodio did not submit his own Statement of Material Facts for Which No Genuine Dispute Exists, as required by Local Rule 56.1[1]. Nor did Rodio file any point-by-point objections to Reynolds's Statement. Thus, the facts as set forth in Reynolds's Statement should be deemed admitted. See Local Rule 56.1:

> Oppositions to motions for summary judgment shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation. **** <u>Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties</u>.

(Emphasis added.) See also Morales v. A.C. Orssleff's EFTF, 246 F.3d 32, 33 (1st Cir. 2001) (if resolution of summary judgment "is not to impose the daunting burden of seeking a needle in a haystack, the court needs help from counsel"); Barry v. Wing Memorial Hosp., 142 F. Supp.2d 161, 162 n. 1 (D. Mass. 2001) (Local Rule 56.1 requires "scrupulous compliance"); Ruiz Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000) (applying similar local rule from District of Puerto Rico, and stating that failure to comply was independent ground for granting summary judgment to movant).

---

[1] Rodio's "Plaintiff's Opposition to Defendant's Motion for Summary Judgment" purports to include "his response to defendant's Statement of Facts, a concise statement of additional material facts not cited by the defendant . . ." but this appears to refer only to his Affidavit and attachments, and his Memorandum of Law. These documents fall far short of satisfying the requirements of Local Rule 56.1.

2

II.      Plaintiff's Advertising Theory Obviously Is Meritless And Must Be Dismissed.

Rodio apparently concedes that the "five-foot requirement" was never the law. Viewing his anti-tobacco screed in the light most favorable to him, it appears that he is arguing that there should be a "public policy" against countertop cigarette advertising, even though the U.S. Supreme Court has found that such a restriction violates the First Amendment to the U.S. Constitution. This argument obviously has no merit. A "public policy" cannot override the requirements of the Constitution. Thus, to the extent that Rodio claims he was terminated for failing to post POS advertising, he admits that his termination did not violate public policy.

III.     Rodio's Discussion of His Minimum-Price Theory Mischaracterizes the Record.

The Minimum-Price Theory is more complex but leads to the same result. Rodio cites to a few lines from a 12-page, single-spaced termination letter to contend that he was expected to set prices for Monarch in his retailers' stores. See, e.g., Pls' Opp. at 11. He then cites an out-of-context snippet of Kane's deposition testimony. Id.; Pls' Exh. E. The full exchange makes clear that there is no inconsistency in Reynolds's evidence: Kane consistently testified that "failing to maintain the everyday low price" clearly meant making sure that the retailer complied with the EDLP contract – not that the sales representative should dictate what the minimum price would be:

> Q.    What did you mean when you said [Rodio] failed to maintain the everyday lowest price, he failed – were you urging him to sell cigarettes at a certain price or not?
>
> A.    The everyday low price program when presented to the retailer, <u>which it's the retailer's option to accept or not</u>, states that RJ Reynolds' brand – and I have to refer here – which would be Monarch, <u>there can be no brand in the store sold to the consumer for a lower price than Monarch</u>.
>
> Q.    If it's the decision of the retailer, then why do you put the burden on your sales rep to maintain the lowest price?

3

A.      Because the sales rep – by signing the retailer up on this program, the retailer has to adhere to the requirements of the program; and <u>the sales rep's job is ensure that the retailer adheres to the contractual requirements that he signed off on</u>.

Q.      Which is to sell your cigarettes below state minimum?

A.      There is nothing here in this sentence that you read to me that speaks anything to state minimum.

Q.      Let's go back and read the rest of this; maybe that will help: "Wave, competitive product, cigarettes retail for $3.52 per pack while RJRT's Monarch retail for $3.62 per pack."

A.      Okay.

Q.      You were blaming Rodio and firing him for not selling your Monarch brand at 3.52 or below. Isn't that what this plain English means?

A.      <u>This is saying that Monarch was not the everyday-low-price brand in the store</u>. The retailer signed up for a program that would require Monarch to be the everyday-low-price brand, regardless of what – <u>the retailer establishes the price</u>.

                                *       *       *

Q.      You were firing Mr. Rodio for failing to sell Monarch below 3.62 when the minimum price set by the state was 4.01. Isn't that what you were doing here in your own words, the words of your company?

MR. LOFTIS: Objection to the form of the question.

Q.      You can answer it. The minimum price for Monarch was 4.01 in October of '02, and you are firing this guy for not selling it at 3.52 or below. This says that in plain English. Doesn't that tell you that you were firing him because he was selling cigarettes – he failed to sell cigarettes substantially below the state minimum?

A.      Is that a question?

Q.      Yes, sir, it is.

A.      He does not sell – Mr. Rodio does not sell the cigarettes. You said he failed to sell the cigarettes.

Q.      Failed to maintain the price. . . . What did you mean by that, that he failed to maintain? . . .

4

\*   \*   \*

A.   <u>The contract states that Monarch, the brand that we are talking about, should be the lowest or at parity with the lowest brand in the store.</u>

\*   \*   \*

A.   State minimum pricing is something for the retailer to adhere to.

Q.   Why do you then say to your sales rep that he failed to maintain that price if the price is set by the wholesaler and the retailer?

A.   <u>Whatever the established price is in the store by the retailer, we want to have our brand be equal to or lower than any other brand in the store. If the retailer decides to charge a hundred dollars for a pack of cigarettes and that's the lowest price, we want to be at a hundred dollars. They determine that price</u>.

Q.   Regardless of whether that hundred dollars is above or below the state minimum?

A.   The state minimum is – it's my understanding that the retailer has to be in accordance with state minimum.

Q.   That's not what I'm asking, Mr. Kane. You have no regard for what the state minimum is as long as the price is established by the retailer. Is that what you're saying?

A.   <u>It is not my role to get involved in any state minimum pricing discussion with a retailer</u>.

(Deposition of Richard Kane at 62-78, which is attached hereto as Exhibit A.) (Emphasis added.)

In his attempt to create a fact issue with respect to the Minimum-Price Theory, Rodio not only misrepresents Kane's deposition testimony, but he also tries to give his own deposition testimony a "makeover" by submitting a conflicting affidavit. These portions of Rodio's Affidavit should be stricken, as set forth in detail in Defendant's Memorandum in Support of Defendant's Motion to Strike Affidavit of Michael Rodio.

IV.     The Prior Unemployment Determination Has No Preclusive Effect.

Rodio attempts to argue that his unemployment determination should have res judicata effect in this case. This argument has no basis. Commissioner of Dep't of Employment and Training v. Dugan, 428 Mass. 138, 697 N.E.2d 533 (1998), which Rodio cites, must be read with its companion case, Tuper v. North Adams Ambulance Service, Inc., 428 Mass. 132, 697 N.E.2d 983 (1998). These decisions, issued on the same day[2], make clear that normally (including in the circumstances of this case) an unemployment determination will have no preclusive effect in a subsequent lawsuit.

A claimant is entitled to unemployment compensation unless he or she engaged in "deliberate misconduct in wilful disregard of the employing unit's interest." See G.L. c. 151A §25(e)(2). This requires an assessment of the claimant's subjective state of mind at the time that the misconduct occurred. See Dugan, 428 Mass. at 143, 697 N.E.2d at 536. Thus, an employee who, for example, is incompetent but does not engage in deliberate misconduct would normally be entitled to unemployment. See, e.g., Director of the Div. of Employment Sec. v. Mattapoisett, 392 Mass. 858, 467 N.E.2d 1363 (1984) (stating that school committee's termination of tenured teacher for inappropriate conduct and incompetence had no preclusive effect on her claim for unemployment because issues in two proceedings were not identical).

Dugan involved a unique situation in which the "unemployment" standard and the "lawful discharge" standard were the same. The employee, a clerk-magistrate, had been removed from office after formal charges were filed against her alleging that she had engaged in "wilful misconduct" including falsification of court records and dishonest disposal of motor vehicle infractions. Dugan, 428 Mass. at 143, 697 N.E.2d at 537. After a hearing with detailed findings of fact, she was removed from office, and her removal was approved by the court. Id.,

---

[2] Both decisions were rendered on August 5, 1998.

6

428 Mass. at 139-40, 697 N.E.2d at 534.  She later filed a claim for unemployment, and the review examiner adopted the findings that had resulted in her removal from office and, after hearing evidence regarding her subjective state of mind, determined that she was not eligible for benefits.  Id., 428 Mass. at 139, 697 N.E.2d at 534.  The Massachusetts Supreme Judicial Court agreed.  Because the plaintiff in Dugan was found in her termination proceeding to have acted willfully, "[t]his finding is sufficient to warrant a conclusion that the defendant was of such a state of mind that her conduct was in wilful disregard of the employer's interest" rather than the result of a mere lapse in judgment or a miscommunication. Id., 428 Mass. at 143, 697 N.E.2d at 537.

Clearly, Dugan is inapposite to the instant case.  Tuper, however, is almost exactly on point.  The plaintiff in Tuper was terminated for gross insubordination (refusing to obey a directive from his supervisor and disparaging the employer).  He applied for unemployment compensation and was found eligible for benefits based on a finding that his behavior might have been a result of "a break-down in communication."  Tuper, 428 Mass. 132, 133, 697 N.E.2d 983, 984.  Thus, the board found that the employer failed to meet the stringent standard for disqualification set forth in G.L. c. 151A §25(e)(2).

The plaintiff then sued the employer for breach of contract, defamation, and tortious interference with a contractual relationship.  The employer won summary judgment on all claims except the breach of contract claim.  Before trial, the plaintiff filed a motion in limine to preclude the employer from presenting any evidence that the plaintiff had been insubordinate, relying on the unemployment decision.

7

On appeal, the Massachusetts Supreme Judicial Court found that the unemployment determination had no preclusive effect on the subsequent employment lawsuit. The Court stated as follows:

> The board [adjudicating the unemployment claim] determined that the plaintiff was not insubordinate and had not disobeyed a direct order because he did not know (and was entitled to know) that the defendant would interpret his actions as constituting insubordination and disobedience. As such, the board's determinations were based on the <u>subjective knowledge and state of mind of the plaintiff</u>. By contrast, the judge in this action instructed the jury that the determination of just cause had to be decided in part on the basis of the <u>objective reasonableness of the defendant's state of mind. The issues surrounding these determinations thus were not identical</u>. It was entirely possible, and even plausible, that the plaintiff could have subjectively believed that his actions did not constitute insubordination or disobedience, while the defendant reasonably believed the opposite. The judge was, therefore, correct in ruling that the board's determinations that the plaintiff was not insubordinate and had not disobeyed a direct order had no preclusive effect in this action.

Id., 428 Mass. at 135-36, 697 N.E.2d at 986 (emphasis added; footnotes omitted). The Tuper court went on to explain that its decision was consistent with the policies underlying the Massachusetts unemployment statute:

> [G.L. c. 151A §25(e)(2)] "was enacted to afford relief to those who are unemployed through no fault of their own." The statute contemplates the prompt adjudication of claims for unemployment benefits, in response to the need to alleviate quickly the harsh financial consequences of unemployment. If successful claimants before the department are allowed to use collateral estoppel offensively in a subsequent civil action, employers will be forced to litigate unemployment compensation claims to the hilt, with full appeals, because of the substantially greater variety and extent of civil claims which might then follow. Such a result would be directly contrary to the objective, and even the Federal mandate, for promptly resolving such claims.

Id., 428 Mass. at 136-37, 697 N.E.2d at 986-87 (citations omitted), quoting Cahalen v. Commissioner of the Dep't of Employment & Training, 41 Mass. App. Ct. 26, 27, 668 N.E.2d 375 (1996) (internal citation omitted).

In the instant case, Rodio was terminated for poor performance after numerous warnings. Based on the very liberal policy in favor of granting benefits that is enunciated in G.L. c. 151A §25(e)(2), the Review Examiner found that Rodio was eligible for benefits; in other words, focusing on Rodio's subjective intent, he found that Rodio had not acted "deliberately" or "wilfully" against Reynolds's interest. This is not to say, however, that Reynolds did not have the right to terminate Rodio's employment. All of Rodio's claims in the instant lawsuit – breach of the covenant of good faith and fair dealing, and public policy retaliatory discharge (whether based on the Pension Theory, the Minimum-Price Theory or the Advertising Theory), turn on a determination of <u>Reynolds's</u> intent, which was not at issue in the unemployment proceeding. Thus, the instant case is analogous to Tuper, not Dugan, and the Court should find that the unemployment decision has no preclusive effect in this case.

V.  **Rodio Has Conceded That His Good Faith and Fair Dealing Claim Must Fail.**

Rodio has already admitted, both in Volume 2 of his deposition[3] and now in his Opposition, that his loss of pension is only a <u>consequence</u> of his allegedly unlawful discharge, not the <u>cause</u> of it. Stmt., ¶56; Pls' Opp. at 10 ("Mr. Rodio believed then and believes now that the <u>consequence</u> of his wrongful termination was depriving him of his heightened pension benefits . . ..") (emphasis added). Therefore, he has conceded that he has no claim based on the covenant of good faith and fair dealing. See Pls' Opp. at 13-14.

---

[3] As stated in Reynolds's original Memorandum in Support of Motion for Summary Judgment, Rodio's claims have been a moving target. As of Volume 1 of his deposition, he was contending that he was terminated because Reynolds allegedly sought to deprive him of his pension. Stmt., ¶¶51-52. In Volume 2, he had expressly repudiated that theory. <u>Id.</u>, ¶56.

9

VI    Rodio Has Waived His Claims Based on M.G.L. Chapter §93A and the "Enron Theory"

Finally, Reynolds notes that Rodio has made no argument regarding his claims under §93A or based on the "Enron Theory." Therefore, the Court should consider those claims and arguments waived.

## CONCLUSION

For all the reasons stated above, as well as those set forth in its original summary judgment materials, Defendant R. J. Reynolds Tobacco Company respectfully requests that its Motion for Summary Judgment be granted.

Respectfully submitted,

R.J. REYNOLDS TOBACCO COMPANY

By its attorneys,

/s/ Mark H. Burak
Mark H. Burak, BBO# 558805
Sandra E. Kahn, BBO # 564510
Morse, Barnes-Brown & Pendleton, P.C.
Reservoir Place
1601 Trapelo Road
Waltham, MA 02451
(781) 622-5930
(781) 622-5933 (facsimile)

OF COUNSEL:

W.R. Loftis, Jr., N.C. Bar No. 2774
Kristine M. Howard, N.C. Bar No. 26903
Candice S. Wooten, N.C. Bar No. 28161
Constangy, Brooks & Smith, LLC
100 North Cherry Street, Suite 300
Winston-Salem, NC   27101
(336) 721-1001
(336) 748-9112 (facsimile)

Dated:  September 29, 2005

## CERTIFICATE OF SERVICE

    I hereby certify that a true copy of the above document was served upon the attorney of record for each party by first class mail on September 29, 2005

                                        /s/ Mark H. Burak