# EXHIBIT A

```
                      VOLUME:    I
                      PAGES:     1 - 80
                      EXHIBITS:  SEE INDEX
```

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

CASE NO. 04-10006-JGD


MICHAEL RODIO,
        plaintiff,

vs.

R.J. REYNOLDS TOBACCO COMPANY,
        Defendant.


**DEPOSITION OF RICHARD F. KANE**, a witness called on behalf of the Plainiff, pursuant to the Federal Rules of Civil Procedure, before Linda A. Menard, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at Sahady Associats, P.C., 199 North Main Street, Fall River, Massachusetts, on Tuesday, June 14, 2005, commencing at 1:10 P.M.


DeTerra Reporting Services
One Bow Drive
Acushnet, Massachusetts 02743
Tel. (508) 763-2542 Fax (508) 763-3521

1    Q.   And this was written by Mr. Fasciani,
2 reviewed by Mr. Deschenes, and the allegations were
3 reviewed by you --
4    A.   That is correct.
5    Q.   -- prior to the delivery of this letter to
6 Mr. Rodio, right?
7    A.   Correct.
8    Q.   What did you mean when you said he failed
9 to maintain the everyday lowest price, he failed --
10 were you urging him to sell cigarettes at a certain
11 price or not?
12    A.   The everyday low price program when
13 presented to the retailer, which it's the
14 retailer's option to accept or not, states that RJ
15 Reynolds' brand -- and I have to refer here --
16 which would be Monarch, there can be no brand in
17 the store sold to the consumer for a lower price
18 than Monarch.
19    Q.   If it's the decision of the retailer, then
20 why do you put the burden on your sales rep to
21 maintain the lowest price?
22    A.   Because the sales rep -- by signing the
23 retailer up on this program, the retailer has to
24 adhere to the requirements of the program; and the

1 sales rep's job is ensure that the retailer adheres
2 to the contractual requirements that he signed off
3 on.
4     Q.   Which is to sell your cigarettes below
5 state minimum?
6     A.   There is nothing here in this sentence
7 that you read to me that speaks anything to state
8 minimum.
9     Q.   Let's go back and read the rest of this;
10 maybe that will help: "Wave, competitive product,
11 cigarettes retail for $3.52 per pack while RJRT's
12 Monarch retail for $3.62 per pack."
13     A.   Okay.
14     Q.   You were blaming Rodio and firing him for
15 not selling your Monarch brand at 3.52 or below.
16 Isn't that what this plain English means?
17     A.   This is saying that Monarch was not the
18 everyday-low-price brand in the store. The
19 retailer signed up for a program that would require
20 Monarch to be the everyday-low-price brand,
21 regardless of what -- the retailer establishes the
22 price.
23     Q.   Regardless of what the state minimum was,
24 yes or no.

1    A.    I don't know what the retailer did
2    regarding state minimum.  I do not know what the
3    state minimum price was at that time.
4    Q.    Shouldn't you have known, Mr. Kane, with
5    all your experience and long standing with this
6    company that the price, minimum price was 4.01 and
7    you are urging this guy to sell it below 3.62?
8    A.    No, I would not; because I do not know
9    that the price that you are referring to, 4.01, was
10   in fact the state minimum at the time.
11   Q.    You don't think the Attorney General has
12   the state minimums for every year?
13   A.    I would assume they would.
14   Q.    Did you ever check on that to see what the
15   minimum was in 2002?
16   A.    Was it part of my role to check what the
17   state minimum price was with the Attorney General?
18   Q.    You were firing Mr. Rodio for failing to
19   sell Monarch below 3.62 when the minimum price set
20   by the state was 4.01.  Isn't that what you were
21   doing here in your own words, the words of your
22   company?
23          MR. LOFTIS:  Objection to the form of the
24   question.

1   Q.   You can answer it.  The minimum price for
2   Monarch was 4.01 in October of '02, and you are
3   firing this guy for not selling it at 3.52 or
4   below.  This says that in plain English.  Doesn't
5   that tell you that you were firing him because he
6   was selling cigarettes -- he failed to sell
7   cigarettes substantially below the state minimum?
8   A.   Is that a question?
9   Q.   Yes, sir, it is.
10  A.   He does not sell -- Mr. Rodio does not
11  sell the cigarettes.  You said he failed to sell
12  the cigarettes.
13  Q.   Failed to maintain the price.  This is
14  your own words, "failed to maintain".  What did you
15  mean by that, that he failed to maintain?  He
16  failed to enforce the contract that requires the
17  retailer to sell below 3.52; is that what you
18  meant?
19      MR. LOFTIS:  Objection.  That's not what
20  the contract says.
21      MR. SAHADY:  Let him tell me what the
22  contract says, if I'm wrong.
23  A.   The contract states that Monarch, the
24  brand that we are talking about, should be the

```
 1    lowest or at parity with the lowest brand in the
 2    store.
 3         Q.   And it didn't matter to Richard Kane
 4    whether this price was below state minimum or not?
 5         A.   The EDLP contract does not speak to state
 6    minimum.
 7         Q.   Of course, you are not going to say that
 8    openly.
 9              MR. LOFTIS:  Whoa --
10         Q.   I know it didn't say that.  That's not
11    what I said.  You are a very brilliant man, Mr.
12    Kane; so please listen to the question and answer
13    it.  You either knew or didn't know the minimum
14    price for Monarch in 2002, in October.  If you knew
15    it, tell me.  If you didn't know it, you should
16    have known it.
17              MR. LOFTIS:   That's not a question.
18              MR. SAHADY:   But I'm just prefacing --
19              MR. LOFTIS:   Lecturing the witness.
20              MR. SAHADY:   Exactly.  Educating him so we
21    can get an answer from him.
22         Q.   Did you know the minimum price for Monarch
23    in October of '02?
24         A.   I do not know at this time what the state
```

1   minimum price of Monarch was in '02.
2       Q.   At this time, you don't know it.  I can
3   accept that, Mr. Kane.  But did you know it in
4   October of '02?
5       A.   I do not recall if I did.
6       Q.   Should you have known it?
7       A.   Not necessarily.
8       Q.   Who should have known it, Fasciani?
9       A.   The retailer should know it.
10      Q.   And you had -- you didn't care whether it
11  was below the state minimum or not, that was the
12  retailer's problem.  Is that what you're saying?
13      A.   Could you rephrase the question?
14      Q.   I'm failing to understand the meaning of
15  your language in this termination letter, "you
16  failed to execute the everyday low price, EDLP,
17  contract requirements in this account by not
18  placing signage and failing to maintain the
19  everyday lowest price for Monarch".
20           You are telling this guy, this grunt in
21  the field, that he failed to maintain the everyday
22  lowest price when that lowest price would bring
23  your product substantially below the state minimum.
24  Is that what you're telling him here or am I

1  misreading this?
2      A.   I don't see anything here that refers to
3  state minimum, so I can't answer that question.
4      Q.   But you are saying that you would have
5  known the state minimum back in '02?
6          MR. LOFTIS:  I don't believe that's what
7  he said.
8      A.   I said I wouldn't necessarily have known
9  that.  Could you read the answer to my question?  I
10 don't think that's my exact words.  I mean, my
11 answer to your question.
12     Q.   So you want to leave it that you didn't
13 know what the minimum was in '02, the state minimum
14 price for Monarch?  Is that how you want to leave
15 your testimony?
16     A.   Is the question, did I know the exact
17 state minimum price of Monarch when this was
18 written?
19     Q.   Do you want to leave it at what you have
20 said to us so far?
21     A.   Could somebody read what I said before I
22 answer that question?
23     Q.   Let me finish my question.  I'll ask you a
24 whole new question.  I'll start it from scratch.

1          You maintained some overview of the
2  minimum pricing of cigarettes in this state, did
3  you not?
4       A.   What do you mean by "overview"?
5       Q.   You became familiar with what the minimum
6  pricing was for Monarch, for Camels, for any other
7  brand that was sold by your competitors as well?
8       A.   I was aware that there was state minimum
9  pricing.
10      Q.   You were aware of that.  Did you come to
11 know at least in a superficial way what these
12 prices were for different products by different
13 companies including your own?
14      A.   At that point in time, in making retail
15 calls, I was probably made familiar with what the
16 various state minimum pricing, price points were.
17      Q.   You were watching your competition here,
18 Wave -- your company was, was it not?
19      A.   We were watching Monarch to ensure that
20 Monarch was the everyday low price brand in the
21 store.
22      Q.   But you were astute enough and careful
23 enough to watch what your competitor is doing, that
24 you say the Wave product was for 3.52; but you were

1  not observant enough to know what the state minimum
2  was?
3      A.   First of all, I didn't write this
4  document; so the observance of the difference
5  between 3.62 for Monarch and 3.52 by Wave would
6  have been made by Mr. Fasciani.
7      Q.   But he's your subordinate and you reviewed
8  this with him you said, correct?
9      A.   Yes.
10     Q.   And you put the onus, the burden here to
11 maintain the everyday low price on Mr. Rodio, your
12 employee?  Is this what this language says, "you
13 failed to maintain the everyday lowest price"?
14     A.   The language states exactly what it
15 states.
16     Q.   Exactly what I just read.  And it means to
17 you something different than the English language
18 means to everybody else?
19         MR. LOFTIS:  Objection to the form of the
20 question.
21     Q.   When you say "you failed to maintain", are
22 you saying to him he should maintain the price?
23 When you say to someone, "you failed to do this",
24 it implies that he had a duty to do it, he had an

1  obligation to do it.  His obligation, the way I
2  read it here -- And if it's different, you tell me.
3  His obligation was to make sure that the Monarch
4  price was below or at parity with 3.52, which would
5  have been making the product substantially below
6  the state minimum of 4.01?
7      A.  I can't speak to the state minimum
8  pricing.
9      Q.  Why, because you don't know it now or
10 because you didn't know it then?
11     A.  I don't know it now.  I don't recall what
12 it was, and the document that you put in front of
13 me means nothing to me.
14     Q.  You don't recall what it was?
15     A.  I know that there was state minimum
16 pricing in effect.  It changes all the time; so I
17 don't recall everytime there's a manufacturer's
18 price increase, a state excise tax increase.  The
19 state changes its formula.  The state minimum
20 changes.
21     Q.  Yes, I agree with that totally, Mr. Kane.
22 You are the manufacturer, right?
23     A.  RJ Reynolds Tobacco is the manufacturer.
24     Q.  When I say "you", I don't mean you

1   personally. So the manufacturer has a great impact
2   upon the minimum price. You just told us the
3   manufacturer and other factors go into it, correct?
4       A.   The manufacturer determines the list price
5   of the cigarettes to the wholesaler.
6       Q.   Which determines eventually the sale of
7   the product to the consumer?
8       A.   The state would determine the formula.
9       Q.   And you are supposed to adhere to that
10  formula?
11      A.   The retailer is supposed to adhere to
12  state minimum pricing.
13      Q.   And you were aware of what the state
14  minimum pricing was in October of '02?
15      A.   I said I was not aware. I was aware there
16  was state minimum pricing, not the actual state
17  minimum price.
18      Q.   So you are telling us now that you knew
19  that there was out there somewhere state minimum
20  pricing, but you didn't know what the state minimum
21  price for Monarch was. Is that what you're saying?
22      A.   At this particular point in time on the
23  date that Mr. Rodio made this call, I don't know
24  what the absolute state minimum price was.

1    Q.    Mr. Rodio made the call.  What call?
2    A.    Isn't this talking about Swidey's Variety,
3    which was one of his calls?
4    Q.    By call you mean --
5    A.    I mean retail establishment that --
6    Q.    I misunderstood.  I take it you subscribe
7    to this letter and what's in it, otherwise you
8    would have vetoed it, certain parts of it?
9    A.    Could you clarify what you mean by
10   "subscribe"?
11   Q.    Subscribe means you agree with it, you
12   bless it.
13   A.    I would agree with the contents of the
14   letter overall, yes.
15   Q.    Now, in establishing -- for the state to
16   establish its minimum pricing for a certain brand,
17   it relies on reporting to it by the manufacturer
18   and the wholesaler?
19   A.    By the manufacturer, yes.
20   Q.    But not by the wholesaler?
21   A.    I'm not sure about that.  My understanding
22   is that the manufacturers give the state their list
23   price.  From that point forward, the state applies
24   a formula, a state minimum markup from the

1   wholesaler to the retailer and then from the
2   retailer to the consumer.
3       Q.   The state minimum pricing has a dual
4   purpose, I think.  What I think isn't important;
5   but -- first, to ensure the proper revenue goes to
6   the state; and second, to prevent predatory
7   practices by the competitors in the tobacco
8   industry.  Is that your understanding as well?
9           MR. LOFTIS:  I would object to the form of
10  the question.  That's calling for a legal
11  conclusion that he would have no basis -- you are
12  asking him what the intent of the law is.  I
13  couldn't even answer that question.
14          MR. SAHADY:  Neither could I.
15          MR. LOFTIS:  Then why ask the witness.
16      A.   May I take a break to get water?
17      (Break.)
18      Q.   So Mr. Kane then --
19      A.   Should I put this away then?  Is this
20  supposed to stay with me?
21          MR. LOFTIS:  I was going to say the only
22  thing that I would ask is that we -- just so we
23  have a very clean copy, nothing written on it.
24          MR. SAHADY:  And we can introduce this as

```
 1    Exhibit 2.
 2           MR. LOFTIS:  You can mark it as Exhibit 2
 3    I don't think it's ever been authenticated.  I
 4    don't know what it is either.
 5           MR. SAHADY:  For identification.
 6           (Marked for identification, Exhibit 2,
 7    List of Prices.)
 8       Q.   So the state, as we were saying, then
 9    relies on the -- I'm quoting, by the various
10    manufacturers to wit in order to set the minimum
11    price?
12       A.   That would be my assumption.  I have never
13    seen correspondence from RJ Reynolds to the state,
14    but I would assume that that is how the state
15    establishes its state minimum pricing.  I'm not
16    involved in that process.
17       Q.   And the state minimum pricing varies from
18    time to time?
19       A.   That is correct.
20       Q.   And it would be important to Phillip
21    Morris or to RJR to maintain either the lowest
22    price or price at parity with other competitors in
23    a given area?
24       A.   I can't speak to Phillip Morris.
```

1      Q.   To you, RJR?

2      A.   Regarding our everyday low price plan,
3   that would be correct.

4      Q.   So you want to stay in competition with
5   your competitors, with Phillip Morris, let's say,
6   if they are your primary competitor?

7      A.   I really don't know how to answer that
8   question.

9      Q.   If you sold Monarch at a higher price than
10  your competitor, say, Wave -- who makes Wave, by
11  the way, do you know?

12     A.   I do not know.

13     Q.   If Monarch is consistently sold below
14  Wave, this would hurt the sales of RJR; if Monarch
15  is sold consistently above Wave in price there goes
16  market share?

17     A.   Potentially.

18     Q.   So the incentive is to maintain Monarch at
19  parity with or below Wave?

20     A.   In that particular example, that would be
21  correct.

22     Q.   And in order to do that, you have created
23  the EDLP program?

24     A.   Not in particular relative to Wave; just

1  to be the everyday-low-price brand in a particular
2  store.
3       Q.   And regardless of what the state minimum
4  prices would be at that time for that brand?  Yes,
5  that's a question, sir.
6       A.   State minimum pricing is something for the
7  retailer to adhere to.
8       Q.   Why do you then say to your sales rep that
9  he failed to maintain that price if the price is
10 set by the wholesaler and the retailer?
11      A.   Whatever the established price is in the
12 store by the retailer, we want to have our brand be
13 equal to or lower than any other brand in the
14 store.  If the retailer decides to charge a hundred
15 dollars for a pack of cigarettes and that's the
16 lowest price, we want to be at a hundred dollars.
17 They determine that price.
18      Q.   Regardless of whether that hundred dollars
19 is above or below the state minimum?
20      A.   The state minimum is  -- it's my
21 understanding that the retailer has to be in
22 accordance with state minimum.
23      Q.   That's not what I'm asking, Mr. Kane.  You
24 have no regard for what the state minimum is as

1  long as the price is established by the retailer.
2  Is that what you're saying?
3      A.   It is not my role to get involved in any
4  state minimum pricing discussion with a retailer.
5      Q.   So you're indifferent as to what the state
6  minimum is and you want to sell your cigarettes at
7  that lowest price in the store regardless of
8  whether it is within the state minimum or not?
9      A.   I can't answer that.
10     Q.   Of course.  Thank you.  I'll be asking you
11 about that in the future.  That's it.
12          MR. LOFTIS:  Let me take a break.  I may
13 or may not have questions.
14          MR. SAHADY:  Sure.  Whatever you want.
15          (Break.)
16          MR. LOFTIS:  We have no questions.
17          (Deposition concluded at 3:05 p.m.)