UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MICHAEL RODIO, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| v. | ) | NO. 04-10006-JGD |
| | ) | |
| R.J. REYNOLDS | ) | |
| TOBACCO COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF DECISION AND ORDER
## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

January 5, 2006

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff, Michael Rodio ("Rodio"), has brought this action against his former employer, defendant R.J. Reynolds Tobacco Company ("Reynolds"), claiming that he was wrongfully terminated after twenty-six years as a sales representative for Reynolds. In his Complaint, Rodio has asserted claims against Reynolds for wrongful termination (Count I), violation of the implied covenant of good faith and fair dealing (Count II), wrongful termination in violation of public policy (Count III), and violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A (Count IV). Presently before this court is the defendant's Motion for Summary Judgment (Docket No. 32) by which Reynolds seeks summary judgment on all of Rodio's claims.  For the reasons stated herein, Reynolds' motion for summary judgment is ALLOWED.

## II.  **STATEMENT OF FACTS**

### **Scope of the Record**

In a separate Order issued on this date, this court has ruled on the "Defendant's

Motion to Strike Portions of Affidavit of Michael Rodio" (Docket No. 39) and on the

"Defendant's Motion to Strike Portions of Plaintiff's Summary Judgment Opposition"

(Docket No. 41).  For the reasons detailed therein, this court has struck Exhibit G to the

"Appendix of Exhibits in [Support of] Plaintiff's Opposition to Defendant's Motion for

Summary Judgment" (Docket No. 37), but otherwise has denied the motions.

Additionally, Reynolds contends that the plaintiff has failed to comply with Local

Rule 56.1, and that therefore, the facts set forth by Reynolds in its Local Rule 56.1

Statement should be deemed admitted.  Local Rule 56.1 reads in relevant part:

> Opposition to motions for summary judgment shall include a concise
> statement of the material facts of record as to which it is contended
> that there exists a genuine issue to be tried, with page references to
> affidavits, depositions and other documentation.  Copies of all
> referenced documentation shall be filed as exhibits to the ... opposi-
> tion.  Material facts of record set forth in the statement required to be
> served by the moving party will be deemed for purposes of the
> motion to be admitted by opposing parties unless controverted by the
> statement required to be served by opposing parties.

On or about October 4, 2005, after Reynolds had filed a reply to Rodio's opposition to

the defendant's motion for summary judgment, Rodio filed "Plaintiff/Respondent's

Statement of Material Facts as to Which He Contends There Exists a Genuine Issue to be

Tried" (Docket No. 43).  This Statement, along with Rodio's opposition brief which

contains facts supported by "page references to affidavits, depositions and other

documentation," as required by Local Rule 56.1, clearly identify which of Reynolds'
factual assertions Rodio disputes.  To the extent that Rodio has asserted facts that are
adequately supported by references to the record, the court will consider them.  To the
extent that Rodio has failed to present supported facts that controvert the factual
assertions contained in Reynolds' Local Rule 56.1 Statement, the court will deem the
defendant's facts admitted.  See Air Line Pilots Assoc. v. Precision Valley Aviation, Inc.,
26 F.3d 220, 224 (1st Cir. 1994) ("District courts enjoy broad latitude in administering
local rules.").

### Statement of Material Facts[1]

The following material facts are undisputed unless otherwise indicated.

### Responsibilities of a Sales Representative

Plaintiff Michael Rodio was employed by Reynolds as an Area Sales Representa-
tive ("sales representative") from October 12, 1976 to October 28, 2002.  (DF ¶¶ 1, 2).
Notwithstanding the title of "sales representative," employees in Rodio's position were
not responsible for direct sales of cigarettes because the company's retail store customers

---

[1]  The facts are derived from the "Defendant's Local Rule 56.1 Statement of Material
Facts as to Which No Genuine Dispute Exists" ("DF ¶ __") (Docket No. 34); the exhibits
contained in the "Defendant's Appendix of Summary Judgment Materials" ("Def. Ex. __")
(Docket No. 35); the "Plaintiff/Respondent's Statement of Material Facts as to Which He
Contends There Exists a Genuine Issue to be Tried" ("PF"); facts contained in the "Plaintiff's
Opposition to Defendant's Motion for Summary Judgment" ("Pl.'s Mem.") (Docket No. 36); and
exhibits contained in the "Appendix of Exhibits in [Support of] Plaintiff's Opposition to
Defendant's Motion for Summary Judgment" ("Pl.'s Ex. __") (Docket No. 37), except for Exhibit
G, which has been stricken.

purchased those products from wholesalers.  (Id. ¶ 6).  Instead, the sales representatives were responsible for selling or offering to retail stores various contractual programs relating to the advertising and promotion of Reynolds' products.  (Id.).  Among the programs available to retailers were "contracts" by which Reynolds would agree to make payments to the retailer in exchange for the retailer's agreement to place certain types of advertising in its store.  (Id.).  There were also "every day low pricing" or "EDLP" contracts under which Reynolds would agree to pay the retailer in exchange for a promise by the retailer not to sell any competing brand of cigarette at a lower price than the Reynolds brands, Monarch and Doral.  (Id. ¶¶ 6, 11).[2]  As a sales representative, Rodio was responsible for visiting independent retail outlets and offering to sell Reynolds' contractual programs, and for promoting the sale of Reynolds' products within his district, which included Fall River, Taunton, Berkley, Assonet, Somerset, Swansea and Easton, Massachusetts.  (Pl.'s Ex. B ¶¶ 2-4).

One of the sales representatives' primary responsibilities involved the administration of contracts between Reynolds and independent retailers.  (DF ¶ 7).  Thus, an important aspect of Rodio's job was to ensure that retailers which had entered into contracts with Reynolds and, consequently, were receiving payments from Reynolds, complied with all of the terms of their agreement.  (Id.).  In particular, Rodio was responsible for making sure that advertising, including value-added promotion ("VAP")

_____

[2] Even without one of these contracts, a retailer may still sell Reynolds products.  (DF ¶ 7).

-4-

and point of sale ("POS") advertising, was placed and maintained in the retail establishments consistent with the terms of any applicable contracts.[3]  (DF ¶¶ 11, 17). Additionally, Rodio was responsible for ensuring that retailers which had entered into EDLP contracts with Reynolds were selling the Reynolds brands at the lowest price or at parity with the lowest priced cigarette in the store.  (Id. ¶¶ 7, 57).

Although Reynolds' sales staff was responsible for enforcing the company's pricing policy, Reynolds instructed its sales representatives not to discuss specific pricing with retailers or to direct retailers to set specific prices because that could raise issues of antitrust law.  (Id. ¶ 61).  They could discuss discounts, rebates, and how the prices of Reynolds' products compared to the prices of competing products, but they were directed to leave the ultimate pricing decision to the retailer.  (Id.).  Accordingly, while sales representatives such as Rodio could tell retailers to sell Reynolds' products at parity with other products, and to pass any discounts from Reynolds along to consumers, they could not require a retailer to sell cigarettes at a particular price.  (Id.).  Rodio agrees that the retailers set the prices, and that he never told a retailer to do anything other than to comply with the EDLP contract's pricing requirements.  (Id.; Def.'s Ex. E, Vol. I at 193-96, 198-200, and Vol. II at 64-65).

---

[3]  VAP advertising is communicated to the consumer by a plastic display.  (DF ¶ 11). POS advertising consists of a paper or card containing pricing information that goes into the VAP display.  (Id.).

According to Reynolds, the job of contract administration became more demanding over the years due to a leaner management structure and the elimination of support staff. (DF ¶ 8). In particular, sales representatives had to become much more adept with computers, more proactive about meeting deadlines, and able to manage a large number of administrative issues. (Id.). Reynolds estimates that one sales representative today must handle a workload that is equivalent to what two or three sales representatives handled in the past. (Id.).

### The Development of Issues Concerning Rodio's Job Performance

In late 1998 or early 1999, Carlo Fasciani ("Fasciani") became a Division Sales Manager for Reynolds with supervisory responsibility over a division that included parts of Massachusetts. (Id. ¶ 4). Shortly thereafter, Rodio came under Fasciani's supervision due to a restructuring. (Id. ¶ 5). The record demonstrates that Fasciani frequently was critical of Rodio's work performance.

Fasciani monitored the performance of the sales representatives he supervised by accompanying them on sales calls, which was known as a "work with," and by visiting the sales representatives' retail accounts one or two days after the representative had been there, which was referred to as a "training analysis." (Id. ¶ 10). Fasciani evaluated whether the sales representative had accurately reported to Reynolds the availability of Reynolds cigarette brands at the store, was enforcing the terms of any applicable contracts, and had placed any required advertising in the store. (Id. ¶¶ 11-15, 17-19).

After conducting a work with and a training analysis, Fasciani would provide feedback to the sales representative regarding the accounts.  (<u>Id.</u> ¶ 10).

Fasciani believed that Rodio had good relationships with retailers and had increased the market share of Reynolds products in his accounts.  (<u>Id.</u> ¶ 9).  However, Fasciani also believed that Rodio's administrative performance was very poor, and that Rodio failed to manage his workload, balance priorities and adapt to the company's strategic direction.  (<u>Id.</u>).  In particular, Fasciani concluded that Rodio made repeated errors in reporting product availability and in administering contracts.  (<u>Id.</u> ¶¶ 16, 19).  This was based on Fasciani's discovery of numerous product availability errors and missing advertisements in Rodio's stores, and on his determination that Rodio had failed to enforce Reynolds' contractual agreements.  (<u>Id.</u>).

In May 1999, Fasciani gave Rodio an oral warning regarding his performance and his failure to follow management direction.  (<u>Id.</u> ¶ 21).  This was followed, in January 2000, by an annual performance evaluation in which Fasciani gave Rodio an overall rating of "Needs Improvement."  (<u>Id.</u> ¶ 22).  Subsequently, Rodio's performance improved, and in January 2001, Fasciani gave him an overall rating of "Fully Meets Expectations."  (<u>Id.</u> ¶ 24).

Fasciani's assessment of Rodio's job performance declined again following two incidents in the summer of 2001.  The first incident occurred in late July or early August of that year, when Fasciani met with the sales representatives in his division to discuss the employees' vacation plans.  (<u>Id.</u> ¶ 27; Def.'s Ex. E, Vol. I at 58-59).  According to

Rodio, during the meeting, Fasciani went into a "rage" when he learned that sales representatives, especially Rodio, were planning on taking vacation without having their stores covered.  (Id.).  The second incident occurred shortly thereafter, when Rodio met with Fasciani to discuss Rodio's mid-year performance evaluation, but Fasciani forgot to bring the written evaluation to the meeting.  (DF ¶ 29; Def.'s Ex. E, Vol. I at 58-61).  Following a comment by Rodio regarding Fasciani's failure to bring the evaluation to the meeting, Fasciani told Rodio that he would "ruin" him and "destroy [his] career."  (Id.).  Rodio complained to Fasciani's supervisor, and Fasciani apologized.  (Id.).  However, Rodio claims that when he and Fasciani went on a work with shortly thereafter, Fasciani "looked for any little thing he could find to make me look – to downplay me and then reprimanded me that day."  (DF ¶ 29; Def.'s Ex. E, Vol I at 60-61).

Thereafter, on September 5, 2001, Fasciani issued Rodio a written reprimand describing various deficiencies in Rodio's performance with respect to one of his accounts.  (DF ¶ 30; Def.'s Ex. B ¶¶ 14-19).  Fasciani's criticisms concerned the inaccurate reporting of product availability and advertising placement, and the failure to place advertising in accordance with Reynolds' requirements.  (Id.).  In a written response to the reprimand, Rodio stated that the account had a high volume and large market share of Reynolds products.  (DF ¶ 31; Def.'s Ex. B ¶ 20).  However, he did not specifically address the issues raised in the reprimand.  (Id.).

On September 18, 2001, Fasciani accompanied Rodio on a work with that was generally positive.  (DF ¶ 34; Def.'s Ex. B ¶ 31).  Afterwards, however, staff in

Reynolds' Regional Office reported that Rodio had made numerous errors and had missed deadlines with respect to contract administration. (DF ¶ 35). Consequently, in November 2001, Fasciani issued a "Final Written Reprimand" to Rodio. (Id.). Rodio refused to sign the Final Reprimand and submitted a rebuttal. (Id.).

### Rodio's Criticisms of Reynolds' Policies

In December 2001, Fasciani and Rodio went on another work with to one of Rodio's accounts. (DF ¶ 37). The store was missing a VAP counter display that was required under its contract with Reynolds. (Id.; Def.'s Ex. E, Vol. I at 162-63). According to Rodio, the manager of the store reported that the Board of Health did not want the advertising next to the cash register because young children would see it. (Def.'s Ex. E, Vol. I at 162). Rodio told Fasciani that placing advertising on counters below five feet was a violation of the State Board of Health regulations. (Id. at 162-64; Pl.'s Ex. B ¶ 8). However, Fasciani responded that it was legal and instructed Rodio to place the advertising on the counter. (Id.). Rodio contends that he was later fired for refusing to place advertisements on countertops in violation of the law.

Rodio also contends that Reynolds later fired him unlawfully for failing to enforce Reynolds' EDLP contracts. The evidence shows that on numerous occasions, Rodio expressed concern to Fasciani about the pricing requirements of Reynolds' EDLP contracts. (Pl.'s Ex. B ¶ 9). In particular, Rodio allegedly told Fasciani that the contracts violated state law because they "coerced" or encouraged retailers to price the Reynolds' brands below the price set by the Massachusetts minimum pricing laws. (Def.'s Ex. E,

Vol. I at 193). Reynolds contends that Rodio was simply to determine compliance with the EDLP program, and that the actual pricing was set by the retailers.[4]

### Rodio's Termination from Reynolds

Reynolds' concerns about Rodio's job performance persisted throughout 2002, and ultimately culminated in his termination from employment on October 28 of that year. In summary, in January 2002, Rodio received an annual performance evaluation in which Fasciani gave him an overall rating of "Failed to Meet Expectations." (DF ¶ 41; Def.'s Ex. B ¶ 34). Rodio did not agree and provided a written response. (DF ¶ 41). Several months later, in May 2002, Fasciani accompanied Rodio on another work with and conducted a training analysis. (Id. ¶ 42). Fasciani identified deficiencies related to the reporting of product availability, lack of compliance with contracts and failure to follow direction from management. (Id.). However, because Fasciani also determined that Rodio's job performance had improved, he documented the problems, but did not take any disciplinary action. (Id.).

On October 9, 2002, Fasciani performed what would turn out to be the final training analysis of Rodio's stores and found that Rodio was still having the same performance issues that Fasciani had identified previously. (Id. ¶ 43). As a result, Reynolds determined that Rodio was not going to improve to a level that would meet expectations, and decided to terminate his employment. (Id.).

---

[4] Additional facts regarding the EDLP program will be discussed below.

Reynolds notified Rodio that he was being discharged in a letter signed by

Fasciani and dated October 28, 2002. (Pl.'s Ex. D). According to the letter, Rodio's

termination was based on "[m]isuse of Company [r]esources (violation of Company

policy)[,] [f]ailure to follow management instructions[,] and [f]ailure to satisfactorily

perform job accountabilities[.]" (Id. at 1). The letter also documented problems that

Fasciani had identified at ten of Rodio's retail accounts during the October 9, 2002

training analysis. (Id. at 2-9). In particular, Fasciani described Rodio's failure to

accurately record product availability in nine of the ten accounts, his failure to administer

Reynolds' EDLP contract requirements and to record two of the retailers' noncompliance

with the contracts, his failure to place POS advertising in the VAP communicators in four

of the stores, and his failure to effectively communicate pricing related to discounting in

five of the retail stores. (Id. at 2-12). With respect to the administration of EDLP

contracts, Fasciani noted, among other things, that in two of the accounts, competitive

brands were priced below Reynolds' Monarch brand, which was a violation of the

contract. (Id. at 5, 8, 10). He also noted, with respect to Rodio's failure to place required

advertising in certain stores, that Rodio had been instructed "to place VAP POS as a first

priority." (Id. at 11).

## Pension Benefits

On April 23, 2003, Rodio filed a charge of discrimination against Reynolds with

the Massachusetts Commission Against Discrimination ("MCAD"). (DF ¶ 48). Therein,

Rodio alleged that Reynolds had discharged him because of his age, which was 50 at the

time. (Id.). He also alleged that Reynolds had terminated his employment in order to deny him benefits, including a pension and other benefits that would have been due to him had he completed another four years with the company. (Def.'s Ex. G).

Currently, Rodio is entitled to a vested pension benefit under the terms of the Reynolds retirement plan, based on his service through October 28, 2002, the date of his termination. (DF ¶ 53). Rodio is receiving a pension, pursuant to the plan, of $604.98 per month based on his twenty-six years of service and his age at the time of his termination. (Pl.'s Ex. B ¶ 18). The calculation of Rodio's vested pension benefit under the plan includes a reduction factor for each year that Rodio is less than 65, as of the date of commencement of his pension benefit. (DF ¶ 53). If Rodio had remained with Reynolds until August 1, 2007, when he will be 55 years old and with thirty years of service with the company, he would have been eligible to receive his full pension under the retirement plan, with no reduction factor for each year under age 65. (DF ¶ 55). Rodio claims his termination wrongfully deprived him of these benefits.

Additional factual details relevant to the court's analysis are described below.

## III.  ANALYSIS

### A.  Summary Judgment Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue is "one that must be

-12-

decided at trial because the evidence, viewed in the light most flattering to the nonmovant

. . . would permit a rational fact finder to resolve the issue in favor of either party."

Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (internal

citations omitted).  A material fact is one which has the "potential to affect the outcome

of the suit under the applicable law."  Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir.

1996) (internal citations and quotation omitted).

    The moving party bears the initial burden of establishing that there is no genuine

issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548,

2553, 91 L. Ed. 2d 265 (1986).  If that burden is met, the opposing party can avoid

summary judgment only by providing properly supported evidence of disputed material

facts that would require trial.  See id. at 324, 106 S. Ct. at 2553.  In evaluating motions

for summary judgment, however, the court will not consider "conclusory allegations,

improbable inferences, and unsupported speculation."  Galloza v. Foy, 389 F.3d 26, 28

(1st Cir. 2004) (internal citation omitted).

### B.    Count I: Wrongful Termination

    In Count I of his Complaint, Rodio alleges that he was wrongfully terminated as an

at-will employee of Reynolds on October 28, 2002, after twenty-six years of service, and

alleges further that the termination was "without the expiration of a reasonable period

following the notice of termination contrary to the laws of the Commonwealth of

Massachusetts."  (Compl. ¶¶ 3-6).  Reynolds asserts that Rodio has presented no legal or

factual support for this claim.

"Under Massachusetts law, an at-will employee generally can be fired for any reason or no reason at all." <u>Acher v. Fujitsu Network Communications, Inc.</u>, 353 F. Supp.2d 26, 29 (D. Mass. 2005) (quoting <u>Smith v. Mitre Corp.</u>, 949 F. Supp. 943, 948 (D. Mass. 1997)).  The courts have recognized limited exceptions to this general rule, including "where the discharge is for reasons that violate clearly-established public policy" or "where a covenant of good faith and fair dealing may be implied" and the employer's decision to terminate the employee constitutes a breach of that implied covenant.  <u>Id.</u> at 29, 39.  Rodio, both in his memorandum and at oral argument, has stated that he intends to proceed with this litigation based only on those two exceptions, which are specifically asserted in Counts II and III of Rodio's Complaint.  <u>See</u> Pl.'s Mem. at 1 (stating that his action against Reynolds is based on his wrongful termination contrary to public policy (Count III) and contrary to the covenant of good faith and fair dealing (Count II)).  Since Rodio has chosen to abandon the wrongful termination claim set forth in Count I, and has not stated any other independent grounds to challenge his termination, Reynolds is entitled to summary judgment on Count I of the Complaint.

### C.    Count II: Breach of Implied Covenant of Good Faith and Fair Dealing

In Count II of his Complaint, Rodio claims that Reynolds breached the covenant of good faith and fair dealing implied in his at-will employment contract when it discharged him from employment on October 28, 2002.  (Compl. ¶ 8).  He further claims that as a result, he lost various benefits, including raises and bonuses, automobile benefits, insurance coverage, retirement and profit sharing benefits, social security contributions,

-14-

stock options and vacation time.  (Id. ¶ 9).  Reynolds argues that it is entitled to summary

judgment on this claim because there is no evidence showing that it terminated Rodio in

bad faith, and because the discharge did not deprive Rodio of any compensation due for

past services.  For the reasons detailed herein, Reynolds is entitled to summary judgment

on Count II.

"[T]he implied covenant of good faith and fair dealing [is] implicit in all

Massachusetts contracts, including contracts for employment at will."  Harrison v.

Netcentric Corp., 433 Mass. 465, 473, 744 N.E.2d 622, 629 (2001).  Despite the general

rule that at-will employment agreements may be terminated by either party for any reason

or no reason whatsoever, the employer remains "accountable to a discharged employee

for unpaid compensation if the employee were terminated in bad faith and the

compensation is clearly connected to work already performed."  Id. (explaining doctrine

established by Fortune v. Nat'l Cash Register Co., 373 Mass. 96, 364 N.E.2d 1251

(1977), and its progeny).  Thus, to recover for a breach of the implied covenant of good

faith and fair dealing, there must be "conduct taken in bad faith either to deprive a party

of the fruits of labor already substantially earned or unfair leveraging of the contract

terms to secure undue economic advantage."  Christensen v. Kingston Sch. Comm., 360

F. Supp. 2d 212, 226 (D. Mass. 2005).  In the instant case, Rodio argues that Reynolds is

liable because it discharged him "after 26 years of service and at a time when he was on

the brink of harvesting a life's labor."  Pl.'s Mem. at 14.  He further contends that in light

of the decision awarding him unemployment compensation, Reynolds is precluded from

justifying its termination decision.  Id. at 14-17.  This court finds both of these arguments unpersuasive.

### 1.    Res Judicata

Rodio argues that Reynolds is precluded under the doctrine of res judicata from claiming that its decision to terminate him did not violate the covenant of good faith and fair dealing.  Specifically, Rodio contends that after his discharge, he applied to the Massachusetts Department of Employment and Training ("DET") for unemployment benefits, which the DET awarded to him.  Id.  Reynolds appealed the DET's decision on the grounds that Rodio allegedly had been discharged for "deliberate misconduct in wilful disregard of the employing unit's interest" and was therefore disqualified from seeking unemployment benefits pursuant to Mass. Gen. Laws ch. 151A, § 25(e)(2).[5]  Id.; Pl.'s Ex. F.  The appeal was unsuccessful.  Pl.'s Ex. F.  Rodio argues that the DET Review Examiner's finding that the plaintiff was discharged without any deliberate misconduct in wilful disregard of the employing unit's interest should preclude Reynolds from arguing in this matter that its actions did not breach the implied covenant.  Pl.'s Mem. at 15; Pl.'s Ex. F.

---

[5]  Pursuant to Mass. Gen. Laws ch. 151A, § 25(e)(2), no benefits shall be paid to an individual "[f]or the period of unemployment next ensuing and until the individual has had at least eight weeks of work and in each of said weeks has earned an amount equivalent to or in excess of the individual's weekly benefit amount after the individual has left work ... by discharge shown to the satisfaction of the [DET] commissioner by substantial and credible evidence to be attributable to deliberate misconduct in wilful disregard of the employing unit's interest ...."

This court finds that the case of <u>Tuper v. North Adams Ambulance Serv.</u>, 428 Mass. 132, 697 N.E.2d 983 (1998), disposes of Rodio's argument.  In that case, the Supreme Judicial Court ruled that the plaintiff could not "use a prior adjudication before an administrative agency offensively to collaterally estop his former employer" where "[t]he issues in the two adjudications were not identical." <u>Id.</u> at 135-36, 697 N.E.2d at 985-86.  That is what Rodio is attempting to do here.

A party will be precluded from relitigating an issue only if the court determines that "(1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication." <u>Id.</u> at 134, 697 N.E.2d at 985.  Moreover, if all the conditions for preclusion are satisfied, "[a] final order of an administrative agency in an adjudicatory proceeding . . . precludes relitigation of the same issues between the same parties, just as would a final judgment of a court of competent jurisdiction." <u>Id.</u> at 135, 697 N.E.2d at 985 (quoting <u>Stowe v. Bologna</u>, 415 Mass. 20, 22, 610 N.E.2d 961, 963 (1993)).  Here, as in <u>Tuper</u>, the issues in the two proceedings are not identical.  The issue on appeal before the DET Hearing Examiner was whether or not Reynolds had terminated Rodio for "deliberate misconduct in wilful disregard of the employing unit's interest."  The issue before this court is whether Reynolds terminated Rodio in order to deprive him of the fruits of his employment agreement, and whether the company failed to compensate Rodio for past services.  Since these issues are not identical, <u>res judicata</u> is not applicable.

-17-

Accordingly, Rodio can avoid summary judgment on Count II only if there is adequate evidence in the record to support the elements of his claim.

### 2.    Termination to Wrongfully Deprive Rodio of Benefits

This court finds that the record does not support the plaintiff's claim that Reynolds terminated him to deprive him of compensation or expected future benefits that he already had earned.  See Mello v. Stop & Shop Cos., Inc., 402 Mass. 555, 556 n.1, 524 N.E.2d 105, 106 n.1 (1988) (implied covenant of good faith and fair dealing "is violated when the employer fails to pay the employee expected future compensation closely related to the employee's past services.").  Rodio does not contend, and nothing in the record suggests that Reynolds failed to pay Rodio income or deprived him of benefits that the defendant owed Rodio for work that he performed up until his termination date.  Moreover, it is undisputed that Rodio obtained that much of his pension to which he was entitled as of the age of 50, his age when his employment was terminated.  See Pl.'s Mem. at 18-20 (damages are compensation and benefits to which Rodio would have been entitled only if employment continued).  Thus, Rodio's employment clearly was not ended to deprive him of earned compensation or benefits.  See Christensen, 260 F. Supp. 2d at 228 (no breach of implied covenant where termination did not deprive plaintiff of compensation based on past services), and cases cited.

Rodio claims that Reynolds discharged him "at a time when he was on the brink of harvesting a life's labor."  Pl.'s Mem. at 14.  He is apparently contending that he should have been employed until age 64, at which point he would have worked for Reynolds for

40 years, and his pension would have been much higher. <u>See</u> Pl.'s Ex. B ¶ 18. Reynolds

notes that if Rodio had worked another 4-5 years, he would have had 30 years of employ-

ment which would have increased his pension benefits as well. <u>See</u> DF ¶ 55. In any

event, the fact that Rodio had to be employed for a significant period of time into the

future for these benefits to vest precludes any inference that his employment was

terminated in order to deprive him of any "future compensation closely related to [his]

past services." <u>Mello</u>, 402 Mass. at 556 n.1, 524 N.E.2d at 106 n.1. The implied

covenant of good faith and fair dealing "does not protect interests contingent on an event

that has not occurred," such as continued employment. <u>See</u> <u>Harrison</u>, 433 Mass. at 475,

744 N.E.2d at 631, and cases cited. Since the record does not support a conclusion that

Reynolds terminated Rodio to deprive him "of the fruits of labor already substantially

earned" or otherwise engaged in "unfair leveraging of the contract terms to secure undue

economic advantage," summary judgment shall enter in favor of Reynolds on Count II of

the Complaint.[6] <u>Christensen</u>, 360 F. Supp. 2d at 226.

## D.    <u>Count III: Wrongful Termination Based on Public Policy</u>

Rodio claims, in Count III of his Complaint, that his termination was unlawful

because it was done for reasons that violate public policy. (Compl. ¶¶ 12-14). In

---

[6] The only other evidence of "bad faith" referred to by the plaintiff is the fact that his termination was allegedly in violation of public policy. These arguments will be addressed in connection with Count III of the Complaint, <u>infra</u>. After a thorough review of the record, this court has not identified any other evidence to support a claim that Reynolds acted in bad faith when it terminated Rodio's employment after numerous warnings.

particular, Rodio contends that Reynolds discharged him for failing to enforce Reynolds'

EDLP contracts to maintain prices of Reynolds brand cigarettes below the minimum

prices established by State law, and for failing to place advertising in stores at heights that

would have violated Massachusetts Board of Health regulations and would have

contravened the public policy against selling cigarettes to minors.  Pl.'s Mem. at 2-9.

However, these contentions are either unsupported by the record or fail to state a claim,

and Reynolds is entitled to summary judgment on Count III of the Complaint as well.

### 1.    The Public Policy Exception Generally

The public policy exception to the general rule that an at-will employee can be

fired for any reason or no reason at all consistently has been interpreted narrowly by the

Massachusetts Supreme Judicial Court so as not to "convert the general rule . . . into a

rule that requires just cause to terminate an at-will employee."  Acher, 354 F. Supp. 2d at

29 (quoting King v. Driscoll, 418 Mass. 576, 582, 638 N.E.2d 488, 492 (1994),

additional citations omitted).  "Thus, the public policy exception does not protect all

employee acts that are 'appropriate [or] socially desirable.'  Nor does it extend so far as

to cover all acts by an employee that are directed to illegal, unsafe, or unethical conduct."

Id. (quoting Smith-Pfeffer v. Superintendent, Walter E. Fernald State Sch., 404 Mass.

145, 150, 533 N.E.2d 1368, 1371(1989)).

"While there is no bright line between protected and non-protected actions," the

courts have defined certain categories of conduct that warrant protection.  Id.  Of

relevance to the instant case, "'[r]edress is available for employees who are terminated

-20-

for asserting a legally guaranteed right . . . for doing what the law requires . . . or for refusing to do that which the law forbids . . . .'" <u>Wright v. Shriners Hosp. for Crippled Children</u>, 412 Mass. 469, 472-73, 589 N.E.2d 1241, 1244 (1992) (quoting <u>Smith-Pfeffer</u>, 404 Mass. at 149-50, 533 N.E.2d at 1371)). "Similarly, employees are generally protected when they report, resist, or refuse to participate in activity that presents a threat to public health or safety." <u>Acher</u>, 354 F. Supp. 2d at 30. In any event, liability may only be imposed "where the discharge is for reasons that violate clearly-established public policy." <u>Id.</u> at 29. <u>See also</u> <u>Upton v. JWP Businessland</u>, 425 Mass. 756, 757-58, 682 N.E.2d 1357, 1358-59 (1997) (public policy must be "well-defined" or "clearly established"). "The issue of whether a public policy is implicated in a particular case is an issue of law for the court[.]" <u>Acher</u>, 354 F. Supp. 2d at 29.

## 2.     <u>Every Day Low Pricing Policy</u>

Rodio asserts that Reynolds discharged him "for failing to maintain its cigarette prices below the minimum mandated by law." Pl.'s Mem. at 3. In other words, the plaintiff claims that he was fired "for refusing to do that which the law forbids." <u>Wright</u>, 412 Mass. at 472, 589 N.E.2d at 1244 (internal quotations and citation omitted). Reynolds argues that the ultimate pricing decision belonged to the retailer, and that at best, Rodio's criticisms of the EDLP program and his failure to follow it involved an internal dispute about a company matter that cannot give rise to liability under the public policy exception to the at-will employment rule. <u>See</u> Def.'s Mem. at 11-13. This court

-21-

concludes that the evidence, even when viewed in the light most favorable to Rodio, does not support the plaintiff's claim.

Rodio has presented evidence which, if believed, shows that Reynolds instructed him to maintain the price of its products at or below the lowest priced brand in the store consistent with its EDLP contracts, regardless of whether the pricing violated State law. (Pl.'s Ex. B ¶¶ 4-5, 9, 11). Rodio also has presented evidence showing that he objected to the EDLP policy because he believed it encouraged or even coerced retailers to break the law. (Def.'s Ex. E, Vol. 1 at 193). Moreover, there is no dispute that one of the reasons for Reynolds' decision to terminate the plaintiff was that he failed to ensure that all of the required components of the EDLP contract were in place, including the requirement that Reynolds' products be priced lowest or at parity with the lowest priced brands in the store. (Pl.'s Ex. D at 10-11). In particular, Reynolds noted in the termination letter that Rodio had

> failed to execute the Every Day Low Price (EDLP) contract requirements in [an] account by not placing signage and failing to maintain the everyday lowest price for Monarch in this account. Wave (competitive product) cigarettes retailed for $3.52 per pack, while [Reynold]'s Monarch retailed for $3.62 per pack. Company guidelines were communicated in a Field Sales Communication letter (FSC) 240-02 dated September 10, 2002, with instructions to place and maintain signage and maintain the every day lowest parity pricing in the EDLP accounts.
>
> Your failure to insure that all the required components of the EDLP contract were in place (signage and everyday lowest price parity) resulted in this account being scheduled to receive contract bonus dollars that should have been withheld. This is a misuse of Company resources (violation of Company policy).

-22-

(Pl.'s Ex. D at 8-9 (emphasis in original)).  At the time Reynolds issued the letter in

October 2002, the minimum price of Monarch was $4.01 per pack.  (Pl.'s Mem. at 2;

Pl.'s Ex. B ¶ 10).  Therefore, there is evidence that Reynolds was critical of Rodio's

failure to enforce the EDLP contract notwithstanding the fact that its product already was

priced below the State minimum.

     Nevertheless, the evidence does not establish that Reynolds fired Rodio for

refusing to break the law.  There is no dispute that the retailers, and not Reynolds,

ultimately decided how to price Reynolds' products, and that Reynolds' sales represen-

tatives did not require the retailers to sell the company's products at a particular price.

(DF ¶ 61)  It is also undisputed that price parity could be accomplished by either lowering

the price of Monarch or raising the price of the competitive product.  (Def.'s Ex. E, Vol. I

at 193-94).  Indeed, Rodio agreed that he never told a retailer to do anything other than to

comply with the EDLP contract's pricing requirements.  (DF ¶ 63; Def.'s Ex. E, Vol. II at

64-65).

     Notwithstanding the evidence that the defendant instructed Rodio to enforce the

EDLP requirements regardless whether the prices were set below the State minimum, it is

undisputed that the retailer, rather than Rodio, was responsible for the actual pricing, and

the decision to comply with or violate the State minimum pricing laws fell to the retailer.

As detailed in his termination letter, if the retailer was unable to meet Reynolds' pricing

requirements, Rodio was to record non-compliance by reporting "EDLP Requirement Not

Met" which would have prevented the customer from receiving contract bonus dollars to

which the customer was not entitled due to its failure to comply with the EDLP program. (<u>See</u> Pl.'s Ex. D at 10-11).  He failed to accurately report such non-compliance. Accordingly, Reynolds' decision to discharge Rodio, in part, for failing to enforce Reynolds' EDLP contracts, did not amount to a termination for refusing to violate the law.

Moreover, nothing in the record indicates that Reynolds' EDLP contracts deceived retailers into violating minimum pricing laws.  As an initial matter, since parity could be achieved by increasing prices, the retailers did not, by definition, have to violate minimum pricing requirements.  Moreover, even if the retailer believed that the EDLP contract required it to violate the State law, it could have rejected or cancelled the contract.  <u>See</u> <u>Acher</u>, 354 F. Supp. 2d at 38-39 (employee claiming he was fired for opposing employer's proposal to customer had no claim for wrongful termination in violation of public policy where customer could reject the proposal if it "felt that such proposal would violate any laws or regulations or quality standards with which it was required to comply").  Therefore, Rodio's belief that Reynolds' EDLP contracts encouraged retailers to violate State law, and his criticism of the company's pricing policy, involved only an internal company matter that "could not be the basis of a public policy exception to the at-will rule." <u>Wright</u>, 412 Mass. at 474, 589 N.E.2d at 1245.

3.    **Placement of Advertisements**

Rodio also contends that he was terminated for failing to place advertisements in violation of health regulations and in violation of the State policy of preventing tobacco use by minors.  Neither the law nor the facts supports Rodio's claim.

It is undisputed that one of the reasons for Rodio's discharge was that he failed to place and maintain VAP communicators and POS advertising on the front counters of some of his retail accounts, as he had been instructed to do by Reynolds' management. (See, e.g., Pl.'s Ex. D at 7 (stating, "[y]ou failed to place and maintain a VAP communicator on the front counter and place the appropriate VAP POS advertising and PRP discounting cards.")).  Rodio argues that "all of these counters are below the minimum 5 feet in height required by the health code and all or, substantially all are within 1,000 feet of a school or a playground."  Pl.'s Mem. at 4.  Thus, Rodio contends that Reynolds' action violated the public policy of keeping cigarettes away from children.  See id. at 4-5.

As an initial mater, the facts do not support Rodio's claim that the required advertising violated state law.  "In January 1999, the Attorney General of Massachusetts promulgated comprehensive regulations governing the advertising and sale of cigarettes, smokeless tobacco, and cigars."  Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 532, 121 S. Ct. 2404, 2410, 150 L. Ed. 2d 532 (2001).  However, before the regulations went into effect, a group of tobacco product manufacturers and retailers filed suit claiming that the

regulations violated federal law and the Constitution.  Id.; Def.'s Ex. C ¶ 3.  Among the

regulations at issue in the litigation was a provision prohibiting:

> [p]oint-of-sale advertising of cigarettes or smokeless tobacco
> products any portion of which is placed lower than five feet from the
> floor of any retail establishment which is located within a one
> thousand foot radius of any public playground, playground area in a
> public park, elementary school or secondary school, and which is not
> an adult-only retail establishment.

Lorillard, 533 U.S. at 535, 121 S. Ct. at 2411.  The challenge to the regulations was

appealed up to the Supreme Court, and enforcement of the regulations was stayed

throughout the appeal process.  (Def.'s Ex. C ¶ 3).  On June 28, 2001, several months

before Rodio ever raised the matter of the regulations with Fasciani, the Supreme Court

ruled that the regulations were unconstitutional.  Lorillard, 533 U.S. at 566, 121 S. Ct. at

2428.  Thus, there was no violation of an enforceable regulation.

The Supreme Court's decision also defeats Rodio's argument that Reynolds'

advertising requirements were per se harmful to children.  With respect to the POS

advertising regulations, the Supreme Court stated:

> A regulation cannot be sustained if it provides only ineffective or
> remote support for the government's purpose, or if there is little
> chance that the restriction will advance the State's goal.  As outlined
> above, the State's goal is to prevent minors from using tobacco
> products and to curb demand for that activity by limiting youth
> exposure to advertising.  The 5-foot rule does not seem to advance
> that goal.  Not all children are less than 5 feet tall, and those who are
> certainly have the ability to look up and take in their surroundings.
>
> ***
>
> Massachusetts may wish to target tobacco advertisements and
> displays that entice children, much like floor-level candy displays in

-26-

> a convenience store, but the blanket height restriction does not constitute a reasonable fit with that goal.

Id. at 566-67, 121 S. Ct. at 2428 (quotations and citations omitted).  Thus, in invalidating the regulations, the Supreme Court determined that the five foot rule did not advance the legitimate policy of preventing underage tobacco use.  Consequently, there is no support for Rodio's contention that the placement of advertisements on retailers' countertops would have violated state regulations or a clearly established public policy.[7] Accordingly,  Reynolds cannot be held liable for its decision to terminate Rodio based, in part, on his failure to place countertop advertising in accordance with management's instructions.

### E.    Count IV: Chapter 93A

Rodio has conceded, and this court finds, that Mass. Gen. Laws ch. 93A does not apply to disputes between an employee and his former employer arising out of the employment relationship.  See Manning v. Zuckerman, 388 Mass. 8, 15, 444 N.E.2d 1262, 1266 (1983).   Accordingly, Reynolds is entitled to summary judgment on Count IV of the Complaint as well.

### IV.  CONCLUSION

For all the reasons detailed herein, the defendant's motion for summary judgment (Docket No. 32) is ALLOWED.

---

[7]  In light of the Supreme Court's ruling, this court will not address whether an individual salesman's personal assessment concerning the effect of advertising (an amorphous subject at best) can ever be deemed to be violative of a clearly defined public policy.

_____/ s / Judith Gail Dein_____
Judith Gail Dein
United States Magistrate Judge